1   **COTCHETT, PITRE & MCCARTHY, LLP**
    Joseph W. Cotchett (SBN 36324)
2   *jcotchett@cpmlegal.com*
    Mark C. Molumphy (SBN 168009)
3   *mmolumphy@cpmlegal.com*
    Anne Marie Murphy (SBN 202540)
4   *ammurphy@cpmlegal.com*
    Tyson C. Redenbarger (SBN 294424)
5   *tredenbarger@cpmlegal.com*
    Julia Q. Peng (SBN 318396)
6   *jpeng@cpmlegal.com*
    San Francisco Airport Office Center
7   840 Malcolm Road, Suite 200
    Burlingame, California 94010
8   Telephone:   (650) 697-6000

9   **BOTTINI & BOTTINI, INC.**
    Francis A. Bottini, Jr. (SBN: 175783)
10  *fbottini@bottinilaw.com*
    Anne B. Beste (SBN 326881)
11  *abeste@bottinilaw.com*
    Albert Y. Chang (SBN 296065)
12  *achang@bottinilaw.com*
    Yury A. Kolesnikov (SBN 271173)
13  *ykolesnikov@bottinilaw.com*
    Nicholas H. Woltering (SBN 337193)
14  nwoltering@bottinilaw.com
    7817 Ivanhoe Avenue, Suite 102
15  La Jolla, California  92037
    Telephone:   (858) 914-2001
16

17  *Counsel for Plaintiff*

18                   **UNITED STATES DISTRICT COURT**

                     **NORTHERN DISTRICT OF CALIFORNIA**
19

20  **WILLIAM HERESNIAK**, on behalf of        Case No.:
    himself and all others similarly situated,
21                                              **Class Action**
                                    Plaintiff,
22                                              **COMPLAINT FOR
                                                (1) VIOLATION OF THE**
23                 vs.                          **CALIFORNIA CORPORATIONS
                                                CODE; AND**
24  **ELON R. MUSK and TWITTER, INC.**,         **(2) DECLARATORY AND
                                                INJUNCTIVE RELIEF**
25                                  Defendants,
26                                              DEMAND FOR JURY TRIAL

27

28

─────────────────────────────────────────────────────────────────

1

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION AND SUMMARY OF THE ACTION.................................................1

II.     JURISDICTION AND VENUE .............................................................................................9

III.    INTRADISTRICT ASSIGNMENT ......................................................................................9

IV.     THE PARTIES.........................................................................................................................9

V.      CLASS ACTION ALLEGATIONS .....................................................................................10

VI.     SUBSTANTIVE ALLEGATIONS ......................................................................................11

        A.     Background of the Musk Buyout of Twitter.............................................................11

        B.     Musk's Failure to Timely Disclose His 9+% Stake in Twitter, Failure to Disclose He
               Had Been Invited to Join the Twitter Board, and Failure to Disclose He Intended to
               Make an Offer to Acquire Twitter, and Contray to the Law ....................................13

        C.     After Unexpectedly Announcing He Would Not Join Its Board, Musk Discloses an
               Intent to Buy Twitter, and Threatens to Go Hostile Through a Tender Offer if
               Twitter's Board Does Not Acquiesce ........................................................................18

        D.     Musk Finances the Proposed Buyout in Part by Pledging Billions of Dollars of His
               Tesla Stock as Collateral for a Loan From Morgan Stanley......................................20

        E.     As Tesla's Stock Plunges in the 30 Days After Announcement of the Buyout,
               Threatening a Margin Call and a Forced Sale of Musk's Tesla Stock, Musk Begins to
               Make False Statements and Engage in Market Manipulation of Twitter's Stock .....24

               1.     Friday May 13, 2022 Tweet.............................................................................25

               2.     Musk's May 14, 2022 Tweet ...........................................................................26

               3.     Musk's May 16, 2022 Statement .....................................................................28

               4.     Musk's May 17, 2022 Tweet ...........................................................................29

               5.     Musk's May 21, 2022 Tweets..........................................................................30

VII.    CAUSES OF ACTION ..........................................................................................................33

        FIRST CAUSE OF ACTION
        Cal. Corp. Code §§ 25400 and 25500...................................................................................33

        SECOND CAUSE OF ACTION
        Cal. Corp. Code §§ 25401 and 25501...................................................................................34

i

THIRD CAUSE OF ACTION
For Declaratory and Injunctive Relief ................................................................... 34

FOURTH CAUSE OF ACTION
For Violation of Cal. Corp. Code § 25402 and 25502.5 ........................................ 35

FIFTH CAUSE OF ACTION
For Unjust Enrichment ............................................................................................ 35

VIII.    **PRAYER FOR RELIEF** .......................................................................................... **36**

IX.    **JURY TRIAL DEMAND** ......................................................................................... **37**

Plaintiff alleges the following (a) upon personal knowledge with respect to the matters pertaining to Plaintiff; and (b) upon information and belief with respect to all other matters, based upon, among other things, the investigations undertaken by Plaintiff's counsel. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth below after a reasonable opportunity for discovery.

## I.  INTRODUCTION AND SUMMARY OF THE ACTION

1.      Plaintiff brings this class action on behalf of all stockholders of Twitter, Inc., a San Francisco based company, who have been harmed by the actions of Defendant Elon R. Musk. Plaintiff asserts claims against Defendant Musk for violations of California Corporations Code §§ 25400, 25401, 25500, and 25501 and against Defendant Twitter, Inc. for declaratory, injunctive relief, and unjust enrichment.

2.      Defendant Twitter, Inc., headquartered in San Francisco, operates a social media platform that allows its users to send and receive "tweets." Defendant Musk is a prolific user of Twitter and one of its most-followed members, with 90 million followers, making Musk's Twitter account the eighth most popular account on Twitter.

3.      On **April 25, 2022**, Twitter, Inc. announced that it had agreed to sell itself to Elon Musk for $54.20 per share, or approximately $44 billion (the "Buyout" or "Proposed Buyout"). Musk negotiated the Twitter Buyout over the weekend of April 23-24, 2022 without carrying out any due diligence. The Buyout is only conditioned on approval of Twitter's shareholders at a meeting to be scheduled this summer, regulatory approval, and closing of the Buyout by October 24, 2022.

4.      Before agreeing to buy Twitter for $44 billion, Musk, one of the world's richest individuals valued at $276 billion according to the Bloomberg Billionaires Index, and a sophisticated businessman with a phalanx of lawyers and investment bankers, according to the press, specifically agreed to waive detailed due diligence as a condition of the merger agreement. At the time, Musk was well aware that Twitter had a certain amount of "fake accounts" and accounts controlled by "bots" and had in fact settled a lawsuit based on the fake accounts for millions of dollars. Musk had tweeted about that issue at Twitter several times in the past, prior to making his offer to acquire Twitter with full knowledge of the bots.

5.      Musk and his team were also well aware of a ***$809.5 million settlement*** Twitter entered into ***in September 2021,*** in a securities fraud class action alleging Twitter overstated its user numbers and growth rate -- *In re Twitter Inc. Securities Litigation*, 16-cv-05314, U.S. District Court, Northern District of California (San Francisco).  All the documents from that case were publicly available to Musk, including a website (www.twittersecuritieslitigation.com) containing, among other things, the Court's order denying Twitter's motion for summary judgment.  *See* **Exhibit A** (April 17, 2020 Order Denying Motion for Summary Judgment, at p. 16)(holding that Twitter's <u>false statements</u> about its Daily Active Users (DAUs) and Monthly Active Users (MAUs) were material because "Twitter has publicly stated that its success and financial performance depend, at least in part, on the size and engagement of its user base.").

6.      Musk believed he was obtaining Twitter at a sale price, since Twitter's stock price had decreased significantly in the months before he made his offer, declining from $71.69 on July 23, 2021 to just $32.42 on March 7, 2022.  After Musk agreed to buy Twitter for $54.20, the stock market experienced a decline.  The market decline, however, did not affect Twitter's stock price.  After the announcement of the Buyout, stock consistently traded close to the Buyout price, and around $50 per share.  The small delta between its trading price and the $54.20 buyout price was typical of the trading prices of companies who have agreed to be acquired, characterized by a small discount for the time value of money and a relatively small risk that the deal will not go through.

7.      Musk had a unique and multi-billion-dollar problem.  Musk pledged his ***Tesla*** stock as collateral for a $12.5 billion loan to finance the buyout of Twitter, however ***Tesla's shares have declined by over 37%*** since the announcement of the Buyout, as reflected below:



8.      Because Tesla's stock is worth much less now than when Musk agreed to buy Twitter, Musk is at risk of a margin call or a requirement to put up more cash. Musk quickly acted to attempt to mitigate these personal risks to himself by engaging in unlawful conduct that moved the price of Twitter's stock down. Musk proceeded to make statements, send tweets, and engage in conduct designed to create doubt about the deal and drive Twitter's stock down substantially in order to create leverage that Musk hoped to use to either back out of the purchase or re-negotiate the buyout price by as much as 25% which, if accomplished, would result in an $11 billion reduction in the Buyout consideration. As detailed herein, Musk's conduct was and continues to be illegal, in violation of the California Corporations Code, and contrary to the contractual terms he agreed to in the deal.

9.      Musk's market manipulation worked -- ***Twitter has lost $8 billion in valuation*** since the Buyout was announced. As subsequently disclosed, Musk first started purchasing Twitter shares on January 31, 2022. Musk thereafter exceeded the 5% threshold, requiring him to file a Form 13G with the SEC. Musk did <u>not timely file</u> the Form 13G; failing to do so benefitted Musk because he was able to continue to buy Twitter shares at depressed prices. When Musk belatedly filed the Form 13G, Twitter's shares increased substantially, rising 27% after he filed the 13G.

10.     ***Musk benefitted himself by approximately $156 million*** by failing to timely file a Form 13G.[1]  By delaying his disclosure of his stake in Twitter, Musk engaged in market manipulation and bought Twitter stock at an artificially low price, in violation of the California Corporations Code.

11.     Musk's disregard for securities laws demonstrates how one can flaunt the law and the tax code to build their wealth at the expense of the other Americans.  Musk's insider trading profits may come with a slap on the wrist in the form of a fine from the SEC but will probably be limited to hundreds of thousands of dollars, according to legal and security experts.[2]

12.     When Musk eventually filed his Form 13G on April 4, 2022, it was materially misleading.  He did not disclose his intent to join the Twitter Board and he failed to disclose that he was contemplating buying Twitter.  Both disclosures would have caused Twitter's stock to increase more than it did when his filing was made.  Musk was later forced to file an amended Form 13G to comply with the law.  As Tesla shares cratered by almost 30% in April and May 2022, Musk began to make disparaging comments about Twitter in an effort to drive its stock price down further.

13.     On **May 13, 2022**, at 5:44 a.m. (*i.e.*, before the stock market opened), Musk issued a tweet which stated that the buyout was "temporarily on hold:"



Elon Musk
@elonmusk

Twitter deal temporarily on hold pending details supporting calculation that spam/fake accounts do indeed represent less than 5% of users

14.     Musk's tweet (and public statement) was misleading and constituted an effort to manipulate the market for Twitter shares as he knew all about the fake accounts.  The statement was false because the buyout was not, in fact, "temporarily on hold."  There is nothing in the buyout contract that allows Musk to put the deal "temporarily on hold."  Moreover, Musk's statement was misleading because it stated or implied that Musk's obligation to consummate the buyout was

---

[1] *See* Reed Albergotti, "Elon Musk Delayed Filing a Form and Made $156 Million," The Washington Post, April 6, 2022.

[2] *Id.*

1  conditioned on his satisfaction with due diligence to determine whether "spam/fake accounts do indeed

2  represent less than 5% of users."  This was false because Musk had <u>specifically waived detailed due</u>

3  <u>diligence</u> as a condition precedent to his obligations under the buyout contract.  Thus, Musk had and has

4  no right to cancel the buyout based on any results from due diligence concerning the number of

5  spam/fake accounts at Twitter.  Musk then continued issuing false and disparaging tweets about Twitter

6  in an effort to drive its stock price down further.

7          15.     Musk's false and misleading tweets had the desired effect, as they caused Twitters' stock

8  to decline in the days following the tweets, in stark contrast to the Nasdaq index, which  increased, as

9  reflected in the following chart:



21          16.     On **May 17, 2022**, Musk doubled down on his "Friday the 13th" tweet, issuing another

22  tweet stating that the deal "cannot go forward" while claiming almost 20% of accounts were fake.



Class Action Complaint for Violations of the California Corporations Code

17.     Musk's wrongful conduct has not only substantially harmed Twitter's shareholders by causing Twitter's stock to crater by approximately 25%, but it has also substantially harmed Twitter's employees.  As reported by the Wall Street Journal on May 21, 2022:

> *In one 24-hour period this month, Twitter Inc.'s chief executive fired two widely liked senior executives and announced a hiring freeze, while billionaire Elon Musk suddenly said he was putting "on hold" an acquisition plan that could lead to a wholesale revamp of the social-media company*.

> It is a tricky time to work at Twitter. Far beyond the usual uncertainty at an acquisition target, *Mr. Musk's $44 billion takeover deal has left employees bewildered about what their jobs are and will be, as well as how to keep operating a platform with around 229 million daily users* while its would-be owner uses it to publicly assail the company for everything from its free-speech policies to its business model.

> Internal conversations and Slack channels are awash in distress and anger over the criticism, while *company leaders who themselves have no way to know the outcome have responded with repeated staff meetings to try to soothe the angst and encourage people to press forward,* according to current and former staffers and internal communications viewed by The Wall Street Journal.

> *"I expect the 'chaos tax' and ups and downs to continue," Jay Sullivan, Twitter's new head of product, wrote on May 13* in an internal message to thousands of employees that was viewed by the Journal.

> Whatever the fate of the deal, many *current and former employees say the company has been irrevocably shaped by the five weeks since Mr. Musk publicly disclosed his unsolicited bid to buy Twitter,* one of the world's most influential social-media platforms. Some employees have left. Many more say they are looking for new jobs. Others are hunkering down to await an uncertain fate under *Mr. Musk,* who *recently tweeted an image of cartoon excrement at the current CEO*.

> *On May 12, Mr. Agrawal told employees the company was pausing hiring and looking to cut costs, and that two senior executives*—Bruce Falck, general manager of revenue, and Kayvon Beykpour, general manager of consumer—*were leaving. Mr. Beykpour tweeted he was on paternity leave when he got the news*.

> *The next day, Mr. Musk tweeted that the deal was "on hold"* until he could get more clarification from the company about how pervasive bots were on the platform. *That rattled already wobbly investor confidence that the deal will happen at the price Mr. Musk agreed to—if at all. Twitter shares are down more than 25% since late April*.[3]

---

[3] *See* Deepa Seetharaman & Sarah Needleman, "Twitter Employees Face 'Chaos Tax'," THE WALL STREET JOURNAL, May 21, 2022.

Class Action Complaint for Violations of the California Corporations Code

18.     Musk's false statements and market manipulation have created "chaos" at Twitter's headquarters in San Francisco:



TECH

# Elon Musk's Planned Twitter Takeover Creates a 'Chaos'

Deal has left employees bewildered about what their jobs are and will be

Twitter, which is based in San Francisco, has held companywide meetings in recent weeks to address employee questions about the takeover.
PHOTO: LAURA MORTON FOR THE WALL STREET JOURNAL

19.     Musk has also bullied current Twitter employees and stated that he would stop censoring hate speech:

> Among those most concerned are staff responsible for moderating content and developing tools that minimize abuse and hate speech on the platform, current and former employees say. ***Mr. Musk has repeatedly said Twitter's limits on expression are too great and that he wants to allow almost all speech on the platform*** that isn't illegal. Mr. Musk's complaints echo those of others, including some conservative lawmakers who have criticized efforts at content moderation, saying they are subjective and can lead to bias.
>
> ***Some current employees say they view Mr. Musk's behavior on the platform, particularly his targeting of Ms. Gadde, as an example of the type of online bullying*** they have been tasked with minimizing.[4]

---

[4] *Id.*

Class Action Complaint for Violations of the California Corporations Code

20.     Musk has been accused of using Twitter to foster "dogpiling," in which he encouraged his users to harass someone else, such as the case of Vernon Unsworth, a British diver who had spent days assisting the rescue of a group of Thai boys trapped in a flooded cave.  After Musk offered a miniscule submarine to the rescue divers, Unsworth told the media that Musk's idea was just a useless public relations stunt.  Musk then took to Twitter, where (in tweets that he later deleted) he baselessly accused Unsworth of being a "pedo guy," or pedophile.  The tweets prompted hundreds of Musk fans to pile on to the diver with abusive, humiliating attacks.[5]

21.     Musk's market manipulation of Twitter's stock has also encouraged other market participants to short Twitter's stock, including Hindenburg.  After Musk began disparaging Twitter and his own buyout, Hindenburg shorted Twitter.  On May 17, 2022, Hindenburg closed its short position for a large profit.[6]

22.     On **May 18, 2022**, Musk announced he would switch parties and become a Republican, calling the Democrats the "party of division & hate" to further excite the media of his conduct.



[5] *See* Billy Perrigo, "Twitter Employees Have Spent Years Trying to Make the Platform Safer. Elon Musk Could Undermine All That," TIME, Apr. 26, 2022.

[6] *See* Joshua Fineman, "Hindenburg Research Closes Twitter Short Position," SEEKING ALPHA, May 17, 2022.

Class Action Complaint for Violations of the California Corporations Code

## II.    JURISDICTION AND VENUE

23.    This Court has jurisdiction as the Defendants are located in and/or conduct business in California, including, but not limited to, the conduct here at issue, and because they have sufficient minimum contacts with California to render the exercise of jurisdiction by the California courts permissible under traditional notions of fair play and substantial justice.

24.    This Court has subject matter jurisdiction over this matter under 28 U.S.C. §1332, as this is a class action where at least one of the members of the Class is a citizen of a state different from at least one of the defendants, and the matter in controversy exceeds the sum or value of $5,000,000.

25.    Venue is proper in this judicial district under 28 U.S.C. §1391, because: (1) one or more defendants reside in this District; and (2) a substantial part of the events or omissions giving rise to the claims occurred in this District.  Twitter is headquartered in San Francisco, California at 1355 Market Street, Suite 900.  Musk's wrongful conduct took place in substantial part and have an effect in San Francisco, California, including his use of Twitter tweets to make false statements and engage in market manipulation of Twitter stock.

## III.    INTRADISTRICT ASSIGNMENT

26.    A substantial part of the events or omissions which give rise to the claims in this action occurred in the county of San Francisco, and as such this action is properly assigned to the San Francisco division of this Court.

## IV.    THE PARTIES

27.    Plaintiff William Heresniak is a current shareholder of Twitter, Inc. and has owned Twitter stock at all relevant times.  Plaintiff is a resident and citizen of Virginia.

28.    Defendant Twitter, Inc. is a Delaware corporation headquartered in San Francisco, California.  Twitter is a citizen of California and Delaware.

29.    Defendant Elon R. Musk is an individual who currently owns approximately 9.2% of Twitter's stock.  On April 25, 2022, Musk announced a definitive agreement to buy Twitter for $54.20 per share in cash.  Upon information and belief, Musk is a citizen and resident of Texas.

## V.     CLASS ACTION ALLEGATIONS

30.     Plaintiff brings this action as a class action, pursuant to F.R.C.P. 23, on behalf of all stockholders of Twitter, Inc. who have been harmed and/or are threatened with harm by Defendants' unlawful conduct in connection with Musk's proposed buyout of Twitter.  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to, or affiliated with, any of the Defendants and their successors in interest (the "Class").

31.     This action is properly maintainable as a class action because:

(a)     The Class is so numerous that joinder of all members is impracticable.  There are millions of shares of the Company's common stock outstanding owned by hundreds, if not thousands, of stockholders;

(b)     There are questions of law and fact which are common to the Class including, *inter alia*, the following:  (i) whether Musk made false and misleading statements; (ii) whether Musk has and continues to engage in conduct in an effort to manipulate the market for Twitter stock; (iii) whether Musk created a false or misleading appearance with respect to the market for Twitter stock; (iv) whether Musk engaged in conduct designed to raise or depress the price of Twitter stock for the purpose of inducing the purchase or sale of Twitter stock by others; (v) whether Musk purchased or sold Twitter stock based on material, non-public information; and (vi) the extent of damage sustained by Class members.

(c)     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature;

(d)     The claims of Plaintiff are typical of the claims of other members of the Class and Plaintiff has the same interests as the other members of the Class.  Plaintiff will fairly and adequately represent the Class; and

(e)     Defendants have acted in a manner which affects Plaintiff and all members of the Class alike, thereby making class treatment appropriate.

The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual

1   members of the Class which would, as a practical matter, be dispositive of the interests of other

2   members not parties to the or substantially impair or impede their ability to protect their interests.

### VI.   SUBSTANTIVE ALLEGATIONS

#### A.   Background of the Musk Buyout of Twitter

5   32.   Elon Musk is an active user of the Twitter platform with close to 90 million followers,

6   making him one of Twitter's most popular accounts.

7   33.   Musk has violated SEC rules related to going-private transactions before.  He issued

8   false tweets in the past claiming he was going to take his company, Tesla, Inc., private, and that he had

9   already secured financing.  The SEC sued Musk, and he was forced to settle the case and agree to a

10   consent decree dated September 29, 2018, as amended April 26, 2019.  The settlement and consent

11   decree required Musk to pay a $20 million fine, give up his role as Tesla's chairman, and refrain from

12   issuing tweets related to Tesla without the pre-approval of a "Securities Counsel" and Tesla's

13   Disclosure Controls Committee.  Musk later demanded that his law firm, Cooley LLP, fire a former

14   SEC lawyer who had worked on the SEC case and later joined Cooley, or else Cooley would lose

15   Musk's business.[7]

16   34.   Musk has been sued by Tesla shareholders.  On April 1, 2022, the United States District

17   Court for the Northern District of California issued an order granting in part Plaintiffs' Motion for

18   Summary Judgment and holding that Musk's tweets regarding his intent to take Tesla private <u>were false</u>

19   <u>and misleading</u> and that Musk <u>knew or recklessly disregarded the falsity of the tweets</u>.  *See In re Tesla,*

20   *Inc. Sec. Litig*., Case No. 18-cv-04685 (N.D. Cal.), Docket No. 387.[8]

---

[7] *See* Rebecca Elliott, "Elon Musk's Tesla Asked Law Firm to Fire Associate Hired From SEC," THE WALL STREET JOURNAL, Jan. 15, 2022.

[8] Musk continues to flaunt court and governmental findings and orders.  Musk gave a TED Talk in Vancouver on April 14, 2022 during which he emphatically proclaimed in reference to his August 7, 2018 Tesla tweets, inter alia, that "funding was actually secured – I want to be clear about that – in fact that gives me a good opportunity to clarify that – and funding was indeed secured" before going on to refer to the SEC's San Francisco office as "bastards" and claiming that he settled with the agency only because they had a "gun to [his] child's head."  See https://www.ted.com/talks/elon_musk_elon _musk_talks_twitter_tesla_and_how_his_brain_works_live_at_ted2022.

Class Action Complaint for Violations of the California Corporations Code

35.     On **May 12, 2022**, it was announced that the SEC was again investigating Musk, this time for his failure to timely file the Form 13D regarding his more than 5% stake in Twitter.  In addition to violating SEC rules, Musk's false tweets and his wrongful conduct constitute a violation of various provisions of the California Corporations Code designed to protect investors.

36.     As disclosed by Twitter in its Proxy Statement filed on May 17, 2022 regarding the Buyout, Musk Tweeted comments regarding Twitter's business, the Twitter platform and functionality, and Twitter's content moderation policies.

37.     On **March 26, 2022**, Musk called Jack Dorsey (Twitter's founder) in California to discuss the future direction of social media, including the benefits of open social protocols.  Dorsey had previously communicated his views on these topics to the Twitter Board and publicly.  Dorsey lives in the Sea Cliff neighborhood of San Francisco and his communications with Musk were made to and from California.

38.     Also on **March 26, 2022**, Musk contacted Egon Durban, one of Twitter's directors, to set up a discussion between Musk and Durban.  Musk and Durban subsequently spoke on March 26, 2022 and March 27, 2022 *and discussed the potential of Musk joining the Twitter Board, as well as the fact that Musk had purchased a significant stake of more than five percent of Twitter's common stock*.[9]  Durban informed Bret Taylor, the chairperson of the Twitter Board,[10] Martha Lane Fox, one of Twitter's directors and the chairperson of Twitter's Nominating and Corporate Governance Committee (the "NomGov Committee"), and Parag Agrawal, Twitter's chief executive officer, of Musk's communication.  Durban, Taylor, Agrawal and Lane Fox discussed Musk's communications and determined (1) that Durban would connect Musk with Taylor, Agrawal and Lane Fox, and they would also discuss with Musk his potential interest in joining the Twitter Board; (2) to call meetings of the NomGov Committee and of the Twitter Board to discuss Musk's communications and potential interest in joining the Twitter Board; and (3) that Lane Fox would inform each member of the Twitter Board in

[9] *See* May 17, 2022 Proxy Statement at 42.

[10] Taylor, in addition to being a Twitter director, is the Co-CEO of Salesforce.com and lives in the San Francisco Bay Area.  His communications with Musk were disseminated from and to California.

1    advance of the Twitter Board meeting of Musk's communications.  Lane Fox subsequently informed

2    the members of the Twitter Board of Musk's initial communications.

3         **B.    Musk's Failure to Timely Disclose His 9+% Stake in Twitter, Failure to Disclose He Had Been Invited to Join the Twitter Board, and Failure to Disclose He Intended to Make an Offer to Acquire Twitter, and Contrary to the Law**

4

5         39.    Despite the fact that Twitter has admitted that Musk already owned 5% of Twitter's

6    stock on or before March 26, 2022, Musk failed to file a Schedule 13D with the SEC, as he was

7    required to do.  Musk belatedly filed a Schedule 13G on April 4, 2022, at least 10 days after his stake

8    surpassed the trigger point for disclosure. Musk has not publicly explained why he did not file the form

9    in a timely manner.

10        40.    Moreover, Musk's April 4, 2022 filing was false and misleading because it was

11   improperly filed on Form 13G, not 13D.  Form 13G is only to be used by passive investors, and thus

12   Musk was required to use Form 13D.  Musk's 13G filing failed to disclose that he had been offered a

13   position on Twitter's Board and that he was interested in buying Twitter.

14        41.    On **May 11, 2022**, the Wall Street Journal reported that the SEC was investigating Musk

15   over his failure to timely disclose his 9.2% stake in Twitter.[11]  ***Musk likely saved more than $143***

16   ***million by not reporting that his trades had crossed the 5% threshold***, according to Daniel Taylor, a

17   University of Pennsylvania accounting professor, since the share price could have been higher had the

18   market known of Musk's growing stake.

19        42.    Because Musk had acquired more than 5% of Twitter's stock, he was required to file a

20   Schedule 13D with the SEC within 10 days. Musk's Twitter holdings surpassed 5% on March 14, 2022,

21   securities filings show, meaning he should have disclosed his stake by March 24, 2022 under SEC rules.

22        43.    After March 24, Musk purchased roughly $513 million of stock at prices between $38.20

23   and $40.31 a share, according to a regulatory filing.  The total buying spree made him Twitter's largest

24   individual shareholder with 9.2% of its shares.

25

26   _____

27   [11] *See* Dave Michaels, "Elon Musk's Belated Disclosure of Twitter Stake Triggers Regulators' Probes," The Wall Street Journal, May 11, 2022.

28

44.     Based on Twitter's closing price of $49.97 on April 4, the day Musk disclosed his stake, he likely saved more than $143 million on those trades, Taylor estimated.

45.     On **March 27, 2022**, Musk, Taylor and Agrawal discussed Musk's interest in Twitter and potentially joining the Twitter Board.  As part of that discussion, Musk stated that he was considering various options with respect to his ownership, including potentially joining the Twitter Board, seeking to take Twitter private or starting a competitor to Twitter.

46.      On **March 30, 2022**, Lane Fox and Musk discussed his potential interest in joining the Twitter Board and the benefits that Musk believed he could potentially bring to Twitter as a Twitter director.

47.     On **March 31, 2022**, Agrawal and Taylor met with Musk in California to discuss Twitter's business and Musk's potential interest in joining the Twitter Board.  At the meeting, Musk reiterated his interest in potentially joining the Twitter Board to help improve Twitter's business as a director of Twitter, and that he was also considering the possibility of taking Twitter private or starting a competitor to Twitter.

48.     On **April 2, 2022**, the NomGov Committee met in California, with Taylor, members of Twitter management and a representative of Wilson Sonsini Goodrich & Rosati, Professional Corporation, Twitter's outside legal counsel reporting to the Twitter Board ("Wilson Sonsini"), in attendance.  Durban, Taylor, Agrawal, and Lane Fox each updated the NomGov Committee on their discussions with Musk.  After considering, among other things, Musk's interest in Twitter's business, his statement that he is one of Twitter's substantial stockholders, his active use of the Twitter platform, his technical expertise in areas critical to Twitter's products and technology, and the perspectives that he could bring to the Twitter Board, the NomGov Committee determined to recommend that the Twitter Board consider inviting Musk to join the Twitter Board, subject to completion of customary onboarding procedures, such as a background check and completing and signing a director onboarding questionnaire.

49.     Upon information and belief, Musk completed the director questionnaire and returned it to Twitter in California.

50.     Also on **April 2, 2022**, at the direction of Taylor and the NomGov Committee, Twitter requested that J.P. Morgan attend the scheduled meeting of the Twitter Board in California to assist Twitter in reviewing Musk's purported purchase of a significant stake in Twitter's common stock, Musk's potential appointment to the Twitter Board and related matters.

51.     On **April 3, 2022**, the Twitter Board met in California, with members of Twitter management and representatives of each of Wilson Sonsini and J.P. Morgan in attendance. Durban, Taylor, Agrawal, and Lane Fox each updated the Twitter Board on their discussions with Musk. The NomGov Committee reported on its discussions at its meeting the previous day and provided its recommendation that the Twitter Board consider inviting Musk to join the Twitter Board. In evaluating the NomGov Committee's recommendation, the Twitter Board considered, among other things, Musk's qualifications, business expertise, knowledge of Twitter's business and user base and technical expertise in areas critical to Twitter's products and technology.

52.     At the meeting, Dorsey informed the Twitter Board that he and Musk were friends, and Durban informed the Twitter Board that he had worked on unrelated matters with Musk in the past. At this and other meetings of the Twitter Board in California relating to Musk joining the Twitter Board, Musk's acquisition proposal and the merger, the Twitter Board regularly met in executive session of independent directors. ***The Twitter Board determined to invite Musk to join the Twitter Board***, subject to his completion of a background check and other customary onboarding procedures. In connection with Musk joining the Twitter Board, ***it was the desire of the Twitter Board that Musk enter into a cooperation agreement that included "standstill" provisions that, among other things, would limit his public statements regarding Twitter***, including the making of unsolicited public proposals to acquire Twitter (but not private proposals) without the prior consent of the Twitter Board.

53.     Following the meeting, at the direction of the Twitter Board, ***Lane Fox called Musk to invite him to join the Twitter Board***, subject to completion of customary onboarding procedures. Lane Fox also noted the desire of the Twitter Board that Musk enter into a cooperation agreement. Following that discussion, representatives of Twitter sent a copy of Twitter's customary director onboarding questionnaire to representatives of Musk.

54.     As noted *supra*, on April 4, 2022, Musk publicly disclosed his ownership of

1    approximately 9.2 percent of Twitter common stock.  Musk's Schedule 13G did not disclose his intent

2    to join the Twitter Board and also failed to disclose that he was contemplating buying Twitter.  Both

3    disclosures would have caused Twitter's stock to increase more than it did when his filing was made.

4    Musk was later forced to file an amended disclosure form on Schedule 13D on April 5, 2022.

5        55.    Musk benefitted himself ***by approximately $156 million*** by failing to timely file the

6    Form 13G.[12]  By delaying his disclosure of his stake in Twitter, Musk engaged in market manipulation

7    and bought Twitter stock at an artificially low price.  Musk was 11 days late in publicly declaring he

8    had amassed a large stake in Twitter.  Musk became a 5% stockholder on  March 14, 2022, according to

9    the SEC filings, but failed to file his Form 13G until April 4, 2022

10       56.    Between March 14 and April 4, 2022,  Musk continued to buy Twitter stock at the price

11   of around $39 per share, bringing his total stake to 9.2 percent.  After his disclosure, Twitter's share

12   price rose roughly 30 percent and then traded at above $50 per share until Musk began disparaging

13   Twitter.

14       57.    Musk saved about $156 million, according to David Kass, a finance professor at

15   University of Maryland's business school, who stated "I really don't know what's going through his

16   mind. Was he ignorant or knowledgeable that he was violating securities law?"  "Whoever was

17   handling the trades for Musk should have known," Kass said.[13]

18       58.    Musk's disregard for securities laws demonstrates how billionaires can skirt the law and

19   the tax code to build their wealth at the expense of the average American.

20       59.    On **April 4, 2022**, representatives of Twitter in California provided Musk with a draft of

21   a cooperation agreement that provided for Musk's appointment to the Twitter Board and included

22   customary "standstill" provisions.  For example, for so long as Musk were to serve on the Twitter Board

23   and for 90 days thereafter, Musk agreed to refrain from, either alone or as a member of a group,

24   becoming the beneficial owner of more than 14.9 percent of Twitter common stock.

25

26   [12] *See* Reed Albergotti, "Elon Musk Delayed Filing a Form and Made $156 Million," The Washington
     Post, April 6, 2022.

27

28   [13] *Id.*

60.     Also on **April 4, 2022**, Twitter sent Musk a draft of a letter agreement providing that Twitter would appoint Musk to the Twitter Board to serve as a Class II director with a term expiring at Twitter's 2024 Annual Meeting of Stockholders.  Twitter requested, but Musk refused, to agree to a customary "cooperation agreement" limiting his public statements about Twitter.  Musk did, however, agree at Twitter's request to limit his purchase of additional Twitter stock to no more than 14.9% ***so long as he was a Twitter director***.

61.     On **April 5, 2022**, Twitter and Musk issued a joint announcement from California disclosing the entry into the letter agreement. Musk and Agrawal tweeted the following:



62.     Over the next three days, Agrawal and Musk continued to discuss Twitter's business and products ***in anticipation of Musk joining the Twitter Board***.  Later that day, Musk called Dorsey in San Francisco to ask Dorsey for his perspectives on Twitter in connection with the announcement of Musk joining the Twitter Board.

63.     On **April 8, 2022**, Lane Fox informed the Twitter Board of the satisfactory completion of Musk's background check.   Taylor informed the Twitter Board of his expectation that Musk's appointment to the Twitter Board would be effective on April 9, 2022.

64.     On **April 9, 2022**, before Musk's appointment to the Twitter Board became effective, Musk notified Taylor and Agrawal in San Francisco that he would not be joining the Twitter Board and would be making an offer to take Twitter private.

Class Action Complaint for Violations of the California Corporations Code

65.     On **April 10, 2022**, Twitter issued an announcement from California that Musk had decided not to join its Board.

**C.     After Unexpectedly Announcing He Would Not Join Its Board, Musk Discloses an Intent to Buy Twitter, and Threatens to Go Hostile Through a Tender Offer if Twitter's Board Does Not Acquiesce**

66.     On **April 13, 2022**, Musk delivered to Twitter's Chairman Bret Taylor in California a non-binding proposal to acquire Twitter, the full text of which is reproduced below. Musk also called Taylor in California to re-iterate that Musk's proposal represented his best and final offer to acquire Twitter and referred Taylor to Musk's public disclosure of the proposal scheduled for the next day for additional details with respect to the proposal.

*Bret Taylor*

*Chairman of the Board,*

*I invested in Twitter as I believe in its potential to be the platform for free speech around the globe, and I believe free speech is a societal imperative for a functioning democracy. However, since making my investment I now realize the company will neither thrive nor serve this societal imperative in its current form. Twitter needs to be transformed as a private company.*

*As a result, I am offering to buy 100% of Twitter for $54.20 per share in cash, a 54% premium over the day before I began investing in Twitter and a 38% premium over the day before my investment was publicly announced. My offer is my best and final offer and if it is not accepted, I would need to reconsider my position as a shareholder.*

*Twitter has extraordinary potential. I will unlock it.*

*/s/ Elon Musk*
*Elon Musk*

67.     Two aspects of Musk's letter are noteworthy.  First, Musk made one and only one offer. He refused to negotiate and simply put the $54.20 per share offer to the Twitter Board as a "take it or leave it" offer.  Second, Musk threatened to sell his Twitter stock if the Twitter Board did not accept his ultimatum.  As will be shown infra, Musk also waived due diligence; he was in a hurry to acquire Twitter, claimed he knew everything he needed to know about Twitter, and did not condition his offer on his satisfaction with any due diligence.

68.     On **April 14, 2022**, Musk publicly disclosed his acquisition proposal.

69.     On **April 15, 2022**, the Twitter Board responded to Musk's takeover attempt by defensively adopting a shareholder rights plan or "poison pill," pursuant to which Musk's acquisition of greater than 15% of Twitter's outstanding common stock would trigger a right for the Company's other stockholders to acquire additional stock at a considerable discount.

70.     Twitter's CEO, Dorsey, took the highly unusual step of criticizing the Board for this. "On April 16, Jack Dorsey . . . tweeted that the board had been the 'consistent dysfunction of the company.'  When asked by a Twitter user whether he was allowed to say that, Dorsey responded, 'no.'"[14]

71.     In response to Twitter's adoption of a poison pill, Musk began laying the groundwork for a hostile tender offer to acquire Twitter over the Board's objection.  He threatened a tender offer in a series of tweets, posting "Love me tender" on April 16, 2022 and "_____ is the Night" on April 19, 2022 (an apparent allusion to the F. Scott Fitzgerald novel Tender is the Night).

72.     Musk also filed an amended Schedule 13D/A on April 21, 2022, which stated that Musk was "exploring whether to commence a tender offer" and that he had secured commitment letters from a group of lenders, led by Morgan Stanley, to provide approximately $46.5 billion to finance his acquisition of Twitter.

73.     Musk then spoke directly with Taylor on Saturday April 23, 2022 and "threatened to take his offer directly to Twitter's shareholders."

74.     The following day, Sunday **April 24, 2022**, the Twitter Board capitulated in the face of Musk's threats and accepted his initial, "best and final" offer to purchase all Twitter's outstanding common stock for $54.20 per share.

75.     On **April 25, 2022**, Twitter approved entry into a definitive agreement to be acquired by an entity wholly-owned by Musk for $54.20 per share in cash, in a transaction valued at approximately $44 billion (the "Proposed Buyout").  The Board's agreement to the Proposed Buyout was announced

---

[14] *See* Lauren Hirsch and Mike Isaac, "How Twitter's Board Went From Fighting Elon Musk to Accepting Him," NEW YORK TIMES (April 30, 2022) (available at: https://www.nytimes.com/2022/04/30/technology/twitter-board-elon-musk.html).

via a Form 8-K filed by Twitter that same day.  The documentation for the Proposed Buyout was negotiated and signed in substantial part in California.

76.     On **May 5, 2022**, Twitter and Musk entered into a confidentiality agreement with respect to Twitter sharing non-public information with Parent, Musk and their representatives, including pursuant to the terms of the merger agreement. Prior to entry into the merger agreement, ***Musk did not ask to enter into a confidentiality agreement or seek from Twitter any non-public information regarding Twitter***.  Further, Musk's obligation to complete the Buyout is not conditioned on his satisfaction with any due diligence.

**D.     Musk Finances the Proposed Buyout in Part by Pledging Billions of Dollars of His Tesla Stock as Collateral for a Loan From Morgan Stanley**

77.     Musk is financing his purchase of Twitter through the following:  (1) $21 billion in cash; (2) $25.5 billion in financing.  As explained below, both the cash component and $12.5 billion of the debt financing are linked to Musk's Tesla shares and the value of those Tesla shares.

78.     With respect to the cash component, at the time the Proposed Buyout was announced on April 25, 2022, Musk was expected to sell about 20 million shares of his Tesla stock to provide such cash.  That was predicated on Tesla stock having a value at the time of close to $1,000 per share.

79.     Indeed, while Tesla stock was still trading around $1,000 per share, Musk initially acted quickly after the Proposed Buyout was announced to sell some of his Tesla shares to raise the cash component.  In the three days after announcement of the deal, Musk sold roughly $8.5 billion worth of shares in Tesla to help fund the purchase.

80.     Musk reported the sale of 9.6 million Tesla shares in filings with the Securities and Exchange Commission on April 28-29, 2022.  The trades were made at prices ranging from $822.68 to $999.13 a share.  But then Musk stopped selling Tesla shares as its price began to decline.  Further, the decline did not abate, and instead got worse.

81.     With respect to the debt financing, Morgan Stanley arranged tens of billions of dollars to finance Musk's buyout of Twitter, and is the largest single lender facilitating the deal.  Musk has received commitment letters to provide, in addition to a $21 billion contribution of his own cash, an aggregate of approximately $25.5 billion in financing as follows: (i) a debt commitment letter dated

April 20, 2022, from Morgan Stanley and certain other financial institutions to provide $13 billion in financing to Musk via a $6.5 billion senior secured term loan facility (the "Term Loan Facility"), a $500 million senior secured revolving facility (the "Revolving Facility"), a $3 billion senior secured bridge loan facility (the "Secured Bridge Facility") and a $3 billion senior unsecured bridge loan facility (the "Unsecured Bridge Facility"); and (ii) a separate debt commitment letter dated April 20, 2022 from Morgan Stanley and certain other financial institutions pursuant to which they committed to provide Musk with $12.5 billion in margin loans. The chart below depicts Musk's financing package:



82.     There are several problems with this financing scenario which provide Musk with a strong motive to make false statements about Twitter and engage in market manipulation.

83.     According to Tesla's regulatory filings, Musk had already pledged about half of his 173 million shares of Tesla stock to fund other ventures and activities. He has now pledged an additional 40 percent to secure the new loans to buy Twitter. That leaves only 10 percent of his Tesla shares available as collateral. Because Tesla's policies allow major shareholders to borrow only 25 percent of the value of each share that is pledged, that would appear to limit further borrowing against his Tesla shares to less than $5 billion.  As noted by Tesla's Amended Form 10-K filed May 2, 2022:

In order to mitigate the risk of forced sales of pledged shares, *the Board has a policy that limits pledging of Tesla stock by our directors and executive officers. Pursuant to this policy,*

21

***directors and executive officers may pledge their stock*** (exclusive of options, warrants, restricted stock units or other rights to purchase stock) as collateral for loans and investments, ***provided that the maximum aggregate loan or investment amount collateralized by such pledged stock does not exceed twenty-five percent (25%) of the total value of the pledged stock.***[15]

84.     As Musk is well aware, the Twitter financing is in major peril since the value of the collateral — Tesla stock (TSLA) — needs to remain at or near the $1,000 per share it was trading at when the deal was announced. Yet that has not happened, as Tesla stock dropped by over 35% since the announcement of the Buyout, as shown in the following chart:



85.     If Tesla's stock falls below $750, Musk could violate Tesla's own leverage ratio. Since it has now done so, Musk appears to be in violation of Tesla's stock pledging policy.

---

[15] Tesla Form 10-K/A, filed May 2, 2022, at p. 21.

86.     Should Tesla stock fall below $600, Morgan Stanley and other banks could demand that Musk post additional collateral, requiring him to quickly sell some of his Tesla shares, which Musk does not want to do at current prices.

87.     Tesla's annual report also warned of the potential consequences of Musk's personal loans on its stock, stating:

> *If Elon Musk were forced to sell shares of our common stock that he has pledged to secure certain personal loan obligations, such sales could cause our stock price to decline.*
>
> Certain banking institutions have made extensions of credit to Elon Musk, our Chief Executive Officer, a portion of which was used to purchase shares of common stock in certain of our public offerings and private placements at the same prices offered to third-party participants in such offerings and placements. We are not a party to these loans, which are partially secured by pledges of a portion of the Tesla common stock currently owned by Mr. Musk. *If the price of our common stock were to decline substantially, Mr. Musk may be forced by one or more of the banking institutions to sell shares of Tesla common stock to satisfy his loan obligations* if he could not do so through other means. Any such sales could cause the price of our common stock to decline further.[16]

88.     The following chart from Tesla's Form 10-K/A filed May 2, 2022 sets forth Musk's current ownership of Tesla stock:

| Beneficial Owner Name | Shares Beneficially Owned | Percentage of Shares Beneficially Owned |
|---|---|---|
| **5% Stockholders** | | |
| Elon Musk(1) | 231,715,206 | 21.2% |
| The Vanguard Group(2) | 62,448,572 | 6.0% |
| Blackrock, Inc.(3) | 52,918,395 | 5.1% |
| **Named Executive Officers & Directors** | | |
| Elon Musk(1) | 231,715,206 | 21.2% |
| Zachary J. Kirkhorn(4) | 635,271 | * |
| Andrew Baglino(5) | 257,383 | * |
| Robyn Denholm(6) | 654,159 | * |
| Ira Ehrenpreis(7) | 560,335 | * |
| Lawrence J. Ellison(8) | 15,270,141 | 1.5% |
| Hiromichi Mizuno(9) | 117,230 | * |
| James Murdoch(10) | 475,765 | * |
| Kimbal Musk(11) | 683,490 | * |
| Kathleen Wilson-Thompson(12) | 260,139 | * |
| All current executive officers and directors as a group (10 persons)(13) | 250,629,119 | 22.9% |

---

[16] *See* Tesla's Form 10-K, filed Feb. 7, 2022, at p. 27.

89.     Tesla's Form 10-K/A also reveals the number of Tesla shares Musk has pledged for personal debts, including the Twitter Buyout: "[Musk's shares include] 92,331,125 shares pledged as collateral to secure certain personal indebtedness."[17]

**E.      As Tesla's Stock Plunges in the 30 Days After Announcement of the Buyout, Threatening a Margin Call and a Forced Sale of Musk's Tesla Stock, Musk Begins to Make False Statements and Engage in Market Manipulation of Twitter's Stock**

90.     Between April 25, 2022, when the Proposed Buyout was announced, and May 12, 2022, Tesla's stock declined by 27%.  The substantial decline in Tesla's stock threatened a margin call on Musk's Tesla stock which was pledged as collateral for his $12.5 billion loan from Morgan Stanley and other banks.  In addition, according to his financing plan, Musk has not only pledged his Tesla stock for the $12.5 billion loan from Morgan Stanley and other banks, but will have to sell $21 billion worth of Tesla stock, about 20 million shares, to fund the cash part of the deal.  With Tesla stock now entering a bear market, selling millions of shares is equivalent to having to book a huge loss. Musk thus has a strong motivation to attempt to delay the Proposed Buyout in the hope that Tesla shares will rebound in value before he is forced to sell them.  It has also been reported that due to his strong aversion to selling more Tesla shares at current depressed valuations, Musk is also looking at funding the Twitter buyout by selling some shares of SpaceX through a private placement.[18]  However, the current stock market decline has made it difficult for Musk to do so at attractive valuations.

91.     In response to these problems and the plunging value of Tesla stock, Musk promptly acted to disparage Twitter in a false and baseless manner, and in violation of both the non-disparagement and non-disclosure clauses of his contract with Twitter.  In doing so, Musk hoped to drive down Twitter's stock price and then use that as a pretext to attempt to re-negotiate the Buyout

---

[17] *See* Tesla Form 10-K/A, filed May 2, 2022, at p. 23.

[18] *See, e.g.*, Sissi Cao, "As Tesla Stock Falters, Elon Musk is Considering Selling SpaceX Shares to Fund His Twitter Deal," The Observer, May 18, 2022 ("Elon Musk appears to be hesitating over his $44 billion acquisition of Twitter as a key funding source, his ownership in Tesla, quickly loses value.").

1   price.[19]  He also began to baselessly state that the Proposed Buyout was "temporarily on hold" in an

2   effort to buy more time and avoid having to sell Tesla stock at depressed prices.  Musk did so

3   predominantly by using his Twitter account, which he established when he was a California citizen.

4   Twitter is headquartered in San Francisco and Musk's tweets were disseminated from San Francisco,

5   California.

6          92.     Beginning on Friday, May 13, 2022, and continuing to the present, Musk has

7   disseminated the following false statements:

8                  1.      **Friday May 13, 2022 Tweet**

9          93.     On Friday, May 13, 2022 ("Friday the 13th"), at 5:44 a.m. (*i.e.*, before the stock market

10  opened), Musk issued a tweet which stated that the buyout was "temporarily on hold:"



23         94.     Musk's statement was false and misleading and constituted an effort to manipulate the

24  market for Twitter shares.  The statement was false because the Buyout was not, in fact, "temporarily on

25  hold."  Vijaya Gadde, Twitter's top lawyer, has stated that here is nothing in the buyout contract that

26  _____

27  [19] The Buyout agreement is also atypical in that it does not have a standstill agreement.  Thus, Musk
    could presumably also be buying additional Twitter shares at the depressed prices caused by his market
28  manipulation.

allows Musk to put the deal "temporarily on hold."  Moreover, Musk's statement was misleading because it stated or implied that Musk's obligation to consummate the Buyout was conditioned on his satisfaction with due diligence to determine whether "spam/fake accounts do indeed represent less than 5% of users."  Musk had specifically waived detailed due diligence as a condition precedent to his obligations under the Buyout contract.  Thus, Musk has no right to cancel the Buyout based on any results from due diligence concerning the number of fake accounts at Twitter.

95.     In response to this Tweet, Twitter's stock price declined.  Later the same day, Musk issued the following Tweet:



**Elon Musk** ✓
@elonmusk                                                  ···

To find out, my team will do a random sample of 100 followers of @twitter.

I invite others to repeat the same process and see what they discover …

6:47 PM · May 13, 2022 · Twitter for iPhone

**10.8K** Retweets   **2,573** Quote Tweets   **128.3K** Likes

96.     In response to a question about why he was using a sample of 100 Twitter users, Musk replied:



**Elon Musk** ✓
@elonmusk                                                  ···

Replying to @PPathole and @Twitter

Any sensible random sampling process is fine. If many people independently get similar results for % of fake/spam/duplicate accounts, that will be telling.

I picked 100 as the sample size number, because that is what Twitter uses to calculate <5% fake/spam/duplicate.

7:39 PM · May 13, 2022 · Twitter for iPhone

### 2.     Musk's May 14, 2022 Tweet

97.     Musk had allegedly obtained non-public information about the process Twitter uses to investigate duplicate and fake accounts from Twitter as part of the Proposed Buyout diligence.  Musk

Class Action Complaint for Violations of the California Corporations Code

1  sent a tweet on Saturday, May 14, 2022, disclosing that he had received a call from Twitter's lawyers

2  advising him that he had violated the terms of the Non-Disclosure Agreement ("NDA"):



9  98.   Musk's supposed concern about the number of bots and fake accounts in Twitter would

10  appear to be  pretextual, given the fact that Musk has known about the issue for long before he offered

11  to acquire Twitter.

12  99.   For example, Musk and his lawyers were well aware of a **$809.5 million settlement**

13  Twitter had been forced to enter into **in September 2021, just hours before trial was set to begin** in a

14  securities fraud class action alleging Twitter overstated its user numbers and growth rate -- *In re Twitter*

15  *Inc. Securities Litigation*, 16-cv-05314, U.S. District Court, Northern District of California (San

16  Francisco).  All the documents from that case were publicly available to Musk, including a website

17  (www.twittersecuritieslitigation.com) containing, among other things, the Court's order denying

18  Twitter's motion for summary judgment.  *See* **Exhibit A** (April 17, 2020 Order Denying Motion for

19  Summary Judgment, at p. 16)(holding that Twitter's false statements about its Daily Active Users

20  (DAUs) and Monthly Active Users (MAUs) were material because "Twitter has publicly stated that its

21  success and financial performance depend, at least in part, on the size and engagement of its user

22  base.").

23  100.   Moreover, Twitter's SEC filings have long disclosed that there are duplicate and fake

24  accounts on Twitter.  For example's Twitter's 2021 Annual Report disclosed that:

25  The numbers of mDAU presented in this Annual Report on Form 10-K are based on internal
    company data. While these numbers are based on what we believe to be reasonable estimates
26  for the applicable period of measurement, there are inherent challenges in measuring usage and
    engagement across our large number of total accounts around the world. Furthermore, our
27  metrics may be impacted by our information quality efforts, which are our overall efforts to
    reduce malicious activity on the service, inclusive of spam, malicious automation, and fake
28  accounts. For example, ***there are a number of false or spam accounts in existence on our***

27

1   *platform. We have performed an internal review of a sample of accounts and estimate that*
2   *the average of false or spam accounts during the fourth quarter of 2020 represented fewer*
3   *than 5% of our mDAU during the quarter.* The false or spam accounts for a period represents
    the average of false or spam accounts in the samples during each monthly analysis period during
4   the quarter. *In making this determination, we applied significant judgment, so our estimation*
    *of false or spam accounts may not accurately represent the actual number of such accounts,*
5   *and the actual number of false or spam accounts could be higher than we have estimated.*[20]

6   101.    In addition, news reports and blog posts as far back as 2017 had regularly reported that

7   "It has been extensively reported that incidences of spamming by bots and fake accounts on Twitter

8   have been increasing."[21]

9   102.    In fact, as noted sarcastically by one of his Twitter followers, getting rid of the bots and

10  fake accounts was one of Musk's stated reasons for wanting to buy Twitter:



16      **3.    Musk's May 16, 2022 Statement**

17  103.    On May 16, 2022, Musk stated during the All In tech conference in Miami that fake and

18  spam accounts make up at least 20% of Twitter's users.

24  [20] See Form 10-K, filed 2/17/21, at p. 5.

25  [21] *See* Ankit Singh, Identifying Fake Accounts and Twitter Bots using Artificial Intelligence," May
26  31, 2017, available at https://blog.paralleldots.com/research/identifying-fake-accounts-twitter-bots-
    using-
27  artificialintelligence/#:~:text=It%20has%20been%20extensively%20reported%20that%20incidences
    %20of,and%20opinions%2C%20creating%20confusions%20and%20potentially%2C%20spreading
    %20rumors.

Class Action Complaint for Violations of the California Corporations Code

104.   Twitter's CEO Parag Agrawal attempted to respond to Musk with the following tweet:



105.   In response, Musk tweeted a poop emoji to Agrawal:



106.   Musk later the same day tweeted the following follow-up comment, stating that information about the number of fake accounts was "fundamental to the financial health of Twitter":



**4.    <u>Musk's May 17, 2022 Tweet</u>**

107.   On May 17, 2022, Musk doubled down on his "Friday the 13th" tweet and May 16th statement and issued another tweet stating that the actual number of fake accounts at Twitter could be

29

1  "much higher" than 20% and that the deal "cannot go forward"



10  108.   In response to this Tweet, Twitter's stock price declined.

11  109.   The same day (May 17, 2022), Musk invited the SEC to investigate Twitter.

12      **5.   Musk's May 21, 2022 Tweets**

13  110.   On May 21, Musk suggested in a series of tweets that he could be seeking to reduce the

14  price of the Buyout by up to 25% of the original agreed-upon price.  Replying to a tweet from Ion Miles

15  Chong, saying "If 25% of the users are bots then the Twitter acquisition deal should cost 25% less,"

16  Musk replied:  "Absolutely."

17  111.   If the Buyout price is reduced by 25%, that would amount to an $11 billion reduction in

18  proceeds to the Class.

19  112.   "I'm worried that Twitter has a disincentive to reduce spam, as it reduces perceived daily

20  users," Musk also tweeted on May 21, and asked whether Twitter had gotten back to him on the bots

21  number discrepancy, he added: "No, they still refuse to explain how they calculate that 5% of daily

22  users are fake/spam! Very suspicious."

23  113.   Musk's false and misleading tweets and disparagement of Twitter had the desired effect,

24  as they caused Twitters' stock to decline substantially in the days following the tweets, erasing over $8

25  billion in market capitalization, reflected in the following chart:

Class Action Complaint for Violations of the California Corporations Code



114.   Musk's false and disparaging statements have caused the spread between the $54.20 Buyout price and Twitter's stock price to exceed $15 per share, which is highly unusual:

Class Action Complaint for Violations of the California Corporations Code

1    115.    Unfortunately for Musk, Tesla's stock price also continued its decline.  On Friday, May 20, 2022, Tesla stock closed at $635.07.  That represented an even further deterioration of Tesla's stock since the Proposed Buyout was announced – *a 35% drop in Tesla's stock price*.  As noted by the Washington Post:

> *Tesla's stock — and Elon Musk's wealth — took a huge hit Friday, continuing a downward spiral and possibly imperiling the billionaire's deal to buy Twitter*.
>
> *Shares of the electric car company*, from which much of Musk's wealth comes, *sank more than 10 percent during trading Friday, falling at one point to about $636 per share. That's about a 35 percent drop from its price on the day Musk's deal to buy Twitter* was announced.
>
> The downturn of Tesla's stock could have more than just a superficial impact on Musk's wealth.
>
>     Tesla's value dropped Tuesday by more than double the cost of Twitter
> Musk has taken out extensive personal loans that are heavily tied to the value of Tesla's stock. At times, he has put down as much as 50 percent of his Tesla shares as collateral to back them. *As the company's share price approaches $600, Musk enters dangerous territory with lenders — where they could seek some of his equity to ease their confidence in his ability to pay*, according to analysts. [22]

116.    On **May 25, 2022**, Twitter held its Annual Meeting.  At the meeting, shareholders of Twitter voted against re-electing Egon Durban, an ally to Musk, as a director to the board.  Durban, the co-head of private equity firm Silver Lake, had partnered with Musk when he sought to take Tesla ((TSLA) - Get Tesla Inc Report), the electric carmaker, private as its CEO.

117.    Also on **May 25, 2022**, Musk filed an Amended Form 13D.  The Amended 13D confirmed the incredible pressure that Musk's margin loan had been exerting on him.  The filing disclosed that he let the $12.5 billion margin loan from Morgan Stanley and other banks, for which he had pledged his Tesla stock as collateral, expire on May 24, 2022.  The Amended Form 13D states that Musk intends to replace the $12.5 billion loan with "equity financing" but does not state where Musk will obtain such equity financing or what form it will take.

---

[22] *See* Rachel Lerman, "Tesla's Stock Price Plummets as Twitter Deal Hangs in the Balance," THE WASHINGTON POST, May 20, 2022.

# VII.   CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Cal. Corp. Code §§ 25400 and 25500

#### (Against Defendant Musk)

118.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein, except for the causes of action.

119.    Defendant Musk violated Corp. Code Section 25400(d) directly and/or indirectly, in this State, for the purpose of inducing the purchase or sale of Twitter securities by others, engaged in manipulative transactions and/or made or materially participated in making the statements alleged in this complaint, each of which contained false or misleading statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Defendant was aware that the relevant statements and omissions were false and misleading and that the relevant transactions were manipulative.

120.    Defendant Musk purchased or offered to purchase Twitter securities and/or willfully participated in the relevant manipulative transactions for the purpose of inducing the purchase or sale of Twitter securities by others.  After purchasing over 9% of Twitter's shares, and entering into a contract to purchase the remaining stock of Twitter he does not already own for $54.20 per share, Defendant Musk has willfully participated in making statements that were false and misleading, or that omitted material facts necessary to make the statements made not false or misleading.  Musk knew such statements were false and misleading as detailed herein.

121.    Through such conduct, Defendant Musk also violated Corp. Code Section 25400(b) by effecting, alone or with one or more other persons, a series of transactions in Twitter securities creating actual or apparent active trading in such securities or raising or depressing the price of such securities, for the purpose of inducing the purchase or sale of such securities by others.

122.    Through the conduct alleged herein, Defendant Musk also violated Corp. Code Section 25400(c).  Musk was and is a person purchasing or offering to purchase Twitter securities.  Musk also induced the purchase or sale of Twitter securities by circulating or disseminating information to the effect that the price of Twitter securities is or is likely to fall because of market operations of any one or

1   more persons conducted for the purpose of depressing the price of Twitter securities.

2        123.   As a result of Defendant's misconduct, plaintiff and the other members of the Class have

3   suffered damages and been harmed.  The fair market value of Twitter securities has been adversely

4   affected by Musk's false statements and wrongful conduct.

5        124.   As a direct and proximate result of defendants' violation of law described herein,

6   plaintiff and members of the Class have been damaged.

7   <center>**SECOND CAUSE OF ACTION**</center>

8   <center>**Cal. Corp. Code §§ 25401 and 25501**</center>

9   <center>**(Against Defendant Musk)**</center>

10       125.   Plaintiffs incorporate by reference and reallege each and every allegation contained

11  above, as though fully set forth herein, except for the causes of action.

12       126.   This claim is brought on behalf of those Class members who Defendant Musk has

13  purchased or offered to purchase their Twitter securities.

14       127.   Defendant Musk offered to purchase and/or purchased securities from plaintiff and

15  members of the Class in and from this state by means of written and oral communications that included

16  untrue statements of material fact and omitted to state material facts necessary to make the statements

17  made, in light of the circumstances under which the statements were made, not misleading.

18       128.   Defendant Musk failed to exercise reasonable care to ensure the truth and accuracy of

19  such statements, and plaintiff had no knowledge of the falsity of such statements.

20       129.   As a direct and proximate result of Defendant's violations of law described herein,

21  plaintiff and members of the Class have been damaged.

22  <center>**THIRD CAUSE OF ACTION**</center>

23  <center>**For Declaratory and Injunctive Relief**</center>

24  <center>**(Against Defendant Twitter, Inc. and Musk)**</center>

25       130.   Plaintiff seeks declaratory and injunctive relief against Defendants pertaining to

26  Defendant Musk's outstanding and current offer to buy the Twitter stock of Plaintiff and the Class for

27  $54.20.

28

131.    A justiciable, present controversy exists between the parties.  Defendant Musk signed a binding contract to buy Plaintiff's stock for $54.20.  But Defendant Musk thereafter publicly stated that the Buyout is "temporarily on hold" and "cannot go forward" until certain conditions are met.

132.    The conditions Musk that has stated must be met before the Buyout can go forward do not appear to be part of the contract he signed with Twitter, Inc.  Plaintiff thus seeks a declaration concerning these facts and issues and the parties' respective rights and obligations.  Plaintiff also seeks appropriate injunctive relief to be determined by the Court.

**FOURTH CAUSE OF ACTION**

**For Violation of Cal. Corp. Code § 25402 and 25502.5**

**(Against Defendants Musk and Twitter, Inc.)**

133.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein, except for the causes of action.

134.    As a result of the conduct alleged herein, Defendant Musk purchased Twitter securities in this state at a time when he knew material information about Twitter which he knew would significantly affect the market price of Twitter securities and which was not generally available to the public, and which he knew was not intended to be so available.

135.    Plaintiff seeks a declaratory judgment that Musk has violated Section 25402 and that Defendant Twitter has an obligation to investigate Musk's conduct and take appropriate action. Plaintiff does not seek any damages on behalf of Twitter and this claim is not brought as a derivative claim.

**FIFTH CAUSE OF ACTION**

**For Unjust Enrichment**

**(Against Defendant Musk)**

136.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein, except for the causes of action.

137.    Through the conduct alleged herein, Defendant Musk has been unjustly enriched.

138.    As a matter of equity, Musk should not be allowed to retain the monies and benefits he unjustly acquired through his false statements, market manipulation, and other improper conduct.

139.    As a matter of equity, Musk should be ordered to disgorge his unjust monies and profits and all interest and interest earned from such monies and benefits.

## VIII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the Class, pray for the following judgment and relief:

A.    Certifying this action as a class action and certifying Plaintiff as the Class representative and their counsel as Class counsel;

B.    Directing that Defendant Musk account to Plaintiff and the other members of the Class for all damages caused to them, and account for all profits and any special benefits obtained as a result of his unlawful conduct;

C.    Declaratory and injunctive relief from Twitter and Musk;

D.    Awarding punitive damages at the maximum amount permitted by law;

E.    Awarding Plaintiff and the other members of the Class compensatory damages;

F.    Awarding Plaintiff and the other members of the Class declaratory, equitable and injunctiverelief;

G.    Awarding Plaintiff and the other members of the Class pre-judgment and post judgment interest,

H.    Awarding Plaintiff the costs and disbursements of this action, including a reasonable allowance for the fees and expenses of attorneys and experts; and

I.    Granting Plaintiff and the other members of the Class such other and further relief as may be just and proper.

///

1

## IX.    JURY TRIAL DEMAND

2

Plaintiff demands a trial by jury on all claims and issues so triable.

3

Dated: May 25, 2022                            Respectfully submitted,

4

**BOTTINI & BOTTINI, INC.**

5

*/s/ Francis A. Bottini, Jr.*
_____
                                               Francis A. Bottini, Jr.

6

7

Francis A. Bottini, Jr. (SBN 175783)
Anne B. Beste (SBN 326881)

8

Albert Y. Chang (SBN 296065)
Yury A. Kolesnikov (SBN 271173)

9

Nicholas H. Woltering (SBN 337193)
7817 Ivanhoe Avenue, Suite 102

10

La Jolla, California  92037
Telephone:     (858) 914-2001

11

Facsimile:     (858) 914-2002

12

**COTCHETT, PITRE & MCCARTHY, LLP**

13

*/s/ Anne Marie Murphy*
_____
                                               Anne Marie Murphy

14

15

Joseph W. Cotchett (SBN 36324)
Mark C. Molumphy (SBN 168009)

16

Anne Marie Murphy (SBN 202540)
Tyson C. Redenbarger (SBN 294424)

17

Julia Q. Peng (SBN 318396)
San Francisco Airport Office Center

18

840 Malcolm Road, Suite 200
Burlingame, California 94010

19

Telephone:     (650) 697-6000

20

*Counsel for Plaintiff*

21

22

23

24

25

26

27

28

37

Class Action Complaint for Violations of the California Corporations Code

# EXHIBIT A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re TWITTER, INC. SECURITIES LITIGATION | Case No. 16-cv-05314-JST |
| _____ | **ORDER DENYING MOTION FOR SUMMARY JUDGMENT** |
| This Document Relates to: | ECF No. 314-4 |
| ALL ACTIONS | |

     In this securities class action, Defendants move for summary judgment as to both claims in the operative complaint.  The Court will deny the motion.[1]

# I.     BACKGROUND AND PROCEDURAL HISTORY

     This is a securities class action against Twitter, Inc., a social media company, and two of its officers, Richard Costolo and Anthony Noto, for alleged violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934.  Costolo was the Chief Executive Officer ("CEO") of Twitter until July 1, 2015.  Noto was Twitter's Chief Financial Officer ("CFO") during all relevant times.

     The gravamen of the operative complaint, ECF No. 81, is that Defendants made misleading statements that caused the price of Twitter stock to trade at artificially high prices during the Class Period, which ranges from February 6, 2015, to July 28, 2015.  Plaintiffs allege that Defendants misled investors during the Class Period by making public statements that did not reflect the actual state of Twitter's user engagement, which is relevant to evaluating Twitter's

---

[1] The parties' motions to exclude certain expert testimony under Federal Rule of Evidence 702 will be resolved in a separate order.

United States District Court
Northern District of California

potential user growth and financial performance. Plaintiffs aver that Defendants omitted

information from the challenged statements that would have provided investors with the necessary

context to evaluate Twitter as an investment. This included information pertaining to Twitter's

daily active users ("DAU") and the ratio of DAU to monthly active users ("MAU")

("DAU/MAU"), which are metrics that measure user engagement or frequency of use. Plaintiffs

allege that persons who purchased Twitter stock during the Class Period suffered economic losses

when the price of Twitter stock declined as a result of two sets of corrective disclosures that

revealed the problems with user engagement, and potentially with user growth, that the challenged

statements had concealed.

On October 16, 2017, the Court granted in part and denied in part Defendants' motion to

dismiss.[2] ECF No. 113. In relevant part, the Court denied the motion as to the theory that

Defendants' omission of information about DAU and DAU/MAU rendered Defendants'

statements about user growth and user engagement misleading.[3] *Id.* at 24-28. The Court also

denied the motion with respect to the theory that Defendants' affirmative statements about

DAU/MAU and ad engagement were misleading. *Id.* at 30-32.

On July 17, 2018, the Court granted the motion for class certification under Rules 23(a)

and (b)(3) filed by Lead Plaintiff KBC Asset Management NV ("KBC"). The Court certified the

following class: "all persons and entities that, during the period from February 6, 2015, through

July 28, 2015, inclusive [], purchased or otherwise acquired shares of the publicly traded common

stock of Twitter, Inc. [], and were damaged thereby."[4] ECF No. 181 at 16. In the same order, the

---

[2] The Court granted the motion with respect to the theory that Defendants made misleading statements about MAU trends by failing to disclose that such trends were based on low-quality users. ECF No. 113 at 32-34.

[3] Defendants argue that Plaintiffs have changed "the theory of their case" by proceeding at summary judgment based on the "untested theory" that Defendants' statements were misleading by virtue of Defendants' omission of DAU/MAU information from such statements. ECF No. 396-4 at 1-2 & n.2. The Court disagrees. One of the theories that survived Defendants' motion to dismiss was the theory that Defendants' statements about MAU growth were misleading because Defendants failed to disclose "companion DAU data" and information that the "DAU to MAU ratio" was declining. *See* ECF No. 113 at 24-26.

[4] Excluded from the Class are Defendants; members of the Individual Defendants' immediate families; Twitter's subsidiaries and affiliates; any person who is or was an officer or director of Twitter during the Class Period; any entity in which any Defendant has a controlling interest; and

1   Court appointed KBC and National Elevator Industry Pension Fund as co-class representatives,

2   and the law firms Motley Rice LLC and Robbins Geller Rudman & Dowd LLP as co-class

3   counsel.  *Id.* at 16-17.

4         Defendants' present motion for summary judgment follows.

## II.   REQUESTS FOR JUDICIAL NOTICE

6         Before turning to the substance of Defendants' motion for summary judgment, the Court

7   first addresses the parties' requests for judicial notice.

8         "The court may judicially notice a fact that is not subject to reasonable dispute because it:

9   (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and

10  readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid.

11  201(b).  The Court "must take judicial notice if a party requests it and the court is supplied with

12  the necessary information."  Fed. R. Evid. 201(c)(2).

13        First, Defendants request that the Court take judicial notice of certain documents that fall

14  within the following categories: (1) analyst reports; (2) Defendants' filings with the Securities and

15  Exchange Commission ("SEC"); (3) four "tweets" by the "verified Selerity Twitter account"; and

16  (4) Twitter's press releases, metrics and financials published on Twitter's website, and transcripts

17  of Twitter's earnings calls.  ECF No. 355.

18        Plaintiffs oppose the request (1) to the extent that Defendants ask the Court to take notice

19  of the truth of the matters asserted in the documents at issue; and (2) to the extent that Defendants

20  request that the Court take judicial notice of the four tweets, which Plaintiffs argue were published

21  by a private non-party and therefore do not have the indicia of accuracy required for judicial

22  notice.  *See* ECF No. 399.

23        Because their authenticity and accuracy is not disputed, the Court will take judicial notice

24  of the analyst reports; Defendants' filings with the SEC; and Twitter's press releases, publicly

25  disseminated metrics and financials, and transcripts of earnings calls.  Courts routinely take

26

27  ───────────────────

28  the legal representatives, heirs, successors and assigns of any such excluded person or entity.  ECF
    No. 181 at 16 n.7.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   judicial notice of these types of documents to determine what information was available to the

2   market. *See, e.g.*, *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 n.7 (9th

3   Cir. 2008) (holding that the district court properly took judicial notice of publicly available

4   financial documents and SEC filings); *Von Saher v. Norton Simon Museum of Art at Pasadena*,

5   592 F.3d 954, 960 (9th Cir. 2009) (holding that courts "may take judicial notice of publications

6   introduced to indicate what was in the public realm at the time, not whether the contents of those

7   articles were in fact true") (citation and internal quotation marks omitted).  Because the truth of

8   the matters asserted in these documents is subject to reasonable dispute, however, the Court takes

9   judicial notice only of the statements contained therein, but not for the purpose of determining the

10  truth of those statements.  *Shaev v. Baker*, No. 16-CV-05541-JST, 2017 WL 1735573, at *7 (N.D.

11  Cal. May 4, 2017) (citing *In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1254 (N.D. Cal.

12  2008)).

13      With regard to the disputed tweets, the Court agrees with those courts that have held that

14  "judicial notice is proper because the existence of the publicly-available articles and tweets cannot

15  reasonably be questioned."  *See, e.g.*, *Unsworth v. Musk*, No. 19-MC-80224-JSC, 2019 WL

16  5550060, at *4 (N.D. Cal. Oct. 28, 2019) (citing *Von Saher*, 592 F.3d at 960); *Olson v. California*,

17  No. 19-CV-10956-DMG (RAOx), 2020 WL 905572, at *4 (C.D. Cal. Feb. 10, 2020) (taking

18  judicial notice of tweets referred to in the complaint and moving papers on the ground that "those

19  documents' existence cannot reasonably be disputed") (citation omitted).  The Court takes judicial

20  notice of the tweets solely "to indicate what was in the public realm at the time," but not for the

21  purpose of determining whether the contents of those tweets "were in fact true."  *Von Saher*, 592

22  F.3d at 960 (citation and internal quotation marks omitted).

23      Second, Plaintiffs request that the Court take judicial notice of documents that fall within

24  the following categories: (1) analyst reports; (2) news articles; (3) and SEC filings.  Plaintiffs

25  request that the Court take judicial notice of the existence and content of these documents, but not

26  for the truth of the matters asserted therein.  ECF No. 369.  Defendants do not oppose Plaintiffs'

27  request.  ECF No. 400.

28      Because their authenticity and accuracy is not disputed, and because, as noted above,

4

courts routinely take judicial notice of these types of documents, the Court will take judicial notice of the analyst reports, news articles, and SEC filings cited by Plaintiffs, but not for the truth of the matters asserted therein.

## III.   UNIDISPUTED FACTS

### A.   Before the Class Period

Twitter has publicly stated that its success and financial performance depend, at least in part, on the size and engagement of its user base.  *See, e.g.*, ECF No. 370-5 at 26 (Twitter's November 4, 2013, Amended Form S-1 Registration Statement stating that "[t]he size of our user base and our users' level of engagement are critical to our success" and "[o]ur financial performance has been and will continue to be significantly determined by our success in growing the number of users and increasing their overall level of engagement on our platform as well as the number of ad engagements").  User growth depends in part on user engagement, because users who are more engaged are less likely to "churn" (i.e., stop using the platform).  *See* ECF No. 362-6 at 4, 10 (Akash Garg, a senior member of Twitter's growth team, testifying during his deposition that more engaged users are less likely to churn and that daily active use "is certainly a prerequisite for healthy MAU growth").

When Twitter first became a public company, it disclosed "Key Metrics" that it used to measure user growth and user engagement.  ECF No. 370-5 at 75-76.  These included MAU (monthly active users), "a measure of the size of [Twitter's] active user base," and Timeline Views and Timeline Views per MAU, "measures of user engagement."  *Id.*

In 2014, Twitter established a Metrics Task Force to evaluate all of Twitter's metrics and decide what metrics it would use internally and externally.  ECF No. 362-10 at 2.  In September 2014, the Metrics Task Force decided to stop reporting Timeline Views and worked on finding a replacement metric.  ECF No. 362-11 at 8-9.

On November 12, 2014, Twitter held an "Analyst Day," during which management discussed products, strategy, and new services.  *See generally* ECF No. 371-2 (Transcript of Analyst Day).  At that event, Twitter announced its "operational goal of building the world's largest daily audience."  *Id.* at 5, 6, 8.  A Twitter representative stated that, although Twitter

5

1   previously had not "focused on DAU . . . if we're going to be the largest daily audience in the

2   world, that has to change." *Id.* at 105.

3         At Analyst Day, Noto presented a "financial overview," during which he discussed eight

4   "major growth drivers" for revenue, which included both DAU and DAU/MAU. *Id.* at 91, 94, 96.

5   With respect to DAU/MAU, Noto stated that the "year-to-date DAU to MAU ratio for our top 20

6   markets" is 48%. *Id.* at 91. Noto described DAU/MAU as a "frequency" metric and the "best

7   way to quantify the impact of engagement." *Id.* at 94. Noto also stated that the top 20 markets

8   "account for 80% of our users and 90% of our revenue," and that Twitter could generate an

9   additional $500 million in annual revenue by increasing its DAU/MAU from 48% to 51%. *Id.*

10  With respect to MAU, Noto stated that Twitter was positioned to "grow [MAU] by 2x," from 284

11  million, *id.* at 91, to over 550 million in the intermediate term, *id.* at 96. Noto also announced that

12  Twitter would no longer disclose Timeline Views because that measure had become "less and less

13  relevant of a metric." *Id.* at 109.

14        After Analyst Day, internal Twitter emails state that dashboards for DAU, DAU/MAU,

15  and MAU would be created to provide daily updates of those metrics for Noto and others, and that

16  regular meetings would be held to discuss metrics, including DAU/MAU. *See, e.g.*, ECF No. 362-

17  23 (email stating that metrics dashboard for Noto would include DAU/MAU); ECF No. 363-19

18  (email stating that CFO dashboard would be updated daily); ECF No. 362-24 (email to Noto and

19  others attaching detailed user metrics slides); ECF No. 363-20 (email stating that weekly meetings

20  to discuss user retention and related metrics, which included DAU/MAU, would be held); ECF

21  No. 363-21 (email to Noto and others containing "Monthly Metrics Review" for Q1 2015,

22  including DAU/MAU trends).

23        Before earnings calls with investors, internal "earnings binders" with "detailed information

24  about financial and operational performance in the quarter" would be prepared and distributed to

25  top executives, including Noto. ECF No. 371-15 at 4-5 (Krista Bessinger deposition testimony).

26  The binders contained detailed information and analysis about DAU, MAU, DAU/MAU. *See*

27  *generally* ECF Nos. 362-15 and 362-38 (earnings binders for Q4 2014 and Q1 2015).

28  / / /

United States District Court
Northern District of California

6

**B.      During the Class Period**

On February 5, 2015, Twitter issued a press release and held its quarterly earnings call with investors and analysts to report results for the fourth quarter of 2014 (Q4 2014).  ECF No. 371-18.  The earnings binder for this earnings call stated that Twitter's DAU/MAU for its top 20 markets had fallen to 44.4%.  ECF No. 362-15 at 178.  The binder also included "Key Takeaways on Users," which stated that "DAUs growth continues to stall" and "DAU/MAU continues to trend lower."  *Id.* at 171.  A separate chart in the earnings binder showed that DAU/MAU had declined throughout 2014 in all of Twitter's top 5 markets and 19 of its top 20 markets.  *Id.* at 80-81.

During the February 5 earnings call, Noto stated that Twitter's more mature markets had a "very high DAU to MAU, 50% plus" and a lower rate in emerging markets, and that they "all migrate up to a higher rate over time."  ECF No. 371-18 at 9.  Twitter also disclosed average MAUs of 288 million for Q4 2014, which meant that its net MAU additions during Q4 amounted to only 4 million, which was less than expected.  *Id.* at 7.  Noto stated, however, that "[t]he user numbers we saw in January, again, indicate that our MAU trend is already turned around."  *Id.* at 2.

After the earnings call, analysts reported that Twitter's "[e]ngagement is improving," ECF No. 371-21 at 2, "slower MAU growth is more than offset by improvements in engagement," ECF No. 371-22 at 2, and "MAU Growth about to Pick Up as Engagement Rate Improves," ECF No. 371-23 at 2.

On April 28, 2015, Twitter made disclosures with respect to its performance in Q1 2015.  It disclosed that its MAU was 302 million, up from 288 million in the previous quarter.  ECF No. 371-27 at 3.  Twitter also revealed that it would be reducing its revenue guidance for the rest of FY2015.  *Id.* at 4.  During the earnings call on April 28, Noto stated that the trend for MAU growth for Q2 2015 was "not similar to Q1" and MAU "visibility is actually limited."  ECF No. 371-28 at 12.  Noto also stated that DAU to MAU ratios in the quarter were "similar" by market relative to Analyst Day.  *Id.* at 20.  The earnings binder prepared before the April 28 earnings call, however, stated that that DAU/MAU for the top 20 markets had fallen to 44.3% from the 48%

7

1  reported at Analyst Day.  ECF No. 362-38 at 139.

2       Twitter's stock price declined on April 28 and April 29, 2015.  ECF No. 352-10 ¶¶ 137-

3  141.

4       On July 28, 2015, Twitter issued results for Q2 2015 and held an earnings call, during

5  which Noto revealed that Twitter's DAU/MAU for the top 20 markets had fallen to 44%, and that

6  Twitter did "not expect to see sustained meaningful growth in MAUs" for "a considerable period

7  of time."  ECF No. 371-32 at 7.

8       Twitter's stock price declined for several days following the July 28, 2015, earnings call.

9  ECF No. 352-10 ¶¶ 142-151.

10  **IV.    JURISDICTION**

11       The Court has subject matter jurisdiction under 28 U.S.C. § 1331.

12  **V.    LEGAL STANDARD**

13       Summary judgment is properly granted when no genuine and disputed issues of material

14  fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant

15  is clearly entitled to prevail as a matter of law.  Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477

16  U.S. 317, 322-23 (1986).

17       Material facts that would preclude entry of summary judgment are those which, under

18  applicable substantive law, may affect the outcome of the case.  The substantive law will identify

19  which facts are material.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

20       Where the moving party does not bear the burden of proof on an issue at trial, the moving

21  party may discharge its burden of production by either of two methods:  the moving party may

22  produce evidence negating an essential element of the non-moving party's case, or, after suitable

23  discovery, the moving party may show that the non-moving party does not have enough evidence

24  of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial.

25  *Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc.*, 210 F.3d 1099, 1106 (9th Cir. 2000).

26       If the moving party discharges its burden by showing an absence of evidence to support an

27  essential element of a claim or defense, it is not required to produce evidence showing the absence

28  of a material fact on such issues, or to support its motion with evidence negating the non-moving

United States District Court
Northern District of California

8

party's claim. *Id.*; *see also Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991). If the moving party shows an absence of evidence to support the non-moving party's case, the burden then shifts to the non-moving party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." *Bhan*, 929 F.2d at 1409. The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The court is not required "to scour the record in search of a genuine issue of triable fact," *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (citations omitted), and it may limit its review to the documents submitted for purposes of summary judgment and those parts of the record specifically referenced therein. *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1030 (9th Cir. 2001). "A mere scintilla of evidence will not be sufficient to defeat a properly supported motion for summary judgment; rather, the non-moving party must introduce some significant probative evidence tending to support the complaint." *Summers v. Teichert & Son, Inc.*, 127 F.3d 1150, 1152 (9th Cir. 1997) (citation and internal quotation marks omitted).

## VI.    DISCUSSION

### A.    Section 10(b) and Rule 10-b5 claim

The Securities and Exchange Act of 1934 "was designed to protect investors against manipulation of stock prices." *Basic Inc. v. Levinson*, 485 U.S. 224, 230 (1988). The Supreme Court "repeatedly has described the fundamental purpose of the Act as implementing a philosophy of full disclosure." *Id.* (citations and internal quotation marks omitted).

Section 10(b) of the Securities Exchange Act of 1934 declares it unlawful to "use or employ, in connection with the purchase or sale of any security . . . , any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary." 15 U.S.C. § 78j(b). There is an "implied [ ] private cause of action" in Section 10(b). *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011).

"SEC Rule 10b-5 implements [Section 10(b)] by making it unlawful to . . . 'make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading.'" *Id.* (quoting 17 C.F.R. § 240.10b–5).

9

"Thus, to prevail on a claim for violations of either Section 10(b) or Rule 10b-5, a plaintiff must prove six elements: '(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1051-52 (9th Cir. 2014) (quoting *Matrixx Initiatives*, 563 U.S. at 37-38).

Defendants move for summary judgment, arguing that Plaintiffs do not have evidence to establish any of the following elements for a claim under § 10(b) and Rule 10b-5: (1) that Defendants made a false or misleading statement during the Class Period; (2) that Defendants acted with scienter; and (3) that Defendants' alleged fraud was a substantial cause of the Twitter stock-price declines on April 28 and 29 and from July 29 to August 3, 2015.

After carefully reviewing the evidence cited by the parties, the Court concludes that Plaintiffs have shown that genuine disputes of material fact preclude the entry of summary judgment in Defendants' favor.

### 1. Material misrepresentation or omission

The first element of a claim under § 10(b) and Rule 10b-5 requires a plaintiff to show that the defendant made a statement that was "*misleading* as to a *material* fact." *Basic*, 485 U.S. at 238 (emphasis in the original). This materiality requirement is satisfied when there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Id.* at 231-232 (citation and internal quotation marks omitted). In other words, "materiality depends on the significance the reasonable investor would place on the withheld or misrepresented information." *Id.* at 240. The determination of materiality requires a "fact-specific inquiry." *Id.*

The purpose of the materiality requirement is "to filter out essentially useless information that a reasonable investor would not consider significant, even as part of a larger mix of factors to consider in making his investment decision." *Basic*, 485 U.S. at 234 (citations and internal quotation marks omitted). Thus, the "securities laws do not create an affirmative duty to disclose any and all material information. Instead, companies can control what they have to disclose under

10

these provisions by controlling what they say to the market. But once defendants cho[o]se to tout positive information to the market, they [are] bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 705-06 (9th Cir. 2016) (internal citations and quotation marks omitted) (alterations in the original).

"In considering whether summary judgment on the issue is appropriate, [courts] must bear in mind that the underlying objective facts, which will often be free from dispute, are merely the starting point for the ultimate determination of materiality. The determination requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact. Only if the established omissions are so obviously important to an investor that reasonable minds cannot differ on the question of materiality is the ultimate issue of materiality appropriately resolved as a matter of law by summary judgment." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976) (citation and internal quotation marks omitted). [5]

Here, Plaintiffs "may defeat summary judgment only by showing a genuine issue of fact with regard to a particular statement by the defendant corporation or its insiders." *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 512 (9th Cir. 1991), *as amended on denial of reh'g* (Dec. 6, 1991) (citation and internal quotation marks omitted). Plaintiffs can do so by "demonstrat[ing] that a particular statement, when read in light of all the information then available to the market, or a failure to disclose particular information, conveyed a false or misleading impression." *Id.*

Plaintiffs argue that a genuine dispute exists with respect to whether three statements that Defendants made on February 5, 2015, and one statement they made on April 28, 2015, were misleading. The Court examines each challenged statement, in turn.

/ / /

---

[5] The materiality standards set forth in *TSC Industries* were "adopt[ed], for the § 10(b) and Rule 10b-5 context" by the Supreme Court in *Basic Inc.*, 485 U.S. at 249.

### a.     February 5, 2015, challenged statements

On February 5, 2015, during the earnings call for Q4 2014, Noto stated that "[i]n our more mature markets, we have very high DAU to MAU, 50% plus."[6]  ECF No. 371-18 at 9.  Plaintiffs argue that this statement was misleading because Defendants failed to disclose that the data in the Q4 2014 earnings binder showed that Twitter's DAU/MAU for its top 20 markets had declined to 44.4% from the 48% that Defendants reported at Analyst Day.  *See* ECF No. 362-15 at 178.

The Court concludes that Plaintiffs have shown that a genuine dispute exists as to whether this challenged statement was misleading.  At Analyst Day, Noto stated that the "year-to-date DAU to MAU ratio for our top 20 markets" is 48%.  ECF No. 371-2 at 91.  Noto also stated that the top 20 markets "account for 80% of our users and 90% of our revenue." *Id.* at 94.  Further, Noto stated that there was a relationship between DAU/MAU and revenue, namely that an increase of 3% from 48% to 51% in the DAU/MAU for the top 20 markets would lead to an increase in revenue of $500 million per year.  *Id.*  In light of these Analyst Day statements, an investor reasonably could have interpreted Noto's February 5 "50% plus" statement, which referred to "mature" markets, as being about the DAU/MAU of the top 20 markets, because the top 20 markets had the vast majority of Twitter's users and accounted for the vast majority of Twitter's revenue.  Further, in the absence of a disclosure of the then-current DAU/MAU for the top 20 markets (44.4%), the "50% plus" statement could have suggested to a reasonable investor, falsely, that the DAU/MAU for the top 20 markets had actually *increased* since Analyst Day (48%).  In light of the relationship between DAU/MAU and revenue disclosed at Analyst Day, this suggested positive trend in DAU/MAU could have impacted a reasonable investor's assessment of Twitter.  Based on the foregoing, a reasonable jury could conclude that the disclosure of the omitted DAU/MAU data for the top 20 markets (which showed a *downward* trend in DAU/MAU)

---

[6] The statement in question is in the following portion of the earnings call: "Additionally, on the consumer side, many companies use DAU to MAU.  And while that is a long term goal of ours to become a daily product, today we have great variance in DAU to MAU across geographies.  In our more mature markets we have very high DAU to MAU, 50% plus, and in emerging markets we have very low DAU to MAU at 20% range.  They all migrate up to a higher rate over time."  ECF No. 371-18 at 9.

United States District Court
Northern District of California

would have been perceived by a reasonable investor as having altered the total mix of information available with respect to Twitter, because that omitted data was relevant to evaluating Twitter's future potential revenue. *Schueneman*, 840 F.3d at 705-06 ("[O]nce defendants cho[o]se to tout positive information to the market, they [are] bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information.") (citation and internal quotation marks omitted).

None of Defendants' arguments warrants a different conclusion. First, Defendants argue that the Court already rejected any claims premised on alleged fraud arising from the "50% plus" statement. ECF No. 396-4 at 9. Defendants misread the Court's prior rulings, however. In its order granting in part and denying in part Defendants' motion to dismiss, the Court *denied* the motion with respect to the theory that the February 5 "50% plus" statement was misleading in the absence of disclosures of specific data showing that user engagement was in fact "flat or declining." *See* ECF No. 113 at 27-28. In other words, the Court found that the omission of specific information regarding user engagement metrics raised the inference that the February 5 "50% plus" statement was misleading. *Id.* Accordingly, the Court's prior rulings do not preclude Plaintiffs from challenging at this juncture the "50% plus" statement on the basis that the statement is misleading in the absence of user engagement disclosures, which would include DAU/MAU data.

Defendants next argue that the "50% plus" statement was accurate and, therefore, not misleading as a matter of law. Defendants point to facts showing that three out of the top 20 markets had a DAU/MAU of 50% or higher. *See* ECF No. 314 at 24-25. While Defendants are correct that three[7] out of the top 20 markets had a DAU/MAU of 50% or more, that does not mean that the challenged statement is not misleading as a matter of law. A reasonable jury could conclude that the "50% plus" statement, which did not specify the "mature" markets it referred to[8],

---

[7] The earnings binder states that one of Twitter's top 20 markets, Japan, had a DAU/MAU above 50%, and two other top 20 markets, Spain and Saudi Arabia, had a DAU/MAU at exactly 50%. ECF No. 362-15 at 80-81. The remaining 17 of the top 20 markets had a DAU/MAU at below 50%. *Id.*

[8] Defendants argue that Noto testified at his deposition that by "mature markets" he meant those

13

United States District Court
Northern District of California

was misleading in light of Defendant's omission of (1) the declining DAU/MAU trend across all top 20 markets, which, as mentioned above, accounted for the vast majority of Twitter's users and revenue, ECF No. 362-15 at 178; (2) the fact that 17 out the top 20 markets had a DAU/MAU of *less* than 50%, *id.*; and (3) the fact that 19 out of the top 20 markets had a DAU/MAU that had fallen over the prior year, ECF No. 362-15 at 80-81.

The second statement that Plaintiffs challenge as misleading is the following:

> In our more mature markets we have very high DAU to MAU, 50% plus, and in emerging markets we have very low DAU to MAU at 20% range. *They all migrate up to a higher rate over time.*

ECF No. 371-18 at 9. Plaintiffs contend that "they all migrate up to a higher rate over time" was misleading because the Q4 2014 earnings binder shows that, over the prior four quarters, the DAU/MAU had fallen in 19 of Twitter's top 20 markets and it declined from 42% to 38% for the "Rest of the World" collectively. ECF No. 362-15 at 80-81. Further, the DAU/MAU for emerging markets had declined throughout 2014. ECF No. 363-9 at 6.

The Court concludes that Plaintiffs have shown that a genuine dispute exists with respect to whether the challenged statement is misleading. As Plaintiffs point out, the Q4 2014 earnings binder shows various declining trends that contradict the positive trend conveyed by the statement "they all migrate up over time." The binder shows a declining trend for DAU/MAU of the top 20 markets collectively, a declining trend for 19 of the top 20 markets individually, and a declining trend for the DAU/MAU for the rest of the world, collectively. ECF No. 362-15 at 80-81. Further, Twitter data shows that DAU/MAU had declined for emerging markets throughout 2014. ECF No. 363-9 at 6. A reasonable jury could conclude that a disclosure of these omitted downward trends would have altered the total mix of information available in the eyes of a reasonable investor, because, as discussed above, Twitter had previously disclosed the existence of a relationship between DAU/MAU and revenue.

Defendants suggest that the "they all migrate up" statement refers exclusively to emerging

---

individual markets that had a DAU/MAU of 50% or more. *See* ECF No. 348-12 at 325-27. This testimony does not alter the conclusion that a genuine dispute exists as to whether the challenged statement was misleading.

markets, and not mature markets, and argue that the statement is accurate because Twitter data shows that emerging markets' DAU/MAU "typically" or "generally" migrated up over time. *See* ECF No. 314-4 at 25. This is insufficient to show that the challenged statement is not misleading as a matter of law. A reasonable jury could interpret the statement in question as referring to the DAU/MAU of mature markets *or* to the DAU/MAU of emerging markets, or *both* (particularly given that the statement expressly referred to "all" markets). Defendants have not even tried to show how or why "they all migrate up" would not be misleading to the extent that a reasonable investor interpreted it as referring to the DAU/MAU of more mature markets, which, as noted above, were overwhelmingly migrating down, not up. Further, with respect to emerging markets, Defendants state only that emerging markets "generally" migrate up over time, but Defendants do not explain how this notion squares with the downward trends discussed above for markets outside of the top 20.

The third statement that Plaintiffs challenge as misleading is one that Costolo made after disclosing that the number net MAUs for Q4 2014 was 4 million, which was lower than expected:

> Importantly, I want to highlight that the user numbers we saw in January of this year indicate that *our MAU trend has already turned around*, and our Q1 trend is likely to be back in the range of absolute net adds that we saw during the first three quarters of 2014.

ECF No. 371-18 at 5 (emphasis added).

Plaintiffs argue that "our MAU trend has already turned around" suggested a positive trend in MAU growth and was misleading because Defendants omitted the declining DAU/MAU trends discussed above.

The Court agrees. Because it was made after disclosing lower-than-expected MAU growth for Q4 2014, a reasonable jury could conclude that the challenged statement suggested a recovery from disappointing MAU growth in Q4 2014 and an upward trend in MAU growth. A reasonable jury could further conclude that Defendants' omission of the declining DAU/MAU trends discussed above, which cut against the notion of positive MAU growth, rendered the challenged statement misleading, because the disclosure of the omitted declining DAU/MAU trends would have altered the total mix of available information in the eyes of a reasonable investor.

15

United States District Court
Northern District of California

Twitter has publicly stated that its success and financial performance depend, at least in part, on the size and engagement of its user base. *See, e.g.*, ECF No. 370-5 at 26 (Twitter's November 4, 2013, Amended Form S-1 Registration Statement stating that "[t]he size of our user base and our users' level of engagement are critical to our success" and "[o]ur financial performance has been and will continue to be significantly determined by our success in growing the number of users and increasing their overall level of engagement on our platform as well as the number of ad engagements"). User growth depends in part on user engagement, because users who are more engaged are less likely to "churn" (i.e., stop using the platform). *See* ECF No. 362-6 at 4, 10 (Akash Garg, a senior member of Twitter's growth team, testifying during his deposition that more engaged users are less likely to churn and that daily active use "is certainly a prerequisite for healthy MAU growth"); ECF No. 413-21 at 2 (email from Costolo to Twitter's board stating that "[w]e simply won't be able to grow the business at the pace we'd like if we don't start adding more healthy users to the platform who use us on a more regular basis in the way our healthiest core users do, almost daily"). Market participants wrote about the existence of a relationship between user engagement, user growth, and Twitter's performance. *See, e.g.*, ECF No. 372-4 at 5 (analyst report stating that "retaining and engaging existing users is also extremely important to Twitter's future growth"); ECF No. 437-1 at 31-33. Based on the foregoing, a reasonable jury could conclude that declining trends in user engagement, as shown by DAU/MAU, which Noto touted as the "best way to quantify the impact of engagement," ECF No. 371-2 at 94, would have been material to a reasonable investor, because such declining trends suggested that Twitter's future user growth and financial performance would stall or decline.

Defendants argue that the challenged statement was not misleading because the MAU numbers that Defendants reported during the February 5 earnings call were accurate. *See* ECF No. 314-4 at 20-21. This argument is unavailing because Plaintiffs are not challenging the accuracy of the MAU numbers reported; instead, they challenge the phrase "our MAU trend has already turned around." As discussed above, a reasonable jury could find that, based on the context in which it was made, the challenged statement conveyed a positive MAU trend, and that, in order to avoid misleading investors, Defendants were required to disclose the declining DAU/MAU trends

16

discussed above, which cut against the implied positive MAU trend. *See Schueneman*, 840 F.3d 698 at 705-706 ("'[O]nce defendants cho[o]se to tout' positive information to the market, 'they [were] bound to do so in a manner that wouldn't mislead investors,' including disclosing adverse information that cut[] against the positive information."). Further, even if the MAU numbers reported on February 5 were accurate, as Defendants contend, that would not preclude a finding that a statement containing or surrounded by the accurate MAU numbers was misleading. *In re Convergent*, 948 F.2d at 512 ("Some statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors. For that reason, the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers.").

Defendants next argue that Plaintiffs cannot show that the challenged statement suggested a positive trend in MAU growth, because Twitter had disclosed a declining trend in MAU growth in its Form 10-K for fiscal year 2014, and because some analysts reported that Twitter's MAU growth was declining. *See* ECF No. 354-1 at 8 (10-K); ECF No. 344-5 (BMO report); ECF No. 344-6 (Wunderlich report); ECF No. 344-7 (Stifel report). This argument is not persuasive because it fails to acknowledge that Noto uttered the challenged statement after discussing lower-than-expected MAU growth for Q4 2014; based on that context, the phrase "turned around" could be reasonably interpreted as suggesting a *positive* MAU trend.[9] Further, at least some analysts interpreted the challenged statement as "suggest[ing] that MAU will grow" over the next quarter. *See* ECF No. 371-23 at 2 (FB analyst report dated February 7, 2015, produced by Defendants in litigation).

Defendants next contend that the omission of the declining DAU/MAU trends did not render the challenged statement misleading, because churn was not increasing during the Class

---

[9] This distinguishes the facts here from the facts in the cases upon which Defendants rely to support the proposition that the challenged statement is not actionable. *See, e.g.*, *Reinschmidt v. Zillow, Inc.*, No. C12-2084 RSM, 2014 WL 5343668, at *1 (W.D. Wash. Oct. 20, 2014) (dismissing a Section 10(b) claim because the plaintiff failed to allege any affirmative statement by the defendant that could be interpreted as misleading in light of the defendants' other disclosures); *Abuhamdan v. Blyth, Inc.*, 9 F. Supp. 3d 175, 195-97 (D. Conn. 2014) (same); *McGovney v. Aerohive Networks, Inc.*, 367 F. Supp. 3d 1038, 1055-58 (N.D. Cal. 2019) (same).

17

1   Period.  Defendants argue that, without proof of an actual increase in churn, Plaintiffs' materiality

2   theory falls apart, because declining DAU/MAU would not have rendered MAU growth

3   implausible if the DAU/MAU decline was not accompanied by increased churn.  *See* ECF No.

4   396-4 at 11-12.  This argument misses the point.  Plaintiffs need not show an actual increase in

5   churn in order to show that a genuine dispute for the jury exists with respect to whether the

6   challenged statement was misleading.[10]  Plaintiffs' materiality theory requires only that relevant

7   market participants have understood that there was a relationship between user engagement and

8   Twitter's user growth and financial success.  Plaintiffs have pointed to evidence from which a

9   reasonable jury could conclude that market participants understood this relationship.  *See, e.g.*,

10  ECF No. 370-5 at 26; ECF No. 372-4 at 5; ECF No. 437-1 at 31-33.

11         Finally, Defendants point to the phrase that came after the challenged statement, namely

12  that "our Q1 trend is likely to be back in the range of absolute net adds that we saw during the first

13  three quarters of 2014," and argue that such language is forward-looking and brings the challenged

14  statement within the safe harbor provision of the Private Securities Litigation Reform Act

15  ("PSLRA"), 15 U.S.C. § 78u-5(c)(1)(A)(i).  The Court disagrees.

16         "The PSLRA's safe harbor is designed to protect companies and their officials from suit

17  when optimistic projections of growth in revenues and earnings are not borne out by events.  But

18  the safe harbor is not designed to protect companies and their officials when they knowingly make

19  a materially false or misleading statement about current or past facts.  Nor is the safe harbor

20  designed to protect them when they make a materially false or misleading statement about current

21  or past facts, and combine that statement with a forward-looking statement.*"  In re Quality Sys.,

22  Inc. Sec. Litig.*, 865 F.3d 1130, 1142 (9th Cir. 2017).

23         Here, the aspect of the statement that Defendants challenge is the statement that "our MAU

24  trend has already turned around," which is not forward-looking.  Defendants have not cited any

25  authority showing that language similar to "has already turned around" has been interpreted as

26

27  ───────────────

    [10] Plaintiffs have nevertheless pointed to evidence showing that the churn rate increased during the
    relevant time period.  *See, e.g.*, ECF No. 367-17 at 27 (showing that churn rate increased from
28  .77% to .80% from January to July 2015).

United States District Court
Northern District of California

forward-looking by any court.  Further, the fact that "has already turned around" was followed by a forecast of future growth does not convert the challenged statement into a forward-looking statement.  *See id.* at 1141 ("We hold that a defendant may not transform non-forward-looking statements into forward-looking statements that are protected by the safe harbor provisions of the PSLRA by combining non-forward-looking statements about past or current facts with forward-looking statements about projected revenues and earnings.").

In sum, a genuine dispute exists with respect to whether three statements made by Defendants during the February 5, 2015, earnings call were misleading.

### b.    April 28, 2015, challenged statement

During an earnings call for Q1 2015 held on April 28, 2015, Noto stated in response to a question about engagement:

> In terms of engagement metrics, there's a lot of different metrics that we look at internally.  There's not one metric for engagement.  And so I can give you a sense of some of them and quite frankly, we would like to be able to give you more visibility on this, but there's just a number of different measurements.  DAU is one measurement of engagement.  We talked about that at Analyst Day.  It's a measurement that is dependent by market and you could have a mix shift so that could be a little bit misleading, but *DAU to MAU ratios in the quarter were similar to what they were by market relative to Analyst Day*.

ECF No. 371-28 at 20 (emphasis added).

Plaintiffs argue that the statement "DAU to MAU ratios in the quarter were similar to what they were by market relative to Analyst Day" is misleading because, according to the earnings binder for Q1 2015, the DAU/MAU for the top 20 markets had fallen to 44.3%, from 48% at Analyst Day, and "continue[d] to go down at a linear pace."  ECF No. 362-38 at 139.  Plaintiffs also note that, from Q3 2014 through Q1 2015, DAU/MAU had fallen in 15 of Twitter's top 20 markets, including all of its top 5 markets.  *Id.* at 69-79.

Defendants do not dispute that the DAU/MAU ratios just described declined since Analyst Day.  Defendants argue, however, that Noto's use of the word "similar" in the challenged statement was not misleading as a matter of law because any declines in DAU/MAU since Analyst

19

Day were not significant.[11]  *See* ECF No. 314-4 at 25-26.

The Court concludes that a genuine dispute exists with respect to whether the challenged statement was misleading.  Plaintiffs argue, and Defendants do not dispute, that the only DAU/MAU ratio reported at Analyst Day was the one for the top 20 markets, collectively, which was 48% at that time.  As a result, a reasonable jury could conclude that Noto's April 28 comparison of DAU/MAU relative to Analyst Day necessarily referred to the DAU/MAU of the top 20 markets.  A reasonable jury could further conclude that, in the eyes of a reasonable investor, the DAU/MAU as of April 28 was not "similar" to the 48% DAU/MAU reported at Analyst Day, and that the disclosure of the omitted DAU/MAU for the top 20 markets of 44.3% would have altered the total mix of information available.  This is so because, per Defendants' own statements at Analyst Day, an increase in the DAU/MAU ratio from 48% to 51% (an increase of 3%) could generate an additional $500 million in annual revenue.  ECF No. 371-2 at 94.  In light of that disclosed relationship between DAU/MAU and revenue, a jury could conclude that a reasonable investor would consider a decline of 3.7% in the DAU/MAU ratio to be significant.

### 2.  Scienter

"To establish liability under § 10(b) and Rule 10b–5, a private plaintiff must prove that the defendant acted with scienter[.]"  *Matrixx Initiatives*, 563 U.S. at 48 (citation and internal quotation marks omitted).  Scienter is "a mental state that not only covers "intent to deceive, manipulate, or defraud," but also "deliberate recklessness[.]"  *Schueneman*, 840 F.3d at 705 (internal citations omitted).  "[D]eliberate recklessness is an extreme departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."  *Id.* (citation and internal quotation marks omitted).  "Scienter can be established by direct or circumstantial evidence."  *Provenz v. Miller*, 102 F.3d 1478, 1490 (9th Cir. 1996) (citation omitted).

---

[11] The authorities upon which Defendants rely for the proposition that the DAU/MAU declines were not significant enough to be actionable are inapposite.  In none of the cited cases did the plaintiff challenge, like Plaintiffs do here, a statement by the defendant indicating that the current level of a particular metric was similar to a level previously disclosed by the defendant.

United States District Court
Northern District of California

"Generally, scienter should not be resolved by summary judgment." *Id.* at 1489-90.

> Cases where intent is a primary issue generally are inappropriate for summary judgment unless all reasonable inferences that could be drawn from the evidence defeat the plaintiff's claim. . . . However, in opposing a motion for summary judgment the plaintiff must present significant probative evidence relevant to the issue of intent, e.g. the time, place or nature of the alleged fraudulent activities; mere conclusory allegations are insufficient to require the motion for summary judgment be denied.

*Id.* (citation and internal quotation marks omitted). "Thus, summary judgment on the scienter issue is appropriate *only* where there is no rational basis in the record for concluding that any of the challenged statements was made with requisite scienter." *Id.* at 1490 (citation and internal quotation marks omitted) (emphasis in the original).

Plaintiffs contend that a genuine dispute exists with respect to whether Defendants acted with scienter when making each of the challenged statements. Plaintiffs point to evidence showing that Defendants were aware of the declining DAU/MAU trends discussed above and that such trends would have been material to investors.

The Court concludes that a genuine dispute exists as to whether Defendants acted with scienter in making the challenged statements.[12] As discussed above, Defendants failed to disclose declining trends in DAU/MAU when making the challenged statements. Plaintiffs have pointed to sufficient evidence based on which a reasonable jury could conclude that Defendants were aware of such declining DAU/MAU trends. *See, e.g.*, ECF Nos. 362-15 and 362-38 (earnings binders for Q4 2014 and Q1 2015, which were disseminated to Noto and top executives before earnings calls and contained detailed information about DAU/MAU); ECF No. 362-23 (email stating that metrics dashboard for Noto would include DAU/MAU); ECF No. 363-19 (email stating that CFO dashboard would be updated daily); ECF No. 362-24 (email to Noto and others attaching detailed user metrics slides); ECF No. 363-20 (email stating that weekly meetings to discuss user retention

---

[12] Because a genuine dispute exists as to whether Costolo and Noto acted with scienter, the same is true as to Twitter. *See In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 476 (9th Cir. 2015) ("The scienter of the senior controlling officers of a corporation may be attributed to the corporation itself to establish liability as a primary violator of § 10(b) and Rule 10b–5 when those senior officials were acting within the scope of their apparent authority.").

1    and related metrics, which included DAU/MAU, would be held); ECF No. 363-21 (email to Noto

2    and others containing "Monthly Metrics Review" for Q1 2015, including DAU/MAU trends); *see

3    also Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir.

4    2004) ("The most direct way to show both that a statement was false when made and that the party

5    making the statement knew that it was false is via contemporaneous reports or data, available to

6    the party, which contradict the statement.").

7          Additionally, Plaintiffs have pointed to evidence from which a reasonable jury could

8    conclude that Defendants should have known that the omitted DAU/MAU information would

9    have been material to investors.  Per Defendants' own statements at Analyst Day, the market was

10   aware that an increase in the DAU/MAU ratio from 48% to 51% (an increase of 3%) could

11   generate an additional $500 million in annual revenue.  ECF No. 371-2 at 94.  In light of that

12   disclosure, and Defendants' awareness of the DAU/MAU declining trends, a reasonable jury could

13   conclude that Defendants should have known that the market would attach significance to the

14   omitted DAU/MAU information, and that the danger of misleading investors by omitting such

15   information from the challenged statements was "obvious."  *See S.E.C. v. Platforms Wireless Int'l

16   Corp.*, 617 F.3d 1072, 1094 (9th Cir. 2010) ("When the defendant is aware of the facts that made

17   the statement misleading, he cannot ignore the facts and plead ignorance of the risk.") (citation

18   and internal quotation marks omitted).

19         Defendants argue that Plaintiffs have not pointed to evidence showing that they intended to

20   mislead investors.  This argument is unavailing, because deliberative recklessness is sufficient to

21   find scienter.  Based on the evidence discussed above, a reasonable jury could conclude that

22   Defendants were, at the very least, deliberatively reckless in failing to disclose the declining

23   DAU/MAU trends, and thus acted with the requisite scienter.

24         Defendants next argue that their failure to disclose DAU/MAU information was justified

25   because Twitter was not ready to disclose it.  As support, Defendants point to evidence of internal

26   debate at Twitter about which user metrics to disclose after Twitter stopped disclosing Timeline

27   Views, as well as "quality control" issues with respect to DAU.  *See* ECF No. 314-4 at 27-28; ECF

28   No. 396-4 at 15.  This argument is unpersuasive because it ignores that Defendants *did* disclose

United States District Court
Northern District of California

specific DAU/MAU data at Analyst Day, as discussed above. *See, e.g.*, ECF No. 371-2 at 91 (Noto states at Analyst Day that the "year-to-date DAU to MAU ratio for our top 20 markets" is 48%). In light of the Analyst Day disclosure, a reasonable jury could find that Defendants' omission of DAU/MAU information on February 5 and April 28 was not justified on the basis that Twitter was not ready to disclose that kind of data.

Defendants also attempt to justify their failure to disclose DAU/MAU data on the ground that disclosing it would have been inconsistent with Twitter's "total audience" strategy, which aimed to increase Twitter's "reach," as opposed to user engagement (or "frequency").[13] *See* ECF No. 314-4 at 26-27. Plaintiffs have pointed to evidence that contradicts this argument. At Analyst Day, Defendants repeatedly mentioned their goal of building the largest "daily audience" and the need to grow their base of "healthy" users who were more engaged and used Twitter more frequently. ECF No. 371-2 at 5, 20. Further, Noto described DAU/MAU as a "major growth driver" of revenue, ECF No. 371-2 at 91, and as a "frequency" metric and the "best way to quantify the impact of engagement," *id.* at 94. Noto also disclosed DAU/MAU at Analyst Day (48%). *Id.* Based on this evidence, a reasonable jury could conclude that the disclosure of DAU/MAU, a "frequency" metric, would not have been inconsistent with Twitter's corporate strategies.

Defendants also argue that they did not believe the challenge statements to be misleading. But that self-serving assertion is unavailing. As the Ninth Circuit has noted, "[i]f such a self-serving assertion could be viewed as controlling, there would never be a successful prosecution or claim for fraud." *S.E.C. v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1095 (9th Cir. 2010). As discussed above, there is sufficient evidence for a jury to conclude that Defendants acted with scienter.

---

[13] In that vein, Defendants also argue that Twitter's goal was for "DAU/MAU to decline" and not increase. ECF No. 396-4 at 16. The relevance of this argument is unclear. In any event, the record contradicts Defendants' assertion; it shows that Twitter experienced a declining trend in DAU/MAU and its goal was to flatten (i.e., slow or stop) the DAU/MAU decline and to increase both DAU and MAU. *See, e.g.*, ECF No. 356-12 at 3, 6 (presentation titled "Audience Goals 2015" stating that goals were to increase DAU and MAU year-over-year and to "target[] flat DAU/MAU," which was the best-case scenario for DAU/MAU in light of its declining trends).

Defendants next argue that their actions are inconsistent with scienter because they disclosed "bad news" with respect to other metrics, such as decreases in ad engagements, and because Twitter has acted in an "honest and candid manner" with respect to its required S-1 disclosures and in communications with the SEC. [14]  ECF No. No. 314-4 at 28.  These arguments ignore the evidence discussed above, which supports a finding of scienter.  It is for the jury to weigh that evidence against the evidence to which Defendants now point, which is, at best, tangential to the challenged statements and issues in this litigation

Finally, Defendants argue that Costolo and Noto's lack of sales of Twitter stock during the Class Period is inconsistent with scienter.  But the absence of stock sales by Costolo and Noto is insufficient to show a lack of scienter as a matter of law.  *See No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003) ("Scienter can be established even if the officers who made the misleading statements did not sell stock during the class period. . . . In other words, the lack of stock sales by a defendant is not dispositive as to scienter.").

### 3.    Loss causation

The Securities Exchange Act of 1934 defines "loss causation" "as the plaintiff's 'burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages.'"  *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018), *cert. denied*, 139 S. Ct. 2741, 204 L. Ed. 2d 1131 (2019) (quoting 15 U.S.C. § 78u-4(b)(4)).  "This inquiry requires no more than the familiar test for proximate cause.  To prove loss causation, plaintiffs need only show a causal connection between the fraud and the loss, by tracing the loss back to the very facts about which the defendant lied[.] Disclosure of the fraud is not a sine qua non of loss causation, which may be shown even where the alleged fraud is not necessarily revealed prior to the economic loss."  *Id.* (internal citations and

---

[14] The fact that the SEC failed to take any adverse action with respect to Twitter's written disclosures has no bearing on the question of whether the challenged statements here were misleading.  *See* 15 U.S.C. § 78z (providing that action or inaction by the SEC shall not be "deemed a finding by such authority that [a] statement or report is true and accurate on its face or that it is not false or misleading").

quotation marks omitted).  "[L]oss causation is a 'context-dependent' inquiry as there are an 'infinite variety' of ways for a tort to cause a loss."  *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016).  "Because loss causation is simply a variant of proximate cause, the ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss."  *Id.*

"A plaintiff is not required to show that a misrepresentation was the sole reason for the investment's decline in value in order to establish loss causation."  *In re Daou Sys., Inc.*, 411 F.3d 1006, 1025 (9th Cir. 2005) (citation and internal quotation marks omitted).  "[A]s long as the misrepresentation is one substantial cause of the investment's decline in value, other contributing forces will not bar recovery under the loss causation requirement but will play a role in determining recoverable damages."  *Id.* (citation and internal quotation marks omitted).

Here, the parties do not dispute that two sets of declines of Twitter's stock price occurred; the first on April 28 and April 29, 2015, and the second from July 29 through August 3, 2015.

The parties disagree that a genuine dispute exists as to whether the declines have a causal link to the challenged statements.  The Court addresses each set of declines, in turn.

### a.      April 28 and April 29 declines

On April 28, 2015, Twitter made disclosures with respect to its performance in Q1 2015.  It disclosed that its MAU was 302 million, up from 288 million in the previous quarter.  ECF No. 371-27 at 3.  Twitter also revealed that it would be reducing its revenue guidance for the rest of FY2015.  *Id.* at 4.  During an earnings call on April 28, Defendants stated that, although Twitter had met its MAU projections for 1Q 2015, there were some "headwinds" and Twitter's "visibility is actually limited as it relates to Q2 MAU," MAU is off to a "slow start" and "the trend [in MAU growth] is not similar to Q1."  ECF No. 371-28 at 12.

Plaintiffs contend that a genuine dispute exists with respect to whether the declines of Twitter's stock price on April 28, 2015, and April 29, 2015, were caused by partial revelations on April 28 of the problems with user growth that the challenged statements had concealed.  Plaintiffs argue that the challenged statements, which are discussed in more detail above, concealed problems with user engagement and user growth, and that the April 28 disclosures regarding

25

revised FY 2015 revenue guidance and poor MAU visibility constituted a partial disclosure of such problems, which, in turn, caused the price of Twitter stock to decline. The April 28 disclosures partially revealed problems with respect to user growth by announcing that there were some "headwinds" with respect to MAU. That said, Defendants' statement on April 28 that DAU/MAU was "similar" to what it was on Analyst Day served to keep concealed problems with user engagement, as well as the potential impact that such problems could have on user growth and revenue.

Plaintiffs contend that the analysis conducted by their expert, Dr. Steven Feinstein, shows that $8.97 of the decline on April 28 and all $3.96 of the decline on April 29 were caused by the April 28 disclosures regarding reduced MAU visibility and reduced revenue guidance, because such disclosures dissipated some of the price inflation that had been created by the challenged statements. *See, e.g.*, ECF No. 352-10 ¶¶ 8-12, 120-137, 140-141. Plaintiffs also point to analyst reports published after the April 28 disclosures, in which analysts stated that they had reduced their revenue estimates for Twitter because of concerns about weaker engagement, lack disclosure of engagement metrics, and audience growth issues. *See, e.g.*, ECF No. 372-9 at 2 (Morgan Stanley report dated April 29, 2015, stating that "[w]e are cutting our revenue estimates by 6% for the full year [2015] on lower user and weaker engagement assumptions"); ECF No. 372-10 (Rosenblatt report dated April 29, 2015, stating that "[u]ser growth lackluster at best in the near term" and "[l]ack of 'usage' metrics (TLVs discontinued) suggests audience growth issues" as "key reasons for our rating downgrade on the stock"). Plaintiffs further point to internal Twitter documents showing that Twitter's revenue estimates for FY2015 were based in part on metrics such as DAU/MAU. *See, e.g.*, ECF No. 363-26 at 2 (email written by Jeff Dejelo stating FY2015 revenue guidance and noting that the "bottom-end of the range" is based on the "metrics driven model" and further noting that one reason for that estimate is that "DAU growth is relatively flat consistent with historicals"); ECF No. 363-27 at 26-27 (identifying MAU and DAU/MAU as inputs to the "Revenue Metrics Model" and "DAU/MAU declining" as one of the "Key Risks" with respect to FY2015 revenue); ECF No. 371-25 at 9 (Jeff Dejelo deposition testimony

confirming that DAU/MAU was a factor in calculating revenue for FY2015 based on revenue metrics model).[15]

The Court concludes that there is a genuine dispute with respect to whether a causal connection exists between the Twitter stock-price declines of April 28 and 29 and the challenged statements of February 5 and April 28, which are discussed at length in the previous section. Based on Dr. Feinstein's analysis and opinions, and the other evidence cited above, a reasonable jury could conclude (1) that the April 28 disclosures about MAU growth and revenue guidance constituted partially corrective disclosures that revealed, to some extent, problems with user growth that the challenged statements of February 5 and April 28 had concealed, and (2) that market participants reacted accordingly based on market perception of a connection between user growth, user engagement, and revenue. Based on this evidence, a reasonable jury could conclude that the stock declines of April 28 and 29 were proximately caused by the challenged statements of February 5 and April 28.

Defendants have not shown that the issue of loss causation can be resolved as a matter of law with respect to the stock declines of April 28 and April 29. Defendants argue that Dr. Feinstein's opinions are unreliable and therefore are insufficient to preclude the entry of summary judgment because Dr. Feinstein failed to explain his methodology, failed to consider confounding variables, and assumed causal connections.[16] The Court concluded in a separate order, however, that Dr. Feinstein's opinions are not subject to exclusion based on these arguments. *See* ECF No. 421. Further, Dr. Feinstein did consider confounding factors and excluded the impact of factors unrelated to the challenged statements from his stock-price decline estimates.[17] *See, e.g.*, ECF

---

[15] Defendants point to other portions of Dejelo's deposition testimony where Dejelo testified that he did not recall using DAU/MAU to estimate revenue. ECF No. 396-4 at 22. Defendants do not dispute, however, that the portions of Dejelo's deposition testimony cited by Plaintiffs show that Dejelo admitted that DAU/MAU was a factor in calculating revenue based on the metrics model.

[16] Defendants make the same arguments with respect to Dr. Feinstein's opinion that the Twitter stock-price declines from July 29 to August 3 were caused by the challenged statements. The Court rejects those arguments for the same reasons stated in this paragraph.

[17] Defendants argue that Dr. Feinstein was incorrect in attributing $2.54 of the decline on April 28 to Defendants' alleged fraud. ECF No. 314-4 at 34. The question of how much of the decline can be attributed to the challenged statements, as opposed to other factors, is a factual question for the jury. *See In re Daou Sys., Inc.*, 411 F.3d at 1025 ("[A]s long as the misrepresentation is one

No. 352-10 ¶¶ 120-137.  It is for the jury to weigh Dr. Feinstein's opinions.

Defendants next argue that the revised revenue guidance[18] was caused by matters unrelated to problems with user growth and user engagement, such as issues relating to advertising revenue, and for that reason, Plaintiffs cannot establish a causal connection between the challenged statements and the stock-price declines of April 28 and 29.  ECF No. 314-4 at 32-33.  To survive summary judgement, however, Plaintiffs need only point to evidence supporting a reasonable finding that the challenged statements were *one* substantial cause for the stock-price declines.  *In re Daou Sys., Inc.*, 411 F.3d at 1025 ( "[A]s long as the misrepresentation is one substantial cause of the investment's decline in value, other contributing forces will not bar recovery under the loss causation requirement but will play a role in determining recoverable damages.") (citation and internal quotation marks omitted).  Plaintiffs have done that by pointing to the evidence discussed above.

### b.    July 29 through August 3 declines

On July 28, 2015, Twitter issued results for Q2 2015 and held an earnings call.  ECF No. 272-15.  During that call, Noto revealed that Twitter's DAU/MAU ratio for the top 20 markets had fallen to 44% from the 48% reported at Analyst Day, and that Twitter did "not expect to see sustained meaningful growth in MAUs" for "a considerable period of time."  ECF No. 371-32 at 7.

The Court concludes that Plaintiffs have shown that a genuine dispute exists as to whether the declines of Twitter's stock price from July 29 to August 3, 2015, were caused by the challenged statements.  Plaintiff point to the testimony of Dr. Feinstein, who concluded that Twitter's stock suffered a company-specific decline of $5.40 per share on July 29 and a decline of $7.41 from July 29 to August 3, 2015.  *See, e.g.*, ECF No. 352-10 ¶¶ 8-12, 142-151.  Dr. Feinstein

---

substantial cause of the investment's decline in value, other contributing forces will not bar recovery under the loss causation requirement but will play a role in determining recoverable damages.").

[18] Defendants argue, in passing, that Plaintiffs' theory of loss causation with respect to the April 28 disclosures was not alleged in the operative complaint.  The Court disagrees.  The operative complaint expressly refers to the revised revenue guidance for FY 2015 as one of the disclosures that caused the price of Twitter stock to decline.  *See, e.g.*, ECF No. 81 ¶¶ 135-36.

1  further concluded that a causal connection exists between these declines and the challenged

2  statements, because the July 28 disclosures revealed problems with user engagement and user

3  growth that the challenged statements had concealed. *Id.* Plaintiffs also point to analyst reports

4  stating that the problems with user engagement and user growth revealed on July 28 affected their

5  evaluation of Twitter as an investment. *See, e.g.*, ECF No. 371-33 at 2, 4 (RBC Capital Markets

6  Report of July 29, 2015, stating that "[u]ser growth is vanishing and engagement is declining" and

7  that "the takeaway here appears to be that both [u]ser growth AND [e]ngagement have hit walls");

8  ECF No. 372-16 at 2 (SunTrust report of July 29, 2015, stating that "Users, Daily Engagement,

9  and Ad Demand Disappoint"); *see also* ECF No. 437-1 at 102-05.

10         Defendants argue that Plaintiffs cannot establish loss causation because the corrective

11  disclosures on July 28 were the materialization of a previously-disclosed risk, namely the

12  disclosure on April 28 that Twitter was experiencing MAU "headwinds," that the company was

13  "off to a slow start in April," and that visibility as to MAU is "limited." ECF No. 314-4 at 33-34.

14  This argument is unpersuasive because it does not take into account that the July 28 disclosures

15  revealed, for the first time, a decline in DAU/MAU; DAU/MAU declines were not disclosed on

16  April 28. As discussed above, Plaintiffs have pointed to sufficient evidence for a reasonable jury

17  to conclude that the declining trend in DAU/MAU, as well as the impact that that declining trend

18  could have on user growth and revenue, were concealed by the challenged statements of February

19  5 and April 28. Accordingly, a genuine dispute exists as to whether the declines following the

20  July 28 disclosures were caused by the disclosure of the DAU/MAU declining trends and the

21  potential impact of such trends on user growth and revenue that the challenged statements had

22  concealed.[19] *See Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 500 (S.D.N.Y. 2018)

23

24  _____

[19] This distinguishes the facts here from those in the cases upon which Defendants rely for the
proposition that they are entitled to summary judgment on the issue of loss causation. *See, e.g.*,
25  *Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, Cal., 730 F.3d 1111, 1121 (9th
Cir. 2013) (affirming summary judgment in favor of defendant on § 10(b) claim because plaintiff
26  failed to establish any link between loss and the alleged fraud); *Nguyen*, 297 F. Supp. at 491
(dismissing securities fraud claim because plaintiff failed to allege sufficient facts to suggest that
27  defendants had concealed a risk of loss); *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1409 (9th Cir.
1996) (dismissing securities fraud claim because plaintiffs' own allegations conceded that losses
28  could have been caused by factors other than the alleged fraud).

United States District Court
Northern District of California

1  ("[W]here the alleged misstatement conceals a condition or event which then occurs and causes

2  the plaintiff's loss, a plaintiff may plead that it is the materialization of the undisclosed condition

3  or event that causes the loss.").

4       Defendants next argue that Plaintiffs cannot claim any damages for stock-price declines

5  after July 29 because Twitter did not make any new disclosures after July 28.  ECF No. 314-4 at

6  34.  However, the question of which losses can be attributed to the July 28 disclosures is a "fact-

7  specific inquiry" for the jury.  *See No. 84 Employer-Teamster*, 320 F.3d at 934 (holding that there

8  is no "bright-line rule assuming that the stock price will instantly react" to corrective disclosures

9  and noting that such a determination is "fact-specific").

10       **B.**    **Section 20(a) claim**

11       "Section 20(a) of the Securities Exchange Act of 1934 provides for liability of a

12  'controlling person.'"  *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1052 (9th Cir. 2014)

13  (quoting 15 U.S.C. § 78t(a)).  "To establish a cause of action under this provision, a plaintiff must

14  first prove a primary violation of underlying federal securities laws, such as Section 10(b) or Rule

15  10b–5, and then show that the defendant exercised actual power over the primary violator."  *Id.*

16  (citation omitted).

17       Defendants argue that Plaintiffs' claim under § 20(a) fails because it is "entirely derivative

18  of their 10(b) and 10b5 claims."  ECF No. 314-4 at 29 n.23.

19       Because the Court has concluded that Defendants have not shown that they are entitled to

20  summary judgment with respect to the § 10(b) claim, Defendants' summary judgment motion with

21  respect to the § 20(a) claim likewise fails.

22  **VII.**   **CONCLUSION**

23       For the reasons stated above, the Court denies Defendants' motion for summary judgment.

24  Within seven days of the date this order is filed, any party may move to seal any portion of this

25  order by filing an administrative motion to seal that complies with applicable local rules and this

26  Court's standing orders.  The moving party must identify with specificity (by page number and

27  line number) the portions of the order it seeks to seal, and it must demonstrate compelling reasons

28  for sealing each portion.  *See Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1179 (9th Cir.

United States District Court
Northern District of California

2006) (holding that "compelling reasons" standard applies to judicial records related to a dispositive motion even if the motion or its attachments were previously filed under seal).

     **IT IS SO ORDERED.**

Dated:  April 17, 2020



                              JON S. TIGAR
                        United States District Judge

United States District Court
Northern District of California