1
**COTCHETT, PITRE & MCCARTHY, LLP**
Joseph W. Cotchett (SBN 36324)
2
*jcotchett@cpmlegal.com*
Mark C. Molumphy (SBN 168009)
3
*mmolumphy@cpmlegal.com*
Anne Marie Murphy (SBN 202540)
4
*ammurphy@cpmlegal.com*
Tyson C. Redenbarger (SBN 294424)
5
*tredenbarger@cpmlegal.com*
Julia Q. Peng (SBN 318396)
6
*jpeng@cpmlegal.com*
San Francisco Airport Office Center
7
840 Malcolm Road, Suite 200
Burlingame, California 94010
8
Telephone:   (650) 697-6000

9
**BOTTINI & BOTTINI, INC.**
Francis A. Bottini, Jr. (SBN: 175783)
10
*fbottini@bottinilaw.com*
Anne B. Beste (SBN 326881)
11
*abeste@bottinilaw.com*
Albert Y. Chang (SBN 296065)
12
*achang@bottinilaw.com*
Yury A. Kolesnikov (SBN 271173)
13
*ykolesnikov@bottinilaw.com*
Nicholas H. Woltering (SBN 337193)
14
nwoltering@bottinilaw.com
7817 Ivanhoe Avenue, Suite 102
15
La Jolla, California  92037
Telephone:   (858) 914-2001
16

17
*Counsel for Plaintiff*

18
**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**
19

| 20 | **WILLIAM HERESNIAK**, on behalf of himself and all others similarly situated, | Case No.:  **3:22-CV-03074** |
|---|---|---|
| 21 | | |
| 22 | Plaintiff, | <u>**Class Action**</u> |
| 23 | vs. | **FIRST AMENDED COMPLAINT FOR:** |
| 24 | **ELON R. MUSK, X HOLDINGS I, INC., X HOLDING II, INC., and TWITTER, INC.**, | **(1) AIDING AND ABETTING BREACH OF FIDUCIARY DUTY;** |
| 25 | | **(2) DECLARATORY AND INJUNCTIVE RELIEF; AND** |
| 26 | Defendants, | **(3) UNJUST ENRICHMENT** |
| 27 | | <u>DEMAND FOR JURY TRIAL</u> |
| 28 | | |

Class Action Complaint for Aiding and Abetting Breach of Fiduciary Duty, Declaratory and Injunctive Relief, and Unjust Enrichment

**TABLE OF CONTENTS**

I.      INTRODUCTION AND SUMMARY OF THE ACTION .................................................. 1

II.     JURISDICTION AND VENUE ............................................................................................ 8

III.    INTRADISTRICT ASSIGNMENT .................................................................................... 9

IV.     THE PARTIES ...................................................................................................................... 9

V.      CLASS ACTION ALLEGATIONS .................................................................................. 10

VI.     SUBSTANTIVE ALLEGATIONS ................................................................................... 11

        A.      BACKGROUND OF THE MUSK BUYOUT OF TWITTER ................................................. 11

        B.      MUSK'S FAILURES TO TIMELY DISCLOSE HIS 9+% STAKE IN TWITTER AND TO
                DISCLOSE HE HAD BEEN INVITED TO JOIN THE TWITTER BOARD ARE CONTRARY TO
                THE LAW ................................................................................................................. 15

                1.      Musk's Failure to Timely Disclose His 9+% Stake in Twitter ...................... 15

                2.      Musk's Failure to Disclose He Had Been Invited to Join the Twitter
                        Board ...................................................................................................... 16

        C.      AFTER UNEXPECTEDLY ANNOUNCING HE WOULD NOT JOIN ITS BOARD, MUSK
                DISCLOSES AN INTENT TO BUY TWITTER, AND THREATENS TO GO HOSTILE THROUGH
                A TENDER OFFER IF TWITTER'S BOARD DOES NOT ACQUIESCE .................................. 21

        D.      MUSK FINANCES THE PROPOSED BUYOUT IN PART BY PLEDGING BILLIONS OF
                DOLLARS OF HIS TESLA STOCK AS COLLATERAL FOR A LOAN FROM MORGAN
                STANLEY, BUT THE PROXY FAILS TO DISCLOSE THE FULL RISKS OF SUCH LOANS ..... 25

        E.      AS TESLA'S STOCK PLUNGES IN THE 30 DAYS AFTER ANNOUNCEMENT OF THE
                BUYOUT, THREATENING A MARGIN CALL AND A FORCED SALE OF MUSK'S TESLA
                STOCK, MUSK BEGINS TO MAKE FALSE STATEMENTS AND ENGAGE IN MARKET
                MANIPULATION OF TWITTER'S STOCK ..................................................................... 32

                1.      Musk's May 13, 2022 Tweet ....................................................................... 33

                2.      Musk's May 14, 2022 Tweet ....................................................................... 35

                3.      Musk's May 16, 2022 Statement ................................................................. 37

                4.      Musk's May 17, 2022 Tweet ....................................................................... 38

                5.      Musk's May 21, 2022 Tweets ..................................................................... 39

VII.    CAUSES OF ACTION ....................................................................................................... 47

        FIRST CAUSE OF ACTION

        Class Action Claim for Aiding and Abetting Breach of Fiduciary Duty Under
                Delaware Law ............................................................................................ 47

        SECOND CAUSE OF ACTION

        Individual Claim For Declaratory and Injunctive Relief Under California Law ................... 48

        THIRD CAUSE OF ACTION

        Class Action Claim For Unjust Enrichment Under Delaware Law ....................................... 48

VIII.   PRAYER FOR RELIEF ...................................................................................................... 49

IX.     JURY TRIAL DEMAND ................................................................................................... 49

i

Plaintiff alleges the following (a) upon personal knowledge with respect to the matters pertaining to Plaintiff; and (b) upon information and belief with respect to all other matters, based upon, among other things, the investigations undertaken by Plaintiff's counsel. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth below after a reasonable opportunity for discovery.

## I.   INTRODUCTION AND SUMMARY OF THE ACTION

1.      Plaintiff brings this class action on behalf of all stockholders of Twitter, Inc., a San Francisco based company, who have been harmed by the actions of Defendant Elon R. Musk.  Plaintiff asserts claims against Defendant Musk for aiding and abetting breach of fiduciary duty and unjust enrichment, and against Defendant Twitter, Inc. for declaratory, injunctive relief.

2.      Defendant Twitter, Inc., headquartered in San Francisco, operates a social media platform that allows its users to send and receive "tweets."  Defendant Musk is a prolific user of Twitter and one of its most-followed members, with 90 million followers, making Musk's Twitter account the eighth most popular account on Twitter.

3.      On **April 25, 2022**, Twitter, Inc. announced that it had agreed to sell itself to Elon Musk for $54.20 per share, or approximately $44 billion (the "Buyout" or "Proposed Buyout").  Musk negotiated the Twitter Buyout over the weekend of April 23-24, 2022 without carrying out any due diligence.  The Buyout is only conditioned on approval of Twitter's shareholders at a meeting to be scheduled this summer, regulatory approval, and closing of the Buyout by October 24, 2022.  A joint press release contained a quote from Musk promising to "make Twitter better" by "defeating the spam bots."

4.      Before agreeing to buy Twitter for $44 billion, Musk, one of the world's richest individuals valued at $276 billion according to the Bloomberg Billionaires Index, and a sophisticated businessman with a phalanx of lawyers and investment bankers, according to the press, specifically agreed to <u>waive detailed due diligence</u> as a condition of the merger agreement.  At the time, Musk was well aware that Twitter had a certain amount of "fake accounts" and accounts controlled by "bots" and had in fact settled a lawsuit based on the fake accounts for millions of dollars.  Musk had tweeted about that issue at Twitter several times in the past, prior to making his offer to acquire Twitter with full

Complaint for Aiding and Abetting Breach of Fiduciary Duty, Declaratory and Injunctive Relief, and Unjust Enrichment

knowledge of the bots.  Indeed, on April 13, 2022, when he sent a letter to Twitter's Board offering to buy Twitter, he later tweeted that "If our Twitter bid succeeds, we will defeat the spam bots or die trying!"

5.      Musk and his team were also well aware of the ***$809.5 million settlement*** Twitter entered into ***in September 2021,*** in a securities fraud class action alleging Twitter overstated its user numbers and growth rate -- *In re Twitter Inc. Securities Litigation*, 16-cv-05314, U.S. District Court, Northern District of California (San Francisco).  All the documents from that case were publicly available to Musk, including a website (www.twittersecuritieslitigation.com) containing, among other things, the Court's order denying Twitter's motion for summary judgment.  *See* **Exhibit A** (April 17, 2020 Order Denying Motion for Summary Judgment, at p. 16) (holding that Twitter's <u>false statements</u> about its Daily Active Users (DAUs) and Monthly Active Users (MAUs) were material because "Twitter has publicly stated that its success and financial performance depend, at least in part, on the size and engagement of its user base.").

6.      Musk believed he was obtaining Twitter at a sale price, since Twitter's stock price had decreased significantly in the months before he made his offer, declining from $71.69 on July 23, 2021 to just $32.42 on March 7, 2022.  After Musk agreed to buy Twitter for $54.20, the stock market experienced a decline.  The market decline, however, did not affect Twitter's stock price.  After the announcement of the Buyout, stock consistently traded close to the Buyout price, and around $50 per share.  The small delta between its trading price and the $54.20 buyout price was typical of the trading prices of companies who have agreed to be acquired, characterized by a small discount for the time value of money and a relatively small risk that the deal will not go through.

7.      Musk had a unique and multi-billion-dollar problem.  Musk pledged his ***Tesla*** stock as collateral for a $12.5 billion loan to finance the buyout of Twitter, however, ***Tesla's shares declined by over 37%*** after the announcement of the Buyout, as reflected below:

Complaint for Aiding and Abetting Breach of Fiduciary Duty, Declaratory and Injunctive Relief, and Unjust Enrichment



8.      Because Tesla's stock was worth much less than when Musk agreed to buy Twitter, Musk was at risk of a margin call or a requirement to put up more cash. Musk quickly acted to attempt to mitigate these personal risks to himself by engaging in unlawful conduct that moved the price of Twitter's stock down. Musk proceeded to make statements, send tweets, and engage in conduct designed to create doubt about the deal and drive Twitter's stock down substantially in order to create leverage that Musk hoped to use to either back out of the purchase or re-negotiate the buyout price by as much as 25% which, if accomplished, would result in an $11 billion reduction in the Buyout consideration. As detailed herein, Musk's conduct was and continues to be illegal, in violation of the California Corporations Code, and contrary to the contractual terms he agreed to in the deal.

9.      Musk's market manipulation worked – ***Twitter has lost $8 billion in valuation*** since the Buyout was announced. As subsequently disclosed, Musk first started purchasing Twitter shares on January 31, 2022. Musk thereafter exceeded the 5% threshold, requiring him to file a Form 13G with the SEC. Musk did <u>not timely file</u> the Form 13G; failing to do so benefitted Musk because he was able to continue to buy Twitter shares at depressed prices. When Musk belatedly filed the Form 13G, Twitter's shares increased substantially, rising 27% after he filed the 13G.

10.      ***Musk benefitted himself by approximately $156 million*** by failing to timely file a Form

3

Complaint for Aiding and Abetting Breach of Fiduciary Duty, Declaratory and Injunctive Relief, and Unjust Enrichment

1    13G.[1]  By delaying his disclosure of his stake in Twitter, Musk engaged in market manipulation and

2    bought Twitter stock at an artificially low price, in violation of the law.

3         11.    Musk's disregard demonstrates how one can flaunt the law and the tax code to build their

4    wealth at the expense of other Americans.  Musk's insider trading profits may come with a slap on the

5    wrist in the form of a fine from the SEC but will probably be limited to hundreds of thousands of

6    dollars, according to legal and security experts.[2]

7         12.    When Musk eventually filed his Form 13G on April 4, 2022, it was materially

8    misleading.  He did not disclose his intent to join the Twitter Board and he failed to disclose that he was

9    contemplating buying Twitter.  Both disclosures would have caused Twitter's stock to increase more

10   than it did when his filing was made.  Musk was later forced to file an amended Form 13G to comply

11   with the law.  As Tesla shares cratered by almost 30% in April and May 2022, Musk began to make

12   disparaging comments about Twitter in an effort to drive its stock price down further.

13        13.    On **May 13, 2022**, at 5:44 a.m. (*i.e.*, before the stock market opened), Musk issued a

14   tweet which stated that the buyout was "temporarily on hold:"

15
16   

17   Twitter deal temporarily on hold pending details

18   supporting calculation that spam/fake accounts do
     indeed represent less than 5% of users

19        14.    Musk's tweet (and public statement) was misleading and constituted an effort to

20   manipulate the market for Twitter shares as he knew all about the fake accounts.  The statement was

21   false because the buyout was not, in fact, "temporarily on hold." There is nothing in the buyout contract

22   that allows Musk to put the deal "temporarily on hold." Moreover, Musk's statement was misleading

23   because it stated or implied that Musk's obligation to consummate the buyout was conditioned on his

24   satisfaction with due diligence to determine whether "spam/fake accounts do indeed represent less than

25
26   [1] *See* Reed Albergotti, "Elon Musk Delayed Filing a Form and Made $156 Million," The Washington
     Post, April 6, 2022.

27   [2] *Id.*

28

Complaint for Aiding and Abetting Breach of Fiduciary Duty, Declaratory and Injunctive Relief,
and Unjust Enrichment

5% of users."  This was false because Musk had <u>specifically waived detailed due diligence</u> as a condition precedent to his obligations under the buyout contract.  Thus, Musk had and has no right to cancel the buyout based on any results from due diligence concerning the number of spam/fake accounts at Twitter.  Musk then continued issuing false and disparaging tweets about Twitter in an effort to drive its stock price down further.

15.     Musk's false and misleading tweets had the desired effect, as they caused Twitters' stock to decline in the days following the tweets, in stark contrast to the Nasdaq index, which increased, as reflected in the following chart:



16.     On **May 17, 2022**, Musk doubled down on his "Friday the 13th" tweet, issuing another tweet stating that the deal "cannot go forward" while claiming almost 20% of accounts were fake.

17.     Musk's wrongful conduct has not only substantially harmed Twitter's shareholders by causing Twitter's stock to crater by approximately 25%, but it has also substantially harmed Twitter's employees. As reported by the Wall Street Journal on May 21, 2022:

> *In one 24-hour period this month, Twitter Inc.'s chief executive fired two widely liked senior executives and announced a hiring freeze, while billionaire Elon Musk suddenly said he was putting "on hold" an acquisition plan that could lead to a wholesale revamp of the social-media company.*
>
> It is a tricky time to work at Twitter. Far beyond the usual uncertainty at an acquisition target, *Mr. Musk's $44 billion takeover deal has left employees bewildered about what their jobs are and will be, as well as how to keep operating a platform with around 229 million daily users* while its would-be owner uses it to publicly assail the company for everything from its free-speech policies to its business model.
>
> Internal conversations and Slack channels are awash in distress and anger over the criticism, while *company leaders who themselves have no way to know the outcome have responded with repeated staff meetings to try to soothe the angst and encourage people to press forward,* according to current and former staffers and internal communications viewed by The Wall Street Journal.
>
> *"I expect the 'chaos tax' and ups and downs to continue," Jay Sullivan, Twitter's new head of product, wrote on May 13* in an internal message to thousands of employees that was viewed by the Journal.
>
> Whatever the fate of the deal, many *current and former employees say the company has been irrevocably shaped by the five weeks since Mr. Musk publicly disclosed his unsolicited bid to buy Twitter*, one of the world's most influential social-media platforms. Some employees have left. Many more say they are looking for new jobs. Others are hunkering down to await an uncertain fate under *Mr. Musk*, who *recently tweeted an image of cartoon excrement at the current CEO*.
>
> *On May 12, Mr. Agrawal told employees the company was pausing hiring and looking to cut costs, and that two senior executives*—Bruce Falck, general manager of revenue, and Kayvon Beykpour, general manager of consumer—*were leaving. Mr. Beykpour tweeted he was on paternity leave when he got the news*.
>
> *The next day, Mr. Musk tweeted that the deal was "on hold"* until he could get more clarification from the company about how pervasive bots were on the platform. *That rattled already wobbly investor confidence that the deal will happen at the price Mr. Musk agreed to—if at all. Twitter shares are down more than 25% since late April.*[3]

---

[3] *See* Deepa Seetharaman & Sarah Needleman, "Twitter Employees Face 'Chaos Tax'," THE WALL STREET JOURNAL, May 21, 2022.

Complaint for Aiding and Abetting Breach of Fiduciary Duty, Declaratory and Injunctive Relief, and Unjust Enrichment

18.    Musk's false statements and market manipulation have created "chaos" at Twitter's headquarters in San Francisco:



TECH

## Elon Musk's Planned Twitter Takeover Creates a 'Chaos'

Deal has left employees bewildered about what their jobs are and will be

Twitter, which is based in San Francisco, has held companywide meetings in recent weeks to address employee questions about the takeover.
PHOTO: LAURA MORTON FOR THE WALL STREET JOURNAL

19.    Musk has also bullied current Twitter employees and stated that he would stop censoring hate speech:

Among those most concerned are staff responsible for moderating content and developing tools that minimize abuse and hate speech on the platform, current and former employees say. ***Mr. Musk has repeatedly said Twitter's limits on expression are too great and that he wants to allow almost all speech on the platform that isn't illegal***. Mr. Musk's complaints echo those of others, including some conservative lawmakers who have criticized efforts at content moderation, saying they are subjective and can lead to bias.

***Some current employees say they view Mr. Musk's behavior on the platform, particularly his targeting of Ms. Gadde, [referenced infra] as an example of the type of online bullying*** they have been tasked with minimizing.[4]

20.    Musk has been accused of using Twitter to foster "dogpiling," in which he encouraged his users to harass someone else, such as the case of Vernon Unsworth, a British diver who had spent days assisting the rescue of a group of Thai boys trapped in a flooded cave.  After Musk offered a

---

[4] *Id.*

Complaint for Aiding and Abetting Breach of Fiduciary Duty, Declaratory and Injunctive Relief, and Unjust Enrichment

minuscule submarine to the rescue divers, Unsworth told the media that Musk's idea was just a useless public relations stunt.  Musk then took to Twitter, where (in tweets that he later deleted) he baselessly accused Unsworth of being a "pedo guy," or pedophile.  The tweets prompted hundreds of Musk fans to pile on to the diver with abusive, humiliating attacks.[5]

21.   Musk's manipulation of Twitter stock has also encouraged other market participants to short Twitter's stock.  After Musk began disparaging Twitter and his own buyout, Hindenburg shorted Twitter.  On May 17, 2022, Hindenburg closed its short position for a large profit.[6]

22.   On **May 18, 2022**, Musk announced he would switch parties and become a Republican, calling the Democrats the "party of division & hate" to further excite the media of his conduct.



## II.    JURISDICTION AND VENUE

23.   This Court has jurisdiction as the Defendants are located in and/or conduct business in California, including, but not limited to, the conduct here at issue, and because they have sufficient minimum contacts with California to render the exercise of jurisdiction by the California courts permissible under traditional notions of fair play and substantial justice.

---

[5] *See* Billy Perrigo, "Twitter Employees Have Spent Years Trying to Make the Platform Safer. Elon Musk Could Undermine All That," TIME, Apr. 26, 2022.

[6] *See* Joshua Fineman, "Hindenburg Research Closes Twitter Short Position," Seeking Alpha, May 17, 2022.

Complaint for Aiding and Abetting Breach of Fiduciary Duty, Declaratory and Injunctive Relief, and Unjust Enrichment

24.     This Court has subject matter jurisdiction over this matter under 28 U.S.C. §1332,  as this is a class action where at least one of the members of the Class is a citizen of a state different from at least one of the defendants, and the matter in controversy exceeds the sum or value of  $5,000,000.

25.     Venue is proper in this judicial district under 28 U.S.C. §1391, because: (1) one or more defendants reside in this District; and (2) a substantial part of the events or omissions giving rise to the claims occurred in this District.  Twitter is headquartered in San Francisco, California at 1355 Market Street, Suite 900.  Musk's wrongful conduct took place in substantial part and have an effect in San Francisco, California, including his use of Twitter tweets to make false statements and engage in market manipulation of Twitter stock.

### III.     INTRADISTRICT ASSIGNMENT

A substantial part of the events or omissions which give rise to the claims in this action occurred in the county of San Francisco, and as such, this action is properly assigned to the San Francisco division of this Court.

### IV.     THE PARTIES

26.     Plaintiff William Heresniak is a current shareholder of Twitter, Inc. and has owned Twitter stock at all relevant times.  Plaintiff is a resident and citizen of Virginia.

27.     Defendant Twitter, Inc. is a Delaware corporation headquartered in San Francisco, California. Twitter is a citizen of California and Delaware.

28.     Defendant Elon R. Musk is an individual who currently owns approximately 9.6% of Twitter's stock and has entered into voting agreements with other shareholders giving him far greater voting control.  On April 25, 2022, Musk announced a definitive agreement to buy Twitter for $54.20 per share in cash. Musk is an affiliate of Twitter for purpose of the Buyout. Upon information and belief, Musk is a citizen and resident of Texas.

29.     Defendants X HOLDINGS I, INC. and X HOLDING II, INC. are Delaware corporations formed by Defendant Musk to effectuate the purchase of Twitter.  The Merger Agreement refers to X Holdings I as "Parent" and X Holdings II as "Acquisition Sub" and states that X Holdings II is a direct wholly-owned subsidiary of X Holdings I.  As a material inducement and condition to Twitter entering into the Merger Agreement, Elon Musk guaranteed Parent's and Acquisition Sub's obligations under

the Merger Agreement.  Pursuant to the Merger Agreement, Musk is responsible for paying the Merger

Consideration directly to Plaintiff and other Twitter shareholders via the X Holdings entities.

## V.      CLASS ACTION ALLEGATIONS

30.      Plaintiff brings this action as a class action, pursuant to F.R.C.P. 23, on behalf of all

stockholders of Twitter, Inc. who have been harmed and/or are threatened with harm by Defendants'

unlawful conduct in connection with Musk's proposed buyout of Twitter.  Excluded from the Class are

Defendants herein and any person, firm, trust, corporation, or other entity related to, or affiliated with,

any of the Defendants and their successors in interest (the "Class").

31.      This action is properly maintainable as a class action because:

(a)      The Class is so numerous that joinder of all members is impracticable.  There are

millions of shares of the Company's common stock outstanding owned by hundreds, if not thousands,

of stockholders;

(b)      There are questions of law and fact which are common to the Class including,

*inter alia*, the following:  (i) whether Musk made false and misleading statements and/or engaged in

conduct in an effort to manipulate the market for Twitter stock; (ii) whether Musk created a false or

misleading appearance with respect to the market for Twitter stock; (iii) whether Musk engaged in

conduct designed to raise or depress the price of Twitter stock for the purpose of inducing the purchase

or sale of Twitter stock by others; (iv) whether has been unjustly enriched; (v) whether Musk aided and

abetting breaches of fiduciary duty by Twitter directors; (vi) the extent of damage sustained by Class

members.

(c)      Plaintiff is committed to prosecuting this action and has retained competent

counsel experienced in litigation of this nature;

(d)      The claims of Plaintiff are typical of the claims of other members of the Class

and Plaintiff has the same interests as the other members of the Class. Plaintiff will fairly and

adequately represent the Class; and

(e)      Defendants have acted in a manner that affects Plaintiff and all members of the

Class alike, thereby making class treatment appropriate.

The prosecution of separate actions by individual members of the Class would create a risk of

1   inconsistent or varying adjudications with respect to individual members of the Class which would

2   establish incompatible standards of conduct for Defendants, or adjudications with respect to individual

3   members of the Class which would, as a practical matter, be dispositive of the interests of other

4   members not parties to the or substantially impair or impede their ability to protect their interests.

## VI.     SUBSTANTIVE ALLEGATIONS

### A.     Background of the Musk Buyout of Twitter

32.     Elon Musk is an active user of the Twitter platform with close to 90 million followers,
making him one of Twitter's most popular accounts.

33.     Musk has violated SEC rules related to going-private transactions before.  He issued
false tweets in the past claiming he was going to take his company, Tesla, Inc., private, and that he had
already secured financing.  The SEC sued Musk, and he was forced to settle the case and agree to a
consent decree dated September 29, 2018, as amended on April 26, 2019.  The settlement and consent
decree required Musk to pay a $20 million fine, give up his role as Tesla's chairman, and refrain from
issuing tweets related to Tesla without the pre-approval of a "Securities Counsel" and Tesla's
Disclosure Controls Committee.  Musk later demanded that his law firm, Cooley LLP, fire a former
SEC lawyer who had worked on the SEC case and later joined Cooley, or else Cooley would lose
Musk's business.[7]

34.     Musk has been sued by Tesla shareholders.  On April 1, 2022, the United States District
Court for the Northern District of California issued an order granting in part Plaintiffs' Motion for
Summary Judgment and holding that Musk's tweets regarding his intent to take Tesla private were false
and misleading and that Musk knew or recklessly disregarded the falsity of the tweets.  *See In re Tesla,
Inc. Sec. Litig.*, Case No. 18-cv-04685 (N.D. Cal.), Docket No. 387.

35.     Musk continues to flaunt court and governmental findings and orders.  Musk gave a TED
Talk in Vancouver on April 14, 2022, during which he emphatically proclaimed in reference to his

---

[7] *See* Rebecca Elliott, "Elon Musk's Tesla Asked Law Firm to Fire Associate Hired From SEC," THE
WALL STREET JOURNAL, Jan. 15, 2022.

Complaint for Aiding and Abetting Breach of Fiduciary Duty, Declaratory and Injunctive Relief,
and Unjust Enrichment

August 7, 2018 Tesla tweets, *inter alia*, that "funding was actually secured – I want to be clear about that – in fact that gives me a good opportunity to clarify that – and funding was indeed secured" before going on to refer to the SEC's San Francisco office as "bastards" and claiming that he settled with the agency only because they had a "gun to [his] child's head."[8]

36.　　On **May 12, 2022**, it was announced that the SEC was again investigating Musk, this time for his failure to timely file the Form 13D regarding his more than 5% stake in Twitter.  In addition to violating SEC rules, Musk's false tweets and his wrongful conduct constitute a violation of various provisions of the California Corporations Code designed to protect investors.

37.　　As disclosed by Twitter in its Proxy Statement filed on May 17, 2022, regarding the Buyout, which was disseminated to Twitter shareholders to seek their approval of the Buyout, Musk began his efforts to acquire Twitter by contacting his two closest friends and allies on Twitter's Board – Jack Dorsey and Egon Durban.  The fact that Durban and Musk are good friends and that Durban's allegiance is to Musk was noted recently by Forbes, which stated:

> Durban and Musk are buds.  Durban and Durban alone was the only person Musk spoke to before his now infamous 2018 tweet about taking Tesla private; three days later, Durban turned up at Musk's home to talk through their options about securing the funding Musk said he'd already secured.[9]

38.　　Indeed, when he announced his plan to take Tesla private in 2018, Musk issued the following tweet stating he intended to work with Silver Lake:



Elon Musk ✔
@elonmusk

Replying to @Tesla

I'm excited to work with Silver Lake and Goldman Sachs as financial advisors, plus Wachtell, Lipton, Rosen & Katz and Munger, Tolles & Olson as legal advisors, on the proposal to take Tesla private

6:02 PM · Aug 13, 2018 · Twitter for iPhone

**1,089** Retweets  **302** Quote Tweets  **11.4K** Likes

---

[8]*See* https://www.ted.com/talks/elon_musk_elon_musk_talks_twitter_tesla_and_how_his_brain_works_live_at_ted2022.

[9] *See* Abram Brown, "Specter Of Elon Musk—And His Wishy-Washy Buyout—Loom Over Twitter's Shareholder Meeting," Forbes, May 25, 2022.

Complaint for Aiding and Abetting Breach of Fiduciary Duty, Declaratory and Injunctive Relief, and Unjust Enrichment

39.     It was reported at the time that Silver Lake was offering assistance to Musk without compensation and had not been hired as a financial adviser in an official capacity.[10]  Both Musk and Durban also serve on the board of entertainment conglomerate Endeavor, and Silver Lake invested $100 million into Musk's SolarCity solar business.

40.     Silver Lake was a key ally for Dorsey in his successful bid to stave off activist investor Elliott.  To help appease Elliott, Silver Lake agreed to invest $1 billion in Twitter in 2020, which funds were earmarked to help finance the buyback of $2 billion of Twitter stock.[11]

41.     Musk is also good friends with Dorsey, as the Proxy admits.  In 2020, Musk came to Dorsey's defense after Elliot Management attempted to knock Dorsey out of his position as CEO of Twitter.  Elliott claimed that Dorsey was unfit to be CEO of Twitter due to running two companies (Twitter and Square) and not having enough focus for both.  At the time, Musk issued the following tweet in support of Dorsey:



42.     Due to their friendship, Dorsey has provided special favors for Musk in the past.  In July 2020, a Twitter hacker targeted famous users, including Musk. Musk allegedly called Dorsey after his account was hacked, and Dorsey then locked his account in a matter of minutes to combat the hackers.

///

---

[10] *See* Everett Rosenfeld, "Elon Musk Says He's Working with Goldman Sachs and Silver Lake on Taking Tesla Private," CNBC, Aug. 14, 2018.

[11] *See* Kate Conger, "Twitter Reaches Deal With Activist Fund That Wanted Jack Dorsey Out," The New York Times, March 9, 2020.

Complaint for Aiding and Abetting Breach of Fiduciary Duty, Declaratory and Injunctive Relief, and Unjust Enrichment

43.     As noted by Bloomberg, Musk began his pursuit of Twitter by reaching out to his friends Dorsey and Durban:

> ***The key relationships in the run-up to Musk's takeover offer revolve around calls with Twitter co-founder Jack Dorsey and board member Egon Durban***, managing partner at private equity firm Silver Lake who helped Musk on his ill-fated 2018 attempt to take Tesla Inc. private, according to a US securities filing on Tuesday.
>
> During the course of March 26, Musk chatted to Dorsey and Durban about his plans for the social media platform, including that he had taken a "significant stake" of more than 5% stake in the company.[12]

44.     The Proxy that Twitter filed with the SEC on May 17, 2022 provided more details about Musk's conversations with Dorsey and Durban.  The Proxy notes that on **March 26, 2022**, Musk called Jack Dorsey (Twitter's founder) in California to discuss the future direction of social media, including the benefits of open social protocols.  Dorsey had previously communicated his views on these topics to the Twitter Board and publicly. Dorsey lives in the Sea Cliff neighborhood of San Francisco and his communications with Musk were made to and from California.

45.     Also on **March 26, 2022**, Musk contacted Egon Durban, one of Twitter's directors, to set up a discussion between Musk and Durban. Musk and Durban subsequently spoke on March 26, 2022 and March 27, 2022 ***and discussed the potential of Musk joining the Twitter Board, as well as the fact that Musk had purchased a significant stake of more than five percent of Twitter's common stock***.[13]  Durban informed Bret Taylor, the chairperson of the Twitter Board,[14] Martha Lane Fox, one of Twitter's directors and the chairperson of Twitter's Nominating and Corporate Governance Committee (the "NomGov Committee"), and Parag Agrawal, Twitter's chief executive officer, of Musk's communication.  Durban, Taylor, Agrawal and Lane Fox discussed Musk's communications and determined (1) that Durban would connect Musk with Taylor, Agrawal and Lane Fox, and they would

---

[12] *See* Giles Turner, "Musk's Talks With Twitter All Started With Dorsey, Durban," Bloomberg, May 17, 2022.

[13] *See* May 17, 2022 Proxy Statement at 42.

[14] Taylor, in addition to being a Twitter director, is the Co-CEO of Salesforce.com and lives in the San Francisco Bay Area.  His communications with Musk were disseminated from and to California.

also discuss with Musk his potential interest in joining the Twitter Board; (2) to call meetings of the NomGov Committee and of the Twitter Board to discuss Musk's communications and potential interest in joining the Twitter Board; and (3) that Lane Fox would inform each member of the Twitter Board in advance of the Twitter Board meeting of Musk's communications.  Lane Fox subsequently informed the members of the Twitter Board of Musk's initial communications.

**B.     Musk's Failures to Timely Disclose His 9+% Stake in Twitter and to Disclose He Had Been Invited to Join the Twitter Board are Contrary to the Law**

**1.     Musk's Failure to Timely Disclose His 9+% Stake in Twitter**

46.     Despite the fact that Twitter has admitted that Musk already owned 5% of Twitter's stock on or before March 26, 2022, Musk failed to file a Schedule 13D with the SEC, as he was required to do.  Musk belatedly filed a Schedule 13G on April 4, 2022, at least 10 days after his stake surpassed the trigger point for disclosure. Musk has not publicly explained why he did not file the form in a timely manner.

47.     Moreover, Musk's April 4, 2022 filing was false and misleading because it was improperly filed on Form 13G, not 13D.  Form 13G is only to be used by passive investors, and thus Musk was required to use Form 13D.  Musk's 13G filing failed to disclose that he had been offered a position on Twitter's Board and that he was interested in buying Twitter.  Form 13G contains an Item 10, called "Certification," which states that "By signing below I certify that, to the best of my knowledge and belief, the securities referred to above were not acquired and are not held for the purpose of or with the effect of changing or influencing the control of the issuer of the securities and were not acquired and are not held in connection with or as a participant in any transaction having that purpose or effect."  Musk's Form 13G inserted a false and misleading representation in Item 10 stating "Not applicable." Musk personally signed the Form 13G.

48.     On April 5, 2022, Musk filed a Form 13D.  The 13D disclosed that Musk had entered into a letter agreement to join Twitter's board. But it misrepresented that Musk "holds the Common Stock of the Issuer for investment purposes" and that Musk "has no present plans or intentions which would result in or relate to any of the transactions described in subparagraphs (a) through (j) of Item 4 of Schedule 13D."  This was false. Item 4(b) required Musk to disclose his intentions with respect to

Complaint for Aiding and Abetting Breach of Fiduciary Duty, Declaratory and Injunctive Relief, and Unjust Enrichment

"An extraordinary corporate transaction, such as a merger, reorganization or liquidation, involving the issuer or any of its subsidiaries." *See* 17 CFR § 240.13d-101.  As noted *infra*, Twitter's Proxy Statement *admits that just four days* later, on April 9, 2022, Musk notified Twitters' Chairman Taylor and CEO Agrawal that he *would be making an offer to take Twitter private*.

49.     April 9, 2022 was a Saturday. Two days later, on Monday, April 11, 2022, Musk filed an Amended Schedule 13D that stated that he would not join Twitter's Board and that he "*might* engage in discussions with the Board" about "potential business combinations."  This constituted yet again a false and misleading misrepresentation to investors.  The Amended 13D failed to disclose that he had *already told* Twitter two days before, on April 9, 2022, that he would be making an offer to take the Company private.

50.     On **May 11, 2022**, the Wall Street Journal reported that the SEC was investigating Musk over his failure to timely disclose his 9.2% stake in Twitter.[15]  *Musk likely saved more than $143 million by not reporting that his trades had crossed the 5% threshold*, according to Daniel Taylor, a University of Pennsylvania accounting professor, since the share price could have been higher had the market known of Musk's growing stake.

51.     Because Musk had acquired more than 5% of Twitter's stock, he was required to file a Schedule 13D with the SEC within 10 days.  Musk's Twitter holdings surpassed 5% on March 14, 2022, securities filings show, meaning he should have disclosed his stake by March 24, 2022 under SEC rules.

52.     After March 24, Musk purchased roughly $513 million of stock at prices between $38.20 and $40.31 a share, according to a regulatory filing. The total buying spree made him Twitter's largest individual shareholder with 9.2% of its shares.

        **2.**    **Musk's Failure to Disclose He Had Been Invited to Join the Twitter Board**

53.     On **March 27, 2022**, Musk, Taylor and Agrawal discussed Musk's interest in Twitter and potentially joining the Twitter Board.  As part of that discussion, Musk stated that he was

---

[15] *See* Dave Michaels, "Elon Musk's Belated Disclosure of Twitter Stake Triggers Regulators' Probes," The Wall Street Journal, May 11, 2022.

Complaint for Aiding and Abetting Breach of Fiduciary Duty, Declaratory and Injunctive Relief, and Unjust Enrichment

considering various options with respect to his ownership, including potentially joining the Twitter Board, seeking to take Twitter private or starting a competitor to Twitter.

54.     On **March 30, 2022**, Lane Fox and Musk discussed his potential interest in joining the Twitter Board and the benefits that Musk believed he could potentially bring to Twitter as a Twitter director.

55.     On **March 31, 2022**, Agrawal and Taylor met with Musk in California to discuss Twitter's business and Musk's potential interest in joining the Twitter Board.  At the meeting, Musk reiterated his interest in potentially joining the Twitter Board to help improve Twitter's business as a director of Twitter, and that he was also considering the possibility of taking Twitter private or starting a competitor to Twitter.

56.     On **April 2, 2022**, the NomGov Committee met in California, with Taylor, members of Twitter management and a representative of Wilson Sonsini Goodrich & Rosati, Professional Corporation, Twitter's outside legal counsel reporting to the Twitter Board ("Wilson Sonsini"), in attendance.  Durban, Taylor, Agrawal, and Lane Fox each updated the NomGov Committee on their discussions with Musk.  After considering, among other things, Musk's interest in Twitter's business, his statement that he is one of Twitter's substantial stockholders, his active use of the Twitter platform, his technical expertise in areas critical to Twitter's products and technology, and the perspectives that he could bring to the Twitter Board, the NomGov Committee determined to recommend that the Twitter Board consider inviting Musk to join the Twitter Board, subject to completion of customary onboarding procedures, such as a background check and completing and signing a director onboarding questionnaire.

57.     Upon information and belief, Musk completed the director questionnaire and returned it to Twitter in California.

58.     Also on **April 2, 2022**, at the direction of Taylor and the NomGov Committee, Twitter requested that J.P. Morgan attend the scheduled meeting of the Twitter Board in California to assist Twitter in reviewing Musk's purported purchase of a significant stake in Twitter's common stock, Musk's potential appointment to the Twitter Board and related matters.

59.     On **April 3, 2022**, the Twitter Board met in California, with members of Twitter management and representatives of each of Wilson Sonsini and J.P. Morgan in attendance. Durban, Taylor, Agrawal, and Lane Fox each updated the Twitter Board on their discussions with Musk.  The NomGov Committee reported on its discussions at its meeting the previous day and provided its recommendation that the Twitter Board consider inviting Musk to join the Twitter Board.  In evaluating the NomGov Committee's recommendation, the Twitter Board considered, among other things, Musk's qualifications, business expertise, knowledge of Twitter's business and user base and technical expertise in areas critical to Twitter's products and technology.

60.     At the meeting, Dorsey informed the Twitter Board that he and Musk were friends, and Durban informed the Twitter Board that he had worked on unrelated matters with Musk in the past.  At this and other meetings of the Twitter Board in California relating to Musk joining the Twitter Board, Musk's acquisition proposal and the merger, the Twitter Board regularly met in executive sessions of independent directors.  ***The Twitter Board determined to invite Musk to join the Twitter Board***, subject to his completion of a background check and other customary onboarding procedures.  In connection with Musk joining the Twitter Board, ***it was the desire of the Twitter Board that Musk enter into a cooperation agreement that included "standstill" provisions that, among other things, would limit his public statements regarding Twitter***, including the making of unsolicited public proposals to acquire Twitter (but not private proposals) without the prior consent of the Twitter Board.

61.     Following the meeting, at the direction of the Twitter Board, ***Lane Fox called Musk to invite him to join the Twitter Board***, subject to completion of customary onboarding procedures.  Lane Fox also noted the desire of the Twitter Board that Musk enter into a cooperation agreement.  Following that discussion, representatives of Twitter sent a copy of Twitter's customary director onboarding questionnaire to representatives of Musk.

62.     As noted *supra*, on April 4, 2022, Musk publicly disclosed his ownership of approximately 9.2 percent of Twitter common stock.  Musk's Schedule 13G did not disclose his intent to join the Twitter Board and also failed to disclose that he was contemplating buying Twitter. Both disclosures would have caused Twitter's stock to increase more than it did when his filing was made. Musk was later forced to file an amended disclosure form on Schedule 13D on April 5, 2022.

63.     Musk benefitted himself ***by approximately $156 million*** by failing to timely file the Form 13G.[16]  By delaying his disclosure of his stake in Twitter, Musk engaged in market manipulation and bought Twitter stock at an artificially low price.  Musk was 11 days late in publicly declaring he had amassed a large stake in Twitter.  Musk became a 5% stockholder on  March 14, 2022, according to the SEC filings, but failed to file his Form 13G until April 4, 2022

64.     Between March 14 and April 4, 2022,  Musk continued to buy Twitter stock at the price of around $39 per share, bringing his total stake to 9.2 percent.  After his disclosure, Twitter's share price rose roughly 30 percent and then traded at above $50 per share until Musk began disparaging Twitter.

65.     Musk saved about $156 million, according to David Kass, a finance professor at University of Maryland's business school, who stated "I really don't know what's going through his mind. Was he ignorant or knowledgeable that he was violating securities law?"  "Whoever was handling the trades for Musk should have known," Kass said.[17]

66.     Musk's disregard for securities laws demonstrates how billionaires can skirt the law and the tax code to build their wealth at the expense of the average American.

67.     On **April 4, 2022**, representatives of Twitter in California provided Musk with a draft of a cooperation agreement that provided for Musk's appointment to the Twitter Board and included customary "standstill" provisions.  For example, for so long as Musk were to serve on the Twitter Board and for 90 days thereafter, Musk agreed to refrain from, either alone or as a member of a group, becoming the beneficial owner of more than 14.9 percent of Twitter common stock.

68.     Also on **April 4, 2022**, Twitter sent Musk a draft of a letter agreement providing that Twitter would appoint Musk to the Twitter Board to serve as a Class II director with a term expiring at Twitter's 2024 Annual Meeting of Stockholders. Twitter requested, but Musk refused, to agree to a customary "cooperation agreement" limiting his public statements about Twitter.  Musk did, however,

---

[16] *See* Reed Albergotti, "Elon Musk Delayed Filing a Form and Made $156 Million," The Washington Post, April 6, 2022.

[17] *Id.*

Complaint for Aiding and Abetting Breach of Fiduciary Duty, Declaratory and Injunctive Relief, and Unjust Enrichment

agree at Twitter's request to limit his purchase of additional Twitter stock to no more than 14.9% *so long as he was a Twitter director*.

69.   On **April 5, 2022**, Twitter and Musk issued a joint announcement from California disclosing the entry into the letter agreement. Musk and Agrawal tweeted the following:



70.   Over the next three days, Agrawal and Musk continued to discuss Twitter's business and products *in anticipation of Musk joining the Twitter Board*.  Later that day, Musk called Dorsey in San Francisco to ask Dorsey for his perspectives on Twitter in connection with the announcement of Musk joining the Twitter Board.  During this time period, Defendant Dorsey failed to protect the best interests of Twitter and instead preferred and favored Musk's interests in the Buyout.  Dorsey in fact publicly denigrated Twitter's Board on April 16, 2022, stating that the Board had "consistently been the dysfunction of the company."

71.   On **April 8, 2022**, Lane Fox informed the Twitter Board of the satisfactory completion of Musk's background check. Taylor informed the Twitter Board of his expectation that Musk's appointment to the Twitter Board would be effective on April 9, 2022.

72.   On **April 9, 2022**, before Musk's appointment to the Twitter Board became effective, Musk notified Taylor and Agrawal in San Francisco that he would not be joining the Twitter Board and would be making an offer to take Twitter private.

73.   On **April 10, 2022**, Twitter issued an announcement from California that Musk had decided not to join its Board.

Complaint for Aiding and Abetting Breach of Fiduciary Duty, Declaratory and Injunctive Relief, and Unjust Enrichment

1

2

### C.   After Unexpectedly Announcing He Would Not Join Its Board, Musk Discloses an Intent to Buy Twitter, and Threatens to Go Hostile Through a Tender Offer if Twitter's Board Does Not Acquiesce

3

4

5

6

7

74.     On **April 13, 2022**, Musk delivered to Twitter's Chairman Bret Taylor in California a non-binding proposal to acquire Twitter, the full text of which is reproduced below. Musk also called Taylor in California to re-iterate that Musk's proposal represented his best and final offer to acquire Twitter and referred Taylor to Musk's public disclosure of the proposal scheduled for the next day for additional details with respect to the proposal.

8

9

10

11

12

13

14

15

16

17

18

19

*Bret Taylor*

*Chairman of the Board,*

*I invested in Twitter as I believe in its potential to be the platform for free speech around the globe, and I believe free speech is a societal imperative for a functioning democracy.*
*However, since making my investment I now realize the company will neither thrive nor serve this societal imperative in its current form. Twitter needs to be transformed as a private company.*

*As a result, I am offering to buy 100% of Twitter for $54.20 per share in cash, a 54% premium over the day before I began investing in Twitter and a 38% premium over the day before my investment was publicly announced. My offer is my best and final offer and if it is not accepted, I would need to reconsider my position as a shareholder.*

*Twitter has extraordinary potential. I will unlock it.*

*/s/ Elon Musk*
*Elon Musk*

20

21

22

23

24

25

75.     Two aspects of Musk's letter are noteworthy.  First, Musk made one and only one offer. He refused to negotiate and simply put the $54.20 per share offer to the Twitter Board as a "take it or leave it" offer.  Second, Musk threatened to sell his Twitter stock if the Twitter Board did not accept his ultimatum. As will be shown *infra*, Musk also waived due diligence; he was in a hurry to acquire Twitter, claimed he knew everything he needed to know about Twitter, and did not condition his offer on his satisfaction with any due diligence.

26

27

28

Complaint for Aiding and Abetting Breach of Fiduciary Duty, Declaratory and Injunctive Relief, and Unjust Enrichment

76.     On **April 14, 2022**, Musk publicly disclosed his acquisition proposal. He later tweeted that "If our Twitter bid succeeds, we will defeat the spam bots or die trying!"



77.     On **April 15, 2022**, the Twitter Board responded to Musk's takeover attempt by defensively adopting a shareholder rights plan or "poison pill," pursuant to which Musk's acquisition of greater than 15% of Twitter's outstanding common stock would trigger a right for the Company's other stockholders to acquire additional stock at a considerable discount.

78.     Twitter's CEO, Dorsey, took the highly unusual step of criticizing the Board for this. "On April 16, 2022, Jack Dorsey . . . tweeted that the board had been the 'consistent dysfunction of the company.'  When asked by a Twitter user whether he was allowed to say that, Dorsey responded, 'no.'"[18] Later the same day, in response to a Twitter user who stated with respect to Twitter that "Good boards don't create good companies, but a bad board will kill a company every time," Dorsey responded to the tweet by agreeing, stating "big facts."

79.     In response to Twitter's adoption of a poison pill, Musk began laying the groundwork for a hostile tender offer to acquire Twitter over the Board's objection.  He threatened a tender offer in a series of tweets, posting "Love me tender" on April 16, 2022 and "_____ is the Night" on April 19, 2022 (an apparent allusion to the F. Scott Fitzgerald novel Tender is the Night).  Musk also allegedly

---

[18] *See* Lauren Hirsch and Mike Isaac, "How Twitter's Board Went From Fighting Elon Musk to Accepting Him," NEW YORK TIMES (April 30, 2022) (available at: https://www.nytimes.com/2022/04/30/technology/twitter-board-elon-musk.html).

approached investment firms, including Silver Lake Partners, to help him gain control of Twitter.[19] Durban's allegiance was with Musk, not Twitter.  Market commentators noted  "***Durban's close ties to Elon Musk***, who is in the process of acquiring Twitter. As co-CEO of the private equity firm Silver Lake, Durban has worked with Musk on a number of major equity deals, including the abortive effort to take Tesla private in 2018. As a result, ***he is seen as one of Musk's closest allies on the board and a crucial figure as Musk's proposed buyout of the company limps towards completion***."[20]

80.     Musk also filed an amended Schedule 13D/A on April 21, 2022, which stated that Musk was "exploring whether to commence a tender offer" and that he had secured commitment letters from a group of lenders, led by Morgan Stanley, to provide approximately $46.5 billion to finance his acquisition of Twitter.

81.     On April 21, 2022, ***Musk filed an Amended Schedule 13D which stated that his acquisition proposal was no longer subject to the completion of financing and business due diligence***:  "At the time of delivery, the Proposal was also subject to the completion of financing and business due diligence, but it is no longer subject to financing as a result of the Reporting Person's receipt of the financing commitments described below and is no longer subject to business due diligence."

82.     At this point, Musk had provided very few details about how he would finance the $44 billion acquisition. Given Musk's false tweets in the past claiming he was going to take Tesla, Inc., private, and that he had already secured financing, the Twitter Board should have applied heightened diligence and scrutiny to Musk's proposed financing for the Twitter Buyout. Yet the Twitter Board failed to do so.  The Proxy for the Buyout admits that as of April 20, 2022, the Board recognized "the need for additional clarity from Mr. Musk on equity financing and any debt financing and other closing certainty matters with respect to the proposed acquisition."

---

[19] *See* Karen Mkrtchyan, "Elon Musk Turns to Silver Lake Partners After Twitter Board Rejects Hostile Takeover Bid," April 18, 2022, Coin Chapter. *See also* Josh Kosman, "Elon Musk considering bringing in partners on Twitter bid," New York Post, April 15, 2022.

[20] *See* Russel Brandom, "Musk-linked Investor Resigns From Twitter Board, Then Returns," The Verge, May 27, 2022 (also noting that "Jack Dorsey, who is also seen as friendly to Musk").

Complaint for Aiding and Abetting Breach of Fiduciary Duty, Declaratory and Injunctive Relief, and Unjust Enrichment

83.     Musk then spoke directly with Taylor on Saturday, April 23, 2022 and "threatened to take his offer directly to Twitter's shareholders."

84.     The following day, Sunday, **April 24, 2022**, the Twitter Board capitulated in the face of Musk's threats and accepted his initial, "best and final" offer to purchase all Twitter's outstanding common stock for $54.20 per share. Dorsey and Durban failed to negotiate at arms'-length with Musk and instead simply accepted Musk's first offer to acquire Twitter.  Dorsey and Durban also failed to engage in sufficient due diligence regarding Musk's sources of financing for the Buyout before voting to accept the first and only offer from Musk. Dorsey and Durban knew that Musk was proposing to finance $12.5 billion of the Buyout price through loans collateralized by Musk's Tesla stock, and yet failed to engage in sufficient inquiry regarding Tesla's stock pledging rules and whether Musk was in compliance with such rules and whether any decline in Tesla's shares could jeopardize Musk's $12.5 billion in margin loan commitments.

85.     Dorsey's motive to prefer Musk's interests was later revealed:  Musk had offered special benefits to Dorsey not available to Twitter's other shareholders. The Proxy disclosed that Musk:

> was having, and would continue to have, discussions with certain existing holders of our common stock (including Mr. Dorsey) regarding the possibility of contributing shares of our common stock of such holders to Parent, at or immediately prior to the closing of the merger, in order to retain an equity investment in Twitter following completion of the merger in lieu of receiving merger consideration.  Mr. Dorsey informed Twitter that his communications with Mr. Musk regarding these matters first occurred following the execution of the merger agreement and that these communications may continue, and may result in Mr. Dorsey continuing to hold equity of the surviving corporation or one or more of its affiliates following the merger.

86.     On **April 25, 2022**, Twitter approved entry into a definitive agreement to be acquired by an entity wholly-owned by Musk for $54.20 per share in cash, in a transaction valued at approximately $44 billion. The Board's agreement to the Proposed Buyout was announced via a Form 8-K filed by Twitter that same day. The documentation for the Proposed Buyout was negotiated and signed in substantial part in California.  A joint press release announcing the Buyout contained a quote from Musk promising to "make Twitter better" by "defeating the spam bots."

Complaint for Aiding and Abetting Breach of Fiduciary Duty, Declaratory and Injunctive Relief, and Unjust Enrichment

87.     Dorsey quickly took to Twitter to praise his good friend Elon Musk, admitting that he had preferred Musk over any other option for Twitter and that Musk was the "singular solution I trust":



88.     The Merger Agreement provides in paragraph 2.3 (b) that the Merger shall be governed by Delaware law and the applicable provisions of the DGCL, that Twitter shall be the surviving corporation in the Merger, that all the property, rights, privileges, immunities, powers, franchises and liabilities of the Company and Acquisition Sub are vested in the Surviving Corporation, and that Twitter shall continue to be governed by the laws of the State of Delaware after the Merger.

89.     On **May 5, 2022**, Twitter and Musk entered into a confidentiality agreement with respect to Twitter sharing non-public information with Parent, Musk and their representatives, including pursuant to the terms of the merger agreement. Prior to entry into the merger agreement, ***Musk did not ask to enter into a confidentiality agreement or seek from Twitter any non-public information regarding Twitter***. Further, Musk's obligation to complete the Buyout is not conditioned on his satisfaction with any due diligence.

**D.     Musk Finances the Proposed Buyout in Part by Pledging Billions of Dollars of His Tesla Stock as Collateral for a Loan From Morgan Stanley, But the Proxy Fails to Disclose the Full Risks of Such Loans**

90.     When the Buyout was originally announced on April 25, 2022, Musk's financing for the Buyout consisted of the following: (1) $21 billion in cash; and (2) $25.5 billion in financing. As explained below, both the cash component and $12.5 billion of the debt financing are linked to Musk's Tesla shares and the value of those Tesla shares.

Complaint for Aiding and Abetting Breach of Fiduciary Duty, Declaratory and Injunctive Relief, and Unjust Enrichment

91.     With respect to the cash component, at the time the Proposed Buyout was announced on April 25, 2022, Musk was expected to sell about 20 million shares of his Tesla stock to provide such cash.  That was predicated on Tesla stock having a value of approximately $1,000 per share, at the time of the closing of the Buyout.

92.     Indeed, while Tesla stock was still trading around $1,000 per share, Musk initially acted quickly after the Proposed Buyout was announced to sell some of his Tesla shares to raise the cash component.   In the three days after the announcement of the deal, Musk sold roughly $8.5 billion worth of shares in Tesla to help fund the purchase.

93.     Musk reported the sale of 9.6 million Tesla shares in filings with the Securities and Exchange Commission on April 28-29, 2022.  The trades were made at prices ranging from $822.68 to $999.13 a share.  But then Musk stopped selling Tesla shares as its price began to decline.  Further, the decline did not abate, and instead got worse.

94.     With respect to the debt financing, Morgan Stanley arranged tens of billions of dollars to finance Musk's buyout of Twitter, and is the largest single lender facilitating the deal. Musk has received commitment letters to provide, in addition to a $21 billion contribution of his own cash, an aggregate of approximately $25.5 billion in financing as follows: (i) a debt commitment letter dated April 20, 2022, from Morgan Stanley and certain other financial institutions to provide $13 billion in financing to Musk via a $6.5 billion senior secured term loan facility (the "Term Loan Facility"), a $500 million senior secured revolving facility (the "Revolving Facility"), a $3 billion senior secured bridge loan facility (the "Secured Bridge Facility") and a $3 billion senior unsecured bridge loan facility (the "Unsecured Bridge Facility"); and (ii) a separate debt commitment letter dated April 20, 2022 from Morgan Stanley and certain other financial institutions pursuant to which they committed to provide Musk with $12.5 billion in margin loans.

///

Complaint for Aiding and Abetting Breach of Fiduciary Duty, Declaratory and Injunctive Relief, and Unjust Enrichment

95.   The chart below depicts Musk's financing package:



96.   There are several problems with this financing scenario which provide Musk with a strong motive to make false statements about Twitter and engage in market manipulation.

97.   According to Tesla's regulatory filings, Musk had already pledged about half of his 173 million shares of Tesla stock to fund other ventures and activities. He has now pledged an additional 40 percent to secure the new loans to buy Twitter. That leaves only 10 percent of his Tesla shares available as collateral. Because Tesla's policies allow major shareholders to borrow only 25 percent of the value of each share that is pledged, that would appear to limit further borrowing against his Tesla shares to less than $5 billion.  As noted by Tesla's Amended Form 10-K filed May 2, 2022:

> In order to mitigate the risk of forced sales of pledged shares, ***the Board has a policy that limits pledging of Tesla stock by our directors and executive officers. Pursuant to this policy, directors and executive officers may pledge their stock*** (exclusive of options, warrants, restricted stock units or other rights to purchase stock) as collateral for loans and investments, ***provided that the maximum aggregate loan or investment amount collateralized by such pledged stock does not exceed twenty-five percent (25%) of the total value of the pledged stock.***[21]

---

[21] Tesla Form 10-K/A, filed May 2, 2022, at p. 21.

Complaint for Aiding and Abetting Breach of Fiduciary Duty, Declaratory and Injunctive Relief, and Unjust Enrichment

98.     As Musk is well aware, the Twitter financing is in major peril since the value of the collateral — Tesla stock (TSLA) — needs to remain at or near the $1,000 per share it was trading at when the deal was announced. Yet that has not happened, as Tesla stock dropped by over 35% since the announcement of the Buyout, as shown in the following chart:



99.     If Tesla's stock falls below $750, Musk could violate Tesla's own leverage ratio. Since it has now done so, Musk appears to be in violation of Tesla's stock pledging policy.

100.    Should Tesla stock fall below $600, Morgan Stanley and other banks could demand that Musk post additional collateral, requiring him to quickly sell some of his Tesla shares, which Musk does not want to do at current prices.

101.    Tesla's annual report also warned of the potential consequences of Musk's personal loans on its stock, stating:

*If Elon Musk were forced to sell shares of our common stock that he has pledged to secure certain personal loan obligations, such sales could cause our stock price to decline.*

Certain banking institutions have made extensions of credit to Elon Musk, our Chief Executive Officer, a portion of which was used to purchase shares of common stock in certain of our public offerings and private placements at the same prices offered to third-party participants in such offerings and placements. We are not a party to these loans, which are partially secured by pledges of a portion of the Tesla common stock currently owned by Mr. Musk. *If the price of our common stock were to decline substantially, Mr. Musk may be forced by one or more of the banking institutions to sell shares of Tesla common stock to satisfy his loan obligations* if he could not do so through other means. Any such sales could cause the price of our common stock to decline further.[22]

102.    Twitter's Proxy Statement did not disclose these risks nor the substantial risk that Musk's proposal to finance $12.5 billion of the Buyout price through loans collateralized by Musk's Tesla stock would be jeopardized by any significant decline in Tesla's stock price. The Proxy also failed to disclose whether Musk was in compliance with Tesla's stock pledging rules.  The Proxy noted that Musk's debt commitment letter providing for $12.5 billion in margin loan commitments was subsequently reduced to $6.25 billion, but failed to disclose the reason: that the substantial decline in Tesla's stock had caused Musk to be in violation of Tesla's stock pledging rules and also that Musk did not want to risk being forced to sell Tesla shares at depressed prices or be forced to re-negotiate the terms of the margin loan.  The Proxy admitted that as of April 20, 2022, the Board recognized "the need for additional clarity from Mr. Musk on equity financing and any debt financing and other closing certainty matters with respect to the proposed acquisition."

///

---

[22] *See* Tesla's Form 10-K, filed Feb. 7, 2022, at p. 27.

Complaint for Aiding and Abetting Breach of Fiduciary Duty, Declaratory and Injunctive Relief, and Unjust Enrichment

103.    The following chart from Tesla's Form 10-K/A filed May 2, 2022 sets forth Musk's current ownership of Tesla stock:

| Beneficial Owner Name | Shares Beneficially Owned | Percentage of Shares Beneficially Owned |
|---|---|---|
| **5% Stockholders** | | |
| Elon Musk(1) | 231,715,206 | 21.2% |
| The Vanguard Group(2) | 62,448,572 | 6.0% |
| Blackrock, Inc.(3) | 52,918,395 | 5.1% |
| **Named Executive Officers & Directors** | | |
| Elon Musk(1) | 231,715,206 | 21.2% |
| Zachary J. Kirkhorn(4) | 635,271 | * |
| Andrew Baglino(5) | 257,383 | * |
| Robyn Denholm(6) | 654,159 | * |
| Ira Ehrenpreis(7) | 560,335 | * |
| Lawrence J. Ellison(8) | 15,270,141 | 1.5% |
| Hiromichi Mizuno(9) | 117,230 | * |
| James Murdoch(10) | 475,765 | * |
| Kimbal Musk(11) | 683,490 | * |
| Kathleen Wilson-Thompson(12) | 260,139 | * |
| All current executive officers and directors as a group (10 persons)(13) | 250,629,119 | 22.9 % |

104.    Tesla's Form 10-K/A also reveals the number of Tesla shares Musk has pledged for personal debts, including the Twitter Buyout: "[Musk's shares include] 92,331,125 shares pledged as collateral to secure certain personal indebtedness."[23]  Before agreeing to Musk's first and only offer, Twitter's directors, including Dorsey and Durban, failed to conduct adequate diligence regarding Musk's sources of financing, including his pledging of Tesla shares for a portion of the financing and whether Musk's pledging of such shares would violate Tesla's stock pledging policies should Tesla's stock price decrease.  Such failure prejudiced Twitter's shareholders because when he abandoned his $12.5 billion in margin loans, Musk was forced to increase his equity commitment to the Buyout. Originally, such equity commitment was for a $21 billion equity financing by Musk. When Musk thereafter was forced to abandon the first half of the margin loan, he was forced to increase his equity

---

[23] *See* Tesla Form 10-K/A, filed May 2, 2022, at p. 23.

Complaint for Aiding and Abetting Breach of Fiduciary Duty, Declaratory and Injunctive Relief, and Unjust Enrichment

commitment by $6.25 billion, to a total of $27.25 billion. The equity financing commitment, however, did not include third party beneficiary rights permitting Twitter to enforce Mr. Musk's equity financing commitment in connection with the Buyout.  Musk thereafter was forced to abandon the other half of the margin loan, forcing him to increase his equity funding even further, to the current total of $33.5 billion.

105.    Dorsey and Durban also failed to engage in adequate due diligence regarding Musk's sources of equity financing.  Musk did not disclose the list of outside individuals and entities who have provided equity commitment letters until May 5, 2022, when he filed Amendment No. 6 to his Form 13D.  That list included a $700 million commitment from Vy Capital, ranking it the third highest on the list.  Vy Capital has links to Russian tycoons, as reported by Bloomberg.[24] In light of the Russian war against Ukraine, which was well underway at the time the Buyout was announced, the assets of Russian tycoons have been seized by many governments. There is no information demonstrating that Twitter's Board did any diligence regarding Vy Capital, whose website consists of a single page, with no address and no contact details.  Vy has few public records showing its funding sources or the nature of its investments.  Vy has supposedly backed Musk's Boring Co. and crypto exchange ErisX according to Bloomberg and PitchBook.[25]

106.    Vy Capital's founder is Alexander Tamas, who worked closely in the past for Russian-Israeli billionaire Yuri Milner, having joined his investment firm DST Global as a partner in 2008. DST is alleged to have close ties to the Kremlin and Putin.

107.    Dorsey and Durban also breached their fiduciary duties by failing to engage in a market check, failing to shop the Company to other potential suitors, and providing Musk with a no-shop agreement. The Twitter Board clearly preferred the interests of Musk to the exclusion of all other parties. The Proxy admits that "The Twitter Board determined not to contact other parties" before

---

[24] *See* Ivan Levingston, "Musk's Twitter Bid Includes Financier Linked to Russian Tycoon," Bloomberg, June 8, 2022.

[25] *Id.*

Complaint for Aiding and Abetting Breach of Fiduciary Duty, Declaratory and Injunctive Relief, and Unjust Enrichment

1   agreeing to accept Musk's first and only offer.[26]   A mere ten days elapsed between the time Musk's

2   offer was publicly announced on April 14, 2022 and the date the Twitter Board accepted his offer on

3   April 24, 2022.

4   **E.   As Tesla's Stock Plunges in the 30 Days After Announcement of the Buyout,**
    **Threatening a Margin Call and a Forced Sale of Musk's Tesla Stock, Musk**

5   **Begins to Make False Statements and Engage in Market Manipulation of**
    **Twitter's Stock**

6

7   108.   Between April 25, 2022, when the Proposed Buyout was announced, and May 12, 2022,

8   Tesla's stock declined by 27%. The substantial decline in Tesla's stock threatened a margin call on

9   Musk's Tesla stock which was pledged as collateral for his $12.5 billion loan from Morgan Stanley and

10  other banks.  In addition, according to his financing plan, Musk has not only pledged his Tesla stock for

11  the $12.5 billion loan from Morgan Stanley and other banks, but will have to sell $21 billion worth of

12  Tesla stock, about 20 million shares, to fund the cash part of the deal. With Tesla stock now entering a

13  bear market, selling millions of shares is equivalent to having to book a huge loss. Musk thus has a

14  strong motivation to attempt to delay the Proposed Buyout in the hope that Tesla shares will rebound in

15  value before he is forced to sell them.  It has also been reported that due to his strong aversion to selling

16  more Tesla shares at current depressed valuations, Musk is also looking at funding the Twitter buyout

17  by selling some shares of SpaceX through a private placement.[27] However, the current stock market

18  decline has made it difficult for Musk to do so at attractive valuations.

19  109.   In response to these problems and the plunging value of Tesla stock, Musk promptly

20  acted to disparage Twitter in a false and baseless manner, and in violation of both the non-

21  disparagement and non-disclosure clauses of his contract with Twitter.[28]  In doing so, Musk hoped to

22

23

24  [26] Proxy at p. 51.

25  [27] *See, e.g.*, Sissi Cao, "As Tesla Stock Falters, Elon Musk is Considering Selling SpaceX Shares to
    Fund His Twitter Deal," The Observer, May 18, 2022 ("Elon Musk appears to be hesitating over his

26  $44 billion acquisition of Twitter as a key funding source, his ownership in Tesla, quickly loses
    value.").

27  [28] The Merger Agreement also states in Paragraph 6.8 that "shall consult with each other before issuing

28  any press release or otherwise making any public statements with respect to this Agreement or the

Complaint for Aiding and Abetting Breach of Fiduciary Duty, Declaratory and Injunctive Relief,
and Unjust Enrichment

drive down Twitter's stock price and then use that as a pretext to attempt to re-negotiate the Buyout price.[29]  He also began to baselessly state that the Proposed Buyout was "temporarily on hold" in an effort to buy more time and avoid having to sell Tesla stock at depressed prices. Musk did so predominantly by using his Twitter account, which he established when he was a California citizen. Twitter is headquartered in San Francisco and Musk's tweets were disseminated from San Francisco, California.

110.    Beginning on Friday, May 13, 2022, and continuing to the present, Musk has disseminated the following false statements:

### 1.    Musk's May 13, 2022 Tweet

111.    On Friday, May 13, 2022 ("Friday the 13th"), at 5:44 a.m. (*i.e.*, before the stock market opened), Musk issued a tweet which stated that the buyout was "temporarily on hold":



transactions contemplated by this Agreement, and none of the parties hereto or their Affiliates shall issue any such press release or make any public statement prior to obtaining the other parties' consent."

[29] The Buyout agreement is also atypical in that it does not have a standstill agreement.  Thus, Musk could presumably also be buying additional Twitter shares at the depressed prices caused by his market manipulation.

Complaint for Aiding and Abetting Breach of Fiduciary Duty, Declaratory and Injunctive Relief, and Unjust Enrichment

112.    Musk's statement was false and misleading and constituted an effort to manipulate the market for Twitter shares.  The statement was false because the Buyout was not, in fact, "temporarily on hold."  Vijaya Gadde, Twitter's top lawyer, has stated that there is nothing in the buyout contract that allows Musk to put the deal "temporarily on hold." Moreover, Musk's statement was misleading because it stated or implied that Musk's obligation to consummate the Buyout was conditioned on his satisfaction with due diligence to determine whether "spam/fake accounts do indeed represent less than 5% of users." Musk had specifically waived detailed due diligence as a condition precedent to his obligations under the Buyout contract. Thus, Musk has no right to cancel the Buyout based on any results from due diligence concerning the number of fake accounts on Twitter.

113.    In response to this Tweet, Twitter's stock price declined. Later the same day, Musk issued the following Tweet:



114.    In response to a question about why he was using a sample of 100 Twitter users, Musk replied:



Complaint for Aiding and Abetting Breach of Fiduciary Duty, Declaratory and Injunctive Relief, and Unjust Enrichment

### 2.   Musk's May 14, 2022 Tweet

115.   Musk had allegedly obtained non-public information about the process Twitter uses to investigate duplicate and fake accounts from Twitter as part of the Proposed Buyout diligence. Musk sent a tweet on Saturday, May 14, 2022, disclosing that he had received a call from Twitter's lawyers advising him that he had violated the terms of the Non-Disclosure Agreement ("NDA"):



116.   Musk's supposed concern about the number of bots and fake accounts in Twitter would appear to be pretextual, given the fact that Musk has known about the issue long before he offered to acquire Twitter.

117.   For example, Musk and his lawyers were well aware of the **$809.5 million settlement** Twitter had been forced to enter into **in September 2021, just hours before trial was set to begin** in a securities fraud class action alleging Twitter overstated its user numbers and growth rate -- *In re Twitter Inc. Securities Litigation*, 16-cv-05314, U.S. District Court, Northern District of California (San Francisco).  All the documents from that case were publicly available to Musk, including a website (www.twittersecuritieslitigation.com) containing, among other things, the Court's order denying Twitter's motion for summary judgment.  *See* **Exhibit A** (April 17, 2020 Order Denying Motion for Summary Judgment, at p. 16)(holding that Twitter's false statements about its Daily Active Users (DAUs) and Monthly Active Users (MAUs) were material because "Twitter has publicly stated that its success and financial performance depend, at least in part, on the size and engagement of its user base.").

118.   Moreover, Twitter's SEC filings have long disclosed that there are duplicate and fake accounts on Twitter.  For example, Twitter's 2021 Annual Report disclosed that:

Complaint for Aiding and Abetting Breach of Fiduciary Duty, Declaratory and Injunctive Relief, and Unjust Enrichment

The numbers of mDAU presented in this Annual Report on Form 10-K are based on internal company data. While these numbers are based on what we believe to be reasonable estimates for the applicable period of measurement, there are inherent challenges in measuring usage and engagement across our large number of total accounts around the world. Furthermore, our metrics may be impacted by our information quality efforts, which are our overall efforts to reduce malicious activity on the service, inclusive of spam, malicious automation, and fake accounts. For example, *there are a number of false or spam accounts in existence on our platform. We have performed an internal review of a sample of accounts and estimate that the average of false or spam accounts during the fourth quarter of 2020 represented fewer than 5% of our mDAU during the quarter.* The false or spam accounts for a period represents the average of false or spam accounts in the samples during each monthly analysis period during the quarter. *In making this determination, we applied significant judgment, so our estimation of false or spam accounts may not accurately represent the actual number of such accounts, and the actual number of false or spam accounts could be higher than we have estimated*.[30]

119.    In addition, news reports and blog posts as far back as 2017 had regularly reported that "It has been extensively reported that incidences of spamming by bots and fake accounts on Twitter have been increasing."[31]

120.    In fact, as noted sarcastically by one of his Twitter followers, getting rid of the bots and fake accounts was one of Musk's stated reasons for wanting to buy Twitter:



---

[30] See Form 10-K, filed 2/17/21, at p. 5.

[31] *See* Ankit Singh, Identifying Fake Accounts and Twitter Bots using Artificial Intelligence," May 31, 2017, available at https://blog.paralleldots.com/research/identifying-fake-accounts-twitter-bots-using-artificialintelligence/#:~:text=It%20has%20been%20extensively%20reported%20that%20incidences %20of,and%20opinions%2C%20creating%20confusions%20and%20potentially%2C%20spreading %20rumors.

Complaint for Aiding and Abetting Breach of Fiduciary Duty, Declaratory and Injunctive Relief, and Unjust Enrichment

### 3.     Musk's May 16, 2022 Statement

121.    On May 16, 2022, Musk stated during the All In Summit,  a tech conference in Miami, that fake and spam accounts make up at least 20% of Twitter's users.

122.    Twitter's CEO Parag Agrawal attempted to respond to Musk with the following tweet:



123.    In response, Musk tweeted a poop emoji to Agrawal:



124.     Musk later the same day tweeted  the  following  follow-up  comment,  stating  that information about the number of fake accounts was "fundamental to the financial health of Twitter":



Complaint for Aiding and Abetting Breach of Fiduciary Duty, Declaratory and Injunctive Relief, and Unjust Enrichment

1

####      4.    Musk's May 17, 2022 Tweet

2       125.    On May 17, 2022, Musk doubled down on his "Friday the 13th" tweet and May 16th

3  statement and issued another tweet stating that the actual number of fake accounts at Twitter could be

4  "much higher" than 20% and that the deal "cannot go forward:"

5

6

7                      

8

9

10

11

12       126.    In response to this Tweet, Twitter's stock price declined.

13       127.    The same day, Twitter caused Musk's afore-mentioned tweet to be filed with the SEC on

14  Schedule 14A as a supplemental proxy solicitation.  The Schedule 14A stated:

15       **In connection with the pending acquisition of Twitter, Inc. by affiliates of Elon**
         **Musk, Elon Musk (@elonmusk), posted the following Tweets on May 17, 2022:**

16       . . .

17

18

19

20

21                      

22

23

24

25

26

27

28

Complaint for Aiding and Abetting Breach of Fiduciary Duty, Declaratory and Injunctive Relief,
and Unjust Enrichment

**Participants in the Solicitation**

Twitter, Inc. ("Twitter"), its directors and certain of its executive officers are participants in the solicitation of proxies from Twitter's stockholders in connection with the pending acquisition of Twitter by the filing persons (the "Transaction"). X Holdings I, Inc., X Holdings II, Inc. and Elon Musk, the filing persons hereunder, may also be deemed to be participants in the solicitation of proxies from Twitter's stockholders in connection with the Transaction. Twitter intends to file a proxy statement (the "Transaction Proxy Statement") with the Securities and Exchange Commission (the "SEC") in connection with the solicitation of proxies to approve the Transaction.

128.    Thus, Twitter's Proxy Statements admit that Twitter, Musk, X Holdings I, Inc., and X Holdings II, Inc are participants in the solicitation of proxies from Plaintiff and other Twitter shareholders.

129.    The same day (May 17, 2022), Musk invited the SEC to investigate Twitter.

    5.    **Musk's May 21, 2022 Tweets**

130.    On **May 21, 2022**, Musk suggested in a series of tweets that he could be seeking to reduce the price of the Buyout by up to 25% of the originally agreed-upon price. Replying to a tweet from Ion Miles Chong, saying "If 25% of the users are bots then the Twitter acquisition deal should cost 25% less," Musk replied: "Absolutely."

131.    If the Buyout price is reduced by 25%, that would amount to an $11 billion reduction.

132.    On May 21, 2022, Musk stated, "I'm worried that Twitter has a disincentive to reduce spam, as it reduces perceived daily users." Musk also tweeted on May 21, and asked whether Twitter had gotten back to him on the bots number discrepancy, he added: "No, they still refuse to explain how they calculate that 5% of daily users are fake/spam! Very suspicious."

    ///

133.   Musk's false and misleading tweets and disparagement of Twitter had the desired effect, as they caused Twitter's stock to decline substantially in the days following the tweets, erasing over $8 billion in market capitalization, reflected in the following chart:



134.   Musk's false and disparaging statements have caused the spread between the $54.20 Buyout price and Twitter's stock price to exceed $15 per share, which is highly unusual:



Complaint for Aiding and Abetting Breach of Fiduciary Duty, Declaratory and Injunctive Relief, and Unjust Enrichment

135. Unfortunately for Musk, Tesla's stock price also continued its decline. On Friday, May 20, 2022, Tesla stock closed at $635.07. That represented an even further deterioration of Tesla's stock since the Proposed Buyout was announced – ***a 35% drop in Tesla's stock price***. As noted by the Washington Post:

> ***Tesla's stock — and Elon Musk's wealth — took a huge hit Friday, continuing a downward spiral and possibly imperiling the billionaire's deal to buy Twitter***.

> ***Shares of the electric car company***, from which much of Musk's wealth comes, ***sank more than 10 percent during trading Friday, falling at one point to about $636 per share. That's about a 35 percent drop from its price on the day Musk's deal to buy Twitter*** was announced.

> The downturn of Tesla's stock could have more than just a superficial impact on Musk's wealth.

> Tesla's value dropped Tuesday by more than double the cost of Twitter
> Musk has taken out extensive personal loans that are heavily tied to the value of Tesla's stock. At times, he has put down as much as 50 percent of his Tesla shares as collateral to back them. ***As the company's share price approaches $600, Musk enters dangerous territory with lenders — where they could seek some of his equity to ease their confidence in his ability to pay***, according to analysts. [32]

136. On **May 25, 2022**, Twitter held its Annual Meeting. At the meeting, shareholders of Twitter voted against re-electing Egon Durban, an ally to Musk, as a director o the board. Durban, the co-head of private equity firm Silver Lake, had partnered with Musk when he sought to take Tesla, the electric carmaker, private as its CEO. As a result, Durban tendered his resignation the same day. The votes were as follows:

| Nominee | For | Against | Abstain | Broker Non-Votes |
|---|---|---|---|---|
| Egon Durban | 196,812,521 | 257,276,746 | 684,456 | 148,105,876 |

137. Also on **May 25, 2022**, Musk filed an Amended Form 13D. The Amended 13D confirmed the incredible pressure that Musk's margin loan had been exerting on him. The filing

---

[32] *See* Rachel Lerman, "Tesla's Stock Price Plummets as Twitter Deal Hangs in the Balance," THE WASHINGTON POST, May 20, 2022.

Complaint for Aiding and Abetting Breach of Fiduciary Duty, Declaratory and Injunctive Relief, and Unjust Enrichment

disclosed that he let the $12.5 billion margin loan from Morgan Stanley and other banks, for which he had pledged his Tesla stock as collateral, expire on May 24, 2022.  The Amended Form 13D states that Musk intends to replace the $12.5 billion loan with "equity financing" but does not state where Musk will obtain such equity financing or what form it will take.

138.    On **May 27, 2022**, Twitter filed a Form 8-K with the SEC disclosing that, on May 26, 2022, its Board determined not to accept Durban's resignation "in connection with Mr. Durban's agreement to reduce his board service commitment to no more than five public company boards by May 25, 2023 (the "Remediation Date").  In making its determination, the Board considered the recommendation of the Company's Nominating and Corporate Governance Committee (the "Nominating Committee") to not accept the Tendered Resignation."

139.    On **June 6, 2022**, Musk filed an Amended Schedule 13D which attached a letter Musk sent to Twitter the same day. In the letter, Musk claimed that "Twitter has, in fact, refused to provide the information that Mr. Musk has repeatedly requested since  May 9, 2022 to facilitate his evaluation of spam and fake accounts on the company's platform" and that "Musk has made it clear that he does not believe the company's lax testing methodologies are adequate so he must conduct his own analysis. The data he has requested is necessary to do so."  Musk then went on to threaten to back out of the deal:

> "Mr. Musk believes the company is actively resisting and thwarting his information rights (and the company's corresponding obligations) under the merger agreement. This is a clear material breach of Twitter's obligations under the merger agreement and Mr. Musk reserves all rights resulting therefrom, including his right not to consummate the transaction and his right to terminate the merger agreement."

140.    In response to this filing, Twitter's stock declined by 5% intra-day and ended the day down 1.5%.

141.    Musk's repudiation of the Merger, false statements, and disparagement of Twitter have harmed Twitter shareholders and served to undermine the financing for the Merger. Any inability of Musk to secure further financing is thus a matter of his own doing.  Musk's false statements that the Merger is "on hold" and his other statements creating uncertainty about the deal have interfered with his own efforts to secure additional financing after he was forced to unwind his $12.5 billion in margin loans secured by Musk's Tesla stock.  As reported by Reuters on June 7, 2022, "Elon Musk's efforts to

arrange new financing that will limit his cash contribution to his $44 billion acquisition of Twitter Inc. have been put on hold because of the uncertainty surrounding the deal."[33]

142.    Musk has been attempting to arrange $2 billion to $3 billion in preferred equity financing for the Buyout from a group of private equity firms led by Apollo Group Management, which if secured would reduce his cash contribution.  According to Reuters and other sources, "These conversations are now on hold until there is clarity about the future of the acquisition, one of the sources said. ***The pause in financing offers the first clear sign that Musk's threats are interfering with steps that would help complete the deal***."[34]

143.    The uncertainty regarding the Buyout caused by Musk's false statements has also interfered with the debt financing.  The banks which have provided commitment letters for $13 billion in debt financing would normally, at this point, be attempting to get the debt off their books through syndication.  However, due to the uncertainty caused by Musk himself, those banks have delayed that effort until the uncertainty is resolved.  The banks do not believe that investors would purchase the debt as long as uncertainty about the Buyout remains.[35]  According to Reuters, "The banks have also found Musk's disparaging public comments about the company unhelpful, and were hoping he would be helping them by now with investor presentations to syndicate the deal. . . The syndication of the debt could emerge as a major issue for the banks were Musk's dispute with Twitter to escalate in litigation and they were forced by a judge to fund the deal.  In that scenario, they could struggle to get investors to buy the debt if Musk were unwilling to own the company."[36]

**F.    Musk and X Holdings I and X Holdings II Are Affiliates of Twitter**

144.    Defendants Musk and X Holdings I, Inc. and X Holdings II, Inc. are affiliates of Twitter for purposes of the Buyout.  Musk entered into a letter agreement with Twitter pursuant to which Musk

---

[33] *See* Krystal Hu and Greg Roumeliotis, "Musk's Twitter Deal Puts New Financing on Ice," Reuters, June 7, 2022.

[34] *Id.* (emphasis added).

[35] *Id.*

[36] *Id.*

Complaint for Aiding and Abetting Breach of Fiduciary Duty, Declaratory and Injunctive Relief, and Unjust Enrichment

was to join Twitter's Board, owns 9.6% of Twitter stock, and is reported to have entered into voting agreements or understandings with Morgan Stanley, which owns 8.8% of Twitter, and Jack Dorsey, who owns 2.4% of Twitter and is Twitter's founder.  Musk also has an equity rollover agreement with Saudi Prince Alwaleed Bin Talal—who owns 34,948,975 shares, or approximately 4.57% of Twitter's outstanding voting stock.  Musk thus controls at least 25.37% of Twitter's stock and vote.  In addition, Musk has offered Dorsey an equity rollover agreement in connection with the Buyout.  Musk has stated he is in negotiations to arrange other equity rollover deals and may also have additional voting agreements with other Twitter shareholders. Also, the Proxy admits that "**X Holdings I, Inc., X Holdings II, Inc. and Elon Musk, the filing persons hereunder, may also be deemed to be participants in the solicitation of proxies from Twitter's stockholders in connection with the Transaction**."

145.    Musk has a longstanding and close relationship with Morgan Stanley that spans more than a decade. Morgan Stanley served as an underwriter for the initial public offering of Tesla in 2010 and Musk's family office is headed by a former Morgan Stanley banker, Jared Birchall. Musk has repeatedly turned to Morgan Stanley in connection with his personal finances. As Mr. Birchall noted in a 2018 text message to Musk made public in other litigation, Morgan Stanley has provided Musk with his largest personal line of credit: "[Morgan Stanley has] been our best resource on the personal side, by far.  They provide you with the largest ($350M) of all the lines and each time we have pressed them for more borrow [sic] power or a lower rate, they've come through."

146.    As of late 2017, when Musk disclosed he had pledged approximately 40% of his shares in Tesla to obtain personal loans, the majority of those shares were pledged with Morgan Stanley. Musk also turned to Morgan Stanley in late 2018 for $61 million in mortgages on five properties he owned in California.  According to a recent Financial Times report, "Between 2016 and 2020, Morgan Stanley had loans outstanding to Musk of between $208.9mn and $344mn."

147.    Morgan Stanley is Musk's financial advisor in the Buyout and stands to profit handsomely from its role in facilitating Musk's Proposed Takeover.  According to a Bloomberg article titled "Goldman and Morgan Stanley Lead Six Banks Sharing Twitter Deal Fees," investment banks typically receive approximately 1% to 3% of the value of a merger deal in fees, which is allocated

among the banks involved.  Based on the approximately $44 billion Proposed Takeover purchase price, the range of investment banking fees for the deal is likely between $440 million and $1.3 billion. In light of its role as lead financial advisor and financier to Musk, Morgan Stanley will presumably receive the lion's share of those fees, potentially amounting to tens or possibly hundreds of millions of dollars.

148.    No later than April 20, 2022—the date of Morgan Stanley's financing commitment to Musk and, significantly, before the Board's agreement to the Buyout—Musk and Morgan Stanley had at least three distinct "agreement[s], arrangement[s] or understanding[s] for the purpose of acquiring, holding, voting . . . or disposing" of Morgan Stanley's Twitter stock.  First, Musk and Morgan Stanley had an agreement or understanding that Morgan Stanley would serve as Musk's financial advisor in connection with the Buyout and would work to accomplish Musk's acquisition of all Twitter shares that he did not already own, including Morgan Stanley's own shares of Twitter stock. Second, Musk and Morgan Stanley had an agreement that Morgan Stanley would finance Musk's acquisition of all Twitter shares that he did not already own, including Morgan Stanley's shares of Twitter stock. Third, Musk and Morgan Stanley had an agreement or understanding that Morgan Stanley would vote its Twitter shares in favor of Musk's bid to acquire Twitter.

149.    Musk also has several agreements or understandings with Dorsey with respect to the Buyout. Dorsey co-founded Twitter, was a member of the Board at all relevant times, and served as Twitter's Chief Executive Officer from May 2007 to October 2008 and from July 2015 to November 2021.  Dorsey and Musk are close friends who have spent years discussing Twitter's future together and, in particular, the possibility of taking Twitter private.  In 2019, Dorsey said of Musk: "I love him. I love what he's trying to do, and I want to help in whatever way."[37]

150.    Dorsey also encouraged Musk's pursuit of the Buyout, specifically encouraging him to take the Company private.  It was reported that "Twitter's co-founder and former Chief Executive Jack Dorsey, who resigned last year under pressure from his board, was whispering in Mr. Musk's ear that

---

[37] *See* Biran Hiatt, "Twitter CEO Jack Dorsey: The Rolling Stone Interview,"  ROLLING STONE (Jan. 23, 2019).

Complaint for Aiding and Abetting Breach of Fiduciary Duty, Declaratory and Injunctive Relief, and Unjust Enrichment

Twitter should be a private company, people familiar with the matter say."[38]  Moreover, after the Board initially reacted defensively to Musk's takeover bid, Dorsey sided with Musk, calling his own  Board the "consistent dysfunction of the company."

151.    On April 18, 2022, CNBC reporter Scott Wapner asked Dorsey for additional information concerning Dorsey's expressed views that the "Board is/was so dysfunctional and kept the company from being great," Dorsey responded on Twitter: "so much to say . . . but nothing that can be said."  When  Board approval for the Buyout was finally secured, Dorsey tweeted: "Elon is the singular solution I trust.  I trust his mission to extend the light of consciousness" and "This is the right path . . . I believe it with all my heart."

152.    In addition, it has been widely speculated that upon closing of the Buyout, Musk may reinstate Dorsey as CEO of Twitter.[39]

153.    Moreover, in a Schedule 13D/A filing with the SEC on May 5, 2022, in which Musk disclosed additional financing sources for the Buyout and noted that he "is having, and will continue to have, discussions with certain existing holders of Common Stock (including Jack Dorsey) regarding the possibility of contributing [their] shares of Common Stock to [Musk's wholly-owned entity acquiring Twitter], at or immediately prior to the closing of the Merger, in order to retain an equity investment in Twitter following completion of the Merger in lieu of receiving  Merger Consideration in the Merger."

154.    In addition to Dorsey, Musk is reported to have an equity rollover agreement with Saudi Prince Alwaleed  Bin Talal—who owns 34,948,975 shares, or approximately 4.57% of Twitter's outstanding voting stock.

///

---

[38] *Id.*

[39] *See, e.g.,* Kurt Wagner, "With Musk in Charge at Twitter, Could Jack Come Back?," BLOOMBERG (April 26, 2022).

# VII.   CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Class Action Claim for Aiding and Abetting Breach of Fiduciary Duty Under Delaware Law

### (Against Defendant Musk and X Holdings I, Inc. and X Holdings II, Inc.)

155.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein, except for the causes of action.

156.    This claim is brought under Delaware law against Defendants Musk and X Holdings I, Inc. and X Holdings II, Inc. for aiding and abetting breach of fiduciary duty.

157.    Dorsey and Durban breached their fiduciary duties by failing to protect the best interests of Twitter and instead preferring and favoring Musk's interests in the Buyout. Dorsey publicly denigrated Twitter's Board, stating that the Board had "consistently been the dysfunction of the company." Durban and Dorsey acted out of allegiance to Musk and supported Musk's interests in the Buyout. Both Dorsey and Durban failed to negotiate at arms'-length with Musk and instead simply accepted Musk's first offer to acquire Twitter.

158.    Dorsey was offered special benefits not available to Twitter's public shareholders, as Musk offered Dorsey the ability to retain an equity investment in Twitter following the completion of the Buyout. The Proxy, however, falsely stated that no director had any special interests in the Buyout. As a result, Dorsey was conflicted in the Buyout and preferred his own interests.

159.    Dorsey and Durban also failed to engage in due diligence regarding Musk's sources of financing for the Buyout before accepting the first and only offer from Musk. Dorsey and Durban failed to shop the Company to other potential suitors, failed to cause the Company's bankers to perform a market check, and provided Musk with a no-shop agreement. A mere 10 days elapsed between the time Musk made his offer and the time Twitter's Board accepted the offer, during which time Musk was given exclusivity and no effort was made to seek alternative options.

160.    Durban was serving on Twitter's Board as Silver Lake's representative. He was Silver Lake's Managing Partner and Co-CEO at the time of the Proposed Buyout. Musk already had a history with the California-based private equity firm. He was in talks with Silver Lake Partners and Goldman Sachs on a similar proposal to take Tesla private in 2018. However, the plan did not

materialize, resulting in a lawsuit against him.  Durban and Silver Lake have been loyal to Musk at all times and preferred his interests in the Buyout over those of Twitter and its other shareholders. X Holdings I, Inc. and X Holdings II, Inc. are entities controlled by Musk and took actions at Musk's direction to carry out his unlawful conduct.

161.    Plaintiff and the Class suffered damages as a result of the acts and conduct of  Dorsey and Durban. As a result of, inter alia, Defendant Musk's knowing participation in Dorsey's and Durban's breaches, Twitter stockholders suffered damages alleged herein.

162.    As a direct and proximate result of Defendant's violations of law described herein, Plaintiff and members of the Class have been damaged.

## SECOND CAUSE OF ACTION

### Individual Claim For Declaratory and Injunctive Relief Under California Law

### (Against Defendant Twitter, Inc., Musk, and X Holdings I, Inc. and X Holdings II, Inc.)

163.    Plaintiff seeks declaratory and injunctive relief, under California law, against Defendants pertaining to Defendant Musk's outstanding and current offer to buy the Twitter stock of Plaintiff and the Class for $54.20.

164.    A  justiciable, present controversy exists between the parties.  Defendants Musk and X Holdings I, Inc. and X Holdings II, Inc. signed a binding contract to buy Plaintiff's stock for $54.20. But  Defendant  Musk thereafter publicly stated that the Buyout is "temporarily on hold" and "cannot go forward" until certain conditions are met.

165.    The conditions that  Musk has stated must be met before the Buyout can go forward do not appear to be part of the contract he signed with Twitter, Inc.  Plaintiff thus seeks a declaration concerning these facts and issues and the parties' respective rights and obligations.  Plaintiff also seeks appropriate injunctive relief to be determined by the Court.

## THIRD CAUSE OF ACTION

### Class Action Claim For Unjust Enrichment Under Delaware Law

### (Against Defendant Musk)

166.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein, except for the causes of action.

167.    This cause of action is brought against Defendant Musk under Delaware law. Through the conduct alleged herein, Defendant Musk has been unjustly enriched.

168.    As a matter of equity, Musk should not be allowed to retain the monies and benefits he unjustly acquired through his false statements, market manipulation, and other improper conduct.

169.    As a matter of equity, Musk should be ordered to disgorge his unjust received monies and profits and all interest earned from such monies and benefits.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the Class, pray for the following judgment and relief:

A.    Certifying this action as a class action and certifying Plaintiff as the Class representative and their counsel as Class counsel;

B.    Directing that Defendant Musk account to Plaintiff and the other members of the Class for all damages caused to them, and account for all profits and any special benefits obtained as a result of his unlawful conduct;

C.    Awarding Plaintiff declaratory and injunctive relief from Twitter and Musk;

D.    Awarding punitive damages at the maximum amount permitted by law;

E.    Awarding Plaintiff and the other members of the Class compensatory damages;

F.    Awarding Plaintiff and the other members of the Class pre-judgment and post judgment interest,

G.    Awarding Plaintiff the costs and disbursements of this action, including a reasonable allowance for the fees and expenses of attorneys and experts; and

H.    Granting Plaintiff and the other members of the Class such other and further relief as may be just and proper.

## IX.   JURY TRIAL DEMAND

Plaintiff demands a trial by jury on all claims and issues so triable.

///

Dated: July 1, 2022

Respectfully submitted,

**BOTTINI & BOTTINI, INC.**

*/s/ Francis A. Bottini, Jr.*
Francis A. Bottini, Jr.

Francis A. Bottini, Jr. (SBN 175783)
Anne B. Beste (SBN 326881)
Albert Y. Chang (SBN 296065)
Yury A. Kolesnikov (SBN 271173)
Nicholas H. Woltering (SBN 337193)
7817 Ivanhoe Avenue, Suite 102
La Jolla, California  92037
Telephone:     (858) 914-2001
Facsimile:     (858) 914-2002

**COTCHETT, PITRE & MCCARTHY, LLP**

*/s/ Anne Marie Murphy*
Anne Marie Murphy

Joseph W. Cotchett (SBN 36324)
Mark C. Molumphy (SBN 168009)
Anne Marie Murphy (SBN 202540)
Tyson C. Redenbarger (SBN 294424)
Julia Q. Peng (SBN 318396)
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone:     (650) 697-6000

*Counsel for Plaintiff*

Complaint for Aiding and Abetting Breach of Fiduciary Duty, Declaratory and Injunctive Relief, and Unjust Enrichment