1 | Daniel H.R. Laguardia (SBN 314654)
SHEARMAN & STERLING LLP
2 | 535 Mission Street, 25th Floor
San Francisco, CA 94105
3 | Telephone:   (415) 616-1100
Fax:   (415) 616-1199
4 | Email: daniel.laguardia@shearman.com

5 | Adam S. Hakki (admitted *pro hac vice*)
Paula H. Anderson (admitted *pro hac vice*)
6 | SHEARMAN & STERLING LLP
599 Lexington Avenue
7 | New York, New York 10022
Telephone:   (212) 848-4000
8 | Fax:   (212) 848-7179
Email: adam.hakki@shearman.com
9 |        paula.anderson@shearman.com

10 | *Attorneys for Defendant Twitter, Inc.*

11 |                 UNITED STATES DISTRICT COURT

12 |               NORTHERN DISTRICT OF CALIFORNIA

13 |                  SAN FRANCISCO DIVISION

14 | WILLIAM HERESNIAK, on behalf of
himself and all others similarly situated,      Case No. 3:22-cv-03074

15 |                                              **DECLARATION OF PAULA H.**
                     Plaintiff,                  **ANDERSON IN SUPPORT OF**
16 |                                              **DEFENDANT TWITTER, INC.'S**
                       v.                        **OPPOSITION TO MOTION TO**
17 |                                              **EXPEDITE AND COORDINATE**
ELON R. MUSK, X HOLDINGS I, INC., X             **DISCOVERY**
18 | HOLDINGS II, INC., and TWITTER, INC.,

19 |                    Defendants.

1    I, Paula H. Anderson, hereby declare as follows:

2        1.    I am a member of the bar of the state of New York and am admitted *pro hac vice* to

3    appear before this Court. I am a partner at the law firm of Shearman & Sterling LLP, attorneys of

4    record for Defendant Twitter, Inc. ("Twitter") in the above-captioned matter. I am familiar with

5    and have personal knowledge of the pleadings and proceedings in this case and the facts set forth

6    in this declaration, and, if called to do so, I could and would testify competently thereto, except

7    where my knowledge is based upon information and belief, and as to those matters, I understand

8    and believe them to be true.

9        2.    Twitter was served with the Amended Complaint in this action on July 11, after

10   Twitter's chairman announced that Twitter would take legal action against Elon Musk ("Musk").

11       3.    Attached hereto as Exhibit 1 is a true and correct copy of the Agreement and Plan of

12   Merger by and among X Holdings I, Inc., X Holdings II, Inc., and Twitter, dated as of April 25,

13   2022 (the "Merger Agreement"), that was filed with the Securities and Exchange Commission

14   ("SEC").

15       4.    Attached hereto as Exhibit 2 is a true and correct copy of a letter from counsel for

16   Musk, X Holdings I, Inc. and X Holdings II, Inc. (the "Musk Defendants"), to Twitter dated July

17   8, 2022, that was filed with the SEC.

18       5.    Attached hereto as Exhibit 3 is a true and correct copy of a Schedule 14A that was

19   filed with the SEC reflecting a public statement made by Twitter's chairman on July 8, 2022.

20       6.    Attached hereto as Exhibit 4 is a true and correct copy of the Verified Shareholder

21   Class Action Complaint filed in Delaware Chancery Court on July 29, 2022, in *Luigi Crispo v.*

22   *Elon R. Musk et al.*, C.A. No. 2022-0666 (the "Crispo Action"). The Crispo Action has been

23   assigned to Chancellor McCormick.

24       7.    Attached hereto as Exhibit 5 is a true and correct copy of Plaintiff's Motion for

25   Expedited and Coordinated Proceedings filed in the Crispo Action.

26

27

28

8.      Attached hereto as Exhibit 6 is a true and correct copy of a letter filed in the Crispo Action by the plaintiff's counsel on August 19, 2022, and an accompanying [Proposed] Order Regarding Scheduling and Coordinated Proceedings.

9.      Attached hereto as Exhibit 7 is a true and correct copy of the Motion to Dismiss Plaintiff's Verified Shareholder Class Action Complaint and the Brief in Support filed by the Musk Defendants in the Crispo Action on August 18, 2022.

10.      Attached hereto as Exhibit 8 is a true and correct copy of an email sent by Plaintiff's counsel to Defendant's counsel on August 9, 2022.

11.      Attached hereto as Exhibit 9 is a true and correct copy of the Amended and Restated Bylaws of Twitter, Inc. as amended on February 14, 2022, that was filed with the SEC.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 23, 2022.

By:  /s/ *Paula H. Anderson*
Paula H. Anderson

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that the foregoing document was served on all counsel of record electronically or by another manner authorized under FED. R. CIV. P. 5(b) on this the 23rd day of August 2022:

By: */s/ Daniel H.R. Laguardia*
Daniel H.R. Laguardia

# Exhibit 1

Exhibit 2.1

**EXECUTION VERSION**

AGREEMENT AND PLAN OF MERGER

by and among

X HOLDINGS I, INC.,

X HOLDINGS II, INC.

and

TWITTER, INC.

Dated as of April 25, 2022

**TABLE OF CONTENTS**

ARTICLE I DEFINITIONS | 2

ARTICLE II THE MERGER | 13

| Section 2.1 | The Merger | 13 |
| Section 2.2 | The Closing | 13 |
| Section 2.3 | Effective Time | 13 |
| Section 2.4 | Certificate of Incorporation and Bylaws | 13 |
| Section 2.5 | Board of Directors | 14 |
| Section 2.6 | Officers | 14 |

ARTICLE III EFFECT OF THE MERGER ON CAPITAL STOCK | 14

| Section 3.1 | Effect on Securities | 14 |
| Section 3.2 | Payment for Securities; Exchange of Certificates | 15 |
| Section 3.3 | Lost Certificates | 17 |
| Section 3.4 | Transfers; No Further Ownership Rights | 17 |
| Section 3.5 | Dissenting Shares | 17 |
| Section 3.6 | Company Equity Awards | 18 |
| Section 3.7 | Company ESPP | 20 |

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE COMPANY | 21

| Section 4.1 | Organization and Qualification; Subsidiaries | 21 |
| Section 4.2 | Capitalization | 21 |
| Section 4.3 | Authority Relative to Agreement | 23 |
| Section 4.4 | No Conflict; Required Filings and Consents | 23 |
| Section 4.5 | Permits; Compliance With Laws | 24 |
| Section 4.6 | Company SEC Documents; Financial Statements | 25 |
| Section 4.7 | Information Supplied | 25 |
| Section 4.8 | Disclosure Controls and Procedures | 25 |
| Section 4.9 | Absence of Certain Changes or Events | 26 |
| Section 4.10 | No Undisclosed Liabilities | 26 |
| Section 4.11 | Litigation | 26 |
| Section 4.12 | Employee Benefit Plans | 26 |
| Section 4.13 | Labor Matters | 28 |
| Section 4.14 | Intellectual Property | 28 |
| Section 4.15 | Taxes | 29 |
| Section 4.16 | Material Contracts | 30 |
| Section 4.17 | RESERVED | 30 |
| Section 4.18 | RESERVED | 30 |
| Section 4.19 | Takeover Statutes | 30 |
| Section 4.20 | Vote Required | 30 |
| Section 4.21 | Brokers | 30 |
| Section 4.22 | Opinions of Financial Advisors | 31 |
| Section 4.23 | Rights Agreement | 31 |
| Section 4.24 | RESERVED | 31 |

| | | |
|---|---|---|
| Section 4.25 | No Other Representations or Warranties | 31 |

**ARTICLE V REPRESENTATIONS AND WARRANTIES OF PARENT AND ACQUISITION SUB** — 31

| | | |
|---|---|---|
| Section 5.1 | Organization and Qualification | 31 |
| Section 5.2 | Authority Relative to Agreement | 32 |
| Section 5.3 | No Conflict; Required Filings and Consents | 33 |
| Section 5.4 | Financing | 33 |
| Section 5.5 | Information Supplied | 35 |
| Section 5.6 | Brokers | 35 |
| Section 5.7 | Compliance With Laws | 36 |
| Section 5.8 | Ownership of Company | 36 |
| Section 5.9 | Solvency | 36 |
| Section 5.10 | Parent Guarantee | 36 |
| Section 5.11 | Acknowledgment of Disclaimer of Other Representations and Warranties | 37 |

**ARTICLE VI COVENANTS AND AGREEMENTS** — 37

| | | |
|---|---|---|
| Section 6.1 | Conduct of Business by the Company Pending the Merger | 37 |
| Section 6.2 | Preparation of the Proxy Statement; Company Stockholders' Meeting | 40 |
| Section 6.3 | Efforts to Close; Regulatory Filings | 41 |
| Section 6.4 | Access to Information; Confidentiality | 43 |
| Section 6.5 | Non-Solicitation; Competing Proposals | 44 |
| Section 6.6 | Directors' and Officers' Indemnification and Insurance | 48 |
| Section 6.7 | Notification of Certain Matters | 50 |
| Section 6.8 | Public Announcements | 50 |
| Section 6.9 | Employee Benefits | 51 |
| Section 6.10 | Financing | 52 |
| Section 6.11 | Financing Cooperation | 56 |
| Section 6.12 | Acquisition Sub | 59 |
| Section 6.13 | Rule 16b-3 Matters | 59 |
| Section 6.14 | Delisting of Company Common Stock | 59 |

**ARTICLE VII CONDITIONS TO THE MERGER** — 59

| | | |
|---|---|---|
| Section 7.1 | Conditions to the Obligations of Each Party | 59 |
| Section 7.2 | Conditions to the Obligations of Parent and Acquisition Sub | 60 |
| Section 7.3 | Conditions to the Obligation of the Company to Effect the Merger | 60 |

**ARTICLE VIII TERMINATION, AMENDMENT AND WAIVER** — 61

| | | |
|---|---|---|
| Section 8.1 | Termination | 61 |
| Section 8.2 | Effect of Termination | 62 |
| Section 8.3 | Termination Fee | 63 |
| Section 8.4 | Amendment | 65 |
| Section 8.5 | Extension; Waiver | 65 |
| Section 8.6 | Expenses; Transfer Taxes | 66 |

ARTICLE IX GENERAL PROVISIONS 66

| | | |
|---|---|---|
| Section 9.1 | Non-Survival of Representations, Warranties and Agreements | 66 |
| Section 9.2 | Notices | 66 |
| Section 9.3 | Interpretation; Certain Definitions | 68 |
| Section 9.4 | Severability | 69 |
| Section 9.5 | Assignment | 69 |
| Section 9.6 | Entire Agreement | 69 |
| Section 9.7 | No Third-Party Beneficiaries | 69 |
| Section 9.8 | Governing Law | 69 |
| Section 9.9 | Specific Performance | 70 |
| Section 9.10 | Consent to Jurisdiction | 71 |
| Section 9.11 | Counterparts | 71 |
| Section 9.12 | WAIVER OF JURY TRIAL | 71 |
| Section 9.13 | Debt Financing Source Related Part | 71 |

**Index of Defined Terms**

| | |
|---|---|
| Acceptable Confidentiality Agreement | Section 6.5(c) |
| Acquisition Sub | Article I, Preamble |
| Acquisition Sub Board | Article I, Recitals |
| Adverse Board Recommendation Change | Section 6.5(d), Article I |
| Affiliate | Article I |
| Aggregate Merger Consideration | Article I |
| Agreement | Article I, Preamble |
| Alternative Financing | Section 6.10(c), Article I |
| Alternative Financing Debt Commitment Letter | Section 6.10(c), Article I |
| Antitrust Laws | Section 4.4(b), Article I |
| Bank Debt Commitment Letter | Section 5.4, Article I |
| Bank Debt Financing | Section 5.4, Article I |
| Blue Sky Laws | Article I |
| Book-Entry Shares | Section 3.1(c), Article I |
| Business Day | Article I |
| Canceled Shares | Section 3.1(b) |
| CCC | Article I |
| Certificate of Merger | Section 2.3(a), Article I |
| Certificates | Section 3.1(c), Article I |
| Closing | Section 2.2, Article I |
| Closing Date | Section 2.2, Article I |
| Code | Article I |
| Company | Article I, Preamble |
| Company ASR Confirmations | Article I |
| Company Benefit Plan | Article I |
| Company Board | Article I, Recitals |
| Company Board Recommendation | Recitals |
| Company Bond Hedge Documentation | Article I |
| Company Bond Hedge Transactions | Article I |
| Company Bylaws | Section 4.1, Article I |
| Company Certificate of Incorporation | Section 4.1, Article I |
| Company Common Stock | Section 3.1(b), Article I |
| Company Disclosure Letter | Article I |
| Company Equity Awards | Article I |
| Company ESPP | Article I |
| Company Intellectual Property | Section 4.14(a), Article I |
| Company Material Adverse Effect | Article I |
| Company Material Contract | Section 4.16(a), Article I |
| Company Option | Article I |
| Company Permits | Section 4.5(a), Article I |
| Company PSU | Article I |
| Company Related Parties | Section 8.3(c), Article I |
| Company RSA | Article I |
| Company RSU | Article I |
| Company SEC Documents | Section 4.6(a), Article I |

| | |
|---|---|
| Company Service Provider | Article I |
| Company Stockholder Advisory Vote | Section 4.3(a), Article I |
| Company Stockholder Approval | Section 4.20, Article I |
| Company Stockholders' Meeting | Section 6.2(c), Article I |
| Company Warrant Confirmations | Article I |
| Competing Proposal | Section 6.5(g)(i), Article I |
| Consent | Section 4.4(b), Article I |
| Continuation Period | Section 6.9(a), Article I |
| Continuing Employees | Section 6.9(a), Article I |
| Contract | Article I |
| COVID-19 | Article I |
| COVID-19 Measures | Article I |
| D&O Indemnified Parties | Section 6.6(a), Article I |
| Debt Commitment Letters | Section 5.4, Article I |
| Debt Financing | Section 5.4, Article I |
| Debt Financing Source | Article I |
| Debt Financing Source Related Party | Article I |
| DGCL | Article I, Recitals |
| Dissenting Shares | Section 3.5, Article I |
| DTC | Article I |
| Effective Time | Section 2.3(a), Article I |
| Enforceability Exceptions | Section 4.3(a), Article I |
| Equity Commitment Letter | Section 5.4, Article I |
| Equity Financing | Section 5.4 |
| Equity Investor | Preamble |
| ERISA | Article I |
| ERISA Affiliate | Article I |
| Exchange Act | Article I |
| Exchange Fund | Section 3.2(a), Article I |
| Existing 2027 Senior Notes | Article I |
| Existing 2030 Senior Notes | Article I |
| Existing Convertible Notes | Article I |
| Existing Credit Agreement | Article I |
| Existing D&O Insurance Policies | Section 6.6(c), Article I |
| Existing Senior Notes | Article I |
| Expenses | Article I |
| Final Offering Period | Section 3.7, Article I |
| Financing | Section 5.4, Article I |
| Financing Agreements | Section 6.10(a)(i), Article I |
| Financing Commitments | Section 5.4, Article I |
| Financing Sources | Article I |
| Foreign Investment Laws | Article I |
| Foreign Plan | Article I |
| Funding Obligations | Section 5.4, Article I |
| GAAP | Article I |
| Goldman Sachs | Section 4.21, Article I |

| | |
|---|---|
| Governmental Authority | Article I |
| Guarantor | Recitals |
| Hazardous Materials | Article I |
| HSR Act | Article I |
| Intellectual Property Rights | Section 4.14(a), Article I |
| Intervening Event | Section 6.5(d) |
| IRS | Article I |
| J.P. Morgan | Section 4.21 |
| Knowledge | Article I |
| Law | Article I |
| Lien | Article I |
| Margin Loan Borrower | Section 5.4, Article I |
| Margin Loan Commitment Letter | Section 5.4, Article I |
| Margin Loan Financing | Section 5.4, Article I |
| Merger | Article I, Recitals |
| Merger Consideration | Section 3.1(c), Article I |
| Notice of Adverse Board Recommendation Change | Section 6.5(d), Article I |
| Notice of Superior Proposal | Section 6.5(d), Article I |
| Order | Article I |
| Parent | Article I, Preamble |
| Parent Board | Article I, Recitals |
| Parent Disclosure Letter | Article I |
| Parent Guarantee | Recitals |
| Parent Material Adverse Effect | Article I |
| Parent Owned Shares | Section 5.8 |
| Parent Related Parties | Section 8.3(c), Article I |
| Parent Termination Fee | Article I |
| Paying Agent | Section 3.2(a), Article I |
| Paying Agent Agreement | Section 3.2(a), Article I |
| Permitted Lien | Article I |
| Person | Article I |
| Personal Information | Section 4.14 |
| Post-Closing Plans | Section 6.9(b), Article I |
| Post-Closing Welfare Plans | Section 6.9(c), Article I |
| Proxy Statement | Section 4.7, Article I |
| Representatives | Section 6.4, Article I |
| SEC | Article I |
| Secretary of State | Section 2.3(a), Article I |
| Securities Act | Article I |
| Silver Lake Investment Agreement | Article I |
| Solvent | Section 5.9, Article I |
| Specified Provisions | Article I, Preamble |
| Stockholder Rights | Article I |
| Stockholder Rights Agreement | Article I |
| Stockholder Rights Plan | Article I |
| Subsidiary | Article I |

| | |
|---|---|
| Superior Proposal | Section 6.5(g)(iii), Article I |
| Surviving Corporation | Section 2.1, Article I |
| Tax | Article I |
| Tax Returns | Article I |
| Taxes | Article I |
| Termination Date | Section 8.1(b)(i), Article I |
| Termination Fee | Article I |
| Tesla Shares | Article I |
| Third Party | Article I |
| U.S. | Article I |
| Unvested Company Option | Section 3.6(a)(ii) |
| Unvested Company PSU | Section 3.6(b)(ii) |
| Unvested Company RSU | Section 3.6(d)(ii) |
| Unvested Option Consideration | Section 3.6(a)(ii) |
| Unvested PSU Consideration | Section 3.6(b)(ii) |
| Unvested RSA Consideration | Section 3.6(c) |
| Unvested RSU Consideration | Section 3.6(d)(ii) |
| Vested Company Option | Section 3.6(a)(i) |
| Vested Company PSU | Section 3.6(b)(i) |
| Vested Company RSU | Section 3.6(d)(i) |
| Vested Option Consideration | Section 3.6(a)(i) |
| Vested PSU Consideration | Section 3.6(b)(i) |
| Vested RSU Consideration | Section 3.6(d)(i) |

### AGREEMENT AND PLAN OF MERGER

THIS AGREEMENT AND PLAN OF MERGER, dated as of April 25, 2022 (this "**Agreement**"), is made by and among Twitter, Inc., a Delaware corporation (the "**Company**"), X Holdings I, Inc., a Delaware corporation ("**Parent**"), X Holdings II, Inc., a Delaware corporation and a direct wholly owned Subsidiary of Parent ("**Acquisition Sub**"), and, solely for purposes of <u>Sections 5.4</u>, <u>6.2(d)</u>, <u>6.3</u>, <u>6.8</u>, <u>6.10</u>, <u>6.11</u>, <u>6.12</u> and <u>9.9</u> (the "**Specified Provisions**"), Elon R. Musk (the "**Equity Investor**").

W I T N E S S E T H:

WHEREAS, the parties desire for Parent to acquire the Company by way of a merger (the "**Merger**") of Acquisition Sub with and into the Company pursuant to the General Corporation Law of the State of Delaware (the "**DGCL**") upon the terms and subject to the conditions set forth in this Agreement;

WHEREAS, the board of directors of Acquisition Sub (the "**Acquisition Sub Board**") has determined that it is advisable to, fair to and in the best interests of Acquisition Sub and its stockholders to effect the Merger of Acquisition Sub with and into the Company pursuant to the DGCL upon the terms and subject to the conditions set forth in this Agreement;

WHEREAS, the Company's board of directors (the "**Company Board**") has, by resolutions duly adopted by the unanimous vote of the directors at a duly held meeting (i) determined that the terms and conditions of this Agreement, the Merger and the other transactions contemplated by this Agreement are advisable and in the best interests of the Company and the Company's stockholders, (ii) authorized the execution and delivery of this Agreement and declared advisable and approved the consummation of the transactions contemplated by this Agreement, including the Merger, (iii) directed that this Agreement be submitted for consideration at a meeting of the Company's stockholders and (iv) subject to the terms of this Agreement, recommended that the Company's stockholders adopt this Agreement and approve the transactions contemplated by this Agreement, including the Merger (the "**Company Board Recommendation**");

WHEREAS, the Acquisition Sub Board has, by resolutions duly adopted, (i) determined that the terms and conditions of this Agreement, the Merger and the other transactions contemplated by this Agreement are advisable and in the best interests of the Acquisition Sub and Parent, as the sole stockholder of Acquisition Sub; (ii) authorized the execution and delivery of this Agreement and declared advisable and approved the consummation of the transactions contemplated by this Agreement, including the Merger, (iii) directed that this Agreement be submitted for consideration by Parent, as the sole stockholder of Acquisition Sub and (iv) recommended that Parent, as the sole stockholder of Acquisition Sub approve the Merger, and Parent, as the sole stockholder of Acquisition Sub, has approved this Agreement and the consummation of the transactions contemplated by this Agreement, including the Merger;

WHEREAS, the board of directors of Parent (the "**Parent Board**") has, by resolutions duly adopted by the unanimous vote of the directors, (i) adopted this Agreement and approved the consummation of the transactions contemplated by this Agreement, including the Merger and (ii) determined that this Agreement and the transactions contemplated by this Agreement are advisable and in the best interests of Parent and Elon Musk, as the sole stockholder of Parent;

WHEREAS, as a material inducement to, and as a condition to, the Company entering into this Agreement, concurrently with the execution of this Agreement, Elon Musk (the "**Guarantor**") has entered into a limited guarantee, dated as of the date hereof, guaranteeing certain of Parent's and Acquisition Sub's obligations under this Agreement (the "**Parent Guarantee**"); and

WHEREAS, each of Parent, Acquisition Sub and the Company desires to make certain representations, warranties, covenants and agreements in connection with the Merger and also to prescribe various conditions to the Merger.

NOW, THEREFORE, in consideration of the foregoing and the representations, warranties and covenants and subject to the conditions herein contained, and intending to be legally bound hereby, the parties hereto hereby agree as follows:

**ARTICLE I**

**DEFINITIONS**

As used in this Agreement, the following terms shall have the respective meanings set forth or referenced below:

"**Acquisition Sub**" shall have the meaning set forth in the Preamble.

"**Acquisition Sub Board**" shall have the meaning set forth in the Recitals.

"**Adverse Board Recommendation Change**" shall have the meaning set forth in Section 6.5(d).

"**Affiliate**" has the meaning set forth in Rule 12b-2 of the Exchange Act.

"**Aggregate Merger Consideration**" shall mean the product of (x) the number of shares of Company Common Stock issued and outstanding (other than those shares canceled or retired pursuant to Section 3.1(b)) immediately prior to the Effective Time *multiplied by* (y) the Merger Consideration.

"**Agreement**" shall have the meaning set forth in the Preamble.

"**Alternative Financing**" shall have the meaning set forth in Section 6.10(c).

"**Alternative Financing Debt Commitment Letter**" shall have the meaning set forth in Section 6.10(c).

"**Antitrust Laws**" shall have the meaning set forth in Section 4.4(b).

"**Bank Debt Commitment Letter**" shall have the meaning set forth in Section 5.4.

"**Bank Debt Financing**" shall have the meaning set forth in Section 5.4.

"**Blue Sky Laws**" shall mean state securities or "blue sky" laws.

"**Book-Entry Shares**" shall have the meaning set forth in Section 3.1(c).

"**Business Day**" shall mean any day other than a Saturday, Sunday or a day on which all banking institutions in San Francisco, California or New York, New York are authorized or obligated by Law or executive order to close.

"**CCC**" means the California Corporations Code.

"**Certificate of Merger**" shall have the meaning set forth in Section 2.3(a).

"**Certificates**" shall have the meaning set forth in Section 3.1(c).

"**Closing**" shall have the meaning set forth in Section 2.2.

"**Closing Date**" shall have the meaning set forth in Section 2.2.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended.

"**Company**" shall have the meaning set forth in the Preamble.

"**Company ASR Confirmations**" means (i) the Master Confirmation re Accelerated Stock Repurchases, dated February 10, 2022, between the Company and Morgan Stanley & Co. LLC and (ii) the Master Confirmation re Accelerated Stock Repurchases, dated February 10, 2022, between the Company and Wells Fargo Bank, National Association, in each case, as amended through the date hereof.

"**Company Benefit Plan**" shall mean (i) "employee benefit plan" (within the meaning of Section 3(3) of ERISA, whether or not subject to ERISA), and (ii) each other employment agreement, bonus, stock option, stock purchase or other equity-based, benefit, incentive compensation, profit sharing, savings, retirement (including early retirement and supplemental retirement), disability, insurance, vacation, incentive, deferred compensation, supplemental retirement (including termination indemnities and seniority payments), severance, termination, retention, change of control and other similar fringe, welfare or other employee benefit plans, benefit programs, benefit agreements, benefit contracts, benefit policies or benefit arrangements (whether or not in writing), in each case, (x) which is sponsored, maintained or contributed to for the benefit of or relating to any current or former director, officer or employee of the Company or its Subsidiaries and (y) with respect to which the Company or any of its Subsidiaries has or may have any liability.

"**Company Board**" shall have the meaning set forth in the Recitals.

3

"**Company Bond Hedge Documentation**" means (a)(i) the call option transaction confirmation, dated June 6, 2018, between the Company and Barclays Bank PLC, (ii) the call option transaction confirmation, dated June 6, 2018, between the Company and JPMorgan Chase Bank, N.A., London Branch, (iii) the call option transaction confirmation, dated June 6, 2018, between the Company and Wells Fargo Bank, National Association, (iv) the additional call option transaction confirmation, dated June 7, 2018, between the Company and Barclays Bank PLC, (v) the additional call option transaction confirmation, dated June 7, 2018, between the Company and JPMorgan Chase Bank, N.A., London Branch, (vi) the additional call option transaction confirmation, dated June 7, 2018, between the Company and Wells Fargo Bank, National Association, and (b)(i) the call option transaction confirmation, dated March 1, 2021, between the Company and Bank of America, N.A., (ii) the call option transaction confirmation, dated March 1, 2021, between the Company and Barclays Bank PLC, (iii) the call option transaction confirmation, dated March 1, 2021, between the Company and Goldman Sachs & Co. LLC, (iv) the call option transaction confirmation, dated March 1, 2021, between the Company and Wells Fargo Bank, National Association, (v) the additional call option transaction confirmation, dated March 12, 2021, between the Company and Bank of America, N.A., (vi) the additional call option transaction confirmation, dated March 12, 2021, between the Company and Barclays Bank PLC, (vii) the additional call option transaction confirmation, dated March 12, 2021, between the Company and Goldman Sachs & Co. LLC, (viii) the additional call option transaction confirmation, dated March 12, 2021, between the Company and Wells Fargo Bank, National Association, (ix) the letter agreement, dated March 1, 2021, between the Company and Bank of America, N.A., (x) the letter agreement, dated March 1, 2021, between the Company and Barclays Bank PLC, (xi) the letter agreement, dated March 1, 2021, between the Company and Goldman Sachs & Co. LLC, (xii) the letter agreement, dated March 1, 2021, between the Company and Wells Fargo Bank, National Association, (xiii) the additional letter agreement, dated March 12, 2021, between the Company and Bank of America, N.A., (xiv) the additional letter agreement, dated March 12, 2021, between the Company and Barclays Bank PLC, (xv) the additional letter agreement, dated March 12, 2021, between the Company and Goldman Sachs & Co. LLC, and (xvi) the additional letter agreement, dated March 12, 2021, between the Company and Wells Fargo Bank, National Association.

"**Company Bond Hedge Transactions**" means each of the call option transactions evidenced by the Company Bond Hedge Documentation.

"**Company Bylaws**" shall have the meaning set forth in Section 4.1.

"**Company Certificate of Incorporation**" shall have the meaning set forth in Section 4.1.

"**Company Common Stock**" shall have the meaning set forth in Section 3.1(a).

"**Company Disclosure Letter**" shall mean the disclosure letter delivered by the Company to Parent simultaneously with the execution of this Agreement.

"**Company Equity Awards**" shall mean, collectively, (i) Company Options, (ii) Company PSUs, (iii) Company RSAs, and (iv) Company RSUs.

"**Company ESPP**" shall mean the Company 2013 Employee Stock Purchase Plan.

"**Company Intellectual Property**" shall have the meaning set forth in Section 4.14(a).

"**Company Material Adverse Effect**" means any change, event, effect or circumstance which, individually or in the aggregate, has resulted in or would reasonably be expected to result in a material adverse effect on the business, financial condition or results of operations of the Company and its Subsidiaries, taken as a whole; provided, however, that changes, events, effects or circumstances which, directly or indirectly, to the extent they relate to or result from the following shall be excluded from, and not taken into account in, the determination of Company Material Adverse Effect: (i) any condition, change, effect or circumstance generally affecting any of the industries or markets in which the Company or its Subsidiaries operate; (ii) any change in any Law or GAAP (or changes in interpretations of any Law or GAAP); (iii) general economic, regulatory or political conditions (or changes therein) or conditions (or changes therein) in the financial, credit or securities markets (including changes in interest or currency exchange rates) in the United States or any other country or region in the world; (iv) any acts of God, force majeure events, natural disasters, terrorism, cyberattack, data breach, armed hostilities, sabotage, war or any escalation or worsening of any of the foregoing; (v) any epidemics, pandemics or contagious disease outbreaks (including COVID-19) and any political or social conditions, including civil unrest, protests and public demonstrations or any other COVID-19 Measures that relate to, or arise out of, an epidemic, pandemic or disease outbreak (including COVID-19) or any change in such COVID-19 Measures, directive, pronouncement or guideline or interpretation thereof, or any continuation or of of any of the foregoing, in the United States or any other country or region in the world; (vi) the negotiation, execution, announcement, performance, consummation or existence of this Agreement or the transactions contemplated by this Agreement, including (A) by reason of the identity of Elon Musk, Parent or any of their Affiliates or their respective financing sources, or any communication by Parent or any of its Affiliates or their respective financing sources, including regarding their plans or intentions with respect to the conduct of the business of the Company or any of its Subsidiaries and (B) any litigation, claim or legal proceeding threatened or initiated against Parent, Acquisition Sub, the Company or any of their respective Affiliates, officers or directors, in each case, arising out of or relating to the this Agreement or the transactions contemplated by this Agreement, and including the impact of any of the foregoing on any relationships with customers, suppliers, vendors, collaboration partners, employees, unions or regulators; (vii) any action taken pursuant to the terms of this Agreement or with the consent or at the direction of Parent or Acquisition Sub (or any action not taken as a result of the failure of Parent to consent to any action requiring Parent's consent pursuant to Section 6.1); (viii) any changes in the market price or trading volume of the Company Common Stock, any failure by the Company or its Subsidiaries to meet internal, analysts' or other earnings estimates or financial projections or forecasts for any period, any changes in credit ratings and any changes in any analysts' recommendations or ratings with respect to the Company or any of its Subsidiaries (provided that the facts or occurrences giving rise to or contributing to such changes or failure that are not otherwise excluded from the definition of "Company Material Adverse Effect" may be taken into account in determining whether there has been a Company Material Adverse Effect); and (ix) any matter disclosed in the Company SEC Documents filed by the Company prior to the date of this Agreement (other than any disclosures set forth under the headings "Risk Factors" or "Forward-Looking Statements").

"**Company Material Contract**" shall have the meaning set forth in Section 4.16(a).

"**Company Option**" shall mean each outstanding option to purchase shares of Company Common Stock granted to any employee or director of, or other Company Service Provider.

"**Company Permits**" shall have the meaning set forth in Section 4.5(a).

"**Company PSU**" shall mean each performance-based restricted stock unit that vests on the basis of time and the achievement of performance metrics and was granted to any Company Service Provider.

"**Company Related Parties**" shall have the meaning set forth in Section 8.3(d).

"**Company RSA**" shall mean each share of Company Common Stock granted to any Company Service Provider that remains subject to vesting, lapse or forfeiture provisions.

"**Company RSU**" shall mean each time-based restricted stock unit that vests on the basis of time and was granted to any Company Service Provider.

"**Company SEC Documents**" shall have the meaning set forth in Section 4.6(a).

"**Company Service Provider**" shall mean each current or former director, employee, consultant or independent contractor of the Company or any of its Subsidiaries

"**Company Stockholder Advisory Vote**" shall have the meaning set forth in Section 4.3(a).

"**Company Stockholder Approval**" shall have the meaning set forth in Section 4.20.

"**Company Stockholders' Meeting**" shall have the meaning set forth in Section 6.2(c).

"**Company Warrant Confirmations**" means (a)(i) the warrant confirmation, dated June 6, 2018, between the Company and Barclays Bank PLC, (ii) the warrant confirmation, dated June 6, 2018, between the Company and JPMorgan Chase Bank, N.A., London Branch, (iii) the warrant confirmation, dated June 6, 2018, between the Company and Wells Fargo Bank, National Association, (iv) the additional warrant confirmation, dated June 7, 2018, between the Company and Barclays Bank PLC, (v) the additional warrant confirmation, dated June 7, 2018, between the Company and JPMorgan Chase Bank, N.A., London Branch, (vi) the additional warrant confirmation, dated June 7, 2018, between the Company and Wells Fargo Bank, National Association, and (b)(i) the warrant confirmation, dated March 1, 2021, between the Company and Bank of America, N.A., (ii) the warrant confirmation, dated March 1, 2021, between the Company and Barclays Bank PLC, (iii) the warrant confirmation, dated March 1, 2021, between the Company and Goldman Sachs & Co. LLC, (iv) the warrant confirmation, dated March 1, 2021, between the Company and Wells Fargo Bank, National Association, (v) the additional warrant confirmation, dated March 12, 2021, between the Company and Bank of America, N.A., (vi) the additional warrant confirmation, dated March 12, 2021, between the Company and Barclays Bank PLC, (vii) the additional warrant confirmation, dated March 12, 2021, between the Company and Goldman Sachs & Co. LLC, and (viii) the additional warrant confirmation, dated March 12, 2021, between the Company and Wells Fargo Bank, National Association.

"**Competing Proposal**" shall have the meaning set forth in Section 6.5(g)(i).

"**Consent**" shall have the meaning set forth in Section 4.4(b).

6

"**Continuation Period**" shall have the meaning set forth in <u>Section 6.9(a)</u>.

"**Continuing Employees**" shall have the meaning set forth in <u>Section 6.9(a)</u>.

"**Contract**" means any written contract, subcontract, lease, sublease, conditional sales contract, purchase order, sales order, task order, delivery order, license, indenture, note, bond, loan, instrument, understanding, permit, concession, franchise, commitment or other agreement.

"**COVID-19**" means SARS-Co V-2 or COVID-19 or any evolutions, variants or mutations thereof.

"**COVID-19 Measures**" means quarantine, "shelter in place," "stay at home," workforce reduction, social distancing, shut down, closure, sequester, safety or similar laws, directives, restrictions, guidelines, responses or recommendations of or promulgated by any Governmental Authority, including the Centers for Disease Control and Prevention and the World Health Organization, or other reasonable actions taken in response to the foregoing or otherwise, in each case, in connection with or in response to COVID-19 and any evolutions, variants or mutations thereof or related or associated epidemics, pandemics or disease outbreaks.

"**D&O Indemnified Parties**" shall have the meaning set forth in <u>Section 6.6(a)</u>.

"**Debt Commitment Letters**" shall have the meaning set forth in <u>Section 5.4</u>.

"**Debt Financing**" shall have the meaning set forth in <u>Section 5.4</u>.

"**Debt Financing Source**" shall mean (i) the commitment parties party, as of the date hereof, to the Debt Commitment Letters that have been delivered to the Company in accordance with <u>Section 5.4</u>, and (ii) the Persons, in their respective capacities as such, that have committed to arrange or provide or have otherwise entered into agreements (including the Debt Commitment Letters or any Financing Agreements), in each case, in connection with all or any portion of the Debt Financing or Alternative Financing in connection with the transactions contemplated hereby, and any joinder agreements, indentures or credit agreements entered into pursuant thereto, together with their Affiliates, and any of their or their Affiliates' respective, direct or indirect, former, current or future stockholders, managers, members, directors, officers, employees, agents, advisors, other representatives or any successors or assignees of any of the foregoing (it being understood that Parent, Acquisition Sub and any of their respective Affiliates shall not constitute "Debt Financing Sources" for any purposes hereunder).

"**Debt Financing Source Related Party**" means any Debt Financing Source, together with their respective Affiliates and their and their respective Affiliates' former, current and future officers, directors, employees, agents and representatives and their respective successors and assigns.

"**DGCL**" shall have the meaning set forth in the Recitals.

"**Dissenting Shares**" shall have the meaning set forth in <u>Section 3.5</u>.

"**DTC**" shall have the meaning set forth in <u>Section 3.2(b)(ii)</u>.

7

"**Effective Time**" shall have the meaning set forth in <u>Section 2.3(a)</u>.

"**Enforceability Exceptions**" shall have the meaning set forth in <u>Section 4.3(a)</u>.

"**Equity Commitment Letter**" shall have the meaning set forth in <u>Section 5.4</u>.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate**" shall mean, for any Person, each trade or business, whether or not incorporated, that, together with such Person, would be deemed a "single employer" within the meaning set forth in Section 414 of the Code.

"**Exchange Act**" shall mean the Securities Exchange Act of 1934, as amended.

"**Exchange Fund**" shall have the meaning set forth in <u>Section 3.2(a)</u>.

"**Existing Credit Agreement**" shall mean that certain Revolving Credit Agreement, dated as of August 17, 2018, among the Company, the lenders from time to time party thereto and JPMorgan Chase Bank, N.A. as administrative agent, as amended, amended and restated, supplemented or otherwise modified from time to time.

"**Existing D&O Insurance Policies**" shall have the meaning set forth in <u>Section 6.6(c)</u>.

"**Existing 2027 Senior Notes**" shall mean the 3.875% Senior Notes due 2027 issued pursuant to that certain Indenture, dated December 9, 2019, among the Company, as issuer, and U.S. Bank National Association, as trustee, as amended, amended and restated, supplemented or otherwise modified from time to time.

"**Existing 2030 Senior Notes**" shall mean the 5.000% Senior Notes due 2030 issued pursuant to that certain Indenture, dated February 25, 2022, among the Company, as issuer, and U.S. Bank National Association, as trustee, as amended, amended and restated, supplemented or otherwise modified from time to time.

"**Existing Convertible Notes**" shall mean the (i) 0.25% Convertible Senior Notes due 2024 issued pursuant to that certain Indenture, dated June 11, 2018, among the Company, as issuer, and U.S. Bank National Association, as trustee, (ii) 0.375% Convertible Senior Notes due 2025 issued pursuant to that certain Indenture, dated March 12, 2020, among the Company, as issuer, and U.S. Bank National Association, as trustee, and (iii) 0% Convertible Senior Notes due 2026 issued pursuant to that certain Indenture, dated March 4, 2021, among the Company, as issuer, and U.S. Bank National Association, as trustee, in each case as amended, amended and restated, supplemented or otherwise modified from time to time.

"**Existing Senior Notes**" shall mean the (i) the Existing 2027 Senior Notes and (ii) the Existing 2030 Senior Notes.

"**Expenses**" shall mean all out-of-pocket expenses (including all fees and expenses of counsel, accountants, investment bankers, experts and consultants to a party hereto and its Affiliates) incurred by a party or on its behalf in connection with or related to the authorization, preparation, negotiation, execution and performance of this Agreement, the preparation, printing, filing and mailing of the Proxy Statement and all SEC and other regulatory filing fees incurred in connection with the Proxy Statement, the solicitation of stockholder approvals, any filing with, and obtaining of any necessary action or non-action, Consent or approval from any Governmental Authority pursuant to any Antitrust Laws or Foreign Investment Laws, engaging the services of the Paying Agent, any other filings with the SEC, and all other matters related to the Closing and the other transactions contemplated by this Agreement.

"**Final Offering Period**" shall have the meaning set forth in <u>Section 3.7</u>.

"**Financing**" shall have the meaning set forth in <u>Section 5.4</u>.

"**Financing Agreements**" shall have the meaning set forth in <u>Section 6.10(a)</u>.

"**Financing Commitments**" shall have the meaning set forth in <u>Section 5.4</u>.

"**Financing Sources**" means the Debt Financing Sources and Elon Musk.

"**Foreign Investment Laws**" shall mean any Laws designed or intended to prohibit, restrict or regulate actions (i) by foreigners to acquire interests in or control over domestic equities, securities, entities, assets, land or interests, or (ii) to acquire interests in or control over equities, securities, entities, assets, land or interests that might harm domestic national security or public interest, other than Antitrust Laws.

"**Foreign Plan**" shall mean each Company Benefit Plan that primarily covers current or former employees, directors or individual service providers of the Company or any of its subsidiaries based outside of the U.S. and/or that is subject to any Law other than U.S., federal, state or local law (other than any plan or program that is required by statute or maintained by a Governmental Authority to which the Company or any of its subsidiaries contributes pursuant to applicable Law).

"**Funding Obligations**" shall have the meaning set forth in <u>Section 5.4</u>.

"**GAAP**" shall mean the U.S. generally accepted accounting principles.

"**Goldman Sachs**" shall have the meaning set forth in <u>Section 4.21</u>.

"**Governmental Authority**" shall mean any U.S. (federal, state or local) or foreign government, or any governmental, regulatory, judicial or administrative authority, agency or commission.

"**Hazardous Materials**" means all substances (i) defined as hazardous substances, oils, pollutants or contaminants in the National Oil and Hazardous Substances Pollution Contingency Plan, 40 C.F.R. § 300.5, or (ii) defined as hazardous substances, hazardous materials, pollutants, contaminants, toxic substances (or words of similar import) by or regulated as such under any Environmental Law.

"**HSR Act**" shall mean the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations thereunder.

"**Intellectual Property Rights**" shall have the meaning set forth in Section 4.14(a).

"**IRS**" shall mean the Internal Revenue Service.

"**Knowledge**" means the actual knowledge of the directors and officers of the relevant party, following due inquiry of their direct reports and others who would be reasonably expected to have knowledge of the subject matter in question.

"**Law**" shall mean any and all domestic (federal, state or local) or foreign laws (including common law), rules, regulations, orders, judgments or decrees promulgated by any Governmental Authority.

"**Lien**" shall mean liens, claims, mortgages, encumbrances, pledges, security interests or charges of any kind.

"**Margin Loan Borrower**" shall have the meaning set forth in Section 5.4.

"**Margin Loan Commitment Letter**" shall have the meaning set forth in Section 5.4.

"**Margin Loan Financing**" shall have the meaning set forth in Section 5.4.

"**Merger**" shall have the meaning set forth in the Recitals.

"**Merger Consideration**" shall have the meaning set forth in Section 3.1(c).

"**Notice of Adverse Board Recommendation Change**" shall have the meaning set forth in Section 6.5(d).

"**Notice of Superior Proposal**" shall have the meaning set forth in Section 6.5(d).

"**Order**" shall mean any decree, order, judgment, injunction, temporary restraining order or other order in any suit or proceeding by or with any Governmental Authority.

"**Parent**" shall have the meaning set forth in the Preamble.

"**Parent Board**" shall have the meaning set forth in the Recitals.

"**Parent Disclosure Letter**" shall mean the disclosure letter delivered by Parent to the Company simultaneously with the execution of this Agreement.

"**Parent Material Adverse Effect**" shall mean any change, effect or circumstance which, individually or in the aggregate, has prevented or materially delayed or materially impaired, or would reasonably be expected to prevent or materially delay or materially impair, the ability of Parent or Acquisition Sub to consummate the Merger and the other transactions contemplated by this Agreement.

"**Parent Related Parties**" shall have the meaning set forth in <u>Section 8.3(c)</u>.

"**Parent Termination Fee**" shall mean an amount equal to $1,000,000,000.

"**Paying Agent**" shall have the meaning set forth in <u>Section 3.2(a)</u>.

"**Paying Agent Agreement**" shall have the meaning set forth in <u>Section 3.2(a)</u>.

"**Permitted Lien**" shall mean (i) any Lien for Taxes not yet delinquent or that are being contested in good faith by any appropriate proceedings and for which adequate accruals or reserves have been established in accordance with GAAP, (ii) Liens securing indebtedness or liabilities that are reflected in the Company SEC Documents or incurred in the ordinary course of business since the end of the most recent fiscal year for which an Annual Report on Form 10-K has been filed by the Company with the SEC and Liens securing indebtedness or liabilities that have otherwise been disclosed to Parent in writing, (iii) such Liens or other imperfections of title, if any, that do not have a Company Material Adverse Effect, including (A) easements or claims of easements whether or not shown by the public records, boundary line disputes, overlaps, encroachments and any matters not of record which would be disclosed by an accurate survey or a personal inspection of the property, (B) rights of parties in possession, (C) any supplemental Taxes or assessments not shown by the public records and (D) title to any portion of the premises lying within the right of way or boundary of any public road or private road, (iv) Liens imposed or promulgated by Laws with respect to real property and improvements, including zoning regulations, (v) Liens disclosed on existing title reports or existing surveys, (vi) mechanics', carriers', workmen's, repairmen's and similar Liens incurred in the ordinary course of business, (vii) Liens securing acquisition financing with respect to the applicable asset, including refinancings thereof and (viii) licenses of Intellectual Property Rights.

"**Person**" shall mean an individual, a corporation, a limited liability company, a partnership, an association, a trust or any other entity or organization, including a Governmental Authority.

"**Post-Closing Plans**" shall have the meaning set forth in <u>Section 6.9(b)</u>.

"**Post-Closing Welfare Plans**" shall have the meaning set forth in <u>Section 6.9(c)</u>.

"**Proxy Statement**" shall have the meaning set forth in <u>Section 4.7</u>.

"**Representatives**" shall have the meaning set forth in <u>Section 6.4</u>.

"**SEC**" shall mean the Securities and Exchange Commission.

"**Secretary of State**" shall have the meaning set forth in <u>Section 2.3(a)</u>.

"**Securities Act**" shall mean the Securities Act of 1933, as amended.

"**Silver Lake Investment Agreement**" means the Investment Agreement, dated as of March 9, 2020, among Twitter, Inc. and Silver Lake Partners V DE (AIV), L.P., as amended, restated, supplemented or otherwise modified from time to time.

"**Solvent**" shall have the meaning set forth in <u>Section 5.12</u>.

"**Specified Provisions**" shall have the meaning set forth in the Preamble.

"**Stockholder Rights**" means the rights distributed to the Stockholders pursuant to Company Stockholder Rights Agreement.

"**Stockholder Rights Plan**" means the Company Stockholder Rights and the Company Stockholder Rights Agreement.

"**Stockholder Rights Agreement**" means the Preferred Stock Rights Agreement, dated as of April 15, 2022, between the Company and Computershare Trust Company, N.A., as rights agent, as amended, restated, supplemented or otherwise modified from time to time

"**Subsidiary**" of any Person shall mean any corporation, partnership, joint venture or other legal entity of which such Person (either above or through or together with any other subsidiary) owns, directly or indirectly, more than 50% of the stock or other equity interests, the holders of which are generally entitled to vote for the election of the board of directors or other governing body of such corporation or other legal entity.

"**Superior Proposal**" shall have the meaning set forth in <u>Section 6.5(g)(iii)</u>.

"**Surviving Corporation**" shall have the meaning set forth in <u>Section 2.1</u>.

"**Tax**" or "**Taxes**" shall mean all federal, state, local and foreign income, profits, franchise, gross receipts, customs duty, capital stock, severance, stamp, payroll, sales, employment, unemployment, disability, use, property, withholding, excise, license, production, value added, occupancy and other taxes of any kind whatsoever, together with all interest, penalties and additions imposed with respect thereto.

"**Tax Returns**" shall mean all returns and reports (including elections, declarations, disclosures, schedules, estimates and information returns) filed or required to be filed with a Tax authority.

"**Termination Date**" shall have the meaning set forth in <u>Section 8.1(b)(i)</u>.

"**Termination Fee**" shall mean an amount equal to $1,000,000,000.

"**Tesla Shares**" means shares of common stock of Tesla, Inc., $0.001 par value.

"**Third Party**" shall mean any Person or group other than Parent, Acquisition Sub and their respective Affiliates.

"**U.S.**" means the United States of America and its territories, commonwealths and possessions.

## ARTICLE II

## THE MERGER

Section 2.1 The Merger. Upon the terms and subject to the conditions of this Agreement, and in accordance with the DGCL, at the Effective Time, Acquisition Sub shall be merged with and into the Company, whereupon the separate existence of Acquisition Sub shall cease, and the Company shall continue under the name "Twitter, Inc." as the surviving corporation (the "**Surviving Corporation**") and shall continue to be governed by the laws of the State of Delaware.

Section 2.2 The Closing. Subject to the provisions of Article VII, the closing of the Merger (the "**Closing**") shall take place at 9:00 a.m. (Pacific Time) on a date to be specified by the parties hereto, but no later than the second (2nd) Business Day after the satisfaction or waiver of all of the conditions set forth in Article VII (other than those conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing). The Closing shall take place virtually by the electronic exchange of documents, unless another time, date or place is agreed to in writing by the parties hereto (such date, the "**Closing Date**").

Section 2.3 Effective Time.

(a) Concurrently with the Closing, the Company, Parent and Acquisition Sub shall cause a certificate of merger with respect to the Merger (the "**Certificate of Merger**") to be executed and filed with the Secretary of State of the State of Delaware (the "**Secretary of State**") in accordance with the relevant provisions of the DGCL and any other applicable Law of the State of Delaware. The Merger shall become effective on the date and time at which the Certificate of Merger has been duly filed with the Secretary of State or such other date and time as may be agreed to by Parent and the Company and as set forth in the Certificate of Merger in accordance with the DGCL (such date and time hereinafter referred to as the "**Effective Time**").

(b) The Merger shall have the effects set forth in this Agreement and in the applicable provisions of the DGCL. Without limiting the generality of the foregoing, from and after the Effective Time, (i) the Company shall be the surviving corporation in the Merger, (ii) all the property, rights, privileges, immunities, powers, franchises and liabilities of the Company and Acquisition Sub are vested in the Surviving Corporation, (iii) the separate existence of Acquisition Sub shall cease and (iv) the Company shall continue to be governed by the laws of the State of Delaware.

Section 2.4 Certificate of Incorporation and Bylaws. The parties will take all necessary actions so that at the Effective Time, the certificate of incorporation and the bylaws of Acquisition Sub, each as in effect immediately prior to the Effective Time, will be the certificate of incorporation and the bylaws, respectively, of the Surviving Corporation (except that the titles thereof shall read "Certificate of Incorporation of Twitter, Inc." and "Bylaws of Twitter, Inc.", respectively) until, subject to Section 6.6, thereafter amended in accordance with the applicable provisions of the DGCL and the certificate of incorporation and bylaws of the Surviving Corporation.

13

Section 2.5 Board of Directors. The board of directors of the Surviving Corporation effective as of, and immediately following, the Effective Time shall consist of the members of the Acquisition Sub Board immediately prior to the Effective Time, each to serve in accordance with the certificate of incorporation and bylaws of the Surviving Corporation until their respective successors shall have been duly elected and qualified, or until their earlier death, resignation or removal in accordance with the certificate of incorporation and bylaws of the Surviving Corporation.

Section 2.6 Officers. From and after the Effective Time, the officers of the Company at the Effective Time shall be the officers of the Surviving Corporation, until their respective successors are duly elected or appointed and qualified in accordance with applicable Law.

## ARTICLE III

## EFFECT OF THE MERGER ON CAPITAL STOCK

Section 3.1 Effect on Securities. At the Effective Time, by virtue of the Merger and without any action on the part of the Company, Parent, Acquisition Sub or the holders of any securities of the Company or Acquisition Sub:

(a) Conversion of Acquisition Sub Capital Stock. At the Effective Time, by virtue of the Merger and without any action on the part of the holder thereof, each share of common stock, $0.01 par value per share, of Acquisition Sub issued and outstanding immediately prior to the Effective Time shall be converted into and become one (1) fully paid share of common stock, $0.01 par value per share, of the Surviving Corporation and constitute the only issued or outstanding shares of capital stock of the Surviving Corporation.

(b) Cancellation of Certain Company Securities. Each share of common stock, par value $0.000005 per share, of the Company (the "**Company Common Stock**") held by the Company or any of its Subsidiaries or held, directly or indirectly, by the Equity Investor, Parent or Acquisition Sub immediately prior to the Effective Time (collectively, the "**Canceled Shares**") shall automatically be canceled and retired and shall cease to exist as issued or outstanding shares, and no consideration or payment shall be delivered in exchange therefor or in respect thereof.

(c) Conversion of Company Securities. Except as otherwise provided in this Agreement, each share of Company Common Stock issued and outstanding immediately prior to the Effective Time (other than any Canceled Shares or Dissenting Shares) shall be converted into the right to receive $54.20 per share of Company Common Stock in cash, without interest (the "**Merger Consideration**"). Each share of Company Common Stock to be converted into the right to receive the Merger Consideration as provided in this Section 3.1(c) shall no longer be issued or outstanding and shall be automatically canceled and shall cease to exist, and the holders of certificates (the "**Certificates**") or book-entry shares ("**Book-Entry Shares**") which immediately prior to the Effective Time represented such shares of Company Common Stock shall cease to have any rights with respect to such Company Common Stock other than the right to receive, upon surrender of such Certificates or Book-Entry Shares in accordance with Section 3.2(b), the Merger Consideration, without interest thereon.

14

(d) <u>Adjustments</u>. Without limiting the other provisions of this Agreement, if at any time during the period between the date of this Agreement and the Effective Time, any change in the number of outstanding shares of Company Common Stock shall occur as a result of a reclassification, recapitalization, stock split (including a reverse stock split) or similar event, or combination or exchange of shares, or any stock dividend or stock distribution with a record date during such period (in each case, other than with respect to the initial distribution of Stockholder Rights under the Stockholder Rights Plan or such Stockholder Rights becoming exercisable as a result of Parent or any of its Affiliates or Representatives becoming an "Acquiring Person" (as defined in the Stockholder Rights Agreement)), the Merger Consideration shall be equitably adjusted to provide the same economic effect as contemplated by this Agreement prior to such event. Nothing in this <u>Section 3.1(d)</u> shall be construed to permit any party to take any action that is otherwise prohibited or restricted by any other provision of this Agreement.

<u>Section 3.2 Payment for Securities; Exchange of Certificates</u>.

(a) <u>Designation of Paying Agent; Deposit of Exchange Fund</u>. Prior to the Closing, Parent shall designate a reputable bank or trust company (the "**Paying Agent**") that is organized and doing business under the laws of the U.S., the identity and the terms of appointment of which to be reasonably acceptable to the Company, to act as Paying Agent for the payment of the Merger Consideration as provided in <u>Section 3.1(b)</u>, and shall enter into an agreement (the "**Paying Agent Agreement**") relating to the Paying Agent's responsibilities with respect thereto, in form and substance reasonably acceptable to the Company. At or prior to the Effective Time, Parent shall deposit, or cause to be deposited with the Paying Agent, cash constituting an amount equal to the Aggregate Merger Consideration (such Aggregate Merger Consideration as deposited with the Paying Agent, the "**Exchange Fund**"). In the event the Exchange Fund shall be insufficient to make the payments contemplated by <u>Section 3.1(b)</u>, Parent shall promptly deposit, or cause to be deposited, additional funds with the Paying Agent in an amount which is equal to the deficiency in the amount required to make such payments in full. Parent shall cause the Exchange Fund to be (A) held for the benefit of the holders of Company Common Stock and (B) applied promptly to make payments pursuant to <u>Section 3.1(b)</u>. The Exchange Fund shall not be used for any purpose other than to fund payments pursuant to <u>Section 3.1</u>, except as expressly provided for in this Agreement.

(b) <u>Procedures for Exchange</u>. As promptly as reasonably practicable following the Effective Time and in any event not later than two (2) Business Days thereafter, the Surviving Corporation shall cause the Paying Agent to mail to each holder of record a Certificate that immediately prior to the Effective Time represented outstanding shares of Company Common Stock (A) a letter of transmittal, which shall specify that delivery shall be effected, and risk of loss and title to the Certificates shall pass, only upon proper delivery of the Certificates (or affidavits of loss in lieu thereof) to the Paying Agent and which shall be in the form and have such other provisions as Parent and the Company may reasonably specify and (B) instructions for use in effecting the surrender of the Certificates in exchange for the Merger Consideration into which the number of shares of Company Common Stock previously represented by such Certificate shall have been converted pursuant to this Agreement (which instructions shall be in the form and have such other provisions as Parent and the Company may reasonably specify). Any holder of Book-Entry Shares shall not be required to deliver a Certificate or an executed letter of transmittal to receive the Merger Consideration with respect to such Book-Entry Shares.

15

(c) <u>Timing of Exchange</u>. Upon surrender of a Certificate (or affidavit of loss in lieu thereof) or Book-Entry Share for cancellation to the Paying Agent, together with, in the case of Certificates, a letter of transmittal duly completed and validly executed in accordance with the instructions thereto, or, in the case of Book-Entry Shares, receipt of an "agent's message" by the Paying Agent (it being understood that holders of Book-Entry Shares will be deemed to have surrendered such Book-Entry Shares upon receipt of an "agent's message" with respect to such Book-Entry Shares), and such other customary evidence of surrender as the Paying Agent may reasonably require, the holder of such Certificate or Book-Entry Share shall be entitled to receive in exchange therefor (and Parent shall cause the Paying Agent to promptly deliver in exchange therefor) the Merger Consideration for each share of Company Common Stock formerly represented by such Certificate or Book-Entry Share upon the later to occur of (i) the Effective Time or (ii) the Paying Agent's receipt of such Certificate (or affidavit of loss in lieu thereof) or Book-Entry Share, in accordance with <u>Section 3.2(b)</u>, as applicable, and the Certificate (or affidavit of loss in lieu thereof) or Book-Entry Share so surrendered shall be forthwith canceled. The Paying Agent Agreement shall provide that the Paying Agent shall accept such Certificates (or affidavits of loss in lieu thereof) or Book-Entry Shares upon compliance with such reasonable terms and conditions as the Paying Agent may impose to effect an orderly exchange thereof in accordance with customary exchange practices. No interest shall be paid or accrued for the benefit of holders of the Certificates or Book-Entry Shares on the Merger Consideration payable upon the surrender of the Certificates or Book-Entry Shares.

(d) <u>Termination of Exchange Fund</u>. Any portion of the Exchange Fund which remains undistributed to the holders of the Certificates or Book-Entry Shares for one (1) year after the Effective Time shall be delivered to the Surviving Corporation, upon written demand, and any such holders prior to the Merger who have not theretofore complied with this <u>Article III</u> shall thereafter look only to the Surviving Corporation as a general creditor thereof for payment of their claims for the Merger Consideration in respect thereof.

(e) <u>No Liability</u>. None of Parent, Acquisition Sub, the Company, the Surviving Corporation or the Paying Agent shall be liable to any Person in respect of any cash held in the Exchange Fund delivered to a public official pursuant to any applicable abandoned property, escheat or similar Law. If any Certificates or Book-Entry Shares shall not have been surrendered immediately prior to the date on which any cash in respect of such Certificate or Book-Entry Share would otherwise escheat to or become the property of any Governmental Authority, any such cash in respect of such Certificate or Book-Entry Share shall, to the extent permitted by applicable Law, become the property of the Surviving Corporation, free and clear of all claims or interest of any Person previously entitled thereto.

(f) <u>Investment of Exchange Fund</u>. The Paying Agent Agreement shall provide that the Paying Agent shall invest any cash included in the Exchange Fund as directed by Parent or, after the Effective Time, the Surviving Corporation; <u>provided</u> that (i) no such investment shall relieve Parent or the Paying Agent from making the payments required by this <u>Article III</u>, and following any losses Parent shall promptly provide additional funds to the Paying Agent for the benefit of the holders of Company Common Stock in the amount of such losses, (ii) no such investment shall have maturities that could prevent or delay payments to be made pursuant to this Agreement and (iii) all such investments shall be in short-term obligations of the U.S. with maturities of no more than thirty (30) days or guaranteed by the U.S. and backed by the full faith and credit of the U.S. Any interest or income produced by such investments will be payable to the Surviving Corporation or Parent, as directed by Parent.

(g) <u>Withholding</u>. Each of Parent, the Surviving Corporation and the Paying Agent shall be entitled to deduct and withhold from the Merger Consideration and any amounts otherwise payable pursuant to this Agreement to any Person such amounts as are required to be deducted and withheld with respect to the making of such payment under any applicable Law. To the extent that amounts are so deducted and withheld, such amounts (i) shall be promptly remitted by Parent, the Surviving Corporation or the Paying Agent, as applicable, to the applicable Governmental Authority, and (ii) shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding was made.

<u>Section 3.3 Lost Certificates</u>. If any Certificate shall have been lost, stolen or destroyed, then upon the making of an affidavit, in form and substance reasonably acceptable to Parent, of that fact by the Person claiming such Certificate to be lost, stolen or destroyed, the Paying Agent shall issue, in exchange for such lost, stolen or destroyed Certificate, the Merger Consideration to which the holder thereof is entitled pursuant to this <u>Article III</u>.

<u>Section 3.4 Transfers; No Further Ownership Rights</u>. After the Effective Time, there shall be no registration of transfers on the stock transfer books of the Company of shares of Company Common Stock that were outstanding immediately prior to the Effective Time. If Certificates or Book-Entry Shares are presented to the Surviving Corporation, Parent or Paying Agent for transfer following the Effective Time, they shall be canceled against delivery of the applicable Merger Consideration, as provided for in <u>Section 3.1(b)</u>, for each share of Company Common Stock formerly represented by such Certificates or Book-Entry Shares. Payment of the Merger Consideration in accordance with the terms of this <u>Article III</u>, and, if applicable, any unclaimed dividends upon the surrender of Certificates, shall be deemed to have been paid in full satisfaction of all rights pertaining to the shares of Company Common Stock formerly represented by such Certificates or Book-Entry Shares.

<u>Section 3.5 Dissenting Shares</u>. Notwithstanding any other provision of this Agreement to the contrary, to the extent that holders thereof are entitled to appraisal rights under Section 262 of the DGCL or similar appraisal or dissenters' rights under any other applicable Law, shares of Company Common Stock issued and outstanding immediately prior to the Effective Time and held by a holder who has properly exercised and perfected his or her demand for appraisal or dissenters' rights under Section 262 of the DGCL or such other applicable Law (the "**Dissenting Shares**"), shall not be converted into the right to receive the Merger Consideration. At the Effective Time, the Dissenting Shares shall no longer be outstanding and shall automatically be canceled and shall cease to exist, and each holder of Dissenting Shares shall cease to have any rights with respect thereto, but the holders of such Dissenting Shares shall be entitled to receive such consideration as shall be determined pursuant to Section 262 of the DGCL or such other applicable Law; <u>provided</u>, <u>however</u>, that if any such holder shall have failed to perfect or shall have effectively withdrawn or lost his or her right to appraisal or dissenters' rights and payment under the DGCL or such other applicable Law, as applicable (whether occurring before, at or after the Effective Time), such holder's shares of Company Common Stock shall thereupon be deemed to have been converted as of the Effective Time into the right to receive the Merger Consideration, without any interest thereon, and such shares shall not be deemed to be Dissenting Shares. Any payments

required to be made with respect to the Dissenting Shares shall be made by Parent (and not the Company or Acquisition Sub), and the Aggregate Merger Consideration shall be reduced, on a dollar-for-dollar basis, as if the holder of such Dissenting Shares had not been a stockholder on the Closing Date. The Company shall give prompt written notice to Parent of any demands for appraisal of or dissenters' rights respecting any shares of Company Common Stock, withdrawals of such demands and any other instruments served pursuant to the DGCL or such other applicable Law received by the Company relating to appraisal or dissenters' demands, and Parent shall have the right to participate in all negotiations and proceedings with respect to such demands. Prior to the Effective Time, the Company shall not, without the prior written consent of Parent (which consent shall not be unreasonably withheld or delayed), voluntarily make any payment with respect to, or settle or offer to settle, any such demands, or agree to do or commit to do any of the foregoing.

Section 3.6 Company Equity Awards.

(a) Company Options.

(i) As of the Effective Time, each Company Option that is vested in accordance with its terms and outstanding as of immediately prior to the Effective Time (each, a "**Vested Company Option**") shall be canceled and converted into the right to receive an amount in cash, without interest, equal to the product of (i) the total number of shares of Company Common Stock subject to such Vested Company Option and (ii) the excess, if any, of the Merger Consideration, over the exercise price per share of Company Common Stock underlying such Vested Company Option (the "**Vested Option Consideration**"); provided, that if the exercise price per share of Company Common Stock underlying such Vested Company Option is equal to or greater than the Merger Consideration, such Vested Company Option shall be canceled without any cash payment or other consideration being made in respect thereof.

(ii) As of the Effective Time, each Company Option that is outstanding and is not a Vested Company Option (each, an "**Unvested Company Option**") shall be canceled and converted into the right to receive an amount in cash, without interest, equal to the product of (i) the total number of shares of Company Common Stock subject to such Unvested Company Option and (ii) the excess, if any, of the Merger Consideration, over the exercise price per share of Company Common Stock underlying such Unvested Company Option (the "**Unvested Option Consideration**"); provided that, if the exercise price per share of Company Common Stock underlying such Unvested Company Option is equal to or greater than the Merger Consideration, such Unvested Company Option shall be canceled without any cash payment or other consideration being made in respect thereof. Subject to the holder's continued service with Parent and its Affiliates (including the Surviving Corporation and its Subsidiaries) through the applicable vesting dates, such Unvested Option Consideration will vest and become payable at the same time as the Unvested Company Option from which such Unvested Option Consideration was converted would have vested and been payable pursuant to its terms and shall otherwise remain subject to the same terms and conditions as were applicable to the underlying Unvested Company Option immediately prior to the Effective Time.

18

(b) Company PSUs.

(i) As of the Effective Time, each Company PSU that is vested in accordance with its terms and outstanding as of immediately prior to the Effective Time (each, a "**Vested Company PSU**") shall be canceled and converted into the right to receive an amount in cash, without interest, equal to the product of (i) the total number of shares of Company Common Stock subject to such Vested Company PSU based on the achievement of the applicable performance metrics at the level of performance for which such Vested Company PSU vested in accordance with its terms and (ii) the Merger Consideration (the "**Vested PSU Consideration**").

(ii) As of the Effective Time, each Company PSU that is outstanding immediately prior thereto and that is not a Vested Company PSU (each, an "**Unvested Company PSU**") shall be canceled and converted into the right to receive an amount in cash, without interest, equal to the product of (i) the total number of shares of Company Common Stock subject to such Unvested Company PSU based on the achievement of the applicable performance metrics at the target level of performance and (ii) the Merger Consideration (the "**Unvested PSU Consideration**"). Subject to the holder's continued service with Parent and its Affiliates (including the Surviving Corporation and its Subsidiaries) through the applicable vesting dates, such Unvested PSU Consideration will vest and become payable at the same time as the Unvested Company PSU from which such Unvested PSU Consideration was converted would have vested and been payable pursuant to its terms and shall otherwise remain subject to the same terms and conditions as were applicable to the underlying Unvested Company PSU immediately prior to the Effective Time (except that performance-based vesting metrics and criteria shall not apply from and after the Effective Time).

(c) Company RSAs. At the Effective Time, each Company RSA that is outstanding immediately prior to the Effective Time shall be canceled and converted into the right to receive an amount in cash, without interest, equal to the product of (i) the total number of shares of Company Common Stock subject to such Company RSA and (ii) the Merger Consideration (the "**Unvested RSA Consideration**"). Subject to the holder's continued service with Parent and its Affiliates (including the Surviving Corporation and its Subsidiaries) through the applicable vesting dates, such Unvested RSA Consideration will vest and become payable at the same time as the Company RSA from which such Unvested RSA Consideration was converted would have vested and been payable pursuant to its terms and shall otherwise remain subject to the same terms and conditions as were applicable to the underlying Company RSA immediately prior to the Effective Time; provided that the Company shall be permitted to accelerate the vesting of any unvested Company RSA if the holder thereof would be subject to Taxes in connection with the Closing as a result of the treatment contemplated by this Section 3.3(c).

(d) Company RSUs.

(i) As of the Effective Time, each Company RSU that is vested in accordance with its terms as of immediately prior to the Effective Time and each Company RSU held by a non-employee member of the Company Board, in either case, that is outstanding immediately prior to the Effective Time, (each, a "**Vested Company RSU**") shall be canceled and converted into the right to receive an amount in cash, without interest, equal to the product of (i) the total number of shares of Company Common Stock subject to such Vested Company RSU and (ii) the Merger Consideration (the "**Vested RSU Consideration**").

19

(ii) As of the Effective Time, each Company RSU that is outstanding immediately prior thereto and that is not a Vested Company RSU (each, an "**Unvested Company RSU**") shall be canceled and converted into the right to receive an amount in cash, without interest, equal to the product of (i) the total number of shares of Company Common Stock subject to such Unvested Company RSU and (ii) the Merger Consideration (the "**Unvested RSU Consideration**"). Subject to the holder's continued service with Parent and its Affiliates (including the Surviving Corporation and its Subsidiaries) through the applicable vesting dates, such Unvested RSU Consideration will vest and become payable at the same time as the Unvested Company RSU from which such Unvested RSU Consideration was converted would have vested and been payable pursuant to its terms and shall otherwise remain subject to the same terms and conditions as were applicable to the underlying Unvested Company RSU immediately prior to the Effective Time.

(e) Delivery of Company Equity Award Payments. Parent shall cause the Surviving Corporation to pay through the payroll system of the Surviving Corporation (to the extent applicable) the Vested Option Consideration, the Vested PSU Consideration, and the Vested RSU Consideration to each holder of a Vested Company Option, Vested Company PSU and Vested Company RSU, as applicable, less any required withholding Taxes and without interest, within five (5) Business Days following the Effective Time.

Section 3.7 Company ESPP. As soon as practicable following the date of this Agreement, the Company Board or a committee thereof shall adopt resolutions or take other actions as may be required to provide that (A) the Offering Period (as defined in the Company ESPP) in effect as of the date hereof shall be the final Offering Period (such period, the "**Final Offering Period**") and no further Offering Period shall commence pursuant to the Company ESPP after the date hereof, and (B) each individual participating in the Final Offering Period on the date of this Agreement shall not be permitted to (x) increase his or her payroll contribution rate pursuant to the Company ESPP from the rate in effect when the Final Offering Period commenced or (y) make separate non-payroll contributions to the Company ESPP on or following the date of this Agreement, except as may be required by applicable Law. Prior to the Effective Time, the Company shall take all action that may be necessary, to effective upon the consummation of the Merger, (A) cause the Final Offering Period, to the extent that it would otherwise be outstanding at the Effective Time, to be terminated no later than ten (10) Business Days prior to the date on which the Effective Time occurs; (B) make any pro rata adjustments that may be necessary to reflect the Final Offering Period, but otherwise treat the Final Offering Period as a fully effective and completed Offering Period for all purposes pursuant to the Company ESPP; and (C) cause the exercise (as of no later than ten (10) Business Days prior to the date on which the Effective Time occurs) of each outstanding purchase right pursuant to the Company ESPP. On such exercise date, the Company shall apply the funds credited as of such date pursuant to the Company ESPP within each participant's payroll withholding account to the purchase of whole shares of Company Common Stock in accordance with the terms of the Company ESPP, and such Common Shares shall be entitled to the Merger Consideration in accordance with Section 3.1(b). Immediately prior to and effective as of the Effective Time (but subject to the consummation of the Merger), the Company shall terminate the Company ESPP.

20

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

Except as disclosed in the Company Disclosure Letter or in the Company SEC Documents filed by the Company prior to the date of this Agreement (other than any disclosures set forth under the headings "Risk Factors" or "Forward-Looking Statements" and any other disclosures included therein to the extent they are forward-looking in nature), the Company hereby represents and warrants to Parent and Acquisition Sub as follows:

Section 4.1 Organization and Qualification; Subsidiaries. Each of the Company and its Subsidiaries is a corporation, partnership or other entity duly organized, validly existing and (to the extent applicable) in good standing under the laws of the jurisdiction of its incorporation or organization and has the requisite entity power and authority to conduct its business as it is now being conducted, except where the failure to be duly organized, validly existing or in good standing or to have such power and authority would not have a Company Material Adverse Effect. Each of the Company and its Subsidiaries is duly qualified or licensed to do business and is in good standing in each jurisdiction in which the nature of the business conducted by it makes such qualification or licensing necessary, except where the failure to be so duly qualified or licensed and in good standing would not have a Company Material Adverse Effect. The Company's Amended and Restated Certificate of Incorporation (as may be further amended from time to time, the "**Company Certificate of Incorporation**") and the Company's Amended and Restated Bylaws (as may be further amended from time to time, the "**Company Bylaws**"), in each case, as currently in effect, are included in the Company SEC Documents.

Section 4.2 Capitalization.

(a) As of March 31, 2022, the authorized capital stock of the Company consists of (i) 5,000,000,000 shares of Company Common Stock, 763,577,530 of which were issued and outstanding (including 1,386,850 Company RSAs), and none of which were held in treasury, and (ii) 200,000,000 shares of preferred stock, par value $0.000005 per share, of the Company, none of which were issued and outstanding. As of March 31, 2022, there were (i) 953,365 Company Options outstanding, (ii) 2,900,689 Company PSUs outstanding (assuming attainment of the applicable performance metrics at the target level of performance), (iii) 67,575,223 Company RSUs outstanding, and (iv) shares of Company Common Stock subject to outstanding purchase rights under the Company ESPP. Except as described above and other than the Stockholder Rights, the Existing Convertible Notes, the Company Warrant Confirmations and any issuances or grants (or promises or offers to issue or grant) Company Equity Awards since March 31, 2022 in connection with employee hiring, retention or promotions in the ordinary course of business in an amount less than 5,000,000 Company Equity Awards (assuming attainment of the applicable performance metrics at the target level of performance) in the aggregate, as of the date of this Agreement, there are no additional existing and outstanding (i) options, warrants, calls, subscriptions or other rights, convertible securities, agreements or commitments of any character to which the Company or any of its Subsidiaries is a party obligating the Company or any of its

21

Subsidiaries to issue, transfer or sell any shares of capital stock or other equity interests in the Company or any of its Subsidiaries or securities convertible into or exchangeable for such shares or equity interests, (ii) contractual obligations of the Company or any of its Subsidiaries to repurchase, redeem or otherwise acquire any capital stock of the Company or any of its Subsidiaries, except pursuant to the other than the Company ASR Confirmations and the Company Bond Hedging Transactions or (iii) voting trusts or similar agreements to which the Company is a party with respect to the voting of the capital stock of the Company, other than the Silver Lake Investment Agreement.

(b) Except as would not be material to the Company and its Subsidiaries, taken as a whole, all of the outstanding shares of capital stock or equivalent equity interests of each of the Company's Subsidiaries are owned of record and beneficially, directly or indirectly, by the Company or the relevant wholly owned Subsidiary (except for de minimis equity interests held by a Third Party for local regulatory reasons) and free and clear of all Liens except for restrictions imposed by applicable securities laws and Permitted Liens.

(c) Prior to the Closing, the Company will provide Parent with a correct and complete list, as of such date, of all outstanding Company Equity Awards, including the holder (by employee identification number), type of Company Equity Award, date of grant, number of shares of Company Common Stock underlying such award (and, if applicable, assuming achievement of the applicable performance metrics at the target level of performance), whether such Company Equity Award is intended to qualify as an "incentive stock option" under Section 422 of the Code, the equity plan pursuant to which the Company Equity Award was granted, and, where applicable, the exercise price per share and expiration date.

22

Section 4.3 <u>Authority Relative to Agreement</u>.

(a) The Company has all necessary corporate power and authority to execute and deliver this Agreement and, assuming the accuracy of the representations and warranties set forth in the second sentence of <u>Section 5.8</u> and subject to obtaining the Company Stockholder Approval and the occurrence of the stockholder advisory vote contemplated by Rule 14a-21(c) under the Exchange Act, regardless of the outcome of such advisory vote (the "**Company Stockholder Advisory Vote**"), to consummate the transactions contemplated by this Agreement, including the Merger. The execution, delivery and performance of this Agreement by the Company, and the consummation by the Company of the transactions contemplated by this Agreement, including the Merger, have been duly and validly authorized by all necessary corporate action by the Company, and assuming the accuracy of the representations and warranties set forth in the second sentence of <u>Section 5.8</u> and except for the Company Stockholder Approval, the occurrence of the Company Stockholder Advisory Vote, no other corporate action or proceeding on the part of the Company is necessary to authorize the execution, delivery and performance of this Agreement by the Company and the consummation by the Company of the transactions contemplated by this Agreement, including the Merger. This Agreement has been duly executed and delivered by the Company and, assuming the due authorization, execution and delivery of this Agreement by the other parties hereto, constitutes a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except that such enforceability may be subject to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other similar Laws, now or hereafter in effect, affecting creditors' rights and remedies generally (the "**Enforceability Exceptions**").

(b) The Company Board has, by resolutions duly adopted by the unanimous vote of the directors at a duly held meeting (i) determined that the terms and conditions of this Agreement, the Merger and the other transactions contemplated by this Agreement are advisable and in the best interests of the Company and the Company's stockholders, (ii) authorized the execution and delivery of this Agreement and declared advisable and approved the consummation of the transactions contemplated by this Agreement, including the Merger, (iii) directed that this Agreement be submitted for consideration at a meeting of the Company's stockholders and (iv) subject to the terms of this Agreement, resolved to recommend that the Company's stockholders adopt this Agreement and approve the transactions contemplated hereby, including the Merger.

Section 4.4 <u>No Conflict; Required Filings and Consents</u>.

(a) Neither the execution and delivery of this Agreement by the Company nor the consummation by the Company of the transactions contemplated by this Agreement will (i) violate any provision of the Company Certificate of Incorporation or the Company Bylaws or (ii) assuming the accuracy of the representations and warranties set forth in the second sentence of <u>Section 5.8</u> and that the Consents, registrations, declarations, filings and notices referred to in <u>Section 4.4(b)</u> have been obtained or made, any applicable waiting periods referred to therein have expired and any condition precedent to any such Consent has been satisfied, conflict with or violate any Law applicable to the Company or any of its Subsidiaries or by which any property or asset of the Company or any of its Subsidiaries is bound or affected or (iii) except with respect to the Existing Credit Agreement and the Existing Notes, result in any breach of, or constitute a default (with or without notice or lapse of time, or both) under, or give rise to any right of termination, acceleration or cancellation of, any Company Material Contract (other than any Company Benefit Plan) , other than, in the case of clauses (ii) and (iii) any such conflict, violation, breach, default, termination, acceleration or cancellation that would not have a Company Material Adverse Effect.

(b) No consent, approval, clearance, license, permit, order or authorization (each of the foregoing, a "**Consent**") of, or registration, declaration or filing with, or notice to, any Governmental Authority is required to be obtained or made by or with respect to the Company or any of its Subsidiaries under applicable Law in connection with the execution, delivery and performance of this Agreement or the consummation of the transactions contemplated by this Agreement, other than (i) the applicable reporting or other requirements of and filings with the SEC under the Exchange Act (including the filing of the Proxy Statement), (ii) the filing of the Certificate of Merger with the Secretary of State in accordance with the DGCL and appropriate documents with the relevant authorities of the other jurisdictions in which the Company or any of its Subsidiaries is qualified to do business, (iii) the applicable requirements under corporation or Blue Sky Laws of various states, (iv) such filings as may be required in connection with the Taxes described in Section 8.6, (v) filings with the New York Stock Exchange, (vi) such other items required solely by reason of the participation of Parent or Acquisition Sub or any of their Affiliates in the transactions contemplated by this Agreement, (vii) compliance with and filings or notifications under the HSR Act and any other applicable U.S. or foreign competition, antitrust or merger control Laws (together with the HSR Act, "**Antitrust Laws**"), (viii) compliance with and filings or notifications under any applicable Foreign Investment Laws, and (ix) such other Consents, registrations, declarations, filings or notices the failure of which to be obtained or made would not have a Company Material Adverse Effect.

Section 4.5 Permits; Compliance With Laws.

(a) As of the date of this Agreement, the Company and its Subsidiaries are in possession of all franchises, grants, authorizations, licenses, permits, easements, variances, exceptions, consents, certificates, approvals and orders necessary for the Company and its Subsidiaries to carry on their respective business as it is now being conducted (the "**Company Permits**") and all Company Permits are in full force and effect and no suspension or cancellation of any of the Company Permits is pending or, to the Knowledge of the Company, threatened, except where the failure to be in possession of or be in full force and effect, or the suspension or cancellation of, any of the Company Permits would not have a Company Material Adverse Effect.

(b) Neither the Company nor any of its Subsidiaries is in default or violation of any Law applicable to the Company, any of its Subsidiaries or by which any of their respective properties or assets are bound, except for any such defaults or violations that would not have a Company Material Adverse Effect. Notwithstanding the foregoing, no representation or warranty in Section 4.5(a) or this Section 4.5(b) is made with respect to Company SEC Documents or financial statements, "disclosure controls and procedures" or "internal control over financial reporting," employee benefits matters, Intellectual Property Rights matters, Tax matters, which are addressed exclusively in Section 4.6 (Company SEC Documents; Financial Statements), Section 4.8 (Disclosure Controls and Procedures), Section 4.12 (Employee Benefit Plans), Section 4.14 (Intellectual Property Rights), Section 4.15 (Taxes), respectively.

24

Section 4.6 Company SEC Documents; Financial Statements.

(a) Since January 1, 2022, the Company has filed or furnished with the SEC all material forms, documents and reports required to be filed or furnished prior to the date of this Agreement by it with the SEC (such forms, documents and reports filed with the SEC, including any amendments or supplements thereto and any exhibits or other documents attached to or incorporated by reference therein, the "**Company SEC Documents**"). As of their respective dates, or, if amended or supplemented, as of the date of the last such amendment or supplement, the Company SEC Documents complied in all material respects with the requirements of the Securities Act and the Exchange Act, as the case may be, and the applicable rules and regulations promulgated thereunder, and none of the Company SEC Documents at the time it was filed (or, if amended or supplemented, as of the date of the last amendment or supplement) contained any untrue statement of a material fact or omitted to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, or are to be made, not misleading.

(b) The consolidated financial statements (including all related notes) of the Company included in the Company SEC Documents fairly present in all material respects the consolidated financial position of the Company and its consolidated Subsidiaries as at the respective dates thereof and its consolidated statements of operations and consolidated statements of cash flows for the respective periods then ended (subject, in the case of unaudited interim statements, to normal year-end audit adjustments, none of which would have a Company Material Adverse Effect, to the absence of notes and to any other adjustments described therein, including in any notes thereto) in conformity with GAAP (except, in the case of unaudited statements, as permitted by Form 10-Q, Form 8-K or any successor form or other rules under the Exchange Act).

Section 4.7 Information Supplied. None of the information supplied or to be supplied by or on behalf of the Company or any of its Subsidiaries expressly for inclusion or incorporation by reference in the proxy statement relating to the matters to be submitted to the Company's stockholders at the Company Stockholders' Meeting (such proxy statement and any amendments or supplements thereto, the "**Proxy Statement**") shall, at the time the Proxy Statement is first mailed to the Company's stockholders and at the time of the Company Stockholders' Meeting to be held in connection with the Merger, contain any untrue statement of material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading at such applicable time, except that no representation or warranty is made by the Company with respect to statements made therein based on information supplied, or required to be supplied, by Parent or its Representatives in writing expressly for inclusion therein. The Proxy Statement will comply as to form in all material respects with the provisions of the Securities Act and the Exchange Act, and the rules and regulations promulgated thereunder.

Section 4.8 Disclosure Controls and Procedures. The Company has established and maintains "disclosure controls and procedures" and "internal control over financial reporting" (as such terms are defined in paragraphs (e) and (f), respectively, of Rule 13a-15 promulgated under the Exchange Act) as required by Rule 13a-15 promulgated under the Exchange Act. The Company has disclosed, based on its most recent evaluation of the Company's internal control over financial reporting prior to the date of this Agreement, to the Company's auditors and the

audit committee of the Company Board (i) any significant deficiencies and material weaknesses in the design or operation of its internal controls over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act) that are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information and (ii) any fraud to the Knowledge of the Company, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

Section 4.9 Absence of Certain Changes or Events. Since January 1, 2022 and until the date of this Agreement, (a) the businesses of the Company and its Subsidiaries have been conducted in the ordinary course of business (other than as a result of COVID-19 and COVID-19 Measures or with respect to the Existing 2030 Notes or the transactions contemplated hereby) and (b) there has not been any adverse change, event, development or state of circumstances that has had a Company Material Adverse Effect.

Section 4.10 No Undisclosed Liabilities. Except (a) as reflected, disclosed or reserved against in the Company's financial statements (as amended or restated, as applicable) or the notes thereto included in the Company SEC Documents, (b) for liabilities or obligations incurred in the ordinary course of business since December 31, 2021, (c) the Existing 2030 Notes, (d) for liabilities or obligations incurred in connection with the transactions contemplated by this Agreement, including the Merger, or (e) for liabilities or obligations that would not have a Company Material Adverse Effect, as of the date of this Agreement, the Company and its Subsidiaries do not have any liabilities of any nature, whether or not accrued, contingent or otherwise, that would be required by GAAP to be reflected on a consolidated balance sheet (or in the notes thereto) of the Company.

Section 4.11 Litigation. As of the date of this Agreement, there is no suit, action or proceeding pending or, to the Knowledge of the Company, threatened in writing against the Company or any of its Subsidiaries, that would have a Company Material Adverse Effect, nor is there any judgment of any Governmental Authority outstanding against, or, to the Knowledge of the Company, investigation by any Governmental Authority involving the Company or any of its Subsidiaries that would have a Company Material Adverse Effect. As of the date of this Agreement, there is no suit, action or proceeding pending or, to the Knowledge of the Company, threatened in writing seeking to prevent, hinder, modify, delay or challenge the Merger or any of the other transactions contemplated by this Agreement.

Section 4.12 Employee Benefit Plans.

(a) Prior to the Closing, the Company will provide a true and complete list, as of the date of this Agreement, of each material Company Benefit Plan (which list may reference a form of such Company Benefit Plan). Prior to the Closing, the Company will make available to Parent a true and complete copy of each material Company Benefit Plan and all amendments thereto and a true and complete copy of the following items (in each case, only if applicable): (i) each trust or other funding arrangement; (ii) each current summary plan description and current summary of material modifications; (iii) the most recently filed annual report on IRS Form 5500; and (iv) the most recently received IRS determination letter or IRS opinion letter.

(b) Except as would not have a Company Material Adverse Effect:

(i) each of the Company Benefit Plans has been maintained, operated, administered and funded in accordance with its terms and in compliance with applicable Laws;

(ii) there are no claims pending, or, to the Knowledge of the Company, threatened actions, suits, disputes or claims (other than routine claims for benefits) against or affecting any Company Benefit Plan, by any employee or beneficiary covered under such Company Benefit Plan, as applicable, or otherwise involving such Company Benefit Plan;

(iii) neither the Company nor its Subsidiaries has any material obligations for post-termination health or life insurance benefits under any Company Benefit Plan (other than for continuation coverage required to be provided pursuant to Section 4980B of the Code); and

(iv) each Foreign Plan (A) if required to be registered or approved by a non-U.S. Governmental Authority, has been registered or approved and has been maintained in good standing with applicable regulatory authorities, and, to the Knowledge of the Company, no event has occurred since the date of the most recent approval or application therefor relating to any such Foreign Plan that would reasonably be expected to adversely affect any such approval or good standing, (B) that is intended to qualify for special Tax treatment meets all requirements for such treatment, and (C) if required to be fully funded or fully insured, is fully funded or fully insured on an ongoing and termination or solvency basis (determined using reasonable actuarial assumptions) in compliance with applicable Laws.

(e) If, and to the extent, the execution or delivery of this Agreement or the consummation of the Merger (either alone or in combination with another event) will: (i) entitle any Company Service Provider to any material payment; (ii) materially increase the amount or value of any benefit or compensation or other obligation payable or required to be provided to any Company Service Provider; (iii) accelerate the time of payment or vesting of amounts due to any Company Service Provider or accelerate the time of any funding (whether to a trust or otherwise) of compensation or benefits in respect of any of the Company Benefit Plans; (iv) give rise to the payment of any amount by the Company or any of its Subsidiaries that would be non-deductible by reason of Section 280G of the Code, then, prior to the Closing, the Company will provide a true and complete list of each Company Benefit Plan that would trigger any of (i) through (iv) above. There is no contract, agreement, plan or arrangement to which the Company or any of its Subsidiaries is a party by which it is required by its terms to compensate, gross-up, indemnify, or otherwise reimburse any Person for excise Taxes imposed pursuant to Section 4999 or Section 409A of the Code.

(f) Except as would not have a Company Material Adverse Effect, there are no claims pending, or, to the Knowledge of the Company, threatened actions, suits, disputes or claims (other than routine claims for benefits) against or affecting any Company Benefit Plan, by any employee or beneficiary covered under such Company Benefit Plan, as applicable, or otherwise involving such Company Benefit Plan.

(g) Except as would not have a Company Material Adverse Effect, neither the Company nor its Subsidiaries has any material obligations for post-termination health or life insurance benefits under any Company Benefit Plan (other than for continuation coverage required to be provided pursuant to Section 4980B of the Code).

(h) Except as would not have a Company Material Adverse Effect, each Foreign Plan (i) has been maintained, operated and administered in compliance with its terms and in compliance with applicable Laws; (ii) if required to be registered or approved by a non-U.S. Governmental Authority, has been registered or approved and has been maintained in good standing with applicable regulatory authorities, and, to the Knowledge of the Company, no event has occurred since the date of the most recent approval or application therefor relating to any such Foreign Plan that would reasonably be expected to adversely affect any such approval or good standing; (iii) that is intended to qualify for special Tax treatment meets all requirements for such treatment; (iv) if required to be fully funded or fully insured, is fully funded or fully insured on an ongoing and termination or solvency basis (determined using reasonable actuarial assumptions) in compliance with applicable Laws; and (v) is not subject to any pending or, to the Knowledge of the Company, threatened claims by or on behalf of any participant in any Foreign Plan, or otherwise involving any such Foreign Plan or the assets of any Foreign Plan, other than routine claims for benefits.

Section 4.13 Labor Matters. If, and to the extent that, the Company or any of its Subsidiaries is a party to or bound by any works council or collective bargaining agreement and no employees of the Company or any of its Subsidiaries are represented by a labor organization with respect to their employment with the Company or any of its Subsidiaries, then, prior to the Closing, the Company will provide a true and complete list of each such works council or collective bargaining agreement, or labor organization, as applicable. There are no labor related strikes, walkouts or work stoppages pending or, to the Knowledge of the Company, threatened in writing.

Section 4.14 Intellectual Property.

(a) Except as would not have a Company Material Adverse Effect, the Company and its Subsidiaries solely and exclusively own all patents, trademarks, trade names, copyrights, Internet domain names, service marks, trade secrets and other intellectual property rights (the "**Intellectual Property Rights**") purported to be owned by the Company and its Subsidiaries (the "**Company Intellectual Property**"), free and clear of all Liens, except Permitted Liens.

(b) To the Knowledge of the Company, the conduct of the business of the Company and its Subsidiaries as currently conducted does not infringe, misappropriate or otherwise violate any Intellectual Property Rights of any other Person, except for any such infringement, misappropriation or other violation that would not have a Company Material Adverse Effect. To the Knowledge of the Company, no other Person is infringing, misappropriating or otherwise violating any Company Intellectual Property, except for any such infringement, misappropriation or other violation as would not have a Company Material Adverse Effect.

28

The Company and its Subsidiaries are in compliance with all applicable Laws, Contracts to which the Company or its Subsidiaries are bound, and internal- and external-facing policies of the Company or its Subsidiaries, in each case, relating to privacy, data protection, and the collection and use of information that constitutes "personal information" under applicable Laws (**"Personal Information"**) collected, used or held for use by the Company or its Subsidiaries, except where the failure to be in compliance would not have a Company Material Adverse Effect.

(e) Neither the Company nor any of its Subsidiaries has experienced any unauthorized access to the information technology systems owned or used by the Company or its Subsidiaries or Personal Information collected, used, held for use or otherwise processed by the Company or its Subsidiaries, except as would not have a Company Material Adverse Effect.

Section 4.15 Taxes.

(a) Except as would not have a Company Material Adverse Effect, (i) the Company and its Subsidiaries have timely filed all Tax Returns (taking into account any extensions) required to be filed, and such Tax Returns (taking into account all amendments thereto) are complete and accurate, and (ii) all Taxes required to be paid by the Company and its Subsidiaries have been paid.

(b) Except as would not have a Company Material Adverse Effect, (i) neither the Company nor any of its Subsidiaries has received written notice of any audit, examination, investigation or other proceeding from any Governmental Authority in respect of liabilities for Taxes of the Company or any of its Subsidiaries, which have not been fully paid or settled; (ii) there are no Liens for Taxes on any of the assets of the Company or any of its Subsidiaries other than Permitted Liens; (iii) with respect to any tax years open for audit as of the date of this Agreement, neither the Company nor any of its Subsidiaries has granted any waiver of any statute of limitations with respect to, or any extension of a period for the assessment of, any Tax; and (iv) neither the Company nor any of its Subsidiaries has any liability for the Taxes of any Person (other than the Company and its Subsidiaries) pursuant to Treasury Regulation Section 1.1502-6 (or any similar provision of state, local or non-U.S. Law) as a transferee or successor, by contract (other than contracts entered into in the ordinary course of business the primary purpose of which does not relate to Tax) or otherwise by operation of law.

(c) Neither the Company nor any of its Subsidiaries has engaged in any "listed transaction" as defined in Treasury Regulation Section 1.6011-4(b)(2) in any tax year for which the statute of limitations has not expired.

(d) The Company is not nor has been during the applicable period specified in Section 897(c)(1)(A)(ii) of the Code a "United States real property holding corporation" within the meaning of Section 897(c)(2) of the Code.

(e) Except with respect to Section 4.12, the representations in this Section 4.15 are the sole and exclusive representations and warranties concerning Tax matters.

29

Section 4.16 Material Contracts.

(a) For purposes of this Agreement, "**Company Material Contract**" means any Contract (other than any Company Benefit Plan) to which the Company or any of its Subsidiaries is a party or by which their respective properties or assets are bound, except for this Agreement, that constitutes a "material contract" (as such term is defined in item 601(b)(10) of Regulation S-K of the Securities Act).

(b) Neither the Company nor any of its Subsidiaries is in breach of or default under the terms of any Company Material Contract where such breach or default would have a Company Material Adverse Effect. To the Knowledge of the Company, no other party to any Company Material Contract is in breach of or default under the terms of any Company Material Contract where such breach or default would have a Company Material Adverse Effect. Each Company Material Contract is a valid and binding obligation of the Company or its Subsidiary and, to the Knowledge of the Company, the other parties thereto, except such as would not have a Company Material Adverse Effect; provided that (i) such enforcement may be subject to the Enforceability Exceptions and (ii) the remedies of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses and to the discretion of the court before which any proceeding therefor may be brought.

Section 4.17 RESERVED.

Section 4.18 RESERVED.

Section 4.19 Takeover Statutes. Assuming the accuracy of the representation contained in Section 5.8, the Company Board has taken such actions and votes as are necessary to render the provisions of any "fair price," "moratorium," "control share acquisition" or any other takeover or anti-takeover statute or similar federal or state Law inapplicable to this Agreement, the Merger or any other transactions contemplated by this Agreement.

Section 4.20 Vote Required. Assuming the accuracy of the representation contained in Section 5.8, the adoption of this Agreement by the affirmative vote of a majority of the outstanding shares of Company Common Stock entitled to vote to adopt this Agreement (the "**Company Stockholder Approval**") are the only votes of holders of securities of the Company that are required to consummate the Merger.

Section 4.21 Brokers. Except for Goldman Sachs & Co. LLC ("**Goldman Sachs**"), J.P. Morgan Securities LLC ("**J.P. Morgan**") and Allen & Company LLC, each of whose fees and expenses shall be borne solely by the Company, no broker, finder, investment banker, consultant or intermediary is entitled to any investment banking, brokerage, finder's or similar fee or commission in connection with the Merger or any of the other transactions contemplated by this Agreement based upon arrangements made by or on behalf of the Company or any of its Subsidiaries.

Section 4.22 <u>Opinions of Financial Advisors</u>. The Company Board has received the oral opinion of Goldman Sachs (to be followed by delivery of a written opinion as of the date hereof), to the effect that, as of such date, and based upon and subject to the limitations, qualifications and assumptions set forth in the written opinion of Goldman Sachs, the Merger Consideration to be paid to the holders of Company Common Stock (other than the Equity Investor, Parent and their respective Affiliates) pursuant to this Agreement is fair from a financial point of view to such holders. On or prior to the date of this Agreement, the Company Board has received the opinion of J.P. Morgan to the effect that, as of the date of such opinion and subject to the assumptions, limitations, qualifications and other factors set forth therein, the Merger Consideration to be paid to holders of Company Common Stock pursuant to this Agreement is fair, from a financial point of view, to such holders.

Section 4.23 <u>Rights Agreement</u>. The Company has taken all action necessary to render the Stockholder Rights Plan, inapplicable to the Merger and this Agreement and the transactions contemplated hereby.

Section 4.24 <u>RESERVED</u>.

Section 4.25 <u>No Other Representations or Warranties</u>. Except for the representations and warranties expressly set forth in this <u>Article IV</u>, neither the Company nor any other Person makes or has made any representation or warranty of any kind whatsoever, express or implied, at Law or in equity, with respect to the Company or any of its Subsidiaries or their respective business, operations, assets, liabilities, conditions (financial or otherwise), notwithstanding the delivery or disclosure to Parent and the Acquisition Sub or any of their Affiliates or Representatives of any documentation, forecasts or other information with respect to any one or more of the foregoing. Without limiting the generality of the foregoing, neither the Company nor any other Person makes or has made any express or implied representation or warranty to Parent, Acquisition Sub or any of their respective Representatives with respect to (a) any financial projection, forecast, estimate or budget relating to the Company, any of its Subsidiaries or their respective businesses or, (b) except for the representations and warranties made by the Company in this <u>Article IV</u>, any oral or written information presented to Parent, Acquisition Sub or any of their respective Representatives in the course of their due diligence investigation of the Company, the negotiation of this Agreement or the course of the Merger, or the accuracy or completeness thereof.

**ARTICLE V**

**REPRESENTATIONS AND WARRANTIES OF PARENT AND ACQUISITION SUB**

Except as disclosed in the Parent Disclosure Letter, Parent and Acquisition Sub hereby jointly and severally represent and warrant to the Company as follows:

Section 5.1 <u>Organization and Qualification</u>.

(a) Each of Parent and Acquisition Sub is a corporation duly organized, validly existing and (to the extent applicable) in good standing under the laws of the jurisdiction of its incorporation and has the requisite corporate entity power and authority to conduct its business as it is now being conducted, except where the failure to be duly organized, validly existing or in good standing or to have such power and authority would not have a Parent Material Adverse Effect. Each of Parent and Acquisition Sub is duly qualified or licensed to do business and is in good standing in each jurisdiction in which the nature of the business conducted by it makes such qualification or licensing necessary, except where the failure to be so duly qualified or licensed and in good standing would not have a Parent Material Adverse Effect.

(b) As of the date of this Agreement, the authorized share capital of Acquisition Sub consists of 1,000 shares, $0.01 par value per share, all of which are validly issued and outstanding. All of the issued and outstanding share capital of Acquisition Sub is, and at the Effective Time will be, owned by Parent. Acquisition Sub was formed solely for the purpose of acquiring the Company, and it has not conducted any business prior to the date of this Agreement and has no, and prior to the Effective Time will have no, assets, liabilities or obligations of any nature other than those incident to its formation and pursuant to this Agreement and the Merger and other transactions contemplated by this Agreement.

(c) As of the date of this Agreement, all of the issued and outstanding share capital of Parent is owned by the Equity Investor.

Section 5.2 Authority Relative to Agreement.

(a) Parent and Acquisition Sub have all necessary corporate power and authority to (a) execute and deliver this Agreement, (b) perform its covenants and obligations hereunder and (c) consummate the transactions contemplated by this Agreement, including the Merger. The execution, delivery and performance of this Agreement by Parent and Acquisition Sub, and the consummation by Parent and Acquisition Sub of the transactions contemplated by this Agreement, including the Merger, have been duly and validly authorized by all necessary corporate action by Parent and Acquisition Sub, and no other corporate action or proceeding on the part of Parent and Acquisition Sub is necessary to authorize the execution, delivery and performance of this Agreement by Parent and Acquisition Sub and the consummation by Parent and Acquisition Sub of the transactions contemplated by this Agreement, including the Merger. This Agreement has been duly executed and delivered by Parent and Acquisition Sub and, assuming the due authorization, execution and delivery of this Agreement by the other party hereto, constitutes a legal, valid and binding obligation of Parent and Acquisition Sub, enforceable against Parent and Acquisition Sub in accordance with its terms, except that such enforceability may be subject to the Enforceability Exceptions.

(b) The Parent Board has, by resolutions duly adopted by the unanimous vote of the directors, (i) adopted this Agreement and approved the consummation of the transactions contemplated by this Agreement, including the Merger, and (ii) determined that this Agreement and the transactions contemplated by this Agreement are advisable and in the best interests of Parent and its stockholders, as applicable. No vote of, or consent by, the holders of any class or series of capital stock of Parent is necessary to authorize the execution, delivery and performance by Parent of this Agreement and the consummation of the transactions contemplated by this Agreement or otherwise required by the certificate of incorporation or bylaws of Parent, applicable Law (including any stockholder approval provisions under the rules of any applicable securities exchange) or any Governmental Authority.

(c) The Acquisition Sub Board has, by resolutions duly adopted by the unanimous vote of the directors, (i) authorized the execution and delivery of this Agreement and declared advisable and approved the consummation of the transactions contemplated by this Agreement, including the Merger, (ii) directed that this Agreement be submitted for consideration by Acquisition Sub's sole stockholder and (iii) recommended that the sole stockholder of Acquisition Sub approve the Merger. Parent, acting in its capacity as the sole stockholder of Acquisition Sub, has approved this Agreement and the consummation of the transactions contemplated by this Agreement, including the Merger, and no further vote is required.

Section 5.3 No Conflict; Required Filings and Consents.

(a) Neither the execution and delivery of this Agreement by Parent and Acquisition Sub nor the consummation by Parent and Acquisition Sub of the transactions contemplated by this Agreement will (i) violate any provision of Parent's or its Subsidiaries' certificates of incorporation or bylaws, (ii) assuming that the Consents, registrations, declarations, filings and notices referred to in Section 5.3(b) have been obtained or made, any applicable waiting periods referred to therein have expired and any condition precedent to any such Consent has been satisfied, conflict with or violate any Law applicable to Parent or any of its Subsidiaries or by which any property or asset of Parent or any of its Subsidiaries is bound or affected or (iii) result in any breach of, or constitute a default (with or without notice or lapse of time, or both) under, or give rise to any right of termination, acceleration or cancellation of any Contract to which Parent or any of its Subsidiaries is a party, or by which any of their respective properties or assets is bound, other than, in the case of clauses (ii) and (iii), any such conflict, violation, breach, default, termination, acceleration or cancellation that would not have a Parent Material Adverse Effect.

(b) No Consent of, or registration, declaration or filing with, or notice to, any Governmental Authority is required to be obtained or made by or with respect to Parent or any of its Subsidiaries under applicable Law in connection with the execution, delivery and performance of this Agreement or the consummation of the transactions contemplated by this Agreement, other than (i) the applicable reporting or other requirements of and filings with the SEC under the Exchange Act (including the filing of the Proxy Statement), (ii) the filing of the Certificate of Merger with the Secretary of State in accordance with the DGCL and appropriate documents with the relevant authorities of the other jurisdictions in which Parent or any of its Subsidiaries is qualified to do business, (iii) such filings as may be required in connection with the Taxes described in Section 8.6, (iv) such other items required solely by reason of the participation of the Company in the transactions contemplated by this Agreement, (v) compliance with and filings or notifications under the HSR Act, other Antitrust Laws (vi) compliance with and filings or notifications under any Foreign Investment Laws, and (vii) such other Consents, registrations, declarations, filings or notices the failure of which to be obtained or made would not have a Parent Material Adverse Effect.

Section 5.4 Financing. Parent has delivered to the Company true, correct and complete copies of the duly executed (i) debt commitment letter, dated as of April 25, 2022, among Morgan Stanley Senior Funding, Inc., the other financial institutions party thereto, Parent and Acquisition Sub, together with true, correct and complete copies of the executed fee letter related thereto (collectively, including all exhibits, schedules and annexes thereto, the "**Bank Debt Commitment Letter**"), pursuant to which, and subject to the terms and conditions therein, the Debt Financing Sources party thereto have committed to lend the amounts set forth therein to Acquisition Sub for the purpose of funding a portion of the amounts required to fund the transactions contemplated by this Agreement (the "**Bank Debt Financing**"), (ii) debt commitment letter, dated as of April 25,

33

2022, among Morgan Stanley Senior Funding, Inc., the other financial institutions party thereto and X Holdings III, LLC, a Delaware limited liability company (the "**Margin Loan Borrower"**), together with true, correct and complete copies of the executed fee letter related thereto (collectively, including all exhibits, schedules and annexes thereto, the "**Margin Loan Commitment Letter**" and, together with the Bank Debt Commitment Letter, the "**Debt Commitment Letters**"), pursuant to which, and subject to the terms and conditions therein, the Debt Financing Sources party thereto have committed to lend the amounts set forth therein to the Margin Loan Borrower for the purpose of funding a portion of the amounts required to fund the transactions contemplated by this Agreement (the "**Margin Loan Financing**" and, together with the Bank Debt Financing, the "**Debt Financing**") and (iii) an equity commitment letter from the Equity Investor, dated as of the date hereof (including all exhibits, schedules, annexes and amendments thereto as of the date of this Agreement, the "**Equity Commitment Letter**" and, together with the Debt Commitment Letters, the "**Financing Commitments**") pursuant to which the Equity Investor has committed to invest the amounts set forth therein (the "**Equity Financing**" and, together with the Debt Financing, the "**Financing**"); <u>provided</u> that the fee and other economic provisions (including "flex" provisions) of fee letters may be redacted in a customary manner so long as none of the redacted terms would (i) reduce the amount of the Debt Financing below the amount that is required to pay the Funded Obligations, (ii) impose any new condition or otherwise adversely amend, modify or expand any conditions precedent to the Debt Financing or (iii) affect the enforceability or impair the validity of, or prevent, impede or delay the consummation of, the Debt Financing at the Closing. As of the date hereof, each of Parent and Acquisition Sub has accepted and is a party to the Bank Debt Commitment Letter, the Margin Loan Borrower has accepted and is a party to the Margin Loan Commitment Letter, and the Financing Commitments are in full force and effect and, are legal, valid and binding obligations of the Equity Investor, Parent and Acquisition Sub or the Margin Loan Borrower, as applicable, and, to the knowledge of the Equity Investor, Parent, Acquisition Sub and the Margin Loan Borrower, each of the other parties thereto, enforceable in accordance with their respective terms against the Equity Investor, Parent, Acquisition Sub or the Margin Loan Borrower, as applicable, and, to the knowledge of Parent and Acquisition Sub, against each of the other parties thereto. As of the date hereof, the Financing Commitments, and the respective commitments or obligations thereunder, have not been withdrawn, terminated, reduced, repudiated, rescinded, amended, supplemented or modified, in any respect, and no such withdrawal, termination, reduction, repudiation, rescission, amendment, supplement or modification is contemplated by the Equity Investor, Parent, Acquisition Sub or the Margin Loan Borrower or, to the knowledge of Parent and Acquisition Sub, any other party thereto. None of the Equity Investor, Parent, Acquisition Sub, the Margin Loan Borrower nor any of their respective Affiliates has, nor has, to the knowledge of the Equity Investor, Parent, Acquisition Sub or the Margin Loan Borrower, any other party to the Financing Commitments, committed any breach or threatened breach of the performance, observance or fulfillment of any covenants, conditions or other obligations set forth in, or is in default under, any of the Financing Commitments. No event has occurred which, with or without notice, lapse of time or both, would or would reasonably be expected to (i) constitute or result in a breach or default on the part of Parent, Acquisition Sub, Margin Loan Borrower or any of the other parties thereto (including the Financing Sources) under the Financing Commitments, (ii) constitute or result in a failure to satisfy a condition or other contingency set forth in the Financing Commitments, or (iii) otherwise result in any portion of the Debt Financing or the Equity Financing not being available on the Closing Date. None of the Equity Investor, Parent, Acquisition Sub or the Margin Loan Borrower, nor any

34

of their respective Affiliates has any reason to believe (both before and after giving effect to any "flex" provisions contained in the Debt Commitment Letters) that it will be unable to satisfy, on a timely basis (and in any event, not later than the Closing), any condition to be satisfied by it (or otherwise within the Equity Investor's, Parent's, Acquisition Sub's or the Margin Loan Borrower's any of their respective Representatives' or Affiliates' control) contained in the applicable Financing Commitments or that the full amounts committed pursuant to the applicable Financing Commitments will not be available as of the Closing. There are no conditions precedent or other contingencies or conditions related to the Financing other than those conditions expressly set forth in the unredacted provisions of the Financing Commitments, and there are no side letters, understandings or other agreements, Contracts or arrangements of any kind relating to the Financing Commitments or the Financing that could adversely affect the availability, conditionality, enforceability or amount of the Financing contemplated by the Financing Commitments. As of the date of this Agreement, Parent, Acquisition Sub, the Margin Loan Borrower and/or their respective Affiliates have fully paid any and all commitment fees or other fees or deposits required by the applicable Financing Commitments to be paid on or before the date of this Agreement. The aggregate proceeds from the Financing are sufficient in amount to provide Parent and Acquisition Sub with the funds necessary to consummate the transactions contemplated hereby and to satisfy their obligations under this Agreement, including for Parent to pay (or cause to be paid) the aggregate amounts payable pursuant to Article II and the payment of all fees, costs and expenses to be paid by Parent related to the transactions contemplated by this Agreement, including such fees, costs and expenses relating to the Financing, and payment of all amounts in connection with the refinancing or repayment of any outstanding indebtedness of the Company required by this Agreement or the Financing Commitments (collectively, the "**Funding Obligations**"). Notwithstanding anything contained in this Agreement to the contrary, the Equity Investor, Parent and Acquisition Sub each acknowledge and affirm that it is not a condition to the Closing or to any of its obligations under this Agreement that the Equity Investor, Parent, Acquisition Sub and/or any of their respective Affiliates obtain any financing (including the Debt Financing) for any of the transactions contemplated by this Agreement. As of the date of this Agreement, the Equity Investor owns, directly or indirectly, all the issued and outstanding capital stock and other equity interests of the Margin Loan Borrower.

Section 5.5 Information Supplied. None of the information supplied or required to be supplied by or on behalf of Parent or any of its Representatives expressly for inclusion or incorporation by reference in the Proxy Statement shall, at the time it is first mailed to the Company's stockholders and at the time of the Company Stockholders' Meeting to be held in connection with the Merger, contain any untrue statement of material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.

Section 5.6 Brokers. Except for Morgan Stanley & Co. LLC, Bank of America Merrill Lynch and Barclays, each of whose fees and expenses shall be borne solely by Parent, no broker, finder, investment banker, consultant or intermediary is entitled to any investment banking, brokerage, finder's or similar fee or commission in connection with the Merger or any of the other transactions contemplated by this Agreement based upon arrangements made by or on behalf of Parent, Acquisition Sub, or any of their respective Subsidiaries.

Section 5.7 Compliance With Laws.

(a) Neither the Parent, Acquisition Sub nor any of their Affiliates is in default or violation of any applicable Law, except for any such defaults or violations that would not have a Parent Material Adverse Effect.

(b) As of the date of this Agreement, there is no suit, action or proceeding pending or, to the knowledge of Parent, threatened in writing against Parent, Acquisition Sub or any of their Affiliates, that would have a Parent Material Adverse Effect, nor is there any judgment of any Governmental Authority outstanding against, or, to the knowledge of Parent, investigation by any Governmental Authority involving Parent, Acquisition Sub or any of their Affiliates or any of the transactions contemplated hereby that would have a Parent Material Adverse Effect.

Section 5.8 Ownership of Company. As of the date hereof, the Equity Investor, Parent and Acquisition Sub beneficially own, in the aggregate, 73,115,038 shares of Company Common Stock (the "**Parent Owned Shares**"). None of Parent, Acquisition Sub or any of their respective directors, officers, general partners or Affiliates has been an "interested stockholder" (as defined in Section 203 of the DGCL) of the Company, in each case during the three years prior to the date of this Agreement.

Section 5.9 Solvency. Neither Parent nor Acquisition Sub is entering into this Agreement with the actual intent to hinder, delay or defraud either present or future creditors of the Company or any of its Subsidiaries. Parent is Solvent as of the date of this Agreement, and each of Parent and the Company and its Subsidiaries (on a consolidated basis) will, after giving effect to the Merger or any other transaction contemplated by this Agreement, including the funding of the Financing, payment of the Funding Obligations, and payment of all other amounts required to be paid in connection with the consummation of the Merger or any other transaction contemplated by this Agreement and the payment of all related fees and expenses, be Solvent at and immediately after the Closing. As used in this Section 5.8, the term "**Solvent**" shall mean, with respect to a particular date, that on such date, (a) the sum of the assets, at a fair valuation, of Parent and, after the Closing, Parent and the Surviving Corporation and its Subsidiaries (on a consolidated basis) and each of them (on a stand-alone basis) will exceed their debts, (b) Parent and, after the Closing, Parent and the Surviving Corporation and its Subsidiaries (on a consolidated basis) and each of them (on a stand-alone basis) has not incurred and does not intend to incur, and does not believe that it will incur, debts beyond its ability to pay such debts as such debts mature, and (c) Parent has and, after the Closing, the Surviving Corporation and its Subsidiaries (on a consolidated basis) and of each of them (on a stand-alone basis) will have, sufficient capital and liquidity with which to conduct its business. For purposes of this Section 5.8, "debt" means any liability on a claim, and "claim" means any (i) right to payment, whether or not such a right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, and (ii) any right to an equitable remedy for breach of performance if such breach gives rise to a payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

Section 5.10 Parent Guarantee. Parent has furnished the Company with a true, complete and correct copy of the Parent Guarantee. The Parent Guarantee is in full force and effect and has not been amended, modified or terminated. The Parent Guarantee is a (i) legal, valid and binding obligation of the Guarantor and of each of the parties thereto and (ii) enforceable in accordance with its respective terms against the Guarantor and each of the other parties thereto. There is no default under the Parent Guarantee by the Guarantor, and no event has occurred that with the lapse of time or the giving of notice or both would constitute a default thereunder by the Guarantor.

36

Section 5.11 Acknowledgment of Disclaimer of Other Representations and Warranties. Except for the representations and warranties expressly set forth in this Article V, in the Equity Commitment Letter and in the Guarantee none of Parent, Acquisition Sub or any other Person makes or has made any representation or warranty of any kind whatsoever, express or implied, at Law or in equity, with respect to Parent or Acquisition Sub or their Affiliates or their respective business, operations, assets, liabilities, conditions (financial or otherwise), notwithstanding the delivery or disclosure to the Company or any of its Affiliates or Representatives of any documentation, forecasts or other information with respect to any one or more of the foregoing. Each of Parent and Acquisition Sub has conducted, to its satisfaction, its own independent investigation, review and analysis of the business, results of operations, prospects, condition (financial or otherwise) or assets of the Company and its Subsidiaries. In making its determination to proceed with the transactions contemplated by this Agreement, including the Merger, each of Parent and Acquisition Sub has relied solely on the results of its own independent review and analysis and the covenants, representations and warranties of the Company contained in this Agreement. Parent and Acquisition Sub hereby acknowledge that, notwithstanding anything contained in this Agreement to the contrary, (i) neither the Company nor any of its Subsidiaries, nor any other Person, makes or has made or is making any express or implied representation or warranty with respect to the Company or any of its Subsidiaries or their respective business or operations, in each case, other than those expressly given solely by the Company in Article IV; and (ii) neither Parent nor Acquisition Sub is relying on any express or implied representation or warranty, or the accuracy or the completeness of the representations and warranties set forth in Article IV, with respect to the Company or any of its Subsidiaries or their respective business or operations, in each case, other than those expressly given solely by the Company in Article IV.

## ARTICLE VI

## COVENANTS AND AGREEMENTS

Section 6.1 Conduct of Business by the Company Pending the Merger. The Company covenants and agrees that, between the date of this Agreement and the earlier of the Effective Time and the date, if any, on which this Agreement is terminated pursuant to Section 8.1, except (a) as may be required by Law, (b) as may be agreed to in writing by Parent (which consent shall not be unreasonably withheld, delayed or conditioned), (c) as may be expressly required or permitted pursuant to this Agreement, or (d) as set forth in Section 6.1 of the Company Disclosure Letter, (x) the Company shall use its commercially reasonable efforts to conduct the business of the Company and its Subsidiaries in the ordinary course of business (except with respect to actions or omissions that constitute COVID-19 Measures), and to the extent consistent therewith, the Company shall use its commercially reasonable efforts to preserve substantially intact the material components of its current business organization, and to preserve in all material respects its present relationships with key customers, suppliers and other Persons with which it has material business relations; provided that no action by the Company or its Subsidiaries with respect to the matters specifically addressed by any provision of this Section 6.1 shall be deemed a breach of this sentence, unless such action would constitute a breach of such relevant provision; and (y) the Company shall not, and shall not permit any of its Subsidiaries to (except for actions or omissions that constitute COVID-19 Measures, following reasonable prior consultation with Parent):

37

(a) amend or otherwise change, in any material respect, the Company Certificate of Incorporation or the Company Bylaws (or, except in the ordinary course of business, such equivalent organizational or governing documents of any of its Subsidiaries);

(b) split, combine, reclassify, redeem, repurchase or otherwise acquire or amend the terms of any capital stock or other equity interests or rights (except in connection with (i) the acceptance of shares of Company Common Stock as payment for the per share exercise price of the Company Options or as payment for Taxes incurred in connection with the exercise, vesting and/or settlement of Company Equity Awards, in each case, in accordance with the applicable Company Benefit Plan, (ii) the forfeiture of Company Equity Awards), (iii) pursuant to the exercise of purchase rights under the Company ESPP or (iv) pursuant to other than the Company ASR Confirmations and the Company Bond Hedge Transactions;

(c) except as permitted pursuant to Section 6.1(f), issue, sell, pledge, dispose, encumber or grant any shares of its or its Subsidiaries' capital stock or other equity interests, or any options, warrants, convertible securities or other rights of any kind to acquire any shares of its or its Subsidiaries' capital stock or equity interests except for transactions among the Company and its direct or indirect wholly owned Subsidiaries or among the Company's direct or indirect wholly owned Subsidiaries; provided, however, that the Company may issue shares of Company Common Stock upon the exercise of any Vested Company Option or pursuant of any other Company Equity Award that becomes vested, pursuant to the exercise of purchase rights under the Company ESPP or to satisfy any obligations under the Existing Convertible Notes;

(d) other than any shares of the Company Common Stock issuable upon conversion of any series of Existing Convertible Notes in accordance with their terms, authorize, declare, pay or make any dividend or other distribution, payable in cash, stock, property or otherwise, with respect to the Company's or any of its Subsidiaries' capital stock or other equity interests, other than dividends paid by any Subsidiary of the Company to the Company or any wholly owned Subsidiary of the Company;

(e) except as required pursuant to existing Company Benefit Plans, (i) increase the compensation payable or to become payable or benefits provided or to be provided to any Company Service Provider except for increases in cash compensation or benefits to Company Service Providers in the ordinary course of business consistent with past practice, (ii) grant or provide any severance or termination payments or benefits to any Company Service Provider other than the payment of severance amounts or benefits in the ordinary course of business consistent with past practice and subject to the execution and non-revocation of a release of claims in favor of the Company and its Subsidiaries, (iii) provide any obligation to gross-up, indemnify or otherwise reimburse any Company Service Provider for any Tax incurred by any such individual, including under Section 409A or 4999 of the Code, (iv) accelerate the time of payment or vesting of, or the lapsing of restrictions related to, or fund or otherwise secure the payment of, any compensation or benefits (including any equity or equity-based awards) to any Company Service Provider, or (v) establish, amend or terminate any Company Benefit Plan (or any plan, program, arrangement or agreement that would be a Company Benefit Plan if it were in existence on the

38

date hereof) other than (x) entry into, amendment or termination of any Company Benefit Plan in a manner that would not materially increase costs to the Company, Parent or the Surviving Corporation or any of their affiliates, or materially increase the benefits provided under any Company Benefit Plan or (y) new hire offer letters entered into in the ordinary course and consistent with past practices;

(f) except in the ordinary course of business and consistent with past practice (including with regard to aggregate grant date value, terms and allocation) or as may be required by the terms of a Company Benefit Plan in effect as of the date hereof, grant, confer or award any Company Equity Awards or other equity-based awards, convertible securities or any other rights to acquire any of its or its Subsidiaries' capital stock, whether settled in cash or shares of Company Common Stock;

(g) unless required by Law or pursuant to existing written Company Benefit Plans, (i) enter into or materially amend any collective bargaining or other labor agreement with any labor organization or (ii) recognize or certify any labor organization or group of employees as the bargaining representative for any employees of the Company or any of its Subsidiaries;

(i) (i) acquire (including by merger, consolidation, or acquisition of stock or assets), except in respect of any merger, consolidation, business combination among the Company and its wholly owned Subsidiaries or among the Company's wholly owned Subsidiaries, any corporation, partnership, limited liability company, other business organization or any division or material amount of assets thereof, or (ii) sell, lease, license, abandon or otherwise subject to a Lien other than a Permitted Lien or otherwise dispose of any material properties, rights or assets of the Company or its Subsidiaries other than (A) sales of inventory in the ordinary course of business, (B) licenses of Company Intellectual Property in the ordinary course of business, or (C) pursuant to agreements existing as of the date of this Agreement or entered into after the date of this Agreement in accordance with the terms of this Agreement;

(j) incur, or amend in any material respect the terms of, any indebtedness for borrowed money for any of its Subsidiaries, or assume or guarantee any such indebtedness for any Person (other than a Subsidiary), except for indebtedness incurred (i) under the Company's existing credit facilities or incurred to replace, renew, extend, refinance or refund any existing indebtedness of the Company or its Subsidiaries on terms and conditions not materially less favorable to the Company and its Subsidiaries than, taken as a whole, the terms or conditions of the replaced, renewed, extended, refinanced or refunded debt or otherwise are not inconsistent with prevailing market conditions for substantially similar indebtedness at such time, as determined by the Company in good faith, (ii) pursuant to other agreements in effect prior to the execution of this Agreement, (iii) under capital leases, purchase money financing, equipment financing and letters of credit in the ordinary course of business, (iv) between or among the Company and/or any of its Subsidiaries or (v) otherwise in the ordinary course of business;

(k) enter into, or amend in any material respect, any Company Material Contract with a term longer than one (1) year which cannot be terminated without material penalty upon notice of ninety (90) days or less other than (x) in the ordinary course of business or (y) which would not have a Company Material Adverse Effect;

(l) make any material change to its methods of accounting in effect at December 31, 2021, except (i) as required by GAAP (or any interpretation thereof), Regulation S-X or a Governmental Authority or quasi-Governmental Authority (including the Financial Accounting Standards Board or any similar organization), (ii) to permit the audit of the Company's financial statements in compliance with GAAP, (iii) as required by a change in applicable Law, (iv) as disclosed in the Company SEC Documents or (v) to the extent that such change would not have a Company Material Adverse Effect;

(m) make or change any Tax election or accounting method, settle or compromise any Tax claim or assessment, file any amended Tax Return, or consent to any extension or waiver of any limitation period with respect to any Tax claim or assessment, except, in each case, that would not have a Company Material Adverse Effect;

(n) solely with respect to the Company, adopt or enter into a plan of complete or partial liquidation or dissolution;

(o) settle or compromise any litigation other than (i) in the ordinary course of business or (ii) settlements or compromises of litigation where the amount paid (less the amount reserved for such matters by the Company or otherwise covered by insurance) in settlement or compromise, in each case, does not exceed $25 million;

(p) adopt a stockholder rights plan (or other similar agreement, plan or arrangement having a similar intent, purpose or effect) that would be triggered (or whose rights would be affected in any way) by the consummation of the transactions contemplated hereby, including the Merger; or

(q) except as otherwise permitted by clauses (a) through (p) above, enter into any agreement to do any of the foregoing.

Section 6.2 Preparation of the Proxy Statement; Company Stockholders' Meeting.

(a) As promptly as reasonably practicable after the date of this Agreement, (i) the Company shall prepare the Proxy Statement, (ii) Parent and Acquisition Sub shall furnish to the Company all information concerning themselves and their Affiliates that is required to be included in the Proxy Statement and shall promptly provide such other assistance in the preparation of the Proxy Statement as may be reasonably requested by the Company from time to time, and (iii) subject to the receipt from Parent and Acquisition Sub of the information described in clause (ii) above, the Company shall file the Proxy Statement with the SEC. The Company shall, as promptly as practicable after receipt thereof, provide Parent with copies of any written comments, and advise Parent of any oral comments, with respect to the Proxy Statement received from the SEC. The Company shall use its reasonable best efforts (with the assistance of, and after consultation with, Parent as provided by this Section 6.2(a)) to respond as promptly as reasonably practicable to any comments from the SEC with respect to the Proxy Statement. No filing or mailing of, or amendment or supplement to, the Proxy Statement will be made by the Company without providing Parent a reasonable opportunity to review and comment thereon (which comments shall be considered by the Company in good faith) (except as required by applicable Law or in connection with and an Adverse Board Recommendation Change.

40

(b) If, at any time prior to the Company Stockholders' Meeting, any information relating to Parent, Acquisition Sub or the Company, or any of their respective Affiliates, officers or directors, is discovered by Parent, Acquisition Sub or the Company that should be set forth in an amendment or supplement to the Proxy Statement so that the Proxy Statement shall not contain an untrue statement or omit to state any material fact required to be stated therein or necessary to make the statements therein (in light of the circumstances under which they were made) not misleading, the party that discovers such information shall promptly notify the other parties hereto, and, to the extent required by Law, an appropriate amendment or supplement describing such information shall be promptly filed with the SEC and disseminated to the Company's stockholders in accordance with applicable Law.

(c) The Company shall, as promptly as practicable following the date on which the SEC confirms that it has no further comments on the Proxy Statement, (i) establish a record date, for and give notice of a meeting of its stockholders, for the purpose of voting upon the approval of the Merger, holding the Company Stockholder Advisory Vote and voting on customary matters of procedure (together with any postponement, adjournment or other delay thereof, the "**Company Stockholders' Meeting**"), (ii) cause the Proxy Statement to be mailed to the Company's stockholders as of the record date established for the Company Stockholders' Meeting and (iii) duly call, convene and hold the Company Stockholders' Meeting; provided that the Company may postpone or adjourn the Company Stockholders' Meeting (on one or more occasions) (A) with the consent of Parent and Acquisition Sub, (B) for the absence of a quorum, (C) to allow reasonable additional time for any supplemental or amended disclosure that the Company has determined in good faith is necessary under applicable Law and for such supplemental or amended disclosure to be disseminated and reviewed by the Company's stockholders prior to the Company Stockholders' Meeting, (D) to allow additional solicitation of votes in order to obtain the Company Stockholder Approval or (E) if required by applicable Law. Subject to the right of the Company Board to make an Adverse Board Recommendation Change pursuant to Section 6.5, Company Board Recommendation include the Company Board Recommendation in the Proxy Statement, and, unless there has been an Adverse Board Recommendation Change pursuant to Section 6.5, the Company shall use commercially reasonable efforts to solicit proxies in favor of the Company Stockholder Approval at the Company Stockholders' Meeting.

(d) The Equity Investor, Parent and Acquisition Sub shall not sell or dispose any shares of Company Common Stock while this Agreement is in effect, and shall cause their controlled Affiliates to, cause Parent Owned Shares and all other shares of Company Common Stock beneficially as of the record date for the Company Stockholder Meeting owned by them to be (A) present at the Company Stockholder Meeting for quorum purposes; and (B) voted at the Company Stockholder Meeting in favor of the adoption of this Agreement.

Section 6.3 Efforts to Close; Regulatory Filings.

(a) Subject to the terms and conditions of this Agreement (including the limitations set forth in Section 6.5), the parties hereto will use their respective reasonable best efforts to consummate and make effective the transactions contemplated by this Agreement and to cause the conditions to the Merger set forth in Article VII to be satisfied, including using reasonable best efforts to accomplish the following: (i) the obtaining of all necessary actions or

41

non-actions, Consents and approvals from Governmental Authorities necessary in connection with the consummation of the transactions contemplated by this Agreement, including the Merger, and the making of all necessary registrations and filings (including filings with Governmental Authorities, if any) and the taking of all reasonable steps as may be necessary to obtain an approval from, or to avoid an action or proceeding by, any Governmental Authority necessary in connection with the consummation of the transactions contemplated by this Agreement, including the Merger; (ii) the obtaining of all other necessary Consents, approvals or waivers from Third Parties; (iii) the defending of any lawsuits or other legal proceedings through the Termination Date, whether judicial or administrative, challenging this Agreement or the consummation of the transactions contemplated by this Agreement, including the Merger, performed or consummated by such party in accordance with the terms of this Agreement, including seeking to have any stay or temporary restraining order entered by any court or other Governmental Authority vacated or reversed; and (iv) the execution and delivery of any additional instruments reasonably necessary to consummate the Merger and any other transactions to be performed or consummated by such party in accordance with the terms of this Agreement and to carry out fully the purposes of this Agreement. Each of the parties hereto shall (x) promptly (and in no event later than ten (10) Business Days following the date that this Agreement is executed) make its respective filings under the HSR Act, and (y) as promptly as reasonably practicable, make any other applications and filings as are mutually agreed by Parent and the Company, acting reasonably, to be (i) material and (ii) required or advisable under any Antitrust Laws or Foreign Investment Laws with respect to the transactions contemplated by this Agreement, including the Merger. Notwithstanding anything in this Agreement to the contrary, except as expressly provided in Section 7.1(b) or Section 7.1(c), obtaining any Consent of any Third Party, approvals or waivers referenced in this Section 6.3(a) above or otherwise shall not be considered a condition to the obligations of Parent and Acquisition Sub to consummate the Merger.

(b) The Equity Investor, Parent and Acquisition Sub agree to take promptly any and all steps necessary to avoid or eliminate each and every impediment and obtain all Consents, actions, non-actions, approvals or waivers (or, as applicable, expiration or termination of the waiting periods with respect thereto) under any Antitrust Laws, Foreign Investment Laws (or, as applicable, expiration or termination of the waiting periods with respect thereto) or other Law that may be required by any foreign or U.S. federal, state or local Governmental Authority, in each case, with competent jurisdiction, so as to enable the parties to consummate the transactions contemplated by this Agreement, including the Merger, as promptly as practicable, but prior to the Termination Date, including committing to or effecting, by consent decree, hold separate orders, trust, or otherwise, (i) the sale or other disposition of such assets or businesses as are required to be divested or (ii) the acceptance of restrictions on freedom of action, conduct, or operations with respect to the business of Company, in the case of the foregoing clauses (i) or (ii) in order to avoid the entry of, or to effect the dissolution of or vacate or lift, any Order, that would otherwise have the effect of preventing or materially delaying the consummation of the Merger and the other transactions contemplated by this Agreement as promptly as practicable. Further, the Equity Investor, Parent and Acquisition Sub will take such actions as are necessary in order to ensure that (x) no requirement for any non-action by, or Consent or approval of, any foreign or U.S. federal, state or local Governmental Authority, (y) no decree, judgment, injunction, temporary restraining order or any other Order in any suit or proceeding and (z) no other matter relating to any Antitrust Laws or Foreign Investment Laws, would preclude consummation of the Merger by the Termination Date. Notwithstanding the foregoing, nothing in Section 6.3(a), Section 6.3(b)

(including with respect to the foregoing clauses (i) and (ii)), or any other part of this Agreement shall require or obligate Parent, Acquisition Sub, or any of their respective Affiliates to (xx) propose, take, or agree to take any actions that would individually or in the aggregate have a material adverse effect on the business, assets, or financial condition of the Company and its Subsidiaries, taken as a whole or (yy) propose, negotiate, effect or agree to, the sale, divestiture, lease, license, hold separate, transfer, or disposition of, or any restriction on the freedom of action with respect to, any assets, business, or equity holdings of, or held or controlled directly or indirectly by, Equity Investor or any Affiliate of Parent (other than Parent, Acquisition Sub or Company after giving effect to the Merger and subject to the restrictions in subpart (xx) of this paragraph).

(c) Each of the parties hereto will furnish to the other such necessary information and reasonable assistance as the other may reasonably request in connection with the preparation of any required governmental filings or submissions and will cooperate in responding to any inquiry from a Governmental Authority, including (i) promptly informing the other party of such inquiry, (ii) consulting in advance before making any presentations or submissions to a Governmental Authority, (iii) cooperating in the filing of any analyses, presentations, memoranda, briefs, arguments, opinions or other written communications explaining or defending the Merger, articulating any regulatory or competitive argument or responding to requests or objections made by any Governmental Authority, (iv) providing each other with a reasonable advance opportunity to review and comment upon, and consider in good faith the views of the other with respect to, all material written communications (including applications, analyses, presentations, memoranda, briefs, arguments and opinions) with a Governmental Authority regarding the Merger or any other transactions, (v) giving the other party the opportunity to attend and participate in any substantive meetings or discussions with any Governmental Authority, to the extent reasonably practical and not prohibited by such Governmental Authority, and (vi) supplying each other with copies of all material correspondence, or communications between any party and any Governmental Authority with respect to this Agreement (provided that such materials may be limited to counsel as required or advisable under applicable Law and may be redacted to remove valuation material). The parties agree that Parent shall control the strategy for all filings, notifications, submissions, and communications, proposals and litigation in connection with any filing, notice, petition, statement, registration, submission of information, application or similar filing under the Antitrust Laws after consulting with, and considering in good faith the view of the Company relating to such strategy.

Section 6.4 <u>Access to Information; Confidentiality</u>. Upon reasonable notice, the Company shall (and shall cause each of its Subsidiaries to) afford to the representatives, officers, directors, employees, agents, attorneys, accountants and financial advisors ("**Representatives**") of Parent reasonable access (at Parent's sole cost and expense), in a manner not disruptive in any material respect to the operations of the business of the Company and its Subsidiaries, during normal business hours and upon reasonable written notice throughout the period commencing on the date of this Agreement until the earlier of the Effective Time and the termination of this Agreement pursuant to <u>Article VIII</u>, to the properties, books and records of the Company and its Subsidiaries and, during such period, shall (and shall cause each of its Subsidiaries to) furnish promptly to such Representatives all information concerning the business, properties and personnel of the Company and its Subsidiaries as may reasonably be requested in writing, in each case, for any reasonable business purpose related to the consummation of the transactions contemplated by this Agreement; <u>provided</u>, <u>however</u>, that nothing herein shall require the

43

Company or any of its Subsidiaries to disclose any information to Parent or Acquisition Sub if such disclosure would, in the reasonable judgment of the Company, (i) cause significant competitive harm to the Company or its Subsidiaries if the transactions contemplated by this Agreement are not consummated, (ii) violate applicable Law or the provisions of any agreement to which the Company or any of its Subsidiaries is a party, or (iii) jeopardize any attorney-client or other legal privilege. No investigation or access permitted pursuant to this <u>Section 6.4</u> shall affect or be deemed to modify any representation or warranty made by the Company hereunder. Each of Parent and Acquisition Sub agrees that it will not, and will cause its Representatives not to, use any information obtained pursuant to this <u>Section 6.4</u> (or otherwise pursuant to this Agreement) for any competitive or other purpose unrelated to the consummation of the transactions contemplated by this Agreement. Parent will use its reasonable best efforts to minimize any disruption to the respective business of the Company and its Subsidiaries that may result from requests for access under this <u>Section 6.4</u> and, notwithstanding anything to the contrary herein, the Company may satisfy its obligations set forth above by electronic means if physical access is not reasonably feasible or would not be permitted under applicable Law as a result of COVID-19 or any COVID-19 Measures. Prior to any disclosure, the Company and Parent shall enter into a customary confidentiality agreement with respect to any information obtained pursuant to this <u>Section 6.4</u> (or otherwise pursuant to this Agreement).

Section 6.5 <u>Non-Solicitation; Competing Proposals</u>.

(a) From the date of this Agreement until the earlier of the Effective Time or the date, if any, on which this Agreement is terminated pursuant to <u>Section 8.1</u>, the Company shall, and shall cause each of its directors, executive officers and Subsidiaries to, and shall instruct its other Representatives to, immediately cease and cause to be terminated any existing solicitation of, or discussions or negotiations with, any Third Party relating to any Competing Proposal, and the Company further agrees that it shall promptly request that all non-public information previously provided in the past twelve (12) months by or on behalf of the Company or any of its Subsidiaries to any Persons that might reasonably be expected to consider making a Competing Proposal be promptly returned or destroyed in accordance with the terms of the applicable confidentiality agreement. Except as otherwise provided in this Section 6.5, from the date of this Agreement until the earlier of the Effective Time or the date, if any, on which this Agreement is terminated pursuant to <u>Section 8.1</u>, the Company shall not, shall cause each of its directors, executive officers and Subsidiaries not to, and shall instruct its other Representatives not to, (i) solicit, initiate, knowingly encourage or knowingly facilitate, whether publicly or otherwise, any substantive discussion, offer or request that constitutes, or would reasonably be expected to lead to, a Competing Proposal and (ii) engage in negotiations or substantive discussions with (it being understood that the Company may inform Persons of the provisions contained in this <u>Section 6.5</u>), or furnish any material non-public information to, any Person relating to a Competing Proposal or any inquiry or proposal that would reasonably be expected to lead to a Competing Proposal; <u>provided</u> that, notwithstanding the foregoing, the Company shall be permitted to grant a waiver of or terminate any "standstill" or similar obligation of any Person with respect to the Company or any of its Subsidiaries to allow such Person to submit a Competing Proposal.

44

(b) From the date of this Agreement until the earlier of the Effective Time or the date, if any, on which this Agreement is terminated pursuant to <u>Section 8.1</u>, as promptly as reasonably practicable, and in any event within one (1) Business Day of receipt by the Company or any of its directors, executive officers or Subsidiaries of any Competing Proposal or any request that would reasonably be expected to lead to the making of a Competing Proposal, the Company shall deliver to Parent a written notice setting forth: (i) the identity of the Person making such Competing Proposal or request; and (ii) the material terms and conditions of any such Competing Proposal. The Company shall keep Parent reasonably informed of any material amendment or other modification of any such Competing Proposal or request on a prompt basis, and in any event within two (2) Business Days following the Company's receipt in writing of such an amendment or modification.

(c) Notwithstanding anything to the contrary in this Agreement, at any time prior to obtaining the Company Stockholder Approval, in the event that the Company receives a Competing Proposal from any Person or group of Persons, (i) the Company and its Representatives may contact such Person to clarify the terms and conditions thereof and (ii) the Company, the Company Board and their respective Representatives may engage in negotiations or discussions with, or furnish any information and other access to, any Person or group of Persons making such Competing Proposal and any of its Representatives or potential sources of financing if the Company Board determines in good faith (after consultation with its legal counsel and financial advisors) that such Competing Proposal either constitutes a Superior Proposal or would reasonably be expected to result in a Superior Proposal; <u>provided</u> that (x) prior to furnishing any material non-public information concerning the Company or its Subsidiaries, the Company receives from such Person or group, to the extent that such Person or group is not already subject to a confidentiality agreement with the Company, an executed confidentiality agreement containing customary confidentiality terms, it being understood that such confidentiality agreement need not contain a standstill provision or otherwise restrict the making, or amendment, of a Competing Proposal (and related communications) to the Company or the Company Board (such confidentiality agreement, an "**Acceptable Confidentiality Agreement**") and (y) any such material non-public information so furnished in writing shall be promptly made available to Parent to the extent that it was not previously made available to Parent or its Representatives. For the avoidance of doubt, none of (A) the determination, in itself with no further action, by the Company Board that a Competing Proposal either constitutes a Superior Proposal or would reasonably be expected to result in a Superior Proposal or (B) the public disclosure, in itself, of such determination will constitute an Adverse Board Recommendation Change or violate this Section 6.5.

(d) Except as otherwise provided in this Agreement, the Company Board shall not (i) (A) publicly recommend that the Company's stockholders vote against the adoption of this Agreement and the approval of the transactions contemplated by this Agreement, including the Merger, or make any public statement or knowingly take any action with a similar intent, purpose or effect, or (B) approve or recommend, or propose publicly to approve or recommend, to the Company's stockholders any Competing Proposal (any action described in this clause (i) being referred to as an "**Adverse Board Recommendation Change**"), or (ii) approve or recommend, or allow the Company or any of its Subsidiaries to execute or enter into, any letter of intent, memorandum of understanding or definitive merger or similar agreement with respect to any Competing Proposal (other than an Acceptable Confidentiality Agreement). Notwithstanding anything in this Agreement to the contrary, at any time prior to receipt of the Company Stockholder Approval, the Company Board may (i) make an Adverse Board Recommendation Change in response to an event, occurrence, change, effect, condition, development or state of facts or circumstances (other than related to a Competing Proposal or Superior Proposal, or any proposal

45

that constitutes or would reasonably be expected to lead to a Competing Proposal or Superior Proposal) that was neither known to, nor reasonably foreseeable by, the Company Board as of the date of this Agreement (or, if known, the consequences of which were not known or reasonably foreseeable to the Company Board as of the date of this Agreement) (an "**Intervening Event**") (where, for the avoidance of doubt, (x) the fact, in itself, that the Company meets or exceeds projections, forecasts or estimates (it being understood that the underlying causes of (or contributors to) such performance that are not otherwise excluded from the definition of Intervening Event may be taken into account) and (y) changes, in themselves, in the price of the Company Common Stock or the trading volume thereof shall be considered known and reasonably foreseeable occurrences (it being understood that the underlying causes of (or contributors to) such changes in price or trading volume that are not otherwise excluded from the definition of Intervening Event may be taken into account)) if the Company Board has determined in good faith (after consultation with its legal counsel and financial advisors) that the failure to take such action would reasonably be expected to be inconsistent with the Company's directors' fiduciary duties under applicable Law; or (ii) (x) make an Adverse Board Recommendation Change if the Company has received a Competing Proposal that the Company Board has determined in good faith (after consultation with its legal counsel and financial advisors) constitutes a Superior Proposal, and (y) authorize, adopt or approve such Superior Proposal and cause or permit the Company to enter into a definitive agreement with respect to such Superior Proposal substantially concurrently with the termination of this Agreement pursuant to <u>Section 8.1(c)(ii)</u>; <u>provided</u>, <u>however</u>, that (1) no Adverse Board Recommendation Change may be made and no termination of this Agreement pursuant to this <u>Section 6.5(d)</u> and <u>Section 8.1(c)(ii)</u> may be effected, in each case, until the end of the fourth (4th) full Business Day following Parent's receipt of a written notice from the Company advising Parent that the Company Board intends to make an Adverse Board Recommendation Change (a "**Notice of Adverse Board Recommendation Change**") or terminate this Agreement pursuant to this <u>Section 6.5(d)</u> and <u>Section 8.1(c)(ii)</u> (a "**Notice of Superior Proposal**"); and (2) during such period, if requested by Parent, the Company and its Representatives shall negotiate with Parent and its Representatives in good faith (to the extent Parent so desires to negotiate) to make adjustments to the terms and conditions of this Agreement so that either the failure to make an Adverse Board Recommendation Change in response to such Intervening Event would no longer reasonably be expected to be inconsistent with the Company's directors' fiduciary duties under applicable Law or such Competing Proposal would cease to constitute a Superior Proposal, as appropriate, and (3) in determining whether to make such Adverse Board Recommendation Change or terminate this Agreement pursuant to this <u>Section 6.5(d)</u> and <u>Section 8.1(c)(ii), the Company Board</u> shall take into account any changes to the terms of this Agreement timely proposed by Parent in response to a Notice of Adverse Recommendation or a Notice of Superior Proposal (as may be extended). Any material amendment to the financial terms or any other material amendment of such Superior Proposal shall require a new Notice of Superior Proposal and the Company shall be required to comply again with the requirements of this <u>Section 6.5(d)</u> with respect to such new Superior Proposal; provided that the new notice period shall be three (3) Business Days. For the avoidance of doubt, none of (A) the delivery, in itself, of a Notice of Adverse Board Recommendation or a Notice of Superior Proposal or (B) the public disclosure, in itself, of such delivery will constitute an Adverse Board Recommendation Change or violate this Section 6.5.

(f) Nothing in this Agreement shall restrict the Company or the Company Board from taking or disclosing a position contemplated by Rule 14d-9 or Rule 14e-2(a) under the Exchange Act, or otherwise making disclosure to comply with applicable Law (it being agreed that a "stop, look and listen" communication by the Company Board to the Company's stockholders pursuant to Rule 14d-9(f) under the Exchange Act or a factually accurate public statement by the Company that describes the Company's receipt of a Competing Proposal and the operation of this Agreement with respect thereto shall not be deemed to be an Adverse Board Recommendation Change or give rise to a Parent termination right pursuant to Section 8.1(d)(ii)). For the avoidance of doubt, a factually accurate public statement by the Company or the Company Board (or a committee thereof) that (A) describes the Company's receipt of a Competing Proposal; (B) identifies the Person or group of Persons making such Competing Proposal; (C) provides the material terms of such Competing Proposal; or (D) describes the operation of this Agreement with respect thereto will not, in any case, be deemed to be (1) an adoption, approval or recommendation with respect to such Competing Proposal; or (2) an Adverse Board Recommendation Change.

(g) For purposes of this Agreement:

(i) "**Competing Proposal**" shall mean any proposal or offer made by any Person (other than Parent, Acquisition Sub or any Affiliate thereof) or group (as defined in Section 13(d)(3) of the Exchange Act) of Persons (i) to purchase or otherwise acquire, directly or indirectly, in one transaction or a series of transactions, (A) beneficial ownership (as defined under Section 13(d) of the Exchange Act) of fifteen percent (15%) or more of any class of equity securities of the Company pursuant to a merger, consolidation or other business combination, sale of shares of capital stock, tender offer, exchange offer or similar transaction; or (B) any one or more assets or businesses of the Company and its Subsidiaries that constitute fifteen percent (15%) or more of the revenues or assets of the Company and its Subsidiaries, taken as a whole; (ii) with respect to the issuance, sale or other disposition, directly or indirectly, to any Person (other than Parent, Acquisition Sub or any Affiliate thereof) or group (as defined in Section 13(d)(3) of the Exchange Act) of Persons of securities (or options, rights, or warrants to purchase, or securities convertible into or exchangeable for, such securities) representing fifteen percent (15%) or more of the voting power of the Company; or (z) with respect to any merger, consolidation, business combination, recapitalization, reorganization or other transaction involving the Company or its Subsidiaries pursuant to which any Person (as defined in Section 13(d)(3) of the Exchange Act) or group of Persons would have beneficial ownership (as defined pursuant to Section 13(d)(3) of the Exchange Act) of securities representing fifteen percent (15%) or more of the total outstanding equity securities of the Company after giving effect to the consummation of such transaction.

(iii) "**Superior Proposal**" shall mean a Competing Proposal (with all percentages in the definition of Competing Proposal increased to ninety percent (90%)) made by a Third Party on terms that the Company Board determines in good faith (after consultation with its legal counsel and financial advisors) and considering such factors as the Company Board considers to be appropriate, are more favorable to the Company's stockholders than the transactions contemplated by this Agreement (including any changes to the terms of this Agreement committed to by Parent to the Company in writing in response to such Competing Proposal under the provisions of Section 6.5(d)).

47

Section 6.6 Directors' and Officers' Indemnification and Insurance.

(a) Parent and Acquisition Sub agree that all rights to exculpation and indemnification for acts or omissions occurring at or prior to the Effective Time, whether asserted or claimed prior to, at or after the Effective Time (including any matters arising in connection with the transactions contemplated by this Agreement), now existing in favor of the current or former directors, officers and employees, if any (the foregoing persons, the "**D&O Indemnified Parties**"), as the case may be, of the Company or its Subsidiaries as provided in their respective organizational documents as in effect on the date of this Agreement or in any Contract shall survive the Merger and shall continue in full force and effect. The Surviving Corporation shall (and Parent shall cause the Surviving Corporation to) indemnify, defend and hold harmless, and advance expenses to D&O Indemnified Parties with respect to all acts or omissions by them in their capacities as such at any time prior to the Effective Time (including any matters arising in connection with this Agreement or the transactions contemplated by this Agreement), to the fullest extent that the Company or its Subsidiaries would be permitted by applicable Law and to the fullest extent required by the organizational documents of the Company or its Subsidiaries as in effect on the date of this Agreement. Parent shall cause the certificate of incorporation, bylaws or other organizational documents of the Surviving Corporation and its Subsidiaries to contain provisions with respect to exculpation, indemnification, advancement of expenses and limitation of director, officer and employee liability that are no less favorable to the D&O Indemnified Parties than those set forth in the Company's and its Subsidiaries' organizational documents as of the date of this Agreement, which provisions thereafter shall not, for a period of six (6) years from the Effective Time, be amended, repealed or otherwise modified in any manner that would adversely affect the rights thereunder of the D&O Indemnified Parties.

(b) Without limiting the provisions of Section 6.6(a), to the fullest extent that the Company would be permitted by applicable Law to do so, Parent shall or shall cause the Surviving Corporation to: (i) indemnify and hold harmless each D&O Indemnified Party against and from any costs or expenses (including reasonable attorneys' fees), judgments, fines, losses, claims, damages, liabilities and amounts paid in settlement in connection with any claim, action, suit, proceeding or investigation, whether civil, criminal, administrative or investigative, to the extent such claim, action, suit, proceeding or investigation arises out of or pertains to: (A) any alleged action or omission in such D&O Indemnified Party's capacity as a director, officer or employee of the Company or any of its Subsidiaries prior to the Effective Time; or (B) this Agreement or the transactions contemplated by this Agreement and (ii) pay in advance of the final disposition of any such claim, action, suit, proceeding or investigation the expenses (including reasonable attorneys' fees) of any D&O Indemnified Party upon confirmation by the D&O Indemnified Party of his or her good faith belief that he or she has met the standard of conduct necessary for indemnification applicable to him or her and a customary written undertaking by him or her or on his or her behalf to repay the amount paid or reimbursed if it is ultimately determined that the standard of conduct for indemnification was not met. Any determination required to be made with respect to whether the conduct of any D&O Indemnified Party complies or complied with any applicable standard shall be made by independent legal counsel selected by the D&O Indemnified Party, which counsel shall be reasonably acceptable to the Surviving Corporation, and the fees of such counsel shall be paid by the Surviving Corporation. Notwithstanding anything to the contrary contained in this Section 6.6(b) or elsewhere in this Agreement, Parent shall not (and Parent shall cause the Surviving Corporation not to) settle or compromise or consent to the entry of any judgment or otherwise seek termination with respect to any claim, action, suit, proceeding or investigation, unless such settlement, compromise, consent or termination includes an unconditional release of all of the D&O Indemnified Parties covered by the claim, action, suit, proceeding or investigation from all liability arising out of such claim, action, suit, proceeding or investigation.

48

(c) Unless the Company shall have purchased a "tail" policy prior to the Effective Time as provided below, for at least six (6) years after the Effective Time, (i) Parent shall cause the Surviving Corporation and its other Subsidiaries to maintain in full force and effect the coverage provided by the existing directors' and officers' liability insurance and fiduciary insurance in effect as of the date of this Agreement and maintained by the Company or any of its Subsidiaries, as applicable (the "**Existing D&O Insurance Policies**"), or provide substitute policies for the Company and its current and former directors and officers who are currently covered by such Existing D&O Insurance Policies, in either case, on terms and conditions no less advantageous to the D&O Indemnified Parties, or any other Person entitled to the benefit of this Section 6.6, as applicable, than the Existing D&O Insurance Policies, covering claims arising from facts, events, acts or omissions that occurred at or prior to the Effective Time, including the transactions contemplated by this Agreement (provided that Parent or the Surviving Corporation, as applicable, shall not be required to pay an annual premium for such insurance in excess of three hundred percent (300%) of the aggregate annual premiums currently paid by the Company or any of its Subsidiaries, as applicable, on an annualized basis, but in such case shall purchase as much of such coverage as possible for such amount) and (ii) Parent shall not, and shall not permit the Surviving Corporation or its other Subsidiaries to, take any action that would prejudice the rights of, or otherwise impede recovery by, the beneficiaries of any such insurance, whether in respect of claims arising before or after the Effective Time. In lieu of such insurance, prior to the Effective Time, the Company may purchase a six (6) year "tail" prepaid policy on such terms and conditions (provided that the premium for such insurance shall not exceed three hundred percent (300%) of the aggregate annual premiums currently paid by the Company or any of its Subsidiaries, as applicable, on an annualized basis), in which event Parent shall cease to have any obligations under the first sentence of this Section 6.6(c).

(d) In the event that Parent, the Surviving Corporation, any of the Company's Subsidiaries or any of their successors or assigns shall (i) consolidate with or merge into any other Person and shall not be the continuing or surviving company or entity of such consolidation or merger or (ii) transfer all or substantially all its properties and assets to any Person, then, and in each such case, Parent shall cause proper provision to be made so that the successor and assign of Parent, the Surviving Corporation or any such Subsidiary assumes the obligations set forth in this Section 6.6.

(e) The D&O Indemnified Parties to whom this Section 6.6 applies shall be third-party beneficiaries of this Section 6.6. The provisions of this Section 6.6 are intended to be for the benefit of each D&O Indemnified Party and his or her successors, heirs or representatives. The Surviving Corporation shall pay all reasonable expenses, including reasonable attorneys' fees, that may be incurred by any D&O Indemnified Party in enforcing its indemnity and other rights under this Section 6.6. The rights of each D&O Indemnified Party hereunder shall be in addition to, and not in limitation of, any other applicable rights such D&O Indemnified Party may have under the respective organizational documents of the Company or any of its Subsidiaries or the Surviving Corporation, any other indemnification arrangement, the DGCL or otherwise. Notwithstanding any other provision of this Agreement, this Section 6.6 shall survive the consummation of the Merger indefinitely (or any earlier period actually specified in this Section 6.6) and shall be binding, jointly and severally, on all successors and assigns of Parent and the Surviving Corporation, and shall be enforceable by the D&O Indemnified Parties and their successors, heirs or representatives.

49

(f) Nothing in this Agreement is intended to, or will be construed to, release, waive or impair any rights to directors' and officers' insurance claims pursuant to any applicable insurance policy or indemnification agreement that is or has been in existence with respect to the Company or any of its Subsidiaries for any of their respective directors, officers or other employees, it being understood and agreed that the indemnification provided for in this Section 6.6 is not prior to or in substitution for any such claims pursuant to such policies or agreements. Following the Effective Time, the obligations of Parent and the Surviving Corporation under this Section 6.6 shall not be terminated or modified in any manner adverse to the rights of any D&O Indemnified Party without the consent of such affected D&O Indemnified Party.

Section 6.7 Notification of Certain Matters. From and after the date of this Agreement until the earlier of the Effective Time or the date, if any, on which this Agreement is terminated pursuant to Section 8.1, the Company shall give prompt notice to Parent, and Parent shall give prompt notice to the Company, of (a) any notice or other communication received by such party from any Governmental Authority in connection with this Agreement, the Merger or the other transactions contemplated by this Agreement, or from any Person alleging that the consent of such Person is or may be required in connection with the Merger or the other transactions contemplated by this Agreement, if the subject matter of such communication or the failure of such party to obtain such consent could be material to the Company, the Surviving Corporation or Parent, and (b) any actions, suits, claims, investigations or proceedings commenced or, to such party's Knowledge, threatened against, relating to or involving or otherwise affecting such party or any of its Subsidiaries which relate to this Agreement, the Merger or the other transactions contemplated by this Agreement. The parties agree and acknowledge the Company's, on the one hand, and Parent's, on the other hand, compliance or failure of compliance with this Section 6.7 shall not be taken into account for purposes of determining whether the condition referred to in Section 7.2(a) or Section 7.3(a), respectively, shall have been satisfied with respect to performance in all material respects with this Section 6.7.

Section 6.8 Public Announcements. Except as otherwise contemplated by Section 6.5, so long as this Agreement is in effect, the Company, Parent and Acquisition Sub shall consult with each other before issuing any press release or otherwise making any public statements with respect to this Agreement or the transactions contemplated by this Agreement, and none of the parties hereto or their Affiliates shall issue any such press release or make any public statement prior to obtaining the other parties' consent (which consent shall not be unreasonably withheld or delayed), except that no such consent shall be necessary to the extent disclosure may be required by Law, Order or applicable stock exchange rule or any listing agreement to which any party hereto is subject, in which case the party required to make such disclosure shall use its reasonable best efforts to allow, to the extent legally permitted, each other party reasonable time to comment on such disclosure in advance of its issuance, or is consistent with prior communications previously consented to by the other parties. In addition, the Company may, without Parent or Acquisition Sub's consent, communicate to its employees, customers, suppliers and consultants; provided that such communication is consistent with prior communications of the Company or any

50

communications plan previously agreed to by Parent and the Company, in which case such communications may be made consistent with such plan. Notwithstanding the foregoing, the restrictions set forth in this Section 6.8 shall not apply in connection with any Adverse Board Recommendation Change or dispute between the parties regarding this Agreement or the transactions contemplated hereby. Notwithstanding the foregoing, the Equity Investor shall be permitted to issue Tweets about the Merger or the transactions contemplated hereby so long as such Tweets do not disparage the Company or any of its Representatives.

Section 6.9 Employee Benefits.

(a) Continuing Employee Benefits. Employees of the Company or its Subsidiaries immediately prior to the Effective Time who remain employees of Parent, the Surviving Corporation or any of their Affiliates following the Effective Time are hereinafter referred to as the "**Continuing Employees**." For the period commencing at the Effective Time and ending on the one-year anniversary of the Effective Time (the "**Continuation Period**"), Parent shall, or shall cause the Surviving Corporation or any of their Affiliates to, provide for each Continuing Employee (i) at least the same base salary and wage rate, (ii) short- and long-term target incentive compensation opportunities that are no less favorable in the aggregate than those provided to each such Continuing Employee immediately prior to the Effective Time (provided that Parent shall not be obligated to provide such incentives in the form of equity or equity-based awards) and (iii) employee benefits (excluding equity and equity-based awards) which are substantially comparable in the aggregate (including with respect to the proportion of employee cost) to those provided to such Continuing Employee immediately prior to the Effective Time. Without limiting the generality of the foregoing, during the Continuation Period, Parent shall provide, or shall cause the Surviving Corporation or any of their Affiliates to provide severance payments and benefits to each Continuing Employee whose employment is terminated during such period that are no less favorable than those applicable to the Continuing Employee immediately prior to the Effective Time under the Company Benefit Plans.

(b) Parent agrees that the Surviving Corporation shall cause the Surviving Corporation's employee benefit plans established following the Closing Date (if any) and any other employee benefit plans covering the Continuing Employees following the Effective Time (collectively, the "**Post-Closing Plans**"), to recognize the service of each Continuing Employee (to the extent such service was recognized by the Company) for purposes of eligibility, vesting and determination of the level of benefits (but not for benefit accrual purposes under a defined benefit pension plan) under the Post-Closing Plans, to the extent such recognition does not result in the duplication of any benefit.

(c) For the calendar year including the Effective Time, the Continuing Employees shall not be required to satisfy any deductible, co-payment, out-of-pocket maximum or similar requirements under the Post-Closing Plans that provide medical, dental and other welfare benefits (collectively, the "**Post-Closing Welfare Plans**") to the extent amounts were previously credited for such purposes under comparable Company Benefit Plans that provide medical, dental and other welfare benefits.

51

(d) As of the Effective Time, any waiting periods, pre-existing condition exclusions and requirements to show evidence of good health contained in such Post-Closing Welfare Plans shall be waived with respect to the Continuing Employees (except to the extent any such waiting period, pre-existing condition exclusion or requirement to show evidence of good health was already in effect with respect to such employees and has not been satisfied under the applicable Company Benefit Plan in which the participant then participates or is otherwise eligible to participate as of immediately prior to the Effective Time).

(e) Nothing contained in this Section 6.9, expressed or implied, shall (i) be treated as the establishment, amendment or modification of any Company Benefit Plan, Post-Closing Plan or other employee benefit plan or constitute a limitation on rights to amend, modify, merge or terminate after the Effective Time any Company Benefit Plan, Post-Closing Plan or other employee benefit plan, (ii) give any Company Service Provider (including any beneficiary or dependent thereof) or other Person any third-party beneficiary or other rights or (iii) obligate Parent or any of its Affiliates to (A) maintain any particular Company Benefit Plan, Post-Closing Plan or (B) retain the employment or services of any Company Service Provider.

Section 6.10 Financing.

(a) Each of the Equity Investor, Parent and Acquisition Sub shall take or cause to be taken, and shall cause their respective Affiliates and its and their respective Representatives to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to arrange, obtain and consummate the Financing at or prior to the Closing on the terms and subject to the conditions set forth in the Financing Commitments (including any "flex" provisions), including executing and delivering all such documents and instruments as may be reasonably required thereunder and:

(i) complying with and maintaining in full force and effect the Financing and the Financing Commitments (and, once entered into, the Financing Agreements) in accordance with the terms and conditions thereof and negotiating and entering into definitive financing agreements with respect to the Debt Financing on the terms and conditions set forth in the Debt Commitment Letters (including any "flex" provisions) and containing no (I) conditions to the consummation of all or any portion of the Debt Financing other than the conditions set forth in Exhibit E to the Bank Debt Commitment Letter or Exhibit B to the Margin Loan Commitment Letter, as the case may be, in each case, as in effect on the date hereof, or (II) provisions that could reasonably be expected to prevent, impede, delay or adversely affect the availability of any of the Debt Financing or the consummation of the Merger and the other transactions contemplated by this Agreement (such definitive agreements, the "**Financing Agreements**") so that the Financing Agreements are in full force and effect no later than the Closing;

(ii) satisfying, or obtaining the waiver of, as promptly as practicable and on a timely basis (and in any event, no later than the Closing) all conditions to the Debt Financing contemplated by the Debt Commitment Letters and Financing Agreements that are within its or their control, including, without limitation:

(A) on or prior to the Closing Date, transferring Tesla Shares to the Margin Loan Borrower and causing the Margin Loan Borrower to credit to collateral accounts pledged to the applicable Debt Financing Sources in respect of the Margin Loan Financing and held through the facilities of DTC, in each case, sufficient Tesla Shares, which shall be free from all transfer restrictions and restrictive conditions (other than permitted restrictions contemplated under the Financing Documents in respect of the Margin Loan Financing), to cause the LTV Ratio (as defined in the Margin Loan Commitment Letter) not to exceed 20% as of the Closing Date;

(B) ensuring the absence of (1) any default or event of default (or any equivalent term) under the Financing Agreements in respect of the Margin Loan Financing, or (2) any Potential Adjustment Event or Mandatory Prepayment Event (in each case, under and as defined in the Margin Loan Commitment Letter);

(C) (x) maintaining the Margin Loan Borrower as a wholly owned subsidiary of Parent and Elon Musk, and (y) causing the organizational documents of the Margin Loan Borrower not to contain, and causing the Margin Loan Borrower not to enter into any Contract, that would (1) impede or prevent the Margin Loan Borrower or any of its Affiliates from enforcing or the Margin Loan Borrower's rights in respect of the Debt Financing Sources under the Margin Loan Commitment Letter or any Financing Agreement in respect thereof or (2) impede or prevent the Margin Loan Borrower or any of its Affiliates from applying the proceeds of the loans to pay any Funding Obligations; and

(D) causing Elon Musk to (1) fully and unconditionally guarantee all obligations of the Margin Loan Borrower under the Margin Loan Financing to the extent required to consummate the Margin Loan Financing and (2) at all times through and including the Closing Date to own (beneficially and of record), directly or indirectly, all of the outstanding equity interests of, and Control, the Margin Loan Borrower;

(iii) accepting (and complying with) to the fullest extent all "flex" provisions contemplated by the Debt Commitment Letters;

(iv) causing the Financing Sources to fund the Financing no later than the Closing (including by enforcing its rights under the Debt Commitment Letters and/or Financing Agreements, as applicable).

(b) None of the Equity Investor, Parent, Acquisition Sub or the Margin Loan Borrower or any of their respective Affiliates shall agree to or permit any amendment, supplement, modification or replacement of, or grant any waiver of, any condition, remedy or other provision under any Financing Commitment or Financing Agreement, or permit any Financing Agreement to contain any provision, without the prior written consent of the Company, if such amendment, supplement, modification, replacement, waiver or provision would or would reasonably be expected to (i) reduce (or would reasonably be expected to have the effect of reducing) the aggregate amount of the Financing (or the cash proceeds available therefrom) from that contemplated by the Financing Commitments delivered as of the date hereof, (ii) impose new or additional conditions or contingencies to the Financing or otherwise expand, amend or modify any of the existing conditions to the receipt of the Financing, or otherwise add, expand, amend or modify any other provision of, or remedies under, the Financing Commitments as in effect on the date hereof, in a manner that would reasonably be expected to delay, impede or prevent the consummation

53

or funding of the Financing (or satisfaction of the conditions to obtaining any portion of the Financing) at the Closing or impair the ability or likelihood of the Closing or impair the ability of Parent and/or Acquisition Sub to timely consummate the Merger and the other transactions contemplated by this Agreement, (iii) make it less likely that any portion of the Financing would be funded (including by making the satisfaction of the conditions to obtaining any portion of the Financing less likely to occur) or otherwise prevent, impede or delay or impair the availability of any of the Financing or impair the ability or likelihood of the Closing or Parent and/or Acquisition Sub to timely consummate the transactions contemplated by this Agreement (including by requiring any additional filings, consents or approvals of any Governmental Authority) or (iv) adversely impact the ability of Parent, Acquisition Sub or the Margin Loan Borrower, or any of their respective Affiliates, to enforce their respective rights against the other parties to the Financing Commitments or the Financing Agreements; provided, however, subject to compliance with the other provisions of this Section 6.10, Parent, Acquisition Sub or their respective Affiliates may amend, modify, supplement or waive any provision of any Debt Commitment Letter (A) to add lenders, lead arrangers, bookrunners, syndication agents or similar entities that have not executed such Debt Commitment Letter as of the date hereof or (B) amend any Debt Commitment Letters to implement any "market flex" provisions applicable thereto. The Equity Investor, Parent, Acquisition Sub, the Margin Loan Borrower and their respective Affiliates shall not agree to the withdrawal, termination, repudiation or rescission of any Financing Commitment without the prior written consent of the Company, and shall not release or consent to the termination of the commitments or obligations of any Debt Financing Source under any Debt Commitment Letter, in each case, unless such Financing Commitment is contemporaneously replaced with a new Financing Commitment that complies with the first sentence of this Section 6.10(b). Upon any permitted amendment, supplement, modification or replacement of, or waiver of, any Financing Commitment in accordance with this Section 6.10(b), Parent shall promptly deliver to the Company a true, correct and complete copy of each Financing Agreement and each amendment, supplement, modification, replacement or waiver to any Financing Commitment or any Financing Agreement and references herein to "Financing Commitments", "Bank Debt Commitment Letter", "Margin Loan Commitment Letter", "Debt Commitment Letters", "Equity Commitment Letter" and "Financing Agreements" shall include and mean such documents as amended, supplemented, modified, replaced or waived in compliance with this Section 6.10(b), as applicable, and references to "Financing", "Bank Debt Financing", "Margin Loan Financing" and "Equity Financing" shall include and mean the financing contemplated by the Financing Commitments or Financing Agreements as amended, supplemented, modified, replaced or waived in compliance with this Section 6.10(b), as applicable.

       (c) In the event that (x) all or any portion of the Debt Financing expires, terminates, becomes or could reasonably be expected to become unavailable on the terms and conditions (including any "flex" provisions) or from the sources contemplated in the applicable Debt Commitment Letters or (y) any of the Debt Commitment Letters or the Financing Agreements shall be withdrawn, terminated, repudiated or rescinded, in whole or in part, for any reason, (i) Parent shall promptly so notify the Company in writing and (ii) Parent and/or its Affiliates shall use their respective reasonable best efforts to arrange and obtain, as promptly as practicable following the occurrence of such event (and in any event no later than the Closing),

and to negotiate and enter into definitive agreements with respect to, alternative financing from the same or alternative sources with terms and conditions (including market flex provisions) not less favorable taken as a whole to Parent than the terms and conditions set forth in the applicable Debt Commitment Letter and which shall not include any conditions or contingencies to the Financing not otherwise included in the Debt Commitment Letters as of the date hereof or include any provision that would reasonably be expected to materially delay or prevent the consummation or funding of the Financing (or satisfaction of the conditions to obtaining any portion of the Financing) at the Closing or materially impair the ability or likelihood of the Closing or Parent and/or Acquisition Sub to timely consummate the Merger and the other transactions contemplated by this Agreement (the "**Alternative Financing**") in an amount sufficient to consummate the transactions contemplated by this Agreement (or replace any unavailable portion of the Debt Financing). In the event any Alternative Financing is obtained and any new debt commitment letters are entered into in accordance with this <u>Section 6.10(c)</u> (each such letter, an "**Alternative Financing Debt Commitment Letter**"), Parent shall promptly deliver a copy thereof to the Company (it being understood that any fee letters related thereto may be redacted in the same manner as the fee letters delivered on or prior to the date of this Agreement) and references herein to (A) "Financing Commitments" and "Debt Commitment Letters" shall be deemed to include any Alternative Financing Debt Commitment Letter to the extent then in effect, and (B) "Financing", "Bank Debt Financing", "Margin Loan Financing" or "Debt Financing" shall include the debt financing contemplated by such Alternative Financing Debt Commitment Letter. Parent, Acquisition Sub and Elon Musk shall be subject to the same obligations with respect to any Alternative Financing as set forth in this Agreement with respect to the Debt Financing.

(d) The Equity Investor, Parent, Acquisition Sub and/or the Margin Loan Borrower shall (i) give the Company prompt written notice of any default, breach or threatened default or breach (or any event or circumstance that, with or without notice, lapse of time or both, would reasonably be expected to give rise to any default or breach) by any party to any of the Financing Commitments or the Financing Agreements of which Parent or any of its Affiliates or their respective Representatives becomes aware or any withdrawal, termination, repudiation or rescission or threatened withdrawal, termination, repudiation or rescission thereof, (ii) give the Company prompt notice of any dispute or disagreement between or among any parties to the Debt Commitment Letters, (iii) notify the Company promptly if for any reason Parent, Acquisition Sub or their respective Affiliates no longer believes in good faith that it will be able to obtain all or any portion of the Financing contemplated by the Financing Commitments, (iv) promptly provide and respond to any updates reasonably requested by the Company with respect to the status of Parent's efforts to arrange and finalize the Financing (or any Alternative Financing) and (v) otherwise keep the Company reasonably informed on a current basis of the status of its efforts to arrange and finalize the Financing (or any Alternative Financing). In no event shall Parent or any of its Affiliates be required to provide access to or disclose information that Parent or any of its Affiliates reasonably determines could jeopardize any attorney-client privilege of, or conflict with any confidentiality requirements applicable to, Parent or any of its Affiliates.

55

(e) Each of Parent and the Equity Investor acknowledges and agrees that it shall be fully responsible for the Equity Financing and each shall take (or cause to be taken) all actions, and do (or cause to be done) all things necessary, proper or advisable to obtain the Equity Financing, including taking all actions necessary to (i) comply with the terms of and maintain in effect the Equity Commitment Letter, (ii) satisfy on a timely basis all conditions and obligations in such Equity Commitment Letter and (iii) consummate and fund the Equity Financing at or prior to the Closing. Parent further agrees that it shall take (or cause to be taken) all actions, and do (or cause to be done) all things necessary, proper or advisable to fully enforce its rights (including through litigation) under the Equity Commitment Letter.

(f) Parent acknowledges and agrees that neither the obtaining of the Financing or any alternative financing, nor the completion of any issuance of securities contemplated by the Financing or any alternative financing (including the Alternative Financing), is a condition to the Closing, and reaffirms its obligation to consummate the transactions contemplated by this Agreement irrespective and independently of the availability of the Financing or any alternative financing (including the Alternative Financing), or the completion of any such issuance, subject to the applicable conditions set forth in Article VII.

(g) Each of the Equity Investor, Parent and the Acquisition Sub shall on or prior to the Closing Date cause the Margin Loan Borrower to apply the cash proceeds of the Margin Loan Financing to payment of the Funding Obligations under this Agreement.

Section 6.11 Financing Cooperation.

(a) The Company shall and shall cause its Subsidiaries to, and shall use its commercially reasonable best efforts to cause each of its Representatives to, at Parent's sole expense, provide any reasonable cooperation reasonably requested by Parent in writing in connection with (i) the arrangement of the Bank Debt Financing and any other debt financing expressly contemplated by the Bank Debt Commitment Letter, including senior unsecured notes and senior secured notes, and (ii) subject to the requirements of Section 6.11(b), the payoff, redemption, defeasance, discharge or other satisfaction of the Existing Credit Agreement and the Existing Senior Notes on or subsequent to the Closing Date, in each case as is necessary, customary and reasonably requested in writing by Parent; provided that any notice of, or documentation with respect to, any such payoff, redemption or other satisfaction of existing indebtedness of the Company pursuant to this Section 6.11(a)(ii) shall provide that the obligation to repay, redeem or satisfy such indebtedness shall, as applicable, be subject to and is conditioned upon the occurrence of the Closing; provided, further, that such requested cooperation with respect to clauses (i) and (ii) of this Section 6.11(a) does not unreasonably or materially interfere with the ongoing operations of the Company and its Subsidiaries. Notwithstanding anything in this Agreement to the contrary, (A) neither the Company nor any of its Subsidiaries shall be required to pay any commitment or other similar fee, incur or reimburse any costs or expenses, enter into any binding agreement or commitment or incur any other liability, indemnity or obligation in connection with the Bank Debt Financing or the cooperation required by this Section 6.11(a) that would be effective prior to the Closing, (B) no director, manager, officer or employee or other Representative or equityholder of the Company or any of its Subsidiaries shall be required to execute, deliver, enter into, approve or perform any agreement, commitment, document, instrument or certificate or take any other action pursuant to this Section 6.11(a) to the extent any such action could reasonably be expected to result in personal liability to such Representative or equityholder, (C) neither the Company nor any of its Subsidiaries (nor any of their respective boards of directors (or similar governing bodies) shall be required to adopt any resolutions, execute any consents or otherwise take any corporate or similar action or deliver any certificate, document, instrument or agreement in connection to the Bank Debt Financing or the incurrence of

56

indebtedness thereby or any cooperation required by this Section 6.11(a) and (D) no cooperation under this Section 6.11(a) shall (I) require the Company or any of its Subsidiaries to provide, or cause to be provided, any information the disclosure of which is prohibited or restricted under applicable Law or any binding agreement with a third party or is legally privileged or consists of attorney work product or could reasonably be expected to result in the loss of any applicable legal privilege, (II) require the Company or any of its Subsidiaries to take any action that would reasonably be expected to conflict with or violate its organizational documents or any Laws or would reasonably be expected to result in (with or without notice, lapse of time, or both) a violation or breach of, or default under, or give rise to any right of termination, cancellation or acceleration of any right or obligation of such Person or to a loss of any benefit or privilege to which such Person is entitled under, any agreement to which the Company or any of its Subsidiaries is a party to or result in the creation or imposition of any Lien on any asset of the Company or any of its Subsidiaries, except any Lien that becomes effective only upon the Closing, (III) cause (or require the taking of any action that would cause) any representation or warranty in this Agreement to be breached or cause any condition to Closing to fail to be satisfied or otherwise cause any breach of this Agreement or require the Company to waive or amend any terms of this Agreement, (IV) require the Company to disclose any material, non-public information other than to recipients of such information that agree to confidentiality arrangements as contemplated under Section 6.11(b) and Section 6.4 or any adjustments or assumptions used in connection therewith, (V) require the Company to prepare or provide any financial statements or other financial information (other than those financial statements (and any other financial information) from time to time filed by the Company with the SEC (and nothing in this Section 6.11(a) shall create or be implied to create any obligation to make any such filings or other readily available financial information), (VI) waive or amend any terms of this Agreement, (VII) require the Company or its Subsidiaries to take any action that, in the good faith determination of the Company or such Subsidiary would create a risk of damage or destruction to any property or assets of the Company or such Subsidiary, (VIII) require the Company or any of its Subsidiaries or any of their Representatives to deliver any legal opinions or reliance letters, (IX) file or furnish any reports or information with the SEC or change any fiscal period or accelerate the Company's preparation of its SEC reports or financial statements, or (X) prepare or provide any (1) information regarding officers or directors prior to consummation of the Merger, executive compensation and related party disclosure or any Compensation Discussion and Analysis or information required by Item 302 (to the extent not so provided in SEC filings) or 402 of Regulation S-K under the Securities Act and any other information that would be required by Part III of Form 10-K (except to the extent previously filed with the SEC), (2) any description of all or any component of the Bank Debt Financing or other information customarily provided by the Financing Sources or their counsel, (3) risk factors relating to all or any component of the Bank Debt Financing, (4) information regarding affiliate transactions that may exist following consummation of the Merger, or (5) other information that is not available to the Company without undue effort or expense. The parties hereto agree that any information with respect to the prospects, projections and plans for the business and operations of the Company and its Subsidiaries in connection with the Financing will be the sole responsibility of Parent, and none of the Company, any of its Subsidiaries or any of their respective Representatives shall be required to provide any information or make any presentations with respect to capital structure, the incurrence of the Financing, other pro forma information relating thereto or the manner in which Parent intends to operate, or cause to be operated, the business of the Company or its Subsidiaries after the Closing. Nothing contained in this Section 6.11 or

otherwise shall require the Company or any of its Subsidiaries, prior to the Closing, to be a borrower, an issuer, a guarantor or other obligor with respect to the Debt Financing. For the avoidance of doubt, the parties hereto acknowledge and agree that the provisions contained in this Section 6.11, represent the sole obligation of the Company, its Subsidiaries and their respective Representatives with respect to cooperation in connection with the arrangement of any financing (including the Financing) to be obtained by the Equity Investor, Parent, Acquisition Sub, the Margin Loan Borrower or any of their respective Affiliates with respect to the transactions contemplated by this Agreement and no other provision of this Agreement (including the Exhibits and Schedules hereto) shall be deemed to expand or modify such obligations. In no event shall the receipt or availability of any funds or financing (including, for the avoidance of doubt, the Financing) by the Equity Investor, Parent, Acquisition Sub, the Margin Loan Borrower or any of their respective Affiliates or any other financing or other transactions be a condition to any of the Equity Investor's, Parent's, Acquisition Sub's or the Margin Loan Borrower's obligations under this Agreement. Notwithstanding anything to the contrary contained in this Agreement, the Company will be deemed to be in compliance with this Section 6.11(a), and neither Parent nor any of its Affiliates shall allege that the Company is or has not been in compliance with this Section 6.11(a), unless Parent's failure to obtain the Bank Debt Financing was due solely to a deliberate action or omission taken or omitted to be taken by the Company in material breach of its obligations under this Section 6.11(a).

(b) On or prior to any applicable date of the Company's payoff, redemption or other satisfaction of the Existing Credit Agreement and/or Existing Senior Notes contemplated by Section 6.11(a), or if applicable, date of satisfaction and discharge, Parent shall deposit or cause to be deposited funds with the applicable paying agent sufficient to effect such payoff, redemption and/or satisfaction, as applicable, as required pursuant to the terms of the agreements governing such indebtedness (and in the event of any delay of the anticipated Effective Time, Parent shall deposit additional funds with the applicable paying agents sufficient to satisfy such payoff, redemption or other satisfaction of the Existing Credit Agreement and/or Existing Senior Notes, as required pursuant to the terms of the agreements governing such indebtedness); provided that the release of any such funds shall be subject to the occurrence of the Effective Time. Parent shall, promptly upon request by the Company, reimburse the Company for all reasonable and documented out-of-pocket costs and expenses (including outside attorneys' fees and disbursements) incurred by the Company, its Affiliates and their respective Representatives in connection with the cooperation contemplated by Section 6.11(a). Parent acknowledges and agrees that the Company, its Affiliates and their respective Representatives shall not have any responsibility for, or incur any liability to any Person under, any financing that Parent may raise in connection with the transactions contemplated by this Agreement or any cooperation provided pursuant to Section 6.11(a), and shall indemnify and hold harmless the Company, its Affiliates and their respective Representatives, from and against any and all losses suffered or incurred by any of them in connection with the Debt Financing, any cooperation provided pursuant to Section 6.11(a) or any alternative financing and any information utilized in connection therewith, except to the extent any such cost or expense, judgment, fine, loss, claim, or damage results directly from the bad faith, willful misconduct or gross negligence of the Company or its Representatives or controlled Affiliates as determined by a court of competent jurisdiction in a final and non-appealable judgment. All non-public or other confidential information provided by or behalf of the Company to Parent or its Affiliates or any of their respective Representatives pursuant to this Section 6.11 shall be kept confidential in accordance with the terms of Section 6.4; provided that

58

Parent and its Affiliates may share any confidential information with respect to the Company and its Subsidiaries with any Debt Financing Sources, and that Parent, such Debt Financing Sources and their respective Affiliates may share such information with potential Debt Financing Sources in connection with any marketing efforts with respect to the Debt Financing; provided, however, that the recipients of such confidential information contemplated to be provided by the preceding proviso shall agree to be bound by confidentiality obligations no less restrictive than those set forth in Section 6.4.

Section 6.12 Acquisition Sub. Parent and the Equity Investor shall take all actions necessary to (a) cause Acquisition Sub to perform its obligations under this Agreement and to consummate the Merger on the terms and conditions set forth in this Agreement and (b) ensure that, prior to the Effective Time, Acquisition Sub shall not conduct any business, or incur or guarantee any indebtedness or make any investments, other than as specifically contemplated by this Agreement. Parent hereby (a) guarantees the due, prompt and faithful payment performance and discharge by Acquisition Sub of, and compliance by Acquisition Sub with, all of the covenants and agreements of Acquisition Sub under this Agreement and (b) agrees to take all actions necessary, proper or advisable to ensure such payment, performance and discharge by Acquisition Sub under this Agreement. Parent agrees that any breach by Acquisition Sub of a representation, warranty, covenant or agreement in this Agreement shall also be a breach of such representation, warranty, covenant or agreement by Parent.

Section 6.13 Rule 16b-3 Matters. Prior to the Effective Time, the Company may take such further actions, if any, as may be reasonably necessary or appropriate to ensure that the dispositions of equity securities of the Company (including any derivative securities) pursuant to the transactions contemplated by this Agreement by any officer or director of the Company who is subject to Section 16 of the Exchange Act are exempt under Rule 16b-3 promulgated under the Exchange Act.

Section 6.14 Delisting of Company Common Stock. Parent shall, with the reasonable cooperation of the Company, take, or cause to be taken, all actions reasonably necessary to cause the Company's securities to be delisted from the New York Stock Exchange and deregistered under the Exchange Act as soon as reasonably practicable following the Effective Time.

<u>**ARTICLE VII**</u>

<u>**CONDITIONS TO THE MERGER**</u>

Section 7.1 Conditions to the Obligations of Each Party. The respective obligations of each party hereto to consummate the Merger, are subject to the satisfaction or waiver by the Company and Parent at or prior to the Effective Time of the following conditions:

(a) the Company Stockholder Approval shall have been obtained;

(b) any waiting period (or any extension thereof) applicable to the consummation of the Merger under the HSR Act shall have expired or early termination thereof shall have been granted; and each Consent or approval that is required under any Antitrust Laws or Foreign Investment Laws of the jurisdictions set forth on Schedule A with respect to the transactions contemplated by this Agreement, including the Merger shall have been made, obtained or received (or, as applicable, the waiting periods with respect thereto shall have expired or been terminated); and

(c) no Governmental Authority of the jurisdictions set forth on <u>Schedule A</u> shall have enacted, issued, promulgated, enforced or entered any Law or Order which is then in effect and has the effect of restraining, enjoining, rendering illegal or otherwise prohibiting consummation of the Merger, or causing the Merger to be rescinded following the completion thereof.

<u>Section 7.2 Conditions to the Obligations of Parent and Acquisition Sub</u>. The obligations of Parent and Acquisition Sub to consummate the Merger, are, in addition to the conditions set forth in <u>Section 7.1</u>, further subject to the satisfaction or waiver by Parent at or prior to the Effective Time of the following conditions:

(a) the Company shall have performed or complied, in all material respects, with its obligations required under this Agreement to be performed or complied with by the Company on or prior to the Closing Date;

(b) (i) each of the representations and warranties of the Company contained in this Agreement (except for the representations and warranties contained in <u>Section 4.2(a)</u> and <u>Section 4.2(b)</u>), without giving effect to any materiality or "Company Material Adverse Effect" qualifications therein, shall be true and correct as of the Closing Date (except to the extent such representations and warranties are expressly made as of a specific date, in which case such representations and warranties shall be so true and correct as of such specific date only), except for such failures to be true and correct as would not have a Company Material Adverse Effect; and (ii) each of the representations and warranties contained in <u>Section 4.2(a)</u> and <u>Section 4.2(b)</u> shall be shall be true and correct in all material respects as of the Closing Date (except to the extent such representations and warranties are expressly made as of a specific date, in which case such representations and warranties shall be so true and correct in all material respects as of such specific date only); and

(c) no Company Material Adverse Effect shall have occurred and be continuing.

<u>Section 7.3 Conditions to the Obligation of the Company to Effect the Merger</u>. The obligation of the Company to consummate the Merger, is, in addition to the conditions set forth in <u>Section 7.1</u>, further subject to the satisfaction or waiver by the Company at or prior to the Effective Time of the following conditions:

(a) Parent and Acquisition Sub shall have performed or complied, in all material respects, with its obligations required under this Agreement to be performed or complied with by Parent or Acquisition Sub, as the case may be, on or prior to the Closing Date; and

(b) each of the representations and warranties of Parent and Acquisition Sub contained in this Agreement, without giving effect to any materiality or "Parent Material Adverse Effect" qualifications therein, shall be true and correct as of the Closing Date, except for such failures to be true and correct as would not have a Parent Material Adverse Effect (except to the extent such representations and warranties are expressly made as of a specific date, in which case such representations and warranties shall be so true and correct as of such specific date only).

## ARTICLE VIII

## TERMINATION, AMENDMENT AND WAIVER

Section 8.1 Termination. Notwithstanding anything contained in this Agreement to the contrary, this Agreement may be terminated at any time prior to the Effective Time, whether before or after the Company Stockholder Approval is obtained (except as otherwise expressly noted), as follows:

(a) by mutual written agreement of each of Parent and the Company;

(b) by either Parent or the Company:

(i) if the Merger shall not have been consummated on or before 5:00 p.m. (Pacific Time) on October 24, 2022 (as such date may be extended pursuant to the terms hereof, the "**Termination Date**"); provided, however, that (x) the right to terminate this Agreement pursuant to this Section 8.1(b)(i) shall not be available to any party if the failure of such party to perform or comply with any of its obligations under this Agreement has been the principal cause of or resulted in the failure of the Closing to have occurred on or before such date and (y) the Termination Date shall be extended for an additional six (6) months if, as at the Termination Date, the condition set forth in Section 7.1(b) or Section 7.1(c) shall not have been satisfied;

(ii) if, prior to the Effective Time, any Governmental Authority of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Law or Order or taken any other action permanently restraining, enjoining, rendering illegal or otherwise prohibiting the consummation of the transactions contemplated by this Agreement, and such Law or Order or other action shall have become final and non-appealable; provided, however, that the party seeking to terminate this Agreement pursuant to this Section 8.1(b)(ii) shall have used the efforts required by this Agreement to remove such Law, Order or other action; provided, further, that the right to terminate this Agreement under this Section 8.1(b)(ii) shall not be available to a party if the issuance of such Law or Order or taking of such action was primarily due to the failure of such party, and, in the case of Parent, the failure of Acquisition Sub or the Equity Investor, to perform any of their obligations under this Agreement; or

(iii) if the Company Stockholder Approval shall not have been obtained at the Company Stockholders' Meeting duly convened therefor or at any adjournment or postponement thereof at which this Agreement and the transactions contemplated by this Agreement have been voted upon; or

(c) by the Company:

(i) if Parent, Acquisition Sub or the Equity Investor shall have breached or failed to perform any of their respective representations, warranties, covenants or other agreements set forth in this Agreement, which breach or failure to perform (A) would give rise to the failure of any condition set forth in Section 7.3(a) or Section 7.3(b) and (B) is not capable of being cured, or is not cured, by Parent, Acquisition Sub or the Equity Investor on or before the earlier of (x) the Termination Date and (y) the date that is thirty (30) calendar days following the Company's delivery of written notice to Parent, Acquisition Sub or the Equity Investor, as applicable, of such breach; provided, however, that the Company shall not have the right to terminate this Agreement pursuant to this Section 8.1(c)(i) if the Company is then in material breach of any of its representations, warranties, covenants or agreements hereunder;

(ii) if the Company Board shall have authorized the Company to enter into a definitive agreement with respect to a Superior Proposal; provided that, substantially concurrently with such termination, the Company enters into such definitive agreement and pays (or causes to be paid) at the direction of Parent the Termination Fee as specified in Section 8.3(a); or

(iii) if (A) the conditions set forth in Section 7.1 and Section 7.2 (other than those conditions that by their nature are to be satisfied at the Closing, which conditions are capable of being satisfied if the Closing were to occur at such time) have been satisfied or waived in accordance with this Agreement and Parent and Acquisition Sub shall have been notified in writing of the same, (B) Parent and Acquisition Sub fail to consummate the Merger within three (3) Business Days following the date on which the Closing should have occurred pursuant to Section 2.2 and (C) during such three (3)-Business Days period described in clause (B), the Company stood ready, willing and able to consummate the Merger and the other transactions contemplated hereby;

(d) by Parent:

(i) if the Company shall have breached or failed to perform any of its representations, warranties, covenants or other agreements set forth in this Agreement, which breach or failure to perform (A) would give rise to the failure of any condition set forth in Section 7.2(a) or Section 7.2(b), and (B) is not capable of being cured, or is not cured, by the Company on or before the earlier of (x) the Termination Date and (y) the date that is thirty (30) calendar days following Parent's delivery of written notice to the Company of such breach; provided, however, that Parent shall not have the right to terminate this Agreement pursuant to this Section 8.1(d)(i) if Parent, Acquisition Sub or the Equity Investor is then in material breach of any of its representations, warranties, covenants or agreements hereunder; or

(ii) prior to the receipt of the Company Stockholder Approval, if the Company Board shall have made an Adverse Board Recommendation Change.

Section 8.2 Effect of Termination. In the event that this Agreement is terminated and the Merger abandoned pursuant to Section 8.1, written notice thereof shall be given to the other party or parties, specifying the provisions of this Agreement pursuant to which such termination is made, and this Agreement shall forthwith become null and void and of no effect without liability on the part of any party hereto (or any of its Representatives), and all rights and obligations of any

party hereto shall cease; provided, however, that, except as otherwise provided in Section 8.3 or in any other provision of this Agreement, no such termination shall relieve any party hereto of any liability or damages (which the parties acknowledge and agree shall not be limited to reimbursement of Expenses or out-of-pocket costs, and, in the case of liabilities or damages payable by Parent and Acquisition Sub, would include the benefits of the transactions contemplated by this Agreement lost by the Company's stockholders) (taking into consideration all relevant matters, including lost stockholder premium, other combination opportunities and the time value of money), which shall be deemed in such event to be damages of such party, resulting from any knowing and intentional breach of this Agreement prior to such termination, in which case, except as otherwise provided in Section 8.3, the aggrieved party shall be entitled to all rights and remedies available at law or in equity; and provided, further, that the expense reimbursement and indemnification obligations contained in Section 6.11 and Section 6.12, and the provisions of this Section 8.2, Section 8.3, Section 8.6 and Article IX shall survive any termination of this Agreement pursuant to Section 8.1 in accordance with their respective terms.

Section 8.3 Termination Fee.

(a) In the event that:

(i) (A) a Third Party shall have made a Competing Proposal after the date of this Agreement, (B) this Agreement is subsequently terminated by (x) the Company or Parent pursuant to Section 8.1(b)(iii) or (y) Parent pursuant to Section 8.1(d)(i), and at the time of such Company Stockholders' Meeting in the case of clause (x) or at the time of such breach in the case of clause (y), a Competing Proposal has been publicly announced and has not been withdrawn, and (C) within twelve (12) months of such termination of this Agreement, the Company consummates a transaction involving a Competing Proposal or enters into a definitive agreement providing for the consummation of a Competing Proposal and such Competing Proposal is subsequently consummated; provided, however, that for purposes of this Section 8.3(a)(i), the references to "fifteen percent (15%)" in the definition of Competing Proposal shall be deemed to be references to "fifty percent (50%)";

(ii) this Agreement is terminated by the Company pursuant to Section 8.1(c)(ii); or

(iii) this Agreement is terminated by Parent pursuant to Section 8.1(d)(ii), then

the Company shall (A) in the case of clause (i) above, no later than two (2) Business Days following the date of the consummation of such transaction involving a Competing Proposal, (B) in the case of clause (ii) above, prior to or substantially concurrently with such termination, and (C) in the case of this clause (iii), no later than two (2) Business Days after the date of such termination, pay, or cause to be paid, by wire transfer of immediately available funds, at the direction of Parent, the Termination Fee; it being understood that in no event shall the Company be required to pay the Termination Fee on more than one occasion.

63

(b) In the event that:

(i) the Agreement is terminated by the Company pursuant to <u>Section 8.1(c)(i)</u>;

(ii) the Agreement is terminated by the Company pursuant to <u>Section 8.1(c)(iii)</u>, then

Parent shall no later than two (2) Business Days after the date of such termination, pay, or cause to be paid, by wire transfer of immediately available funds, at the direction of the Company, the Parent Termination Fee; it being understood that in no event shall Parent be required to pay the Parent Termination Fee on more than one occasion.

(c) Notwithstanding anything to the contrary set forth in this Agreement, but subject to <u>Section 9.9</u>, (i) except in the case of a knowing and intentional breach of this Agreement by the Company (in which case Parent shall be entitled to seek monetary damages, recovery or award from the Company in an amount not to exceed the amount of the Termination Fee in the aggregate), Parent's right to receive payment from the Company of the Termination Fee pursuant to <u>Section 8.3(a)</u>, shall constitute the sole and exclusive monetary remedy of Parent and Acquisition Sub against the Company and its Subsidiaries and any of their respective former, current or future general or limited partners, stockholders, members, managers, directors, officers, employees, agents, Affiliates or assignees of any of the foregoing (collectively, the "**Company Related Parties**") for all losses and damages suffered as a result of the failure of the transactions contemplated by this Agreement to be consummated or for a breach or failure to perform hereunder, and upon payment of such amount, none of the Company Related Parties shall have any further liability or obligation relating to or arising out of this Agreement or the transactions contemplated by this Agreement (except that the Company shall also be obligated with respect to <u>Section 8.6</u>); <u>provided</u>, that, in no event shall the Company be subject to an aggregate amount for monetary damages (including any payment of the Termination Fee) in excess of an aggregate amount equal to the Termination Fee (except in all cases that the Company shall also be obligated with respect to its applicable obligations under <u>Section 8.3(d)</u> and <u>Section 8.6</u>), and (ii) except in the case of a knowing and intentional breach of this Agreement by the Equity Investor, Parent or Acquisition Sub (in which case the Company shall be entitled to seek monetary damages, recovery or award from the Equity Investor, Parent or Acquisition Sub in an amount not to exceed the amount of the Parent Termination Fee, in the aggregate), the Company's right to receive payment from Parent of the Parent Termination Fee pursuant to <u>Section 8.3(b)</u>, shall constitute the sole and exclusive monetary remedy of the Company against the Parent, Acquisition Sub and the Equity Investor and any of their respective former, current or future general or limited partners, stockholders, members, managers, directors, officers, employees, agents, Affiliates or assignees of any of the foregoing (collectively, the "**Parent Related Parties**") for all losses and damages suffered as a result of the failure of the transactions contemplated by this Agreement, the Equity Commitment Letter or the Parent Guarantee to be consummated or for a breach or failure to perform the applicable provisions hereunder, and upon payment of such amount, none of the Parent Related Parties shall have any further liability or obligation relating to or arising out of this Agreement, the Equity Commitment Letter or the Parent Guarantee or the transactions contemplated by thereby (except in all cases that Parent shall also be obligated with respect to its expense reimbursement and indemnification obligations contained in <u>Section 6.11</u> and its

64

applicable obligations under <u>Section 8.3(d)(iii)</u> and <u>Section 8.6(b)</u>); <u>provided</u>, that, in no event shall Equity Investor, Parent or Acquisition Sub collectively be subject to an aggregate amount for monetary damages (including any payment of the Parent Termination Fee) in excess of an aggregate amount equal to the Parent Termination Fee (except in all cases that Parent shall also be obligated with respect to its expense reimbursement and indemnification obligations contained in <u>Section 6.11</u> and its applicable obligations under <u>Section 8.3(d)(iii)</u> and <u>Section 8.6(b)</u>). For the avoidance of doubt, any liability or obligation of the Parent, Acquisition Sub or Equity Investor hereunder shall be subject to the terms of the Equity Commitment Letter and the Parent Guarantee.

(d) Each of the parties hereto acknowledges that (i) the agreement contained in this <u>Section 8.3</u> is an integral part of the transactions contemplated by this Agreement, (ii) the Termination Fee is not a penalty, but is liquidated damages, in a reasonable amount that will compensate Parent and its Affiliates in the circumstances in which such fee is payable for the efforts and resources expended and opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the transactions contemplated by this Agreement, which amount would otherwise be impossible to calculate with precision, and (iii) without the agreement contained in this <u>Section 8.3</u>, the parties would not enter into this Agreement, accordingly, if the Company or Parent, as the case may be, fails to timely pay any amount due pursuant to this <u>Section 8.3</u> and, in order to obtain such payment, either Parent or the Company, as the case may be, commences a suit that results in a judgment against the other party for the payment of any amount set forth in this <u>Section 8.3</u>, such paying party shall pay the other party its costs and Expenses in connection with such suit, together with interest on such amount at the annual rate of five percent (5%) plus the prime rate as published in *The Wall Street Journal* in effect on the date such payment was required to be made through the date such payment was actually received, or such lesser rate as is the maximum permitted by applicable law.

<u>Section 8.4 Amendment</u>. This Agreement may be amended by mutual agreement of the parties hereto by action taken by or on behalf of their respective boards of directors at any time before or after receipt of the Company Stockholder Approval; <u>provided</u>, <u>however</u>, that (i) after the Company Stockholder Approval has been obtained, there shall not be any amendment that by Law or in accordance with the rules of any stock exchange requires further approval by the Company's stockholders without such further approval of such stockholders nor any amendment or change not permitted under applicable Law and (ii) any amendment of this <u>Section 8.4</u>, <u>Section 8.3(b)</u>, <u>Section 8.3(c)</u>, <u>Section 9.4</u>, <u>Section 9.7</u>, <u>Section 9.8</u>, <u>Section 9.10</u>, <u>Section 9.12</u> or <u>Section 9.13</u>, in each case, to the extent such amendment would adversely affect the rights of a Debt Financing Source party to the Debt Commitment Letter under such Section, shall also be approved by such Debt Financing Source. This Agreement may not be amended except by an instrument in writing signed by each of the parties hereto.

<u>Section 8.5 Extension; Waiver</u>. At any time prior to the Effective Time, subject to applicable Law, the Company may (a) extend the time for the performance of any obligation or other act of Parent or Acquisition Sub, (b) waive any inaccuracy in the representations and warranties of Parent or Acquisition Sub contained herein or in any document delivered pursuant hereto and (c) waive compliance with any agreement or condition by Parent or Acquisition Sub contained herein. Any such extension or waiver shall only be valid if set forth in an instrument in writing signed by the party or parties to be bound thereby. Notwithstanding the foregoing, no failure or delay by the Company, Parent or Acquisition Sub in exercising any right hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise of any other right hereunder. Any agreement on the part of a party hereto to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of such party.

Section 8.6 <u>Expenses; Transfer Taxes</u>.

(a) Except as expressly set forth herein, all Expenses incurred in connection with this Agreement and the transactions contemplated by this Agreement shall be paid by the party incurring such Expenses.

(b) Parent shall timely and duly pay all (i) transfer, stamp and documentary Taxes or fees, (ii) sales, use, gains, real property transfer and other similar Taxes or fees arising out of or in connection with entering into and carrying out this Agreement and (iii) filing fees incurred in connection with any applications and filings under any Antitrust Laws or Foreign Investment Laws.

**ARTICLE IX**

**GENERAL PROVISIONS**

Section 9.1 <u>Non-Survival of Representations, Warranties and Agreements</u>. The representations, warranties, covenants and agreements in this Agreement and any certificate delivered pursuant hereto by any Person shall terminate at the Effective Time or, except as provided in <u>Section 8.2</u>, upon the termination of this Agreement pursuant to <u>Section 8.1</u>, as the case may be, except that this <u>Section 9.1</u> shall not limit any covenant or agreement of the parties which by its terms contemplates performance after the Effective Time or after termination of this Agreement, including those contained in <u>Section 6.6</u> and <u>Section 6.9</u>.

Section 9.2 <u>Notices</u>. All notices, consents and other communications hereunder shall be in writing and shall be given (and shall be deemed to have been duly given upon receipt) by hand delivery, by prepaid overnight courier (providing written proof of delivery) or by confirmed electronic mail, addressed as follows:

<u>if to Parent or Acquisition Sub</u>:

     \*\*\*

     Attn: Elon Musk

with a copy (which shall not constitute notice) to:

     Skadden, Arps, Slate, Meagher & Flom LLP
     525 University Ave, Suite 1400
     Palo Alto, California 94301
     Attn: Mike Ringler
          Sonia K. Nijjar
          Dohyun Kim

66

Email: ***
     ***
     ***

<u>if to the Company</u>:

Twitter, Inc.
1355 Market Street, Suite 900
San Francisco, California 94103
Attn: General Counsel
Email: ***

with a copy (which shall not constitute notice) to:

Wilson Sonsini Goodrich & Rosati
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Attn: Katharine A. Martin
     Martin W. Korman
     Douglas K. Schnell
     Remi P. Korenblit
Email: ***
     ***
     ***
     ***

and

Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, New York 10017
Attn: Alan Klein
     Anthony F. Vernace
     Katherine M. Krause
Email: ***
     ***
     ***

or to such other address or electronic mail address for a party as shall be specified in a notice given in accordance with this <u>Section 9.2</u>; <u>provided</u> that any notice received by electronic mail or otherwise at the addressee's location on any Business Day after 5:00 p.m. (addressee's local time) or on any day that is not a Business Day shall be deemed to have been received at 9:00 a.m. (addressee's local time) on the next Business Day; <u>provided</u>, <u>further</u>, that notice of any change to the address or any of the other details specified in or pursuant to this <u>Section 9.2</u> shall not be deemed to have been received until, and shall be deemed to have been received upon, the later of the date specified in such notice or the date that is five (5) Business Days after such notice would otherwise be deemed to have been received pursuant to this <u>Section 9.2</u>.

67

Section 9.3 <u>Interpretation; Certain Definitions</u>.

(a) The parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

(b) Disclosure of any fact, circumstance or information in any Section of the Company Disclosure Letter or Parent Disclosure Letter shall be deemed to be disclosure of such fact, circumstance or information with respect to any other Section of the Company Disclosure Letter or Parent Disclosure Letter, respectively, only if it is reasonably apparent that such disclosure relates to any such other Section. The inclusion of any item in the Company Disclosure Letter or Parent Disclosure Letter shall not be deemed to be an admission or evidence of materiality of such item, nor shall it establish any standard of materiality for any purpose whatsoever.

(c) The words "hereof," "herein," "hereby," "hereunder" and "herewith" and words of similar import shall refer to this Agreement as a whole and not to any particular provision of this Agreement. References to articles, sections, paragraphs, exhibits, annexes and schedules are to the articles, sections and paragraphs of, and exhibits, annexes and schedules to, this Agreement, unless otherwise specified, and the table of contents and headings in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the phrase "without limitation." Words describing the singular number shall be deemed to include the plural and vice versa, words denoting any gender shall be deemed to include all genders, words denoting natural persons shall be deemed to include business entities and vice versa, and references to a Person are also to its permitted successors and assigns. The phrases "the date of this Agreement" and "the date of this Agreement" and terms or phrases of similar import shall be deemed to refer to April 25, 2022, unless the context requires otherwise. When used in reference to the Company or its Subsidiaries, the term "material" shall be measured against the Company and its Subsidiaries, taken as a whole. References to any statute shall be deemed to refer to such statute as amended from time to time and to any rules or regulations promulgated thereunder (<u>provided</u> that for purposes of any representations and warranties contained in this Agreement that are made as of a specific date or dates, references to any statute shall be deemed to refer to such statute, as amended, and to any rules or regulations promulgated thereunder, in each case, as of such date). Terms defined in the text of this Agreement have such meaning throughout this Agreement, unless otherwise indicated in this Agreement, and all terms defined in this Agreement shall have the meanings when used in any certificate or other document made or delivered pursuant hereto unless otherwise defined therein. Any Law defined or referred to herein or in any agreement or instrument that is referred to herein means such Law as from time to time amended, modified or supplemented, including (in the case of statutes) by succession of comparable successor Laws (<u>provided</u> that for purposes of any representations and warranties contained in this Agreement that are made as of a specific date or dates, references to any statute shall be deemed to refer to such statute, as amended, and to any rules or regulations promulgated thereunder, in each case, as of such date). All references to "dollars" or "$" refer to currency of the U.S. Nothing contained in <u>Article IV</u> or <u>Article V</u> may be construed as a covenant under the terms of this Agreement, other than the acknowledgments and agreements set forth in <u>Section 4.25</u> and <u>Section 5.10</u> to the extent necessary to give full effect to the acknowledgments and agreements set forth therein.

Section 9.4 <u>Severability</u>. If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void, illegal, unenforceable or against its regulatory policy, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated. Upon such determination that any term or other provision is invalid, void, illegal, unenforceable or against its regulatory policy, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties hereto as closely as possible in a mutually acceptable manner in order that the transactions contemplated by this Agreement, including the Merger, be consummated as originally contemplated to the fullest extent possible.

Section 9.5 <u>Assignment</u>. Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto (whether by operation of Law or otherwise) without the prior written consent of the other parties. Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of and be enforceable by the parties and their respective permitted successors and assigns. Any attempted assignment in violation of this <u>Section 9.5</u> shall be null and void.

Section 9.6 <u>Entire Agreement</u>. This Agreement (including the exhibits, annexes and appendices hereto) constitutes, together with the Company Disclosure Letter and the Parent Disclosure Letter, the entire agreement, and supersedes all other prior agreements and understandings, both written and oral, among the parties, or any of them, with respect to the subject matter hereof.

Section 9.7 <u>No Third-Party Beneficiaries</u>. Subject to <u>Section 9.13</u>, this Agreement is not intended to and shall not confer upon any Person other than the parties hereto any rights or remedies hereunder; <u>provided</u>, <u>however</u>, that it is specifically intended that (A) the D&O Indemnified Parties (with respect to <u>Section 6.6</u> from and after the Effective Time), (B) the Company Related Parties (with respect to <u>Section 8.3</u>) are third-party beneficiaries and (C) the Parent Related Parties (with respect to <u>Section 8.3</u>) are third-party beneficiaries.

Section 9.8 <u>Governing Law</u>. This Agreement and all actions, proceedings or counterclaims (whether based on contract, tort or otherwise) arising out of or relating to this Agreement, or the actions of Parent, Acquisition Sub or the Company in the negotiation, administration, performance and enforcement thereof, shall be governed by, and construed in accordance with, the laws of the State of Delaware, without giving effect to any choice or conflict of laws provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware.

Section 9.9 Specific Performance.

(a) The parties hereto agree that irreparable damage for which monetary damages, even if available, would not be an adequate remedy, would occur in the event that the parties hereto do not perform the provisions of this Agreement (including failing to take such actions as are required of it hereunder to consummate this Agreement) in accordance with its specified terms or otherwise breach such provisions. Accordingly, the parties hereto acknowledge and agree that the parties hereto shall be entitled to an injunction, specific performance and other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof, in addition to any other remedy to which they are entitled at law or in equity. Each of the parties hereto agrees that it will not oppose the granting of an injunction, specific performance and other equitable relief on the basis that any other party has an adequate remedy at law or that any award of specific performance is not an appropriate remedy for any reason at law or in equity. Any party seeking an injunction or injunctions or any other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement shall not be required to show proof of actual damages or provide any bond or other security in connection with any such order or injunction.

(b) Notwithstanding anything herein to the contrary, including the availability of the Parent Termination Fee or other monetary damages, remedy or award, it is hereby acknowledged and agreed that the Company shall be entitled to specific performance or other equitable remedy to enforce Parent and Acquisition Sub's obligations to cause the Equity Investor to fund the Equity Financing, or to enforce the Equity Investor's obligation to fund the Equity Financing directly, and to consummate the Closing if and for so long as, (i) all of the conditions set forth in Section 7.1 and Section 7.2 (other than those conditions that are to be satisfied at the Closing; provided, that such conditions are capable of being satisfied if the Closing were to occur at such time) have been satisfied or waived and Parent has failed to consummate the Closing on the date required pursuant to the terms of Section 2.2, (ii) the Debt Financing (or, as applicable, the Alternative Financing) has been funded or will be funded at the Closing if the Equity Financing is funded at the Closing, and (iii) the Company has confirmed that, if specific performance or other equity remedy is granted and the Equity Financing and Debt Financing are funded, then the Closing will occur. For the avoidance of doubt, (A) while the Company may concurrently seek (x) specific performance or other equitable relief, subject to the terms of this Section 9.9, and (y) payment of the Parent Termination Fee or other monetary damages, remedy or award if, as and when required pursuant to this Agreement), under no circumstances shall the Company be permitted or entitled to receive both a grant of specific performance to cause the Equity Financing to be funded, on the one hand, and payment of the Parent Termination Fee or other monetary damages, remedy or award, on the other hand; provided, however, that in no event shall the Company be permitted or entitled to receive aggregate monetary damages in excess of the Parent Termination Fee (except in all cases that Parent shall also be obligated with respect to its expense reimbursement and indemnification obligations contained in Section 6.11 and its applicable obligations under Section 8.3(d)(iii) and Section 8.6(b)).

(c) To the extent any party hereto brings an action, suit or proceeding to specifically enforce the performance of the terms and provisions of this Agreement (other than an action to enforce specifically any provision that expressly survives the termination of this Agreement), the Termination Date shall automatically be extended to (i) the twentieth (20th) Business Day following the resolution of such action, suit or proceeding or (ii) such other time period established by the court presiding over such action, suit or proceeding.

Section 9.10 <u>Consent to Jurisdiction</u>.

(a) Each of the parties hereto hereby (i) expressly and irrevocably submits to the exclusive personal jurisdiction of the Delaware Court of Chancery, any other court of the State of Delaware or any federal court sitting in the State of Delaware in the event any dispute arises out of this Agreement or the transactions contemplated by this Agreement, (ii) agrees that it will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court, (iii) agrees that it will not bring any action relating to this Agreement or the transactions contemplated by this Agreement in any court other than the Delaware Court of Chancery, any other court of the State of Delaware or any federal court sitting in the State of Delaware, (iv) waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement and (v) agrees that each of the other parties shall have the right to bring any action or proceeding for enforcement of a judgment entered by the state courts of the Delaware Court of Chancery, any other court of the State of Delaware or any federal court sitting in the State of Delaware. Each of the Equity Investor, Parent, Acquisition Sub and the Company agrees that a final judgment in any action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(b) Each party hereto irrevocably consents to the service of process outside the territorial jurisdiction of the courts referred to in <u>Section 9.10(a)</u> in any such action or proceeding by mailing copies thereof by registered or certified U.S. mail, postage prepaid, return receipt requested, to its address as specified in or pursuant to <u>Section 9.2</u>. However, the foregoing shall not limit the right of a party to effect service of process on the other party by any other legally available method.

Section 9.11 <u>Counterparts</u>. This Agreement may be executed in multiple counterparts, all of which shall together be considered one and the same agreement. Delivery of an executed signature page to this Agreement by electronic transmission shall be as effective as delivery of a manually signed counterpart of this Agreement.

Section 9.12 <u>WAIVER OF JURY TRIAL</u>. EACH OF THE EQUITY INVESTOR, PARENT, ACQUISITION SUB AND THE COMPANY HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF PARENT, ACQUISITION SUB OR THE COMPANY IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE AND ENFORCEMENT THEREOF (INCLUDING THE DEBT FINANCING).

Section 9.13 <u>Debt Financing Source Related Party</u>. Notwithstanding anything in this Agreement to the contrary, but in all cases subject to and without in any way limiting the rights and claims of Parent or any of its Affiliates under and pursuant to any debt commitment letter or other applicable definitive document relating to the Debt Financing, the Company hereby:

71

(a) agrees that any claim, action, suit, investigation or other proceeding, whether in law or in equity, whether in contract or in tort or otherwise, involving the Debt Financing Sources, arising out of or relating to, this Agreement and/or the Debt Financing or any of the agreements entered into in connection therewith or any of the transactions contemplated hereby or thereby or the performance of any services thereunder shall be subject to the exclusive jurisdiction of the Supreme Court of the State of New York, County of New York, or, if under applicable law exclusive jurisdiction is vested in the Federal courts, the United States District Court for the Southern District of New York sitting in New York County (and appellate courts thereof) and each party hereto irrevocably submits itself and its property with respect to any such claim, action, suit, investigation or other proceeding to the exclusive jurisdiction of such court;

(b) agrees that any such claim, action, suit, investigation or other proceeding shall be governed by the laws of the State of New York (without giving effect to any conflicts of law principles that would result in the application of the laws of another state), except as otherwise provided in any debt commitment letter or other applicable definitive document relating to the Debt Financing;

(c) agrees not to bring or support or permit any of its respective Affiliates to bring or support any claim, action, suit, investigation or other proceeding of any kind or description, whether in law or in equity, whether in contract or in tort or otherwise, against any Debt Financing Source in any way arising out of or relating to, this Agreement or the Debt Financing or any of the transactions contemplated hereby or the performance of any services thereunder in any forum other than the Supreme Court of the State of New York, County of New York, or, if under applicable law exclusive jurisdiction is vested in the Federal courts, the United States District Court for the Southern District of New York sitting in New York County (and appellate courts thereof);

(d) irrevocably waives, to the fullest extent that it may effectively do so, the defense of an inconvenient forum to the maintenance of such claim, action, suit, investigation or other proceeding in any such court;

(e) **KNOWINGLY, INTENTIONALLY AND VOLUNTARILY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW TRIAL BY JURY IN ANY CLAIM, ACTION, SUIT, INVESTIGATION OR OTHER PROCEEDING BROUGHT AGAINST ANY DEBT FINANCING SOURCE RELATED PARTY IN ANY WAY ARISING OUT OF OR RELATING TO, THIS AGREEMENT OR THE DEBT FINANCING OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY OR THE PERFORMANCE OF ANY SERVICES THEREUNDER;**

(f) agrees that no Debt Financing Source Related Party will have any liability to the Company or any its Affiliates or Representatives relating to or arising out of this Agreement or the Debt Financing or any of the transactions contemplated hereby or thereby or the performance of any services thereunder, whether in law or in equity, whether in contract or in tort or otherwise; and

(g) agrees that the Debt Financing Sources are express third party beneficiaries of, and may enforce, any of the provisions of this <u>Section 9.13</u> and that such provisions and the definitions of "Debt Financing Sources" and "Debt Financing Source Related Party" shall not be amended or waived in any way adverse to the rights of any Debt Financing Source without the prior written consent of such Debt Financing Source.

[Remainder of page intentionally left blank.]

73

IN WITNESS WHEREOF, each of Parent, Acquisition Sub, the Company and, solely with respect to the Specified Provisions, the undersigned individual, have caused this Agreement to be executed as of the date first written above in their individual capacity or by their respective officers thereunto duly authorized, as applicable.

X HOLDINGS I, INC.

By: /s/ Elon R. Musk
Name: Elon R. Musk
Title: President, Secretary and Treasurer

X HOLDINGS II, INC.

By: /s/ Elon R. Musk
Name: Elon R. Musk
Title: President, Secretary and Treasurer

[Signature Page to Agreement and Plan of Merger]

TWITTER, INC.

By:   /s/ Bret Taylor
      Name: Bret Taylor
      Title: Chair of the Board of Directors

[Signature Page to Agreement and Plan of Merger]

SOLELY WITH RESPECT TO THE SPECIFIED PROVISIONS:

ELON R. MUSK

/s/ Elon R. Musk

[Signature Page to Agreement and Plan of Merger]

**SCHEDULE A**
**Specified Jurisdictions**

With respect to <u>Section 7.1(b)</u>:

Any Consent or approval that is required under any Antitrust Laws or Foreign Investment Laws of the following jurisdictions, including as a result of any interventions by a Governmental Authority or voluntary filings under any Antitrust Laws or Foreign Investment Laws that Parent determines to make (for the avoidance of doubt, an approval shall be deemed to be required once the Parent determines it will make a voluntary filing in that jurisdiction, but only if an approval is typically granted for a filing of such a type in such a jurisdiction, whether through a decision or deemed by expiry of any applicable waiting periods):

1. The federal government of the United States
2. The State of Delaware
3. Japan
4. The United Kingdom
5. The European Commission (but not any member states)

With respect to <u>Section 7.1(c)</u>:

1. The federal government of the United States
2. The State of Delaware
3. Japan
4. The United Kingdom
5. The European Commission (but not any member states)

# Exhibit 2

**Exhibit P**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

525 UNIVERSITY AVENUE
PALO ALTO, CALIFORNIA 94301
_____
TEL: (650) 470-4500
FAX: (650) 470-4570
www.skadden.com
July 8, 2022

Twitter, Inc.
1355 Market Street, Suite 900
San Francisco, CA 94103
Attn: Vijaya Gadde, Chief Legal Officer
Dear Ms. Gadde:

We refer to (i) the Agreement and Plan of Merger by and among X Holdings I, Inc., X Holdings II, Inc. and Twitter, Inc. dated as of April 25, 2022 (the "Merger Agreement") and (ii) our letter to you dated as of June 6, 2022 (the "June 6 Letter"). As further described below, Mr. Musk is terminating the Merger Agreement because Twitter is in material breach of multiple provisions of that Agreement, appears to have made false and misleading representations upon which Mr. Musk relied when entering into the Merger Agreement, and is likely to suffer a Company Material Adverse Effect (as that term is defined in the Merger Agreement).

While Section 6.4 of the Merger Agreement requires Twitter to provide Mr. Musk and his advisors all data and information that Mr. Musk requests "for any reasonable business purpose related to the consummation of the transaction," Twitter has not complied with its contractual obligations. For nearly two months, Mr. Musk has sought the data and information necessary to "make an independent assessment of the prevalence of fake or spam accounts on Twitter's platform" (our letter to you dated May 25, 2022 (the "May 25 Letter")). This information is fundamental to Twitter's business and financial performance and is necessary to consummate the transactions contemplated by the Merger Agreement because it is needed to ensure Twitter's satisfaction of the conditions to closing, to facilitate Mr. Musk's financing and financial planning for the transaction, and to engage in transition planning for the business. Twitter has failed or refused to provide this information. Sometimes Twitter has ignored Mr. Musk's requests, sometimes it has rejected them for reasons that appear to be unjustified, and sometimes it has claimed to comply while giving Mr. Musk incomplete or unusable information.

1

Mr. Musk and his financial advisors at Morgan Stanley have been requesting critical information from Twitter as far back as May 9, 2022—and repeatedly since then—on the relationship between Twitter's disclosed mDAU figures and the prevalence of false or spam accounts on the platform. If there were ever any doubt as to the nature of these information requests, the May 25 Letter made clear that Mr. Musk's goal was to understand how many of Twitter's claimed mDAUs were, in fact, false or spam accounts. That letter noted that "Items 1.03 to 1.13 of the diligence request list contain high-priority requests for enterprise data and other information intended to enable Mr. Musk and his advisors to make an independent assessment of the prevalence of fake or spam accounts on Twitter's platform…" The letter then provided Twitter with a detailed list of requests to this effect.

Since then, Mr. Musk has provided numerous additional follow-up requests, all aimed at filling the gaps in the incomplete information that Twitter provided in response to his broad requests for information relating to Twitter's reported mDAU counts and reported estimates of false and spam accounts.[1] For example, in our letter to you dated June 29, 2022 (the "June 29 Letter"), we referenced Mr. Musk's request in the May 25 Letter for "information that would allow him 'to make an independent assessment of the prevalence of fake or spam accounts on Twitter's platform.'" Because Twitter, by its own admission, provided only incomplete data that was not sufficient to perform such an independent assessment,[2] the June 29 Letter "endeavored to be *even more* specific, and to reduce the burden of the [original] request," by identifying a specific subset of high priority information, responsive to Mr. Musk's prior requests, for Twitter to immediately make available.

[1] Mr. Musk sought the same information in letters dated June 6, 2022, June 17, 2022, and June 29, 2022. In each of these letters, Mr. Musk referenced his information rights under Section 6.4 of the Merger Agreement. Twitter has thus been on notice of the information sought by Mr. Musk—and the contractual bases for these requests—for two months. For the past month, Mr. Musk has been clear that he views Twitter's non-responsiveness as a material breach of the Merger Agreement giving him the right to terminate the Merger Agreement if uncured. *See* June 6, 2022 (explaining that Twitter was "refusing to comply with its obligations under the Merger Agreement"). Thus, Mr. Musk has been clear about his requests, his right to seek such information, and his view regarding Twitter's material breach of the Merger Agreement.

[2] *See* your letter to us dated June 20, 2022 (noting that the information Twitter was agreeing to provide was "insufficient to perform the spam analysis that [Mr. Musk] purport[s] to wish to do.").

2

Notwithstanding these repeated requests over the past two months, Twitter has still failed to provide much of the data and information responsive to Mr. Musk's repeated requests, including, but not limited to:

1.  *Information related to Twitter's process for auditing the inclusion of spam and fake accounts in mDAU.* Twitter has still not provided much of the information specifically requested by Mr. Musk in Sections 1.01-1.03 of the May 19 diligence request list that is necessary for him to make an assessment of the prevalence of false or spam accounts on its website. As recently as the June 29 Letter, Mr. Musk reiterated this long-standing request for information related to Twitter's sampling process for detecting fake accounts. The June 29 Letter identified specific data necessary to enable Mr. Musk to independently verify Twitter's representations regarding the number of mDAU on its platform—including, but not limited to (1) daily global mDAU data since October 1, 2020; (2) information regarding the sampling population for mDAU, including whether the mDAU population used for auditing spam and false accounts is the same mDAU population used for quarterly reporting; (3) outputs of each step of the sampling process for each day during the weeks of January 30, 2022 and June 19, 2022; (4) documentation or other guidance provided to contractor agents used for auditing mDAU samples; (5) information regarding the user interface of Twitter's ADAP tool and any internal tools used by the contractor agents; and (6) mDAU audit sampling information, including anonymized information identifying the contractor agents and Quality Analyst that reviewed each sampled account, the designation given by each contractor agent and Quality Analyst, and the current status of any accounts labelled "compromised." A subsequent request along these lines should not have been necessary, as this information should have been provided in response to Mr. Musk's original diligence request. Yet, to date, Twitter has not provided any of this

information.

2.   *Information related to Twitter's process for identifying and suspending spam and fake accounts*. In addition to information regarding Twitter's mDAU audits, the June 29 Letter also reiterated requests for data specifically identified in Sections 1.04-1.05 of the May 19 diligence request list regarding Twitter's methodology and performance data relating to identification and suspension of spam and false accounts, including, but not limited to, information regarding account suspensions, including information sufficient to identify daily numbers of account suspensions since October 2020 and numbers of account suspensions for each of Twitter's internal reasons for suspension. In addition, during the June 30, 2022 call, Twitter's representatives indicated for the first time that the workflow and processes for detecting spam and false accounts in the mDAU population is different and separate from the workflow and processes for identifying and suspending accounts in violation of Twitter's policies. On that call, Twitter indicated that it would not be willing to provide information regarding the methodologies employed to identify and suspend such accounts.

3

3.   *Daily measures of mDAU for the past eight (8) quarters*. On June 17, 2022 (the "June 17 Letter") Mr. Musk reiterated his request for "access to the sample set used and calculations performed, as well as any related reports or analysis, to support Twitter's representation that fewer than 5% of its mDAUs are false or spam account." To that end, Mr. Musk requested that Twitter provide "daily measures of mDAU for the previous eight quarters, and through the present." This information is derivative of the information Mr. Musk first sought in Sections 1.01-1.03 of the May 19 diligence request list. Although Twitter has provided certain summary data regarding the mDAU calculations, Twitter has not provided the complete daily measures as requested.

4.   *Board materials related to Twitter's mDAU calculations*. In the June 17 Letter, Mr. Musk requested a variety of board materials and communications related to Twitter's mDAU metric, its calculation of the number of spam and false accounts, its disclosure of the mDAU metric, and the company's disclosure of the number of spam accounts on the platform. Twitter has provided an incomplete data set in response to this request, and has not provided information sufficient to enable Mr. Musk to make an independent assessment of Twitter's board and management's understanding of its mDAU metric.

5.   *Materials related to Twitter's financial condition*. Mr. Musk is entitled, under Section 6.4 of the Merger Agreement to "all information concerning the business … of the Company … for any reasonable business purpose related to the consummation of the transactions" and under Section 6.11 of the Merger Agreement, to information "reasonably requested" in connection with his efforts to secure the debt financing necessary to consummate the transaction. To that end, Mr. Musk requested on June 17 a variety of board materials, including a working, bottoms-up financial model for 2022, a budget for 2022, an updated draft plan or budget, and a *working* copy of Goldman Sachs' valuation model underlying its fairness opinion. Twitter has provided only a pdf copy of Goldman Sachs' final Board presentation.

4

In short, Twitter has not provided information that Mr. Musk has requested for nearly two months notwithstanding his repeated, detailed clarifications intended to simplify Twitter's identification, collection, and disclosure of the most relevant information sought in Mr. Musk's original requests.

While Twitter has provided some information, that information has come with strings attached, use limitations or other artificial formatting features, which has rendered some of the information minimally useful to Mr. Musk and his advisors. For example, when Twitter finally provided access to the eight developer "APIs" first explicitly requested by Mr. Musk in the May 25 Letter, those APIs contained a rate limit lower than what Twitter provides to its largest enterprise customers. Twitter only offered to provide Mr. Musk with the same level of access as some of its *customers* after we explained that throttling the rate limit prevented Mr. Musk and his advisors from performing the analysis that he wished to conduct in any reasonable period of time.

Additionally, those APIs contained an artificial "cap" on the number of queries that Mr. Musk and his team can run regardless of the rate limit—an issue that initially prevented Mr. Musk and his advisors from completing an analysis of the data in any reasonable period of time. Mr. Musk raised this issue as soon as he became aware of it, in the first paragraph of the June 29 Letter: "we have just been informed by our data experts that Twitter has placed an artificial cap on the number of searches our experts can perform with this data, which is now preventing Mr. Musk and his team from doing their analysis." That cap was not removed until July 6, after Mr. Musk demanded its removal for a second time.

Based on the foregoing refusal to provide information that Mr. Musk has been requesting since May 9, 2022, Twitter is in breach of Sections 6.4 and 6.11 of the Merger Agreement.

Despite public speculation on this point, Mr. Musk did not waive his right to review Twitter's data and information simply because he chose not to seek this data and information before entering into the Merger Agreement. In fact, he negotiated access and information rights within the Merger Agreement precisely so that he could review data and information that is important to Twitter's business before financing and completing the transaction.

5

As Twitter has been on notice of its breach since at least June 6, 2022, any cure period afforded to Twitter under the Merger Agreement has now lapsed. Accordingly, Mr. Musk hereby exercises X Holdings I, Inc.'s right to terminate the Merger Agreement and abandon the transaction contemplated thereby, and this letter constitutes formal notice of X Holding I, Inc.'s termination of the Merger Agreement pursuant to Section 8.1(d)(i) thereof.

In addition to the foregoing, Twitter is in breach of the Merger Agreement because the Merger Agreement appears to contain materially inaccurate representations. Specifically, in the Merger Agreement, Twitter represented that no documents that Twitter filed with the U.S. Securities and Exchange Commission since January 1, 2022, included any "untrue statement of a material fact" (Section 4.6(a)). Twitter has repeatedly made statements in such filings regarding the portion of its mDAUs that are false or spam, including statements that: "We have performed an internal review of a sample of accounts and estimate that the average of false or spam accounts during the first quarter of 2022 represented fewer than 5% of our mDAU during the quarter," and "After we determine an account is spam, malicious automation, or fake, we stop counting it in our mDAU, or other related metrics." Mr. Musk relied on this representation in the Merger Agreement (and Twitter's numerous public statements regarding false and spam accounts in its publicly filed SEC documents) when agreeing to enter into the Merger Agreement. Mr. Musk has the right to seek rescission of the Merger Agreement in the event these material representations are determined to be false.

Although Twitter has not yet provided complete information to Mr. Musk that would enable him to do a complete and comprehensive review of spam and fake accounts on Twitter's platform, he has been able to partially and preliminarily analyze the accuracy of Twitter's disclosure regarding its mDAU. While this analysis remains ongoing, all indications suggest that several of Twitter's public disclosures regarding its mDAUs

are either false or materially misleading. *First*, although Twitter has consistently represented in securities filings that "fewer than 5%" of its mDAU are false or spam accounts, based on the information provided by Twitter to date, it appears that Twitter is dramatically understating the proportion of spam and false accounts represented in its mDAU count. Preliminary analysis by Mr. Musk's advisors of the information provided by Twitter to date causes Mr. Musk to strongly believe that the proportion of false and spam accounts included in the reported mDAU count is wildly higher than 5%. *Second*, Twitter's disclosure that it ceases to count fake or spam users in its mDAU when it determines that those users are fake appears to be false. Instead, we understand, based on Twitter's representations during a June 30, 2022 call with us, that Twitter includes accounts that have been suspended—and thus are known to be fake or spam—in its quarterly mDAU count even when it is aware that the suspended accounts were included in mDAU for that quarter. *Last*, Twitter has represented that it is "continually seeking to improve our ability to estimate the total number of spam accounts and eliminate them from the calculation of our mDAU…" But, Twitter's process for calculating its mDAU, and the percentage of mDAU comprised of non-monetizable spam accounts, appears to be arbitrary and ad hoc. Disclosing that Twitter has a reasoned process for calculating mDAU when the opposite is true would be false and misleading.

6

Twitter's representation in the Merger Agreement regarding the accuracy of its SEC disclosures relating to false and spam accounts may have also caused, or is reasonably likely to result in, a Company Material Adverse Effect, which may form an additional basis for terminating the Merger Agreement. While Mr. Musk and his advisors continue to investigate the exact nature and extent of this event, Mr. Musk has reason to believe that the true number of false or spam accounts on Twitter's platform is substantially higher than the amount of less than 5% represented by Twitter in its SEC filings. Twitter's true mDAU count is a key component of the company's business, given that approximately 90% of its revenue comes from advertisements. For this reason, to the extent that Twitter has underrepresented the number of false or spam accounts on its platform, that may constitute a Company Material Adverse Effect under Section 7.2(b)(i) of the Merger Agreement. Mr. Musk is also examining the company's recent financial performance and revised outlook, and is considering whether the company's declining business prospects and financial outlook constitute a Company Material Adverse Effect giving Mr. Musk a separate and distinct basis for terminating the Merger Agreement.

Finally, Twitter also did not comply with its obligations under Section 6.1 of the Merger Agreement to seek and obtain consent before deviating from its obligation to conduct its business in the ordinary course and "preserve substantially intact the material components of its current business organization." Twitter's conduct in firing two key, high-ranking employees, its Revenue Product Lead and the General Manager of Consumer, as well as announcing on July 7 that it was laying off a third of its talent acquisition team, implicates the ordinary course provision. Twitter has also instituted a general hiring freeze which extends even to reconsideration of outstanding job offers. Moreover, three executives have resigned from Twitter since the Merger Agreement was signed: the Head of Data Science, the Vice President of Twitter Service, and a Vice President of Product Management for Health, Conversation, and Growth. The Company has not received Parent's consent for changes in the conduct of its business, including for the specific changes listed above. The Company's actions therefore constitute a material breach of Section 6.1 of the Merger Agreement.

7

Accordingly, for all of these reasons, Mr. Musk hereby exercises X Holdings I, Inc.'s right to terminate the Merger Agreement and abandon the transaction contemplated thereby, and this letter constitutes formal notice of X Holding I, Inc.'s termination of the Merger Agreement pursuant to Section 8.1(d)(i) thereof.

Sincerely,
/s/ Mike Ringler
Mike Ringler
Skadden, Arps, Slate, Meagher & Flom LLP

cc:
Katherine A. Martin, Wilson Sonsini Goodrich & Rosati, Professional Corporation
Martin W. Korman, Wilson Sonsini Goodrich & Rosati, Professional Corporation
Douglas K. Schnell, Wilson Sonsini Goodrich & Rosati, Professional Corporation
Remi P Korenblit, Wilson Sonsini Goodrich & Rosati, Professional Corporation
Alan Klein, Simpson Thacher & Bartlett LLP
Anthony F. Vernace, Simpson Thacher & Bartlett LLP
Katherine M. Krause, Simpson Thacher & Bartlett LLP
Elon Musk
Alex Spiro, Quinn Emanuel Urquhart & Sullivan, LLP
Andrew Rossman, Quinn Emanuel Urquhart & Sullivan, LLP

8

# Exhibit 3

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# SCHEDULE 14A
### PROXY STATEMENT PURSUANT TO SECTION 14(a) OF THE
### SECURITIES EXCHANGE ACT OF 1934

Filed by the Registrant ☒

Filed by a Party other than the Registrant ☐

Check the appropriate box:

☐   Preliminary Proxy Statement
☐   **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**
☐   Definitive Proxy Statement
☐   Definitive Additional Materials
☒   Soliciting Material under §240.14a-12

# TWITTER, INC.
#### (Name of Registrant as Specified In Its Charter)

Payment of Filing Fee (Check all boxes that apply):

☒   No fee required.
☐   Fee paid previously with preliminary materials.
☐   Fee computed on table in exhibit required by Item 25(b) per Exchange Act Rules 14a-6(i)(1) and 0-11.

**In connection with the pending acquisition of Twitter by an affiliate of Elon Musk, Bret Taylor (@btaylor), chair of Twitter's board of directors, posted the following (the "Taylor Post"):**

The Twitter Board is committed to closing the transaction on the price and terms agreed upon with Mr. Musk and plans to pursue legal action to enforce the merger agreement. We are confident we will prevail in the Delaware Court of Chancery.



> **Bret Taylor** ✔
> @btaylor
>
> The Twitter Board is committed to closing the transaction on the price and terms agreed upon with Mr. Musk and plans to pursue legal action to enforce the merger agreement. We are confident we will prevail in the Delaware Court of Chancery.
>
> 2:51 PM · Jul 8, 2022 · Twitter for iPhone

**Each of Parag Agrawal (@paraga), Twitter's Chief Executive Officer; Ned Segal (@nedsegal), Twitter's Chief Financial Officer; Vijaya Gadde (@vijaya), Twitter's Chief Legal Officer; and Patrick Pichette (@pichette) and Martha Lane Fox (@marthalanefox), members of Twitter's board of directors, subsequently retweeted the Taylor Post.**

### Additional Information and Where to Find It

Twitter, its directors and certain executive officers are participants in the solicitation of proxies from stockholders in connection with the pending acquisition of Twitter (the "Transaction"). Twitter has filed a preliminary proxy statement with the Securities and Exchange Commission (the "SEC") in connection with the solicitation of proxies to approve the Transaction. Twitter will furnish the definitive proxy statement, when available, together with a WHITE proxy card to each Twitter stockholder entitled to vote at the special meeting to consider the Transaction. Additional information regarding such participants, including their direct or indirect interests, by security holdings or otherwise, is included in the proxy statement and other relevant documents filed with the SEC in connection with the Transaction. Additional information relating to the foregoing can also be found in Twitter's definitive proxy statement for its 2022 Annual Meeting of Stockholders, which was filed with the SEC on April 12, 2022. STOCKHOLDERS ARE URGED TO READ THE PROXY STATEMENT (INCLUDING ANY AMENDMENTS OR SUPPLEMENTS THERETO) AND ANY OTHER RELEVANT DOCUMENTS THAT TWITTER WILL FILE WITH THE SEC WHEN THEY BECOME AVAILABLE BECAUSE THEY WILL CONTAIN IMPORTANT INFORMATION. Stockholders may obtain, free of charge, the proxy statement, any amendments or supplements thereto, and any other relevant documents filed by Twitter with the SEC in connection with the Transaction at the SEC's website (http://www.sec.gov). Copies of the proxy statement, any amendments or supplements thereto, and any other relevant documents filed by Twitter with the SEC in connection with the Transaction will also be available, free of charge, at Twitter's investor relations website (https://investor.twitterinc.com) or by writing to Twitter, Inc., Attention: Investor Relations, 1355 Market Street, Suite 900, San Francisco, California 94103.

### Forward-Looking Statements

This communication contains forward-looking statements that involve risks and uncertainties, including statements regarding the Transaction, including related to the closing of the Transaction. If any of these risks or uncertainties materialize, or if any of Twitter's assumptions prove incorrect, Twitter's actual results could differ materially from the results expressed or implied by these forward-looking statements. Additional risks and uncertainties include those associated with: the possibility that the conditions to the closing of the Transaction are not satisfied, including the risk that required approvals from Twitter's stockholders for the Transaction or required regulatory approvals to consummate the Transaction are not obtained; litigation relating to the Transaction; uncertainties as to the timing of the consummation of the Transaction; the ability of each party to consummate the Transaction; possible disruption related to the Transaction to Twitter's current plans and operations, including through the loss of customers and employees; and other risks and uncertainties detailed in the periodic reports that Twitter files with the SEC, including Twitter's Annual Report on Form 10-K filed with the SEC on February 16, 2022, and Quarterly Report on Form 10-Q filed with the SEC on May 2, 2022, which may be obtained on the investor relations section of Twitter's website (https://investor.twitterinc.com). All forward-looking statements in this communication are based on information available to Twitter as of the date of this communication, and Twitter does not assume any obligation to update the forward-looking statements provided to reflect events that occur or circumstances that exist after the date on which they were made, except as required by law.

# Exhibit 4

EFiled: Jul 29 2022 02:57PM EDT
Transaction ID 67859708
Case No. 2022-0666-

## IN THE COURT OF CHANCERY IN THE STATE OF DELAWARE

LUIGI CRISPO,                                )
                                             )
        Plaintiff,                     )
                                             )
    v.                                 )   C.A. No. _____
                                             )
ELON R. MUSK, X HOLDINGS I,                  )
INC. AND X HOLDINGS II, INC.                 )
                                             )
        Defendants.                    )

### VERIFIED SHAREHOLDER CLASS ACTION COMPLAINT

Luigi Crispo ("Plaintiff") brings this Verified Shareholder Class Action Complaint (the "Complaint") individually on behalf of himself as a stockholder of Twitter, Inc. ("Twitter" or the "Company"), and as a class action on behalf of Twitter stockholders as of April 25, 2022 (excluding Defendants) and their successors and assignees (the "Class"). Plaintiff asserts individual and class claims for specific performance of the obligation of Elon R. Musk ("Musk") and Musk's acquisition vehicles, X Holdings I, Inc., ("Parent") and X Holdings II, Inc. ("Acquisition Sub") under the April 25, 2022 Agreement and Plan of Merger by and among Twitter, Musk (as to certain provisions), Parent and Acquisition Sub (the "Merger Agreement") to purchase their Twitter shares. Plaintiff also asserts individual and class claims that Defendants' self-interested refusal to purchase the Twitter shares and related conduct is a breach of the fiduciary duty Defendants owe to Twitter's public stockholders as a result of their ownership and control of the Company. The

allegations of the Complaint are based on Plaintiff's knowledge as to himself and as to all other matters on information and belief, including from the public filings of Twitter and Musk with the United States Securities and Exchange Commission (the "SEC") and the investigation of counsel.

## **INTRODUCTION**

1.      Plaintiff holds 5,500 shares of Twitter, Inc. ("Twitter" or the "Company") stock.   Under the Agreement and Plan of Merger (the "Merger Agreement"), defendants agreed to purchase Plaintiff's Twitter shares for $54.20 per share (the "Merger"), which entitles him to a cash payment of $298,100 when the Merger closes.

2.      The Merger Agreement is a binding contract with Defendants signed for Twitter by Brett Taylor, Chair of Twitter's board of directors (the "Board"), for the benefit of Plaintiff and other Twitter stockholders.  Because the purpose of the Merger Agreement is for Defendants to purchase the Twitter shares of Plaintiff and the Class, they are third-party beneficiaries of the Merger Agreement and have individual and class rights to enforce Defendants' obligation under that agreement to purchase those shares.

3.      Through their ownership of 9.6% of Twitter's stock, their beneficial ownership as a result of the Merger Agreement, and their continued rights under the Merger Agreement, and actions taken by Defendants and Twitter based on the

2

Merger Agreement, Defendants have obtained majority ownership and a controlling interest over Twitter.

4.      Elon R. Musk and his corporate acquisition entities planned to finance their purchase of Twitter stock from Plaintiff and the Class through a combination of bank debt, a margin loan and equity financing.  Merger Agreement § 5.4.  The sale and pledge of Musk's personal Tesla, Inc. ("Tesla") stock holdings would provide the majority of the margin and equity funding.  After the signing of the Merger Agreement, Musk's sources of financing dwindled and the value of his Tesla stock declined significantly.  The $54.20 per-share cash consideration for Twitter stock under the Merger Agreement remained unchanged.  Musk developed cold feet and decided to walk away from the deal.  But, having agreed to take on the foreseeable risk of a market decline (including a drop in the price of Tesla's shares), Musk is contractually prohibited from reneging on the Merger Agreement.

5.      In an effort to circumvent his clear contractual obligation under Section 5.4 of the Merger Agreement to finance the Merger Consideration, Musk has fabricated several excuses which he claims let him back out of the deal.  His lame rationales for reneging on his contract are without merit.  On July 12, 2022, Twitter sued Musk and his acquisition entities for specific performance of their obligations to Twitter under the Merger Agreement.

3

6.      In the Merger Agreement, Defendants agreed to purchase Plaintiff's Twitter stock, but they are refusing to do so.  Therefore, Plaintiff and the Class seek specific performance of Defendants' obligation to purchase their stock for $54.20 per share. They also assert that Defendants have breached their fiduciary duty of loyalty as controlling stockholders by pursuing their financial self-interest through reneging on their contractual promise to buy the Twitter shares of Plaintiff and the Class.  In addition, Plaintiff and the Class seek damages against Defendants for the harm their breaches of contract and fiduciary duty has caused and will cause the Twitter stockholders.

## PARTIES

7.      Plaintiff Luigi Crispo is a Twitter stockholder and has continuously held shares since the time the Merger was first publicly disclosed to Twitter stockholders.

8.      Defendant Elon R. Musk ("Musk") is the direct owner of 9.6% of Twitter's stock.  Musk is referred to in the Merger Agreement as "Equity Investor." He is the President, Secretary, Treasurer and sole shareholder of both Parent and Acquisition Sub, and agreed to be a party to the Merger Agreement in his individual capacity as Equity Investor with respect to his unqualified obligation to fund the Merger, among other provisions.

4882-5036-1644, v. 1

9.     Defendant X Holdings, I, Inc. is a Delaware corporation formed on April 19, 2022, for the sole purpose of engaging in, and arranging financing for, the transactions contemplated by the Merger Agreement.  Parent will provide the funding for the purchase of the Twitter stock in the Merger, but Musk must provide that funding to Parent.

10.    Defendant X Holdings II, Inc. is a Delaware corporation and a wholly owned subsidiary of Parent.  Acquisition Sub was formed on April 19, 2022 solely for the purpose of engaging in, and arranging financing for, the transactions contemplated by the Merger Agreement.

11.    Musk, Parent and Acquisition Sub are collectively referred to herein as "Defendants" and because of Musk's ownership and control of Parent and Acquisition Sub, they are sometimes referred together herein as simply "Musk."

## <u>JURISDICTION</u>

12.    This Court has subject matter jurisdiction under 10 *Del. C.* § 341, 8 *Del. C.* § 111(a), and 6 *Del. C.* § 2708.

13.    Personal jurisdiction over Parent and Acquisition Sub is proper because both are incorporated under the laws of Delaware and have consented to jurisdiction by agreeing to "expressly and irrevocably submit[] to the exclusive personal jurisdiction of the Delaware Court of Chancery . . . in the event any dispute arises

out of [the merger agreement] or the transactions contemplated by [the merger agreement]."  Merger Agreement § 9.10(a).

14.     Personal jurisdiction over Musk is proper pursuant to 10 *Del. C.* § 3104(c)(1), because, among other reasons: (a) Musk wholly owns and formed two Delaware corporations, Parent and Acquisition Sub, and which he created for the sole purpose of acquiring Twitter, a Delaware corporation; (b) Musk agreed to undertake "reasonable best efforts" to complete the Merger, which includes the delivery of a Certificate of Merger to the Delaware Secretary of State by Parent and Acquisition Sub.  Merger Agreement §§ 2.3(a), 6.3(a).  In addition, through his shareholdings and power under the Merger Agreement and actions pursuant to the Merger Agreement, Musk is a majority beneficial owner and controlling stockholder of Twitter.

## SUBSTANTIVE ALLEGATIONS

### A.     Musk's Pursuit of Twitter

15.     Musk has been a Twitter user since 2010.  Since then, he has tweeted approximately 18,700 times and has accrued over 100 million followers, making him one of Twitter's most prolific, and most followed, users.

16.     In January 2022, Musk began secretly purchasing Twitter stock.  In March 2022, Musk issued a series of tweets soliciting his followers' support for

fundamental changes in how Twitter conducted its operations.  His comments made his negative view of Twitter and its content modification policies clear.

17.    Also in March 20222, Musk began publicly and privately communicating with Twitter directors and officers, musing about joining Twitter's Board, purchasing the Company, or starting a competitor. On April 4, 2022, Musk filed a Schedule 13G indicating he owned 9.2% of Twitter's outstanding stock.  Also on April 4, 2022, Musk and Twitter entered into a letter agreement for Musk to become a director of the Company.  Musk agreed that while he served as a director and for 90 days thereafter, he would not become the beneficial owner of more than 14.9% of Twitter's outstanding stock.   Twitter and Musk announced the letter agreement providing that Musk was joining Twitter's board of directors.  On April 9, 2022, Musk notified Twitter that he would not be joining Twitter's board, but would instead make an offer to take Twitter private.

18.    On April 13, 2022, Musk delivered a "best and final" offer "to buy 100% of Twitter stock $54.20 per share in cash" proclaiming he would "unlock" Twitter's "extraordinary potential" as a platform for free speech.  Musk's initial offer was conditioned on regulatory approval, confirmatory diligence, execution of a definitive agreement and completion of financing.   On April 14, 2022, Musk publicly announced his offer.  In response, Twitter's Board approved a so-called poison pill (or shareholders' rights) plan.  In a Schedule 13D filed April 21, 2022,

7

Musk announced a debt commitment letter for $13 billion, a separate margin loan commitment letter for $12.5 billion and an equity commitment letter from Musk for $21 billion, all dated April 20, 2022.  Musk also publicly proclaimed that his $54.20 offer was no longer conditioned on financing or diligence.  He publicly tweeted about the possibility of launching a hostile tender offer, if his offer was not accepted.

19.     On April 24, 2022, Musk indicated to Twitter that his $54.20 per share offer was "binary – my offer will either be accepted or I will exit my position." Musk recognized his $54.20 offer was for the benefit of Twitter's stockholders and even said he would explore a rollover transaction "to provide further value and choice to shareholders."   On April 25, 2022, the parties signed the Merger Agreement.  In the joint press release issued by Twitter and Musk, Musk stated:

> Under the terms of the agreement, Twitter stockholders will receive $54.20 in cash for each share of Twitter common stock that they own upon closing of the proposed transaction.

Twitter Board Chair Bret Taylor said the Merger Agreement was "the best path forward for Twitter's stockholders."  Musk described his plans for Twitter, including "defeating the spam bots."  In further materials filed with the SEC and shared with Twitter employees, the Twitter Board stated that the Merger Agreement "delivers a substantial cash premium to stockholders [and] is the best path forward for Twitter's stockholders."

8

20.     On April 26, 2022, Musk filed Amendment No. 5 to his Schedule 13D statement of beneficial ownership, stating that under the Merger Agreement Twitter would become wholly owned by Parent, which is wholly owned by Musk.

**B.     The Merger Agreement**

21.     Musk (as to certain provisions), Parent, Merger Sub and Twitter are parties to the Merger Agreement.  At the time the Merger becomes effective (the "Effective Time"), Twitter will merge with Acquisition Sub, with Twitter surviving the Merger, keeping its name and remaining a Delaware corporation.  Merger Agreement § 2.1.  Under Sections 2.4 and 2.5, the parties agreed that the certificate of incorporation and bylaws of Acquisition Sub would become the certificate and bylaws of Twitter and Acquisition Sub's board of directors would become Twitter's board.  The Twitter shares of Plaintiff and the Class "shall be converted into the right to receive $54.20 per share of Company common stock in cash" (the "Merger Consideration").  Merger Agreement § 3.1(c).  Each share of Acquisition Sub shall be converted into one share of Twitter.  Merger Agreement § 3.1(a).

22.     Twitter will not receive any of the Merger Consideration.  Parent will deposit the Merger Consideration with a paying agent "for the benefit of the holders of Company Common Stock" to be applied promptly to payment of the Merger Consideration to those Twitter stockholders.  Merger Agreement § 3.2(a).  If there is any investment loss on the fund containing the Merger Consideration, Parent is

required to deposit additional funds "for the benefit of the holders of Company Common Stock." Merger Agreement § 3.2(f). The paying agent will pay Plaintiff and the Class the Merger Consideration.   Merger Agreement §§ 3.2(b)-(c).

23.     Musk is a party to Sections 5.4, 6.2(d), 6.3, 6.8, 6.10, 6.11, 6.12 and 9.9 of the Merger Agreement.  Section 5.4 of the Merger Agreement provides for the Bank Debt Financing, Margin Loan Financing and Equity Financing and further provides that these Financing Commitments "are legal, valid and binding obligations of the Equity Investor, Parent and Acquisition Sub" and are enforceable against them.  Section 6.10 reinforces the obligation of Musk, Parent and Acquisition Sub to finance the purchase of the Twitter shares of Plaintiff and the Class.  The Merger Agreement requires Musk to transfer Tesla shares to support the Margin Loan at an LTY Ratio not to exceed 20%.  Merger Agreement § 6.10(a)(ii)(A).  He is also bound by Section 6.3, which requires reasonable best efforts to consummate the transactions contemplated by the Merger Agreement and cause the conditions to the Merger to be satisfied.  Under Section 6.8, Musk is not permitted to issue Tweets about the Merger which disparage Twitter or its representatives.  Section 6.12 requires Musk and Parent to cause Acquisition Sub to consummate the Merger.

24.     The Merger Agreement contains several provisions to ensure Defendants cannot walk away from the deal. Section 5.2(a) provides that the Merger Agreement "constitutes a legal, valid and binding obligation of Parent and

10

Acquisition Sub, enforceable against Parent and Acquisition Sub." There is no financing condition and few conditions to closing. *See, e.g.,* Merger Agreement §§ 7.1; 7.2. Section 6.10(e) imposes a hell-or-highwater obligation for Defendants, including Musk personally, to "take (or cause to be taken) all actions, and do (or cause to be done) all things necessary, proper or advisable to obtain the Equity Financing." Most importantly, Musk, Parent and Acquisition Sub agreed in Section 9.9 that the Merger Agreement would be specifically enforceable against them.

25. Section 8.2 of the Merger Agreement, which concerning as the effect of termination of the Merger Agreement provides in pertinent part:

> . . . except as otherwise provided in <u>Section 8.3</u> or in any other provision of this Agreement, no such termination shall relieve any party hereto of any liability or damages (which the parties acknowledge and agree shall not be limited to reimbursement of Expenses or out-of-pocket costs, and, in the case of liabilities or damages payable by Parent and Acquisition Sub, would include the benefits of the transactions contemplated by this Agreement lost by the Company's stockholder) (taking into consideration all relevant matters, including lost stockholder premium, other combination opportunities and the time value of money), which shall be deemed in such event to be damages of such party, resulting from any knowing and intentional breach of this Agreement prior to such termination, in which case, except as otherwise provided in <u>Section 8.3</u>, the aggrieved party shall be entitled to all rights and remedies available at law or in equity.

Thus, the Merger Agreement specifically recognizes that the Twitter stockholders are intended recipients of "the benefits of the transactions contemplated by this Agreement" and are "entitled to all rights and remedies available at law or in equity" for "any knowing and intentional breech" of the Merger Agreement, including the

11

loss of benefits to them contemplated by the Merger Agreement, such as the "lost stockholder premium."

### C.   The Merger Agreement Benefits Twitter Stockholders

26.   The Merger Agreement does not provide any financial benefit directly to Twitter.  Twitter itself survives the merger and continues to operate.  Merger Agreement § 2.1.   Instead, the Merger Agreement provides for Twitter's stockholders to sell their shares to Musk, Parent and Acquisition Sub.  Indeed, Twitter's July 12, 2022 Complaint[1] against Defendants notes the Merger Agreement's assurances that the "agreement would stick" were included "for the benefit of stockholders."  Twitter Complaint ¶ 38.  That Complaint acknowledges that "Musk refuses to honor his obligations to Twitter <u>and</u> <u>its</u> <u>stockholders</u>." *Id.* ¶ 1 (emphasis added).  Twitter further recognizes that Defendants' conduct creates "uncertainty and delay that harm Twitter <u>and its stockholders</u> and <u>deprive them of their bargained-for rights</u>." *Id.* ¶146 (emphasis added).

27.   The Merger Agreement includes numerous provisions described above that are for the benefit of the Twitter stockholders, including Sections 3.1, 3.2, 5.4, 6.3, 6.10, 6.12, 8.2 and 9.9.

28.   Twitter filed preliminary proxy materials concerning the Merger on May 17, June 21 and July 15, 2022.  Under Section 6.2 of the Merger Agreement,

---

[1] Trans. ID 67812653.

Parent has the right to review and comment on the proxy statement.  Thus, Musk and his affiliates and counsel presumably reviewed the contents of the preliminary proxy materials.

29.     In the July 15, 2022 Preliminary Proxy Statement ("PPS"), Twitter and its Board repeatedly recognize that Musk's acquisition of Twitter was "for the benefit of our stockholders."  PPS at 54, 56.  The Twitter Board acknowledged "the financial benefit of the transaction to our stockholders."  PPS at 57.  In a June 20, 2022 letter from Twitter's counsel to Musk's counsel, Twitter brought up Musk's April 24, 2022 threat to make his $54.20 offer directly to the Twitter stockholders "without giving them the benefit of the definitive merger agreement to protect their interest."  PPS at 68.

### D.     Musk Is the Majority Owner and Controller of Twitter

30.     Before and after the signing of the Merger Agreement, Musk directly owned 9.6% of Twitter's outstanding shares.  The only larger Twitter stockholder is The Vanguard Group, a passive investor.

31.     Through the signing of the Merger Agreement, Musk gained significant additional beneficial ownership and influence over Twitter.  The Merger Agreement gave Musk the right to acquire the 90.4% of Twitter's stock he does not already own.  The Merger Agreement is an agreement for the purpose of acquiring the Twitter

stock owned by the other Twitter stockholders.  As a result of the Merger Agreement, Musk became the owner of a majority of Twitter's stock.

32.     Through the Merger Agreement, Musk obtained veto power over numerous matters ordinarily reserved for the Board and Twitter's stockholders under Twitters' certificate of incorporation (the "Certificate"), bylaws (the "Bylaws") and Delaware law.

33.     Pursuant to 8 *Del. C.* § 242(b), the Board and Twitter's stockholders can amend the Certificate.  Under the Merger Agreement, the Certificate cannot be amended in any material respect without Defendants' consent (§ 6.1(a)).

34.      Per Article VI.A. of the Certificate, the Board can amend the Bylaws. Under the Merger Agreement, the Board cannot amend the Bylaws in any material respect without Defendants' consent (§ 6.1(a)).

35.     Per Article XI of the Bylaws, Twitter's stockholders can repeal, adopt and amend bylaws.  Under the Merger Agreement, the stockholders cannot amend the Bylaws in any material respect without Defendants' consent (§ 6.1(a)).

36.     Under the Delaware General Corporation Law Twitter may issue, split, combine, reclassify, repurchase or amend the terms of its stock.  Pursuant to the Merger Agreement, Twitter cannot take such actions without Defendants' consent (§§ 6.1(b)-(c)).

37.     Under 8 *Del. C.* §170, the Board can cause Twitter to issue dividends. Under the Merger Agreement, dividends cannot be issued without Defendants' consent (§ 6.1(d)).

38.     Under Article V.A. of the Certificate, Section 3.1 of the Bylaws, and 8 *Del. C.* § 141(a), the Board manages Twitter.  Under the Merger Agreement, without Defendants' consent, the Board cannot:

   a.      increase employee salaries unless "consistent with past practice" (§ 6.1(e));

   b.      acquire any companies (§ 6.1(i));

   c.      incur material debt (§ 6.1(j)); or

   d.      communicate with its employees, customers, suppliers and consultants unless "consistent with prior communications" (§ 6.8)).

39.     Notably, Twitter, which had adopted a stockholders' rights plan on April 15, 2022, to protect stockholders from Musk's takeover, now cannot do so without his consent.  Merger Agreement § 6.1(p).

**E.     Musk Walks Away from the Merger Agreement**

40.     Musk himself is largely required to finance the Merger, through a margin loan secured with his Tesla stock, a huge equity commitment, and loans made directly to Twitter.  Since Musk is using Tesla shares to help finance the Merger, the more Tesla's stock price declines, the more Tesla shares Musk has to

15

sell or pledge to fund the Merger.  Musk is well-known for his reluctance to sell Tesla shares because he wants to continue to maintain control of that company.

41.     On April 23, 2022, the last trading day before the Merger Agreement was signed on April 25, 2022, the closing trading price for a share of Tesla stock was $1,005.05.  After the signing of the Merger Agreement, as Musk started to sell his holdings to finance the Merger, the price of Tesla stock began to fall.  By the end of the week, April 29, 2022, Tesla stock was trading at $870.76 per share.  In other words, the portion of the Merger that Musk was financing through Tesla stock got 13% more expensive for Musk by the week's end.

42.     On May 4, 2022, the Margin Loan Commitment was cut from $13.5 billion to $6.25 billion and Musk's Equity Funding Commitment was increased by $6.25 billion to $27.25 billion.  In Amendment No. 6 to his 13D, Musk announced Co-Investor Equity Commitment Letters for approximately $7.139 billion in cash from investors on Twitter shares (valued at $54.20 per share) to provide part of the equity financing for the purchase of the Twitter stock of Plaintiff and the Class. Thus, Musk was attempting to reduce his obligation to use his Tesla stock to support the margin debt and reduce his obligation to provide equity financing which would require sale of Tesla stock.

43.     Tesla's stock price kept falling, closing at $728.00 per share on May 12, 2022.

44.     Musk wanted an out.  But Defendants' ability to terminate the Merger Agreement was (and is) highly restricted by the terms of the Merger Agreement. One of Defendants' few possible grounds for terminating the Merger Agreement is showing that Twitter's representations in the Merger Agreement are not true and correct, causing a Material Advise Effect (an "MAE").  Merger Agreement §§ 7.2(b), 8.1(d)(i).  One of Twitter's representations in the Merger Agreement, contained in Section 4.6(a), is that Twitter's filings with the SEC are materially accurate.

45.     On May 13, 2022, Musk tweeted "Twitter deal temporarily on hold," and linked to a story about Twitter's May 2, 2022 disclosure in a Form 10-Q that it estimated fewer than 5% of its monetizable daily active users were "fake or spam accounts."  Under the Merger Agreement, Musk had no right or authority to put the merger "on hold."  This tweet violated Musk's agreement in Section 6.3 of the Merger Agreement to use reasonable best efforts to consummate the purchase of the Twitter shares.

46.     To lay the groundwork for an exit from the Merger Agreement, Musk publicly claimed that the 10-Q disclosure was an admission that Twitter's SEC filings were false and misleading.  On May 13, 2022, Musk made more tweets about fake accounts, misleadingly contending Twitter's estimates are based upon a

sampling of only 100 accounts.  In reality, the estimates are made through review of thousands of accounts.

47.     Musk continued to try to derail the Merger.  On May 15, 2022, in response to another Twitter user's tweet about fake accounts, Musk tweeted that fake accounts may comprise "over 90% of daily active users."  Musk repeated this statement the next day at an industry conference, hosted by the *All-In* podcast.

48.     When Musk appeared at the *All-In* podcast's May 16, 2022 conference, he stated he believes the number of fake Twitter accounts is "four to five times" the 5% figure contained in Twitter's SEC disclosures.  He further stated: "I am still waiting for some sort of logical explanation for the number of sort of fake or spam accounts on Twitter, and Twitter is refusing to tell us.  So you know, this just seems like a strange thing. . . .they claim that they do know. And they claim they have this complex methodology that only they can understand. . . . This is a material public statement, is a Material Adverse Misstatement."

49.     On May 17, 2022, Musk claimed in a tweet that at least 20% of Twitter accounts are fake and the deal could not move forward until Twitter's Chief Executive Officer publicly proved that less than 5% of accounts were fake.  But the most egregious tweet came later that day when Musk, in a reply to his own post about fake accounts, tweeted "Hello @SECGov, anyone home?"

4882-5036-1644, v. 1

50.    Tesla's share price continued to decline.  On May 24, 2022, Musk scrapped entirely the margin loan secured by his Tesla stock, and increased his equity commitment to $33.5 billion.  Tesla stock continued to decline, closing at $628.16 per share that day.  On May 25, 2022, Musk's lawyers claimed Musk was surprised by what he considered Twitter's "tax methodologies" for determining fake or spam accounts and demanded "rigorous computer-aided and third-party testing." The letter did not explain why Musk has not conducted analysis of Twitter's methodologies and requested testing <u>before</u> he signed the Merger Agreement.

51.    It was Musk and his tweets, not Twitter, that attracted the SEC's scrutiny.  On May 18, 2022 the SEC issued comments to Musk's legal counsel concerning his 13D filings.  When Musk did not respond, the SEC issued a June 2, 2022 letter reiterating those comments in writing.  The SEC observed that Musk's May 17, 2022 tweet that "[t]his deal cannot move forward" suggested Musk was "exercising a legal right under the terms of the merger agreement to suspend completion of the acquisition of Twitter or otherwise do not intent to complete the acquisition."  Thus, the SEC recognized that Musk was trying to back out of the Merger Agreement and demanded that he amend his 13D.

52.    On June 6, 2022, Musk filed a 13D amendment attaching a letter from his counsel to Twitter, which repeated Musk's demands for information on spam and fake accounts and asserted he had a right to such information under Section 6.4 and

6.11 of the Merger Agreement.  The letter asserted that Musk had the right "not to consummate the transaction" and the "right to terminate the merger agreement." Thus, Musk confirmed what was increasingly clear since mid-May: he had no intention of honoring his contractual commitment and fiduciary obligation to buy the Twitter stock of Plaintiff and the Class.

53.     From late May, 2022 through early July, 2022, Musk's lawyers and Twitter's lawyers exchanged letter volleys arguing over who had breached the Merger Agreement.  Not surprisingly, Twitter's efforts to provide information could not satisfy Musk, who was merely trying to fabricate an excuse for defaulting on his agreement to buy Twitter's stock.

54.     Despite his clear obligation under the Merger Agreement to fund the purchase of Twitter's stock and the lack of any financing condition, during June 2022 Musk raised doubts about the Bank Debt Financing being available to allow the Merger to be consummated, including stating on June 21, 2022 that the Bank Debt Financing "need[ed] to be resolved before the transaction can complete."

55.     On July 8, 2022, with Tesla stock opening at only $727.00 per share, Musk purported to terminate the Merger Agreement in a letter from his counsel to Twitter.  Musk's grounds for doing so were a pretext.

56.     Musk claimed Twitter violated Section 6.4 of the Merger Agreement by failing to provide Musk with information he needed to consummate the Merger,

but, as described at length in Twitter's Complaint against Defendant, Musk's information requests related to fake users were reasonably satisfied and, in any event, were for the purpose of *not* consummating the Merger. Musk's letter admitted that he chose not to seek data and information on fake users before entering into the Merger Agreement.

57.    Musk also contended Twitter's disclosures about fake accounts contained in SEC filings "may have also caused, or is reasonably likely to result in," an MAE and be untrue, because, Musk believes, more than 5% of Twitter accounts may be spam of fake. Musk Termination Letter. But even if Musk is correct (and Musk provides no reason to believe he is), this does not contradict Twitter's SEC filings about spam and fake accounts, which merely disclose that Twitter's own estimate is that less than 5% of accounts are spam or fake, and Musk does not contend that is not Twitter's true estimate. Indeed, Twitter's disclosures of "false or spam accounts" being less than 5% of Twitter's mDAU have been consistently qualified by statements that the mDAU calculation "may not accurately reflect the actual number of people or organizations using our platform" and that the calculation of spam or false accounts involves "significant judgement" and "may not accurately represent the actual number . . . ."

58.    Finally, Musk contends Twitter violated Section 6.1 of the Merger Agreement since some employees have resigned and Twitter implemented layoffs,

fired two employees, and implemented a hiring freeze, all without Musk's consent. But, as detailed in Twitter's Complaint, Twitter tried to engage with Musk on these issues, without any cooperation or substantive response, even though his consent cannot be "unreasonably withheld, delayed or conditioned." Merger Agreement § 6.1. Musk cannot create a breach of Section 6.1 by breaching it himself. Twitter's Complaint details the factual and legal reasons that Twitter has not breached the Merger Agreement.

59.    Later that day, Bret Taylor, Twitter's Board Chair tweeted: "The Twitter Board is committed to closing the transaction on the price and terms agreed upon with Mr. Musk and plans to pursue legal action to enforce the merger agreement. We are confident we will prevail in the Delaware Court of Chancery."

60.    On July 10, 2022, Twitter's counsel advised Musk's counsel that Musk's purported termination of the Merger Agreement "is invalid and wrongful, and it constitutes a repudiation of their obligation under the Agreement." Twitter asserted that Musk "knowingly, intentionally, willingly, and materially breached" Sections 6.3, 6.8 and 6.10 of the Merger Agreement.

61.    Apparently aware that his termination letter would not be effective, Musk continued to try to create an MAE. On July 11, 2022, Musk tweeted images of himself with the text "THEY SAID I COULDN'T BUY TWITTER; THEN THEY WOULDN'T DISCLOSE THE BOT INFO; NOW THEY WANT TO

FORCE ME TO BUY TWITTER IN COURT; NOW THEY HAVE TO DISCLOSE

BOT INFO IN COURT."  This was followed by a picture of Chuck Norris and the

text "Chuckmate."



62.     That same day, Musk once again encouraged the SEC to investigate

Twitter's disclosures, responding to a tweet suggesting that more than 5% of

Twitter's users were fake by writing "Hello???@SECGov."

63.     Also on July 11, 2022, Musk tweeted "Problematic" in response to a

tweet about Twitter's May 2, 2022 Form 10-Q's explanation that Twitter identified,

and corrected, a technical error in calculating its mDAU figures.  None of the

23

adjustments to historical mDAU figures exceeded 0.88% of the previously reported mDAU figures.

64.    Only after exhausting its options, on July 12, 2022, Twitter filed its action against Musk and his acquisition entities, seeking to enforce the Company's rights under the Merger Agreement.  Twitter's Complaint acknowledges that the Twitter stockholders also have rights under the Merger Agreement.

## CLASS ACTION ALLEGATIONS

65.    Plaintiff brings this Action pursuant to Rule 23 of the Rules of the Court of Chancery, individually and on behalf of all other holders of Twitter common stock on or after April 25, 2022 (except Defendants and any person, firm, trust, corporation or other entity related to or affiliated with them and their successors in interest) (previously defined as the "Class").

66.    This Action is properly maintainable as a class action.  The Class is so numerous that joinder of all members is impracticable.  According to Section 4.2 of the Merger Agreement, as of March 31, 2022, there were 763,577,530 shares of Twitter common stock issued and outstanding.  Thus, upon information and belief, there are at least thousands of Twitter stockholders scattered throughout the United States.

67.    There are questions of law and fact common to the Class, including, *inter alia*, whether:

24

a.      Plaintiff and the Class are intended beneficiaries of the Merger Agreement and, therefore, have standing to sue for specific performance and breach of the Merger Agreement;

b.      Defendants breached the Merger Agreement;

c.      Musk breached his individual and personal obligation to fund the Merger;

d.      Musk violated the Section 6.8 of the Merger Agreement and his fiduciary duties though his tweets and public statements, including those on May 13, 14, 15 and 17, and July 11, 2022;

e.      Musk's control of Twitter through his large stock holding, his influence over investors (including through his tweets), his ownership and rights under the Merger Agreement and his actions since the signing of the Merger Agreement, impose fiduciary duties to Twitter stockholders on him;

f.      Plaintiff and the Class are entitled to specific performance of the Merger Agreement; and

g.      Plaintiff and the other members of the Class were injured by the wrongful conduct alleged herein, and, if so, what is the proper measure of damages.

68.     Plaintiff is committed to prosecuting this Action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are

typical of the claims of the other members of the Class, and Plaintiff has the same interests as the other members of the class.  Plaintiff is an adequate representative of the Class.

69.    The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class.  Such inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants and/or with respect to individual members of the Class would, as a practical matter, be dispositive of the interests of the other members not party to the adjudication and/or would substantially impair or impede their ability to protect their interests.

70.    In purporting to terminate the Merger Agreement and refusing to consummate the purchase of Twitter shares in the Merger, Defendants have acted and refused to act on grounds generally applicable to the Class, making appropriate final injunctive relief, misleading an order of specific performance, and related declaration relief with respect to the Class as a whole.

71.    Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

## COUNT I

**Direct Claim for Specific Performance and Breach of Contract**
(Against All Defendants)

72.     Plaintiff repeats and realleges the allegations above as if fully set forth herein.

*Plaintiff and the Class Are Third-Party*
*Beneficiaries of the Merger Agreement*

73.     Twitter and Musk intended for the Merger Agreement to confer a material benefit on the Plaintiff and the Class.  Therefore, Plaintiff and the Class are intended beneficiaries of that agreement and have enforceable rights thereunder. The Merger Agreement manifests an unambiguous intent to benefit Twitter stockholders because it provides compensation for their stock, which is to be converted into $54.20 in cash in the Merger.  Furthermore, stockholder approval of the Merger Agreement was required.   The specific benefits to the stockholders override the Merger Agreement's disclaimer of third-party beneficiary rights.

74.     Plaintiff and the Class seek to enforce a right specifically and explicitly granted in the Merger Agreement: the right to sell their stock to Musk for cash.  That right is not incidental—the overriding purpose of the Merger Agreement is for Musk to purchase the stockholders' shares through the Merger.

75.     As detailed above, the terms of the Merger Agreement, the Preliminary Proxy Statement and other public statements by Twitter and Musk admit that the Merger Agreement is for the benefit of Twitter's stockholders.

76.     Twitter's Complaint against Musk confirms that the Twitter stockholders are intended beneficiaries of the Merger Agreement who will be harmed by Musk's breach. *E.g.*, Twitter Complaint ¶ 1 (recognizing Musk's obligations to the Twitter stockholders and that Musk's breach is destroying stockholder value); *id.* ¶ 6 (Musk's breach seeks to shift the cost of the market downturn to the Twitter stockholders); *id.* ¶ 11 (the Twitter stockholders are entitled to "the benefit of Musk's bargain"); *id.* ¶ 36 (Musk agreed to specific performance requiring him to buy the shares of the Twitter stockholders); ¶ 38 (the Twitter Board obtained assurances in the Merger Agreement "[f]or the benefit of stockholders" in order that "the agreement would stick"); *id.* ¶ 40 ("Under the [Merger Agreement] . . . Twitter stockholders will receive $54.20 per share in cash").

77.     The Merger Agreement affects the rights of the Twitter stockholders and gives them rights. Section 3.1(c) provides that their stock can be taken from them but as a substitute creates the right for them to receive $54.20 in cash as compensation. Under Section 3.5, even dissenting shares will no longer be outstanding and the right to appraisal will be substituted for the shares. Section 6.1 restricts *inter alia* the stockholders' rights to (a) amend the certificate or bylaws; (b)

have their shares repurchased; (c) receive dividends; (d) participate in a stockholder rights plan. Section 6.2(c) and Section 6.5 impinges on rights relating to notice, voting and alienability.  Section 8.3 further limits the remedies available to Plaintiff and the Class if Defendants violate the Merger Agreement.  The right of Twitter stockholders to have their shares purchased in the Merger is in substitution for these pre-existing rights, which are restricted by the terms of the Merger Agreement.

*Plaintiff and the Class Have a Right to Specific Performance of the Obligation of Defendants to Purchase Their Twitter Shares*

78.     The Merger Agreement is a valid contract and Plaintiff and the Class are intended beneficiaries of that contract for the sale of their Twitter shares to the Defendants for $54.20 per share in cash.  Plaintiff and the Class are ready, willing and able to sell their shares to Defendants for $54.20 per share in cash pursuant to the Merger Agreement.  The balance of equites tips in favor of Plaintiff and the Class.  They are victims of Musk's machinations and efforts to avoid his contractual obligation.   Based on changed market circumstances, Musk suffered buyer's remorse, sought to trash Twitter, knowingly and intentionally breached the Merger Agreement and reneged on his obligation under the Merger Agreement to purchase the Twitter shares.  Defendants have knowingly and intentionally breached Sections 3.1(c), 3.2, 5.4, 6.3(a), 6.10 and 6.12 of the Merger Agreement.

79.     In Section 9.9 of the Merger Agreement, Defendants agreed that their failure to perform the Merger Agreement, including consummating the Merger by

buying the shares of Plaintiff and the Class, would cause irreparable harm for which monetary damages would not be an adequate remedy and that an injunction, specific performance and other equitable relief would be warranted. Defendants are sophisticated parties represented by sophisticated counsel and have agreed that specific performance is an appropriate remedy for their failure to consummate the purchase of the Twitter shares of Plaintiff and the Class pursuant to the Merger Agreement.

80.     Plaintiff and the Class have suffered and will continue to suffer irreparable harm as a result of Defendants knowing and intentional breaches of the Merger Agreement and refusal to complete the purchase of their Twitter shares.

81.     Plaintiff and the Class also seek damages resulting from Defendants' breaches of the Merger Agreement, including the time value of money. If specific performance of Defendants' obligation to purchase the Twitter share of Plaintiff and the Class is not ordered and accomplished, then in the alternative Plaintiff and the Class seek damages, including the lost stockholder premium, resulting from Defendants' knowing and intentional breaches of the Merger Agreement.

4882-5036-1644, v. 1

## COUNT II

### Direct Claim for Breach of Fiduciary Duty

(Against All Defendants)

82.     Plaintiff repeats and realleges the allegations above as if fully set forth herein.

*Musk Owes Fiduciary Duties to the Twitter Stockholders*

83.     Because of his direct share ownership, his right to acquire shares under the Merger Agreement, his contract rights under the Merger Agreement and his actions after the signing of the Merger Agreement, Musk and his acquisition entities are the majority /controlling stockholder of Twitter and owe fiduciary duties to the Twitter stockholders.

84.     Musk acknowledges he is the owner of 9.6% of Twitter's outstanding shares. The Merger Agreement gives him the contractual right to acquire the remaining shares of Twitter.  Under Delaware law, Musk is the beneficial owner of a majority of Twitter's outstanding stock.  *See, e.g.*, 8 *Del. C.* § 203 (definition of beneficial ownership).  The Merger Agreement contains few conditions.  Twitter has acknowledged that: "As of July 13, 2022, stockholder approval of the Merger Agreement [was] the only remaining approval or regulatory condition to consummating the closing of the Merger under the Merger Agreement." As Twitter

31

has acknowledged at paragraph 37 of its Complaint, there is a "high level of closing certainty."

85.    The Merger Agreement gives Musk substantial control of Twitter's operations and activities.  Section 6.1 requires Musk's approval for a wide array of corporate actions and permits him to require Twitter to operate its business only in the ordinary course.  Section 6.2 gives Musk contractual rights as to a stockholder meeting, proxy statement and proxy solicitation.  Section 6.5 gives Musk contractual rights as to a sale of Twitter and recommendations of the Twitter Board.  Musk thus holds veto power over stockholders' votes on certain matters, and the ability of Twitter's stockholder-elected Board to exercise its powers.

*Defendants Have Breached Their Fiduciary Duty of Loyalty*

86.    In reneging on the Merger Agreement, acting to undermine the transaction and seeking to shift the market risk to Twitter stockholders, Defendants have pursued their own self-interest at the expense of Plaintiff and the Class.  This violates Defendants' duty of loyalty.

87.    Defendants' breach of loyalty will result in irreparable harm to Plaintiff and the Class and entitles them to injunctive and other equitable relief and damages. Defendants' duty of loyalty requires that they fulfill their commitment to purchase the Twitter shares or be liable for damages, including the lost stockholder premium.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment and relief in his favor and in favor of the Class, and against the Defendants as follows:

A.     Declaring that this Action is properly maintainable as a class action and certifying the proposed Class;

B.     Finding Plaintiff and the Class to be intended beneficiaries of the Merger Agreement;

C.     Issuing an order of specific performance, requiring Defendants to comply with the Merger Agreement and effectuate the Merger;

D.     Finding that Defendants violated the Merger Agreement;

E.     Finding Defendant Elon Musk liable for breaches his fiduciary duties owed to Plaintiff and the Class;

F.     Awarding damages to Plaintiff and the Class against all Defendants for all losses and damages suffered as a result of Defendants' wrongdoing alleged herein, in an amount to be determined at trial; together with interest thereon;

G.     Awarding the Class members damages together with pre- and post-judgment interest;

H.     Awarding Plaintiff the costs, expenses, and disbursements of this Action, including all reasonable attorneys' and experts' fees; and

I.     Awarding Plaintiff and the Class such other relief as this Court

deems just and equitable.

PRICKETT, JONES & ELLIOTT, P.A.

OF COUNSEL:                              */s/ Michael Hanrahan*
                                         Michael Hanrahan (Bar No. 941)
SCOTT+SCOTT                              Samuel L. Closic (Bar No. 5468)
ATTORNEYS AT LAW LLP                     John G. Day (Bar No. 6023)
Max Huffman                              Robert B. Lackey (Bar No. 6843)
Joseph A. Pettigrew                      1310 N. King Street
600 W. Broadway, Suite 3300             Wilmington, Delaware 19801
San Diego, CA 92101                      (302) 888-6500
(619) 233-4565
                                         *Counsel for Plaintiff*
SCOTT+SCOTT
ATTORNEYS AT LAW LLP
Scott R. Jacobsen
Jing-Li Yu (Bar No. 6483)
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
(212) 223-6444


Dated: July 29, 2022

34

# Exhibit 5

EFiled:  Jul 29 2022 02:57PM EDT
Transaction ID 67859708
Case No. 2022-0666-

# IN THE COURT OF CHANCERY IN THE STATE OF DELAWARE

| | |
|---|---|
| LUIGI CRISPO, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. _____ |
| | ) |
| ELON R. MUSK, X HOLDINGS I, | ) |
| INC. AND X HOLDINGS II, INC. | ) |
| | ) |
| Defendants. | ) |

## PLAINTIFF'S MOTION FOR EXPEDITED AND COORDINATED PROCEEDINGS

Plaintiff seeks expedited proceeding for this action for specific performance of Defendants' obligation under the April 25, 2022 Merger Agreement[1] to purchase the shares of Twitter, Inc. held by Plaintiff and Twitter's other stockholders. Plaintiff also seeks that this action be coordinated with *Twitter, Inc. v. Elon R. Musk*, Del. Ch. C.A. No. 2022-0613-KSJM (the "Twitter Action") for all matters of discovery and trial preparation, including a schedule consistent with the Twitter Action which is set for an expedited trial in October 2022.[2] Plaintiff will coordinate with the Twitter Action, but will represent the independent interests and rights of the

---

[1] Unless otherwise defined, capitalized terms have the meaning ascribed to them in Plaintiff's Class Action Shareholder Complaint (the "Complaint") filed contemporaneously herewith. "¶ __" refers to the Complaint.

[2] On July 28, 2022, the Court entered an Order Governing Case Schedule in the Twitter Action.

Twitter stockholders under the Merger Agreement and as fiduciaries to whom Musk as Twitter's controlling stockholder owes duties.  *See*, *e.g.*, ¶¶ 2, 25, 26-29, 70-83.

## GROUNDS FOR THE MOTION

### A.     Expedited Proceedings

The Court held in the Twitter Action that there are colorable claims to specifically enforce the Merger Agreement against Defendants and that the threat of irreparable harm exists.[3]  As the Court recognized, "the longer the merger transaction remains in limbo, the larger the cloud of uncertainty cast over the company, and the greater the risk of irreparable harm to the sellers and to the target itself."[4]  The stockholders are the sellers threatened with this irreparable harm.

### B.     Coordinated Proceedings

Court of Chancery Rule 42(a) provides for consolidation of separate actions involving common questions of fact or law.  This action and the Twitter Action share a common question of fact and law: whether Defendants breached the Merger Agreement.

---

[3] *Twitter, Inc. v. Musk*, Del. Ch. C.A. No. 2022-0613-KSJM (July 19, 2022) Tr. at 61-62.

[4] *Id*. at 63.

2

As this Court has done before,[5] it should coordinate discovery and case schedules when stockholders of a corporation, and the corporation itself, bring claims related to the same matters against the same set of defendants.  While Plaintiff in this action faces harm that is distinguishable from Twitter's, the actions concern many of the same facts and are seeking the same injunctive relief for the same transaction.  Coordinating this action and the Twitter Action further Rule 42(a)'s goal to "avoid unnecessary costs or delay."

## CONCLUSION

For the reasons stated above, Plaintiff respectfully request that the Court grant the motion and enter a form of Order Granting Plaintiff's Motion for Expedited and Coordinated Proceedings.

---

[5] *CBS Corp. v. Nat'l Amusements, Inc.,* No. 2018-0342-AGB, Oral Argument on Motion to Consolidate at 30:17-31:7 (Del. Ch. June 20, 2018) (TRANSCRIPT) (ordering coordination of related actions on the same timeline due to "enormous overlap between the cases . . . cover[ing] exactly the same grounds"); *see also In re Williams, Cos., Inc. S'holder Litig.*, 2016 WL 197177 (Del. Ch. Jan. 13, 2016) (ordering the coordination of related actions to achieve "certain efficiencies" in discovery); *Air Prods. & Chems., Inc. v. Airgas, Inc.*, 2010 WL 1057527 (Del. Ch. Mar. 17, 2010) (ordering the coordination of related actions "in an efficient manner"); *Bank of America v. Steel Partners II (Offshore) Ltd.*, 2009 WL 1211623 (Del. Ch. Apr. 21, 2009) (ordering the coordination of related actions to save "duplicative efforts by the parties").

PRICKETT, JONES & ELLIOTT, P.A.

OF COUNSEL:

*/s/ Michael Hanrahan*

SCOTT+SCOTT
ATTORNEYS AT LAW LLP
Max Huffman
Joseph A. Pettigrew
600 W. Broadway, Suite 3300
San Diego, CA 92101
(619) 233-4565

Michael Hanrahan (Bar No. 941)
Samuel L. Closic (Bar No. 5468)
John G. Day (Bar No. 6023)
Robert B. Lackey (Bar No. 6843)
1310 N. King Street
Wilmington, Delaware 19801
(302) 888-6500

*Counsel for Plaintiff*

SCOTT+SCOTT
ATTORNEYS AT LAW LLP
Scott R. Jacobsen
Jing-Li Yu (Bar No. 6483)
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
(212) 223-6444

Words: 554

Dated: July 29, 2022

4

# Exhibit 6

EFiled: Aug 19 2022 04:18PM EDT
Transaction ID 67948089
Case No. 2022-0666-KSJM

**PRICKETT, JONES & ELLIOTT**

Writer's Direct Dial:
(302) 888-6517

Writer's E-Mail
SLClosic@pri

**1310 N. KING STREET
WILMINGTON, DELAWARE** 19899
TEL: (302) 888-6500
FAX: (302) 658-8111
http://www.prickett.com

August 19, 2022

*By File & ServeXpress and Hand Delivery*

The Honorable Kathaleen St. Jude McCormick
Chancellor
Court of Chancery
Leonard L. Williams Justice Center
500 North King St.
Wilmington, DE 19801

RE:   *Luigi Crispo v. Elon R. Musk, et al.,*
      <u>C.A. No. 2022-0666-KSJM</u>

Dear Chancellor McCormick:

Plaintiff filed this case and a motion for expedition on July 28, 2022 and has diligently sought for over three weeks to get Defendants and Twitter, Inc. ("Twitter") to agree to a stipulation and order for a coordinated, expedited schedule. Plaintiff agreed at the outset to proceed in his action in a manner that would not be duplicative or disruptive of Twitter's action against the same Defendants. As Defendants and Twitter have alternately insisted on further conditions, Plaintiff has attempted to obtain the agreement of Defendants and Twitter by consenting to numerous additional restrictions, including a stay of his fiduciary duty claim pending trial of the specific performance claims in both actions, limitations on participation in depositions and a shortened, non-duplicative pre-trial brief. However, the parties were not able to come to an agreement because Defendants and Twitter have

The Honorable Kathaleen St. Jude McCormick
August 19, 2022
Page 2

demanded terms that would fundamentally compromise the interests of Plaintiff and the class of stockholders he represents.

First, Twitter and Defendants are demanding that the "final resolution" of Twitter's specific performance claim on behalf of the company shall constitute final resolution of Plaintiff's Count I specific performance claim on behalf of the stockholders.[1] This would severely impair the separate interests of Plaintiff and the Class. For example, if the "final resolution" of Twitter's action is a settlement with Twitter buying back Musk's shares at a premium in order to entrench the Twitter Board and management, that would be considered "final resolution" of Plaintiff's claim though Plaintiff and the Class would receive no benefit and would suffer a detriment from that final resolution. Alternatively, the final resolution of Twitter's claim could be some agreement between Musk and Twitter or a payment from Musk to Twitter or some other arrangement where the stockholders receive little or no benefit. In essence, Twitter seeks to use the stipulation as authority for Twitter to settle and finally resolve the stockholders' individual claim for the purchase of their stock. Delaware law does not give the corporation the authority to settle or release

---

[1] Of course, the Court could issue a single opinion resolving the specific performance claims in both actions.

The Honorable Kathaleen St. Jude McCormick
August 19, 2022
Page 3

the rights of the stockholders to benefit the corporation, its directors and its

management.[2]

That both Twitter and Musk seek to limit Plaintiff's participation in the

litigation and to determine the resolution of the stockholders' claim establishes why

separate and independent representation of the stockholders is critically important.

Perhaps discussions for a "final resolution" are already underway and Musk and

Twitter want the ability to impose on the stockholders their resolution, reached

without stockholder participation.

Second, Twitter and Defendants want Count II of Plaintiff's Complaint stayed

until "final resolution" of Twitter's action.  As a matter of discretion this Court may

or may not grant a stay until a motion to dismiss is resolved.  Here, Plaintiff yielded

to Twitter's concern that proceedings under Count II might complicate trial of

Twitter's action and agreed to stay Count II until after that.  Twitter and Defendants,

however, now insist on a stay until final resolution of Twitter's action, including a

post-trial decision, possible further post-trial proceedings, almost certain appeals, a

possible remand and further proceedings on remand, and any post-remand decision

and appeals.  The stay would be in effect for many months and perhaps years.

---

[2] *In re Ebix, Inc. S'holder Litig*, 2016 WL 208402, at *10-11 (Del. Ch. Jan. 15, 2016);
*Carlton Investments v. TLC Beatrice Int'l Holdings, Inc.*, 1997 WL 208962, at *2
(Del. Ch. April 21, 1997).

The Honorable Kathaleen St. Jude McCormick
August 19, 2022
Page 4

Third, Twitter has demanded a veto power over Plaintiff's participation in discovery. Twitter wishes to provide that Plaintiff may participate in discovery only "to the extent Twitter determines." While Plaintiff is willing to coordinate and cooperate with Twitter, it would substantially impair the stockholders' interests to let Twitter decide how and when Plaintiff can participate in discovery.

Fourth, Defendants insist that Plaintiff should not be able to use discovery in the Twitter action to amend his Complaint for the entire duration of Plaintiff's action. Even where a stay is granted pending a motion to dismiss, a Plaintiff is entitled to discovery and to amend his complaint based on discovery taken after an initial motion to dismiss is denied. Plaintiff agreed not to use discovery in the Twitter action to amend the Complaint until after Defendants' motion to dismiss is determined. Extending that prohibition for the full length of Plaintiff's action would be particularly unfair where Plaintiff agreed to rely largely on in the Twitter action to avoid duplicative discovery.

Plaintiff also requests a reasonable briefing schedule on the motion to dismiss Defendants filed last night. Defendants initially proposed that Plaintiff not participate in the litigation at all until a motion to dismiss by Defendants was briefed, argued and decided. Plaintiff refused and Defendants agreed to reasonable, non-duplicative participation by Plaintiff, but proposed a shortened time for

The Honorable Kathaleen St. Jude McCormick
August 19, 2022
Page 5

Defendants to file a motion to dismiss and opening brief with an answering brief due

in 10 calendar days and a reply in 5 days.

While negotiations over the scheduling stipulation dragged on, Defendants

have for the past three weeks been drafting a motion to dismiss brief, which they did

not file until 11:57 last evening, the very last moment of the twenty day time period

to respond to the Complaint.  Because Defendants took twenty days to file their

opening brief, Plaintiff should have the same period to file an answering brief.

Plaintiff requests that the Court entered his proposed Order on Plaintiff's

motion for expedited proceedings, enclosed herewith.

Counsel is available at the convenience of the Court.

Sincerely,

*/s/ Samuel L. Closic*

Samuel L. Closic (#5468)

Words: 921

cc:   Edward B. Micheletti, Esq. (via *File&Serve Express*)
      Kevin R. Shannon, Esq. (via *File&Serve Express*)
      Brad Sorrels, Esq. (via *File&Serve Express*)

Enclosure

EFiled: Aug 19 2022 04:18PM EDT
Transaction ID 67948089
Case No. 2022-0666-KSJM

**IN THE COURT OF CHANCERY IN THE STATE OF DELAWARE**

| | | |
|---|---|---|
| LUIGI CRISPO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2022-0666-KSJM |
| | ) | |
| ELON R. MUSK, X HOLDINGS I, | ) | |
| INC.  AND X HOLDINGS II, INC. | ) | |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| TWITTER, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2022-0613-KSJM |
| | ) | |
| ELON R. MUSK, X HOLDINGS | ) | |
| INC. AND X HOLDINGS II, INC. | ) | |
| | ) | |
| Defendants. | ) | |

**[PROPOSED] ORDER REGARDING SCHEDULING
AND COORDINATED PROCEEDINGS**

WHEREAS, this Court has ordered expedited proceedings in *Twitter, Inc. v. Elon R. Musk,* Del. Ch. C.A. No. 2022-0613-KSJM (the "Company Action"), where Twitter, Inc. ("Twitter") is seeking specific performance of the merger agreement entered into between Twitter and Elon R Musk, X Holdings I, Inc. and X Holdings II, Inc. (together the "Defendants") and dated April 25, 2022 (the "Merger Agreement");

1

WHEREAS, on July 28, 2022, a schedule was entered by the Court in the Company Action (the "Scheduling Order"), and Trial has been scheduled for the week of October 17, 2022 (the "Trial");

WHEREAS, on July 29, 2022, Plaintiff Luigi Crispo ("Plaintiff") filed an action bringing claims against the same Defendants and seeking specific performance of the Merger Agreement, and moved for expedited proceedings and to coordinate the above captioned action (the "Stockholder Action") with the Company Action (the "Motion");

WHEREAS, Plaintiff names the same Defendants in the Stockholder Action, which Plaintiff contends concerns certain common questions of fact and law as the Company Action;

WHEREAS, Plaintiff contends that it is desirable for the purposes of judicial economy for Plaintiff to coordinate the prosecution of his claims in the Stockholder Action in a reasonable, non-duplicative fashion with Twitter's prosecution of its claims in the Company Action;

WHEREAS, Court of Chancery Rule 42(a) permits coordination of actions where "actions involving a common question of law or fact are pending before the Court," and the Court may "make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay";

2

WHEREAS, Plaintiff contends that the above-captioned actions have the potential to involve numerous common questions of fact and law, and all parties to the above-captioned actions wish to avoid unnecessary costs or delay;

WHEREAS, Plaintiff, in connection with the Stockholder Action, seeks to monitor the discovery and Trial in connection with the Company Action, and to participate in the discovery and Trial in connection with the Company Action in a reasonable, non-duplicative manner;

WHEREAS, for purposes of coordination and judicial economy, Plaintiff will agree to sign on to the confidentiality order entered by the Court in the Company Action on July 22, 2022 (the "Confidentiality Order"), and will agree that any discovery obtained will be governed by the Confidentiality Order and shall not be used to amend the complaint in the Stockholder Action or to assert additional claims prior to resolution of Defendants' motion to dismiss;

WHEREAS, Plaintiff agrees to abide by the Scheduling Order in the Company Action and any other separate dates specified herein;

WHEREAS, based upon the Court's consideration of the foregoing:

IT IS HEREBY ORDERED this _____day of August, 2022, that:

**A. Case Schedule**

1.      The Stockholder Action and Company Action will be coordinated as provided herein.

2.    Count I of Plaintiff's complaint in the Stockholder Action, asserting a claim for specific performance, shall be coordinated with the Company Action for purposes of Trial.

3.    Count II of Plaintiff's complaint in the Stockholder Action, asserting a claim for breach of fiduciary duty, is hereby stayed through Trial.

4.    To the extent applicable, Plaintiff will abide by the deadlines set forth in the Scheduling Order in the Company Action.

5.    The following additional schedule shall govern proceedings in this matter:

| (a) | Defendants' Motion to Dismiss Opening Brief, Plaintiff's answering brief is due within 20 calendar days of the filing of the Defendants' opening brief, and Defendants' reply brief is due within 10 calendar days of the filing of the Plaintiff's answering brief | Filed August 18, 2022 at 11:57 p.m.<br><br>September 7, 2022<br><br>September 17, 2022 |
| --- | --- | --- |
| (b) | Deadline for Defendants to serve requests for production of documents and interrogatories | August 22, 2022 |

6.    The parties to the Stockholder Action may amend the additional schedule set forth in this Order by written agreement, without Court approval.  All other deadlines and dates may be amended in accordance with the procedure set forth in the respective Scheduling Orders.

## B. Certain Discovery and Pre-Trial Procedures

7.    Plaintiff agrees to abide by the Confidentiality Order as provided herein;

4

8.     Defendants and Twitter shall provide Plaintiff with unredacted copies of any filings and document productions made by every party and non-party in the Company Action prior to the date of this Order within three business days of the Court's entry of the Order assuming that Plaintiff has executed the Confidentiality Order.   Following the entry of this Order, Plaintiff's counsel of record will be included on the service list for any filings made in the Company Action.

9.     Plaintiff will be permitted to monitor the discovery and Trial of the Company Action, and may participate in the discovery and Trial of the Company Action in a reasonable non-duplicative manner.   All submissions to the Court will be streamlined, including but not limited to the submission of only one pre-trial order and exhibit list for both the Stockholder Action and the Company Action.   Plaintiff will be permitted to file a pre-trial brief not to exceed 30 pages which will not duplicate, but only supplement, the facts and argument in Twitter's pre-trial brief and address issues particular to Plaintiff and Twitter's stockholders, filed in accordance with the Scheduling Order.

10.     Plaintiff's discovery requests and third -party subpoenas will be limited to those already served by Twitter and Defendants.   If Plaintiff proposes to serve additional discovery requests, the parties will meet and confer regarding such requests.

5

11.     Plaintiff will abide by the search protocols negotiated by Twitter and the Defendants.

12.     All written discovery responses and objections served by any Party, all documents produced by any Party, and all privilege logs produced by any Party shall be simultaneously served on or produced to all Parties pursuant to the Scheduling Order.

13.     If the Parties determine that non-duplicative motion practice is necessary regarding discovery, they must abide by the process identified in the Scheduling Order.   Before engaging in any non-duplicative discovery motion practice, Plaintiff must first confer with the Parties to the Company Action to determine if such motions can be streamlined.

14.     If the Court awards any relief arising out of any motion practice concerning any Party in either the Company Action or Stockholder Action, such as a motion to compel document production, that Party shall produce any Court-ordered documents or Court-ordered information to all Parties in both Actions without the need for any Party to file a motion seeking such relief.

15.     Plaintiff shall not notice in the Stockholder Action the deposition of any witness scheduled to be deposed in the Company Action.   Plaintiff shall be permitted to attend depositions scheduled in the Company Action and, following the conclusion of Twitter's and/or Defendants' examinations, to participate by asking

6

non-duplicative questions only after conferring with Twitter. Plaintiff's participation in any deposition shall not exceed one hour.

16.    Plaintiff, Twitter and Defendants (the "Parties") will not object to the admission of deposition testimony in either Action on the grounds that such testimony was originally elicited in the other Action. For the avoidance of doubt, all the Parties' other bases to object to the admissibility of deposition testimony are preserved.

SO ORDERED this ___ day of August, 2022.

_____
Chancellor Kathaleen S. McCormick

7

# Exhibit 7

**EFiled:  Aug 18 2022 11:52PM EDT**
**Transaction ID 67896108**
**Case No. 2022-0666-KSJM**

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| LUIGI CRISPO, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   C.A. No. 2022-0666-KSJM |
| | ) |
| ELON R. MUSK, X HOLDINGS I, INC., | ) |
| and X HOLDINGS II, INC., | ) |
| | ) |
| Defendants. | ) |

## DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S VERIFIED SHAREHOLDER CLASS ACTION COMPLAINT

Defendants Elon R. Musk, X Holdings I, Inc. and X Holdings II, Inc. ("Defendants"), by and through their undersigned counsel, hereby move this Court for an Order dismissing the Verified Shareholder Class Action Complaint in the above-captioned action pursuant to Court of Chancery Rule 12(b)(6) for lack of standing and failure to state a claim upon which relief can be granted.  The grounds for this motion are set forth in Defendants' Brief in Support of the Motion to Dismiss the Verified Shareholder Class Action Complaint.

Respectfully submitted,

*/s/ Edward B. Micheletti*

Edward B. Micheletti (ID No. 3794)
Lauren N. Rosenello (ID No. 5581)
Ryan M. Lindsay (ID No. 6435)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware  19899-0636
(302) 651-3000

*Attorneys for Defendants*
*Elon R. Musk, X Holdings I, Inc.,*
*and X Holdings II, Inc.*

DATED:  August 18, 2022                    **WORDS:  85**

## <u>CERTIFICATE OF SERVICE</u>

I, Edward B. Micheletti, hereby certify that on August 18, 2022, a

copy of Defendants' Motion to Dismiss Plaintiff's Verified Shareholder Class

Action Complaint, [Proposed] Order and Brief with Exhibit 1 was served

electronically via File & Serve*Xpress* upon the following counsel of record:

> Michael Hanrahan (ID No. 941)
> Samuel L. Closic (ID No. 5468)
> John G. Day (ID No. 6023)
> Robert B. Lackey (ID No. 6843)
> PRICKETT, JONES & ELLIOT, P.A.
> 1310 North King Street
> Wilmington, Delaware  19801
> (302) 888-6500
>
> *Attorneys for Plaintiff Luigi Crispo*
>
> /s/  *Edward B. Micheletti*
> Edward B. Micheletti (ID No. 3794)

916172-WILSR01A - MSW

EFiled:  Aug 18 2022 11:52PM EDT
Transaction ID 67896108
Case No. 2022-0666-KSJM

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| LUIGI CRISPO, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    C.A. No. 2022-0666-KSJM |
| | ) |
| ELON R. MUSK, X HOLDINGS I, INC., | ) |
| and X HOLDINGS II, INC., | ) |
| | ) |
| Defendants. | ) |

## DEFENDANTS' BRIEF IN SUPPORT OF THE MOTION TO DISMISS THE VERIFIED SHAREHOLDER CLASS ACTION COMPLAINT

OF COUNSEL:

Alex Spiro
Andrew J. Rossman
Christopher D. Kercher
Silpa Maruri
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York  10010

Edward B. Micheletti (ID No. 3794)
Lauren N. Rosenello (ID No. 5581)
Ryan M. Lindsay (ID No. 6435)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware  19899-0636
Tel.:  (302) 651-3000

*Attorneys for Defendants Elon R. Musk, X Holdings I, Inc. and X Holdings II, Inc.*

DATED:  August 18, 2022

# TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT ...................................................................1

STATEMENT OF FACTS ..........................................................................4

      A.    The Parties...............................................................................4

      B.    The Merger Agreement ...........................................................4

      C.    The Termination......................................................................7

ARGUMENT...............................................................................................8

I.     PLAINTIFF DOES NOT HAVE STANDING TO BRING A CLAIM FOR SPECIFIC PERFORMANCE OR BREACH OF CONTRACT............8

      A.    Plaintiff Lacks Standing To Seek Specific Performance. ...................9

      B.    Plaintiff's Claim For Damages Is Not Ripe. .......................................13

II.    PLAINTIFF FAILS TO ADEQUATELY PLEAD A BREACH OF FIDUCIARY DUTY CLAIM. ....................................................................16

CONCLUSION ..........................................................................................23

# TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE(S)**

*Amirsaleh v. Board of Trade of City of New York, Inc.*,
  2008 WL 4182998 (Del. Ch. Sept. 11, 2008) ...............................14

*Arnold v. Soc'y for Sav. Bancorp, Inc.*,
  678 A.2d 533 (Del. 1996)................................................19

*Benerofe v. Cha*,
  1998 WL 83081 (Del. Ch. Feb. 20, 1998)..................................11

*Consol. Edison, Inc. v. Ne. Utilities*,
  426 F.3d 524 (2d Cir. 2005) .........................................14, 15

*In re Digex Inc. S'holders Litig.*,
  789 A.2d 1176 (Del. Ch. 2000) ..........................................21

*E.I. du Pont de Nemours & Co. v. MacDermid Printing Sols. L.L.C.*,
  248 F. Supp. 3d 570 (D. Del. 2017) ......................................9

*Fortis Advisors LLC v. Medicines Co., & Melinta Therapeutics, Inc.*,
  2019 WL 7290945 (Del. Ch. Dec. 18, 2019) ...........................10, 11

*In re Frederick's of Hollywood, Inc. S'holders Litig.*,
  1998 WL 398244 (Del. Ch. July 9, 1998), *aff'd sub nom.*
  *Malpiede v. Townson*, 780 A.2d 1075 (Del. 2001) ........................18

*In re GGP, Inc. S'holder Litig.*,
  2021 WL 2102326 (Del. Ch. May 25, 2021), *rev'd on other grounds*,
  2022 WL 2815820 (Del. July 19, 2022).................................16, 17

*Gilbert v. El Paso Co.*,
  490 A.2d 1050 (Del. Ch. 1984), *aff'd*,
  575 A.2d 1131 (Del. 1990)...............................................19

*Ivanhoe Partners v. Newmont Mining Corp.*,
  535 A.2d 1334 (Del. 1987)...............................................20

ii

*Lidya Holdings Inc. v. Eksin*,
2022 WL 274679 (Del. Ch. Jan. 31, 2022) ..................................................19

*Madison Realty Partners 7, LLC v. Ag ISA, LLC*,
2001 WL 406268 (Del. Ch. Apr. 17, 2001) ...................................................9

*Malpiede v. Townson*,
780 A.2d 1075 (Del. 2001)...........................................................................8

*Mangano v. PeriCor Therapeutics*,
2009 WL 4345149 (Del. Ch. Dec. 1, 2009) ................................................21

*Mentor Graphics Corp. v. Quickturn Design Sys., Inc.*,
789 A.2d 1216 (Del. Ch. 2001), *aff'd sub nom.*
*Mentor Graphics Corp. v. Shapiro*, 818 A.2d 959 (Del. 2003) ...................18

*Miramar Firefighters Pension Fund v. AboveNet, Inc.*,
2013 WL 4033905 (Del. Ch. July 31, 2013)..................................................8

*In re Morton's Rest. Grp., Inc. S'holders Litig.*,
74 A.3d 656 (Del. Ch. 2013) ...................................................................16, 20

*Nemec v. Shrader*,
2009 WL 1204346 (Del. Ch. Apr. 30, 2009), *aff'd*,
991 A.2d 1120 (Del. 2010)......................................................................17, 18

*O'Gara v. Coleman*,
2020 WL 752070 (Del. Ch. Feb. 14 , 2020)................................................17

*In re PNB Holding Co. S'holders Litig.*,
2006 WL 2403999 (Del. Ch. Aug. 18, 2006)...............................................19

*Ritchie CT Opps, LLC v. Huizenga Managers Fund, LLC*,
2019 WL 2319284 (Del. Ch. May 30, 2019) .................................................9

*In re Rouse Props., Inc.*,
2018 WL 1226015 (Del. Ch. Mar. 9, 2018)...........................................18, 20

*Thermopylae Cap. Partners, L.P. v. Simbol, Inc.*,
2016 WL 368170 (Del. Ch. Jan. 29, 2016) .................................................18

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.*,
    845 A.2d 1031 (Del. 2004)..............................................................14

*United Rentals, Inc. v. RAM Holdings, Inc.*,
    2007 WL 4327770 (Del. Ch. Nov. 29, 2007)................................10

*In re USG Corp. S'holder Litig.*,
    2020 WL 5126671 (Del. Ch. Aug. 31, 2020), *aff'd sub nom.*
    *Anderson v. Leer*, 265 A.3d 995 (Del. 2021) .................................20

*Weinstein Enters., Inc. v. Orloff*,
    870 A.2d 499 (Del. 2005)..............................................................19

*In re W. Nat'l Corp. S'holders Litig.*,
    2000 WL 710192 (Del. Ch. May 22, 2000) ...................................20

*Zlotnick v. Newell Cos.*,
    1984 WL 8242 (Del. Ch. July 30, 1984)...................................19, 20

## AUTHORITIES

8 *Del. C.* § 203(c) ......................................................................21

## PRELIMINARY STATEMENT

Plaintiff, Luigi Crispo, a purported stockholder of Twitter, Inc. ("Twitter") brings this unprecedented action in a misguided attempt to insert himself into the existing expedited breach of contract dispute between Twitter and Elon Musk, X Holdings I, Inc. and X Holdings II, Inc. (collectively, "Defendants"). Plaintiff's Verified Shareholder Class Action Complaint (the "Complaint") asserts direct claims seeking specific performance of the Agreement and Plan of Merger by and among Twitter and Defendants (the "Merger Agreement") and, alternatively, damages for a purely hypothetical lost transaction premium.  Plaintiff also attempts to plead a claim for breach of fiduciary duty alleging that Musk – who recently acquired Twitter shares (amounting to approximately 9.6%), and has no board representation or management responsibility – is the controlling stockholder of Twitter and therefore owes fiduciary duties to Twitter's other stockholders.  As explained further below, both claims should be dismissed.

*First*, Plaintiff's specific performance and breach of contract claim fails because Plaintiff lacks standing to pursue this claim.  Delaware law enforces contracting parties' decisions to limit and narrow third-party beneficiary status. Plaintiff is neither a party to, nor a third-party beneficiary of, the Merger Agreement and thus cannot bring a claim under that agreement.  The Merger Agreement provides, at most, limited third-party beneficiary status only in narrow circumstances

that are wholly inapposite here.  Moreover, the Merger Agreement only affords the parties (*i.e.*, Twitter and Defendants)– not Plaintiff– the right to seek specific performance.  And Twitter itself, a party to the Merger Agreement, is already seeking the exact same remedy in the existing litigation.

Moreover, Plaintiff's damages claim alleging a hypothetical, unrealized lost transaction premium must be dismissed because it is not ripe.  Under the terms of the Merger Agreement, Twitter's stockholders' right to receive $54.20 per share of Twitter common stock in cash only ripens upon the Effective Date (as defined in the Merger Agreement), which has not, and may never, occur.  This is consistent with Delaware law, which does not permit stockholders to seek damages before a right to payment has ripened.  Therefore, the breach of contract claim must be dismissed in its entirety.

*Second*, Plaintiff's claim for breach of fiduciary duty fails because Musk is not a controlling stockholder under Delaware law.  While Plaintiff acknowledges that Defendants are arm's-length buyers that owe Twitter's stockholders no fiduciary duties, Plaintiff wrongly claims that Musk occupies controller status due to his 9.6% equity stake in Twitter and Defendants' consent rights under the Merger Agreement. It has been settled law for decades that buyers do not owe fiduciary duties to the target companies that they seek to buy or to their stockholders.  Similarly, commercially standard, bargained for consent rights under

a merger agreement do not convert a buyer into a controlling stockholder.  Further, Musk owns less than 10% of Twitter with no board representation or influence– hardly indicative of control over Twitter's board.   Indeed, the argument that Defendants actually control or have the ability to coerce Twitter's board is belied by the fact that Twitter's board *is suing Defendants under the Merger Agreement*. Last, Plaintiff's fantastical attempt to pin Defendants with beneficial ownership of 100% of Twitter's stock based on the Merger Agreement is flatly wrong.  Defendants currently have no control over the stockholders that hold more than 90% of Twitter stock that Musk does not own.

In short, Plaintiff has alleged no facts from which this Court could reasonably infer that he has standing to specifically enforce the Merger Agreement or that Defendants owe fiduciary duties as a controlling stockholder of Twitter. Therefore, Plaintiff's Complaint should be dismissed with prejudice.

## STATEMENT OF FACTS[1]

### A.    The Parties

Plaintiff Luigi Crispo purports to be a Twitter stockholder holding 5,500 shares of Twitter.  (Compl. ¶ 1)

Defendant Elon R. Musk owns 9.6% of Twitter's stock.  (Compl. ¶ 8) He is the President, Secretary, Treasurer and sole stockholder of both X Holdings I, Inc. and X Holdings II, Inc.  (*Id.*)

Defendant X Holdings I, Inc. ("Parent") is a Delaware corporation formed for purposes of engaging in, and arranging financing for the transactions contemplated by the Merger Agreement.  (Compl. ¶ 9)

Defendant X Holdings II, Inc. ("Merger Sub") is a Delaware corporation and a wholly owned subsidiary of Parent formed for purposes of engaging in, and arranging financing for, the transactions contemplated by the Merger Agreement.  (Compl. ¶ 10)

### B.    The Merger Agreement

Musk began purchasing Twitter stock in January 2022.  (Compl. ¶ 16) By April 2022, Musk owned just over 9% of Twitter's stock.  (*Id.* ¶ 17)  On April 4,

---

[1]  For purposes of this motion, only well-pled allegations of specific facts are accepted as true, and only reasonable inferences should be drawn in favor of the plaintiff.  *In re Crimson Expl. Inc. S'holder Litig.*, 2014 WL 5449419, at *17 (Del. Ch. Oct. 24, 2014).

2022, Musk and Twitter entered into a letter agreement for Musk to become a director of Twitter.  (*Id.*)  On April 9, Musk notified Twitter that he would not be joining Twitter's board and instead would make an offer to take Twitter private. (*Id.*)

On April 25, 2022, the Merger Agreement was entered into by Parent, Merger Sub, Twitter, and, solely for purposes of certain provisions, Musk.  (Compl. ¶ 19)  Under the terms of the Merger Agreement, Twitter stockholders were to receive $54.20 in cash for each share of Twitter common stock that they owned *upon closing of the proposed transaction*.  (*Id.*)

Pursuant to the terms of the Merger Agreement, at the time the merger would be considered effective (defined as the "Effective Time"), Twitter would merge into Merger Sub, with Twitter surviving the merger and remaining a Delaware corporation.  (Compl. ¶ 21; Merger Agreement § 2.1)  As of the Effective Time, the shares of Twitter would have been converted into the right to receive $54.20 per share of Twitter common stock in cash.  (*Id.*; Merger Agreement § 3.1(c))  The Effective Time was to occur concurrently with the closing.  The Closing was defined to take place on "a date to be specified by the parties hereto, but no later than the second (2nd) Business Day after the satisfaction or waiver of all of the conditions set forth in Article VII." (Merger Agreement § 2.2)  The Effective Time was defined as "the date and time at which the Certificate of Merger has been duly filed with the

Secretary of State or such other date and time as may be agreed to by Parent and the Company and as set forth in the Certificate of Merger in accordance with the DGCL." (Merger Agreement § 2.3)

The only parties to the Merger Agreement were Twitter and Defendants, with Musk being a party to certain specified provisions.  The parties also negotiated and agreed to a provision providing for no third-party beneficiaries except for three narrow carve-outs for specific, limited purposes.   (Merger Agreement § 9.7) Specifically, Section 9.7, titled "No Third-Party Beneficiaries," states:

> Subject to Section 9.13, this Agreement is not intended to and shall not confer upon any Person other than the parties hereto any rights or remedies hereunder; provided, however, that it is specifically intended that (A) the D&O Indemnified Parties (with respect to Section 6.6 from and after the Effective Time), (B) the Company Related Parties (with respect to Section 8.3) are third-party beneficiaries and (C) the Parent Related Parties (with respect to Section 8.3) are third-party beneficiaries.

There are three narrow exceptions to this provision. *First*, directors and officers of Twitter who are indemnified by Twitter will continue to be indemnified by post-merger Twitter for certain actions occurring before the Effective Time. (Merger Agreement § 6.6(a))   These directors and officers can enforce this indemnification right as intended third-party beneficiaries.  (*Id.* § 6.6(e) ("The D&O Indemnified Parties to whom this Section 6.6 applies shall be third-party beneficiaries of this Section 6.6."))  *Second*, certain parties listed in Section 8.3(c) are considered third-party beneficiaries under Section 9.7, insofar as Defendants'

6

damages against those parties are limited to the Merger Agreement's termination fee. (*Id.* § 8.3(c))  Similarly, certain non-parties related to Defendants cannot be held liable for damages exceeding the termination fee. (*Id.*)  *Third*, under Section 9.13, defined parties related to the debt financing of the Merger were given certain rights under the Merger Agreement. (*Id.* § 9.13)  None of these expressly identified third parties include Plaintiff.

### C.    The Termination

In the months following signing of the Merger Agreement, the parties began to move toward closing.  However, during that period, Defendants became concerned that Twitter's public disclosures regarding its estimate of the percentage of monetizable daily active users (or mDAU) that are fake or spam accounts were false or misleading.  (Compl. ¶¶ 45-49)  Defendants then sought to exercise their information rights under the Merger Agreement to obtain information on spam and fake accounts.  (*Id*. at ¶ 52)  From late May through early July, the parties' lawyers exchanged multiple letters regarding this and other issues related to their obligations under the Merger Agreement.  (*Id*. at ¶ 53)

On July 8, 2022, Defendants' counsel sent a letter to Twitter stating that Defendants were terminating the Merger Agreement due to Twitter's violations of the Merger Agreement.  (Compl. ¶¶ 55-58)  On July 12, 2022, Twitter filed an action in this Court against Musk, Parent and Merger Sub seeking specific performance of

7

the Merger Agreement.  (*Id*. at 64) On July 19, 2022, this Court granted Twitter's

motion to expedite and later set a five-day trial beginning October 17, 2022.  On July

29, 2022, Defendants filed Counterclaims asserting fraud and breach of contract.

Thereafter, Plaintiff filed the Complaint on July 29, 2022, which largely

copied allegations from Twitter's complaint, even though Plaintiff lacked any

personal knowledge as to their veracity.

## ARGUMENT

"A motion to dismiss must be granted when a 'plaintiff could not

recover under any reasonably conceivable set of circumstances susceptible of proof.'"

*Miramar Firefighters Pension Fund v. AboveNet, Inc.*, 2013 WL 4033905, at *3 (Del.

Ch. July 31, 2013) (quoting *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap.

Holdings LLC*, 27 A.3d 531, 536 (Del. 2011)).  Although a plaintiff receives "all

reasonable inferences that logically flow from the face of the complaint," the Court

"is not required to accept every strained interpretation of the allegations proposed

by the plaintiff."  *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001).

## I.   PLAINTIFF DOES NOT HAVE STANDING TO BRING A CLAIM FOR SPECIFIC PERFORMANCE OR BREACH OF CONTRACT.

Plaintiff lacks standing to bring a direct claim for breach of contract and

specific performance.  Additionally, Plaintiff cannot pursue a claim for damages

because any such claim is unripe.

### A.   Plaintiff Lacks Standing To Seek Specific Performance.

8

Plaintiff alleges that "[b]ecause the purpose of the Merger Agreement is for Defendants to purchase the Twitter shares of Plaintiff and the Class, they are third-party beneficiaries of the Merger Agreement and have individual and class rights to enforce Defendants' obligation under that agreement to purchase those shares." (Compl. ¶ 2)  Plaintiff is wrong.

"Standing is a threshold issue, predicate to substantive consideration of a claim."  *Ritchie CT Opps, LLC v. Huizenga Managers Fund, LLC*, 2019 WL 2319284, at *8 (Del. Ch. May 30, 2019) (citing *Dover Hist. Soc'y v. City of Dover Plan. Comm'n*, 838 A.2d 1103, 1110 (Del. 2003)).  It is well-settled Delaware law that only parties to a contract and intended third-party beneficiaries have standing to enforce contracts.  *See, e.g.*, *E.I. du Pont de Nemours & Co. v. MacDermid Printing Sols. L.L.C.*, 248 F. Supp. 3d 570, 575 (D. Del. 2017); *Madison Realty Partners 7, LLC v. Ag ISA, LLC*, 2001 WL 406268, at *5 (Del. Ch. Apr. 17, 2001).  Here, as neither a party to the Merger Agreement nor a third-party beneficiary, Plaintiff lacks standing to seek specific performance.

Plaintiff cannot establish that he is a party, nor can he establish third-party beneficiary status as a matter of law.  Plaintiff concedes that he is not a party to the Merger Agreement.  (Compl. at 1 (stating the Merger Agreement is "by and among Twitter and [Defendants]."))  While Plaintiff attempts to claim third-party beneficiary status through its pleading, the Merger Agreement includes a "no third-

9

party beneficiary" provision, which only provides specifically enumerated third parties with discrete enumerated rights and obligations.  Delaware courts will look to no third-party beneficiary provisions when determining whether a non-party to a contract is an intended third-party beneficiary and for what purposes.  *Fortis Advisors LLC v. Medicines Co., & Melinta Therapeutics, Inc.*, 2019 WL 7290945, at *3 (Del. Ch. Dec. 18, 2019) (holding, "[w]ith regard to the first element[,]" that the contract parties intended to confer a third-party right, "Delaware courts will look to the text of the [relevant] agreement and respect its plain language . . . [i]n the same vein, Delaware courts will enforce contractual provisions disclaiming an intent to benefit third parties.") (citations omitted) (internal quotations omitted); *United Rentals, Inc. v. RAM Holdings, Inc*., 2007 WL 4327770, at *1 (Del. Ch. Nov. 29, 2007) (denying motion to intervene because the plaintiff was neither a party nor beneficiary to the merger agreement, explaining "[t]he merger agreement explicitly states that its only intended beneficiaries are the parties to the agreement themselves").

Here, the relevant third-party beneficiary clause states:

> Section 9.7 ***No Third-Party Beneficiaries.*** **Subject to Section 9.13, *this Agreement is not intended to and shall not confer upon any Person other than the parties hereto any rights or remedies hereunder*;** provided, however, that it is specifically intended that (A) the D&O Indemnified Parties (with respect to Section 6.6 from and after the Effective Time), (B) the Company Related Parties (with respect to Section 8.3) are third-party beneficiaries and (C) the Parent Related Parties (with respect to Section 8.3) are third-party beneficiaries.

10

(Merger Agreement § 9.7) (emphasis added)

Thus, the parties generally foreclosed third-party beneficiaries, except in three limited circumstances that are not applicable here. (*See Supra* Statement of Facts, Section B)

Plaintiff's purported status as a Twitter stockholder does not change this analysis. Delaware courts have noted, "Plaintiffs' standing as third-party beneficiaries, rather than as parties, to the Agreement limits their rights under the Agreement to those clearly provided by the Agreement." *Benerofe v. Cha*, 1998 WL 83081, at *6 n.22 (Del. Ch. Feb. 20, 1998) (noting that while the contract at issue "provide[d] a number of rights and remedies" to stockholder plaintiff, "[n]owhere do plaintiffs provide the basis for their alleged right" the plaintiff was suing to enforce).[2] Notably, none of the enumerated exceptions bestow a right to seek specific performance onto Twitter stockholders. Section 9.13 deals with debt

---

[2] Delaware courts respect the parties' choices regarding carveouts to no third-party beneficiary provisions and assume that the parties make these choices deliberately. *See, e.g.*, *Fortis Advisors LLC*, 2019 WL 7290945, at *4 (explaining "[t]he negative implication created by [the provision's] express inclusion of [f]inancing [s]ources as third-party beneficiaries is that other third parties are not intended beneficiaries . . . [p]ut differently, the carve-out reveals that the parties knew how to expressly confer third-party beneficiary status, and the Court presumes that excluding the former [stockholders] from the carve-out was intentional.").

financing, Section 6.6 covers indemnification of Twitter's directors and officers, and Section 8.3 addresses termination fees.  (Merger Agreement, §§ 9.13, 6.6, 8.3)

The Merger Agreement also restricts the remedy of specific performance to parties to the agreement, meaning that such remedy is unavailable to Plaintiff.  Section 9.9 states: "[t]he *parties* hereto agree that irreparable damage for which monetary damages, even if available, would not be an adequate remedy, would occur in the event that *the parties* hereto do not perform the provisions of this Agreement."  (Merger Agreement, § 9.9) (emphases added)  The provision references "the parties" (*i.e.*, Twitter and Defendants) a total of eight times, and says nothing whatsoever about  stockholders or third-party beneficiaries.

Thus, it is clear on the face of the Merger Agreement that the parties did not intend to make Plaintiff (or any stockholder) a third-party beneficiary with the right to seek specific performance. [3]

In addition to the absence of any legal merit to Plaintiff's claim, Plaintiff's attempt to imply a right for stockholders to sue on the basis of the Merger Agreement is inefficient and burdensome to this Court.  The parties to the Merger

---

[3]   Perhaps recognizing as much, Plaintiff's Complaint circularly alleges that Plaintiff is an intended beneficiary of the Merger Agreement because "Twitter and Musk intended for the Merger Agreement to confer a material benefit on the Plaintiff and the Class." (Compl. ¶ 73)  This conclusory theory of standing should be rejected.

12

Agreement– those with standing to assert their claims– are already engaged in expedited litigation regarding specific performance of the Merger Agreement.  This fact further demonstrates the impropriety of Plaintiff's unprecedented attempt to insert himself into the middle of litigation to seek the same remedy despite no contractual language or authority providing him that right.  For all of these reasons, Plaintiff has no standing to bring a claim alleging breach of the Merger Agreement.

## B.  Plaintiff's Claim For Damages Is Not Ripe.

Plaintiff's alternative request for damages for breach of the Merger Agreement also fails because it is not ripe.

The terms of the Merger Agreement make clear that the purported right to merger consideration has not been triggered.  The Merger Agreement states in Section 3.1(c): "Except as otherwise provided in this Agreement, each share of Company Common Stock issued and outstanding *immediately prior to the Effective Time* (other than any Canceled Shares or Dissenting Shares) shall be converted into the right to receive $54.20 per share of Company Common Stock in cash, without interest (the "Merger Consideration")."  (Merger Agreement § 3.1(c))  (emphasis added)

"Effective Time" is defined in Section 2.3(a) as "the date and time at which the Certificate of Merger has been duly filed with the Secretary of State or such other date and time as may be agreed to by Parent and the Company and as set

forth in the Certificate of Merger in accordance with the DGCL." (Merger Agreement § 2.3(a))

Simply put, the Effective Time has not occurred and Plaintiff's ability to obtain the merger consideration is entirely *conditional*. *See Consol. Edison, Inc. v. Ne. Utilities*, 426 F.3d 524, 528 (2d Cir. 2005) ("[W]e see that the only third-party right conferred on [target's] shareholders is a right, arising *upon completion of the merger,* to receive payment for their shares . . . [s]ince it is undisputed that the . . . Effective Time never arrived, that right never arose.") (emphasis in original). Therefore, any direct claim that Plaintiff may have to enforce this right has not been triggered and is not ripe. *See Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1034-35 (Del. 2004) ("[A]ny contractual shareholder right to payment of the merger consideration did not ripen until the conditions of the agreement were met.").

This is consistent with Delaware law, which, in limited circumstances, only permits stockholders to assert direct claims for payment of merger consideration post-closing.  For example, in *Amirsaleh v. Board of Trade of City of New York, Inc*., the Court of Chancery held that a member had standing to sue ***post-closing*** for breach as a third-party beneficiary.  2008 WL 4182998 (Del. Ch. Sept. 11, 2008).  Citing a decision of the District Court for the District of Delaware, the Court noted that "***former shareholders*** of a corporation are intended third party beneficiaries where the merger agreement provided that the shareholders would

14

receive compensation for their shares and the merger required shareholder approval." *Id.* at *4 (emphasis added).

Here, Plaintiff is obviously not bringing a direct, post-closing, claim to recover merger consideration; rather, he is seeking to obtain merger consideration for a transaction that may never close.[4]  The limited circumstances in which this Court has allowed a former stockholder to sue directly to recover merger consideration underscore that Plaintiff lacks standing to pursue his pre-closing breach of contract claim.[5]

\* \* \*

Accordingly, for all of the above-stated reasons, Plaintiff's claim for breach of contract and specific performance (Count I) should be dismissed.

---

[4]   Unlike in *Amirsaleh*, Twitter's stockholders have not even voted on the merger yet.  For the Effective Date to occur, even Plaintiff concedes that, at least, "stockholder approval of the Merger Agreement" is required. (Compl. ¶ 84)

[5]   Similarly, in *Consolidated Edison*, the Second Circuit considered whether the target's stockholders "enjoy[ed] the right, as third-party beneficiaries, to sue [buyer] for the $1.2 billion premium that [buyer] would have paid but for its allegedly wrongful failure to complete the merger."  426 F.3d 524, 527 (2d Cir. 2005).  The Second Circuit held the stockholder did not have a right to the merger consideration, noting that, ultimately, the question was whether the parties "intended to confer on [target's] shareholders a right to enforce [buyer's] promise to complete the merger" and that there was no intent by the contractual parties to confer that right.  *Id*. at 527-28.

## II.   PLAINTIFF FAILS TO ADEQUATELY PLEAD A BREACH OF FIDUCIARY DUTY CLAIM.

In Count II, Plaintiff attempts to plead a direct claim for breach of fiduciary duty through a strained, hybrid buyer/controller argument.  (*See* Compl. ¶ 83)  But this claim finds no support in Delaware law and would improperly convert purely commercial relationships into fiduciary relationships.

As discussed further below, the parties' dispute is contractual, not fiduciary, in nature and the fiduciary duty claims should be dismissed for this reason alone.  Setting that aside, Plaintiff's breach of fiduciary duty claim fails because Delaware law is clear that buyers do not owe fiduciary duties to target stockholders.  Moreover, owning 9.6% of Twitter's stock does not make Musk a controller, and Plaintiff does not, and cannot, allege "domination" by Defendants "through *actual* control of corporate conduct." *In re Morton's Rest. Grp., Inc. S'holders Litig.*, 74 A.3d 656, 664 (Del. Ch. 2013) (emphasis added) (internal citation omitted). Likewise, Plaintiff's claim that Defendants are beneficial owners of the remainder of Twitter's stock because they signed the Merger Agreement is meritless.  And the routine and commercially accepted provisions giving Defendants consent rights over certain corporate actions between signing and closing do not resemble the "managerial supremacy" relevant to controller inquiries.  *In re GGP, Inc. S'holder Litig.*, 2021 WL 2102326, at *23 (Del. Ch. May 25, 2021), *rev'd on other grounds*, 2022 WL 2815820 (Del. July 19, 2022).   Furthermore, Plaintiff's claim that

16

Defendants are beneficial owners of the remainder of Twitter's stock because they signed the Merger Agreement is meritless, and a contrary finding would improperly impose fiduciary duties on every person or entity that signs a contract to acquire a Delaware entity.  For all of these reasons, the breach of fiduciary duty claim (Count II) must be dismissed.

"A claim for breach of fiduciary duty requires proof of two elements: (1) **that a fiduciary duty existed** and (2) that the defendant breached that duty." *O'Gara v. Coleman*, 2020 WL 752070, at *6 (Del. Ch. Feb. 14, 2020) (emphasis added).  Thus, where Plaintiff does not adequately plead the requisite fiduciary duty, its claim must be dismissed.  *In re GGP*, 2021 WL 2102326, at *24 (dismissing breach of fiduciary duty claim after finding defendant was not a controlling stockholder, explaining the claim was "predicated on the existence of" a fiduciary duty).  Plaintiff fails to plead a breach of fiduciary duty claim for several reasons, including the fact that no fiduciary duty existed.  Accordingly, the claim must be dismissed.

*First*, the Court need not engage in a controlling stockholder or fiduciary analysis.  Even if the Defendants had controlling ownership of the Company, and they do not, where "'fiduciary claims relate to obligations that are expressly treated' by contract [] this Court will review those claims as breach of contract claims and any fiduciary claims will be dismissed." *Nemec v. Shrader*, 2009

17

WL 1204346, at *4 (Del. Ch. Apr. 30, 2009), *aff'd*, 991 A.2d 1120 (Del. 2010); *see also In re Rouse Props., Inc.*, 2018 WL 1226015, at *17 (Del. Ch. Mar. 9, 2018) ("It is 'well established' in our law that 'a non-majority shareholder [can] act in its self-interest,' and the fact it has done so 'is not particularly probative of whether the large shareholder exercises actual control over the business and affairs of the corporation.'"); *Thermopylae Cap. Partners, L.P. v. Simbol, Inc.*, 2016 WL 368170, at *14 (Del. Ch. Jan. 29, 2016) ("An individual who owns a contractual right, and who exploits that right– even in a way that forces a reaction by a corporation– is simply exercising his own property rights, not that of others, and is no fiduciary."). Simply put, Plaintiff's fiduciary duty claim is inconsistent with his breach of contract claim and "[f]or this reason alone, the fiduciary duty claim should be dismissed." *Nemec*, 2009 WL 1204346, at *4.

*Second*, buyers do not owe fiduciary duties to target stockholders. *In re Frederick's of Hollywood, Inc. S'holders Litig.*, 1998 WL 398244, at *4 (Del. Ch. July 9, 1998) (recognizing that an acquiring corporation does not owe fiduciary duties to a target company) *aff'd sub nom. Malpiede v. Townson*, 780 A.2d 1075 (Del. 2001); *see also Mentor Graphics Corp. v. Quickturn Design Sys., Inc.*, 789 A.2d 1216, 1227 (Del. Ch. 2001) (recognizing that while a "bidder for control . . . has a fiduciary duty to its *own* investors," it has interests that are inherently and structurally in conflict with the target company's stockholders' interests (emphasis

added)), *aff'd sub nom. Mentor Graphics Corp. v. Shapiro*, 818 A.2d 959 (Del. 2003);

*Arnold v. Soc'y for Sav. Bancorp, Inc.*, 678 A.2d 533, 540 (Del. 1996) (finding that

third-party buyer owed no fiduciary duty of disclosure to stockholders of target).

*Third*, Musk, as a minority stockholder of Twitter, does not owe

fiduciary duties to Twitter's other stockholders.  "A shareholder owes fiduciary

duties in two instances: (1) when it is a 'majority shareholder,' owning more than 50

percent of the shares, or (2) when it 'exercises control over the business affairs of

the corporation.'"  *Lidya Holdings Inc. v. Eksin*, 2022 WL 274679, at *5 n.45 (Del.

Ch. Jan. 31, 2022) (citing *Superior Vision Servs., Inc. v. ReliaStar Life Ins. Co.*, 2006

WL 2521426, at *4 (Del. Ch. Aug. 25, 2006)).  Neither situation is present here.

Plaintiff concedes that Musk owns only 9.6% of Twitter stock, far and

away from a majority stake.  *See Weinstein Enters., Inc. v. Orloff*, 870 A.2d 499, 507

(Del. 2005) ("[A] stockholder that owns less than half of a corporation's shares will

generally not be deemed to be a controlling stockholder, with concomitant fiduciary

responsibilities.");  *Gilbert v. El Paso Co.*, 490 A.2d 1050, 1055 (Del. Ch. 1984),

*aff'd*, 575 A.2d 1131 (Del. 1990) (same); *In re PNB Holding Co. S'holders Litig.*,

2006 WL 2403999, at *10 (Del. Ch. Aug. 18, 2006) (noting that 33.5% is "an overall

level of ownership that is relatively low"); *Zlotnick v. Newell Cos.*, 1984 WL 8242,

at *2 (Del. Ch. July 30, 1984) (33% ownership "means little" in the controller

analysis).  Plaintiff also cannot support a control argument by pointing to Musk's

role or influence in the Twitter boardroom because Musk is not a member of the Twitter board, having declined that role.[6]

Thus, to adequately allege that Musk is a controlling stockholder despite his minority stake, Plaintiff "must allege domination" by Musk "through *actual* control of corporate conduct." *In re Morton's Rest. Grp.*, 74 A.3d at 664 (emphasis added) (internal citation omitted). The test for pleading actual control "is not an easy one to satisfy." *In re Rouse*, 2018 WL 1226015, at *11 n.111 (internal citation omitted).

Plaintiff fails to adequately plead that Musk exercised day-to-day control over the Twitter board. Indeed, given the current adversarial relationship

---

[6] *See, e.g.*, *In re USG Corp. S'holder Litig.*, 2020 WL 5126671, at *17 (Del. Ch. Aug. 31, 2020), *aff'd sub nom. Anderson v. Leer*, 265 A.3d 995 (Del. 2021) (finding the plaintiffs did not meet "steep uphill climb to plead" minority 10.6% stockholder had actual control over business affairs); *Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 70 (Del. 1989) ("For a dominating relationship to exist in the absence of controlling stock ownership, a plaintiff must allege domination by a minority shareholder through actual control of corporate conduct"); *Ivanhoe Partners v. Newmont Mining Corp.*, 535 A.2d 1334, 1344 (Del. 1987) ("[A] shareholder owes a fiduciary duty only if it owns a majority interest in or exercises control over the business affairs of the corporation"); *In re Rouse*, 2018 WL 1226015, at *18 ("Brookfield's 33.5% ownership stake in Rouse is not impressive on its own"); *In re Morton's Rest. Grp.*, 74 A.3d at 666 ("Not only did [stockholder] hold less than 30% of the company's voting power, the Complaint is devoid of any well-pled facts about any influence [stockholder] had over any of the unaffiliated directors"); *In re W. Nat'l Corp. S'holders Litig.*, 2000 WL 710192, at *8 (Del. Ch. May 22, 2000) (explaining that whether a non-majority stockholder "exercises control over the corporation requires a judicial finding of actual control over the business and affairs of the corporation").

between Twitter and Defendants, it is baseless to argue that Musk is "influencing or controlling any action by the Board." *Superior Vision*, 2006 WL 2521426, at *5. Plaintiff does not even attempt to allege that Defendants exercise control over even a single board member. And as noted above and pled in the Complaint, Musk himself turned down a seat on Twitter's board. (Compl. ¶ 17) Thus, Plaintiff's strained control-by-influence argument fails.

Perhaps in recognition of these pleading failures, Plaintiff strangely claims that Musk is somehow the beneficial owner of 100% of Twitter's stock by virtue of the Merger Agreement. (Compl. ¶¶ 31, 84) But it is obviously false that Defendants are the beneficial owners of a majority of Twitter's outstanding stock.[7] *Mangano v. PeriCor Therapeutics*, 2009 WL 4345149, at *5 (Del. Ch. Dec. 1, 2009) (acknowledging that Delaware case law "make[s] clear that ["beneficial interest"] still necessarily implies some right in the securities, be it the right to vote or to expect to receive duties of loyalty and due care from a fiduciary"). Defendants, *inter alia*, do not have the right to vote or to direct the disposition of more than 50% of Twitter stock, and therefore do not qualify as beneficial owners. Again, Plaintiff concedes

---

[7]   Plaintiff's attempt to use the definitions in 8 *Del. C.* § 203 to define "beneficial ownership" is misplaced. The express language of Section 203 states that the definitions apply "**[a]s *used in this section only.***" 8 *Del. C.* § 203(c) (emphasis added). *In re Digex Inc. S'holders Litig.*, 789 A.2d 1176, 1199 (Del. Ch. 2000) (acknowledging that Section 203(c) defines terms and "limits [those] definition[s] strictly to [the] use of [such] term[s] within § 203").

that "stockholder approval of the Merger Agreement" remains a condition to "consummating the closing of the Merger under the Merger Agreement"– in other words, Plaintiff admits that the beneficial ownership of a majority of the stock currently rests within the hands of public stockholders.  (Compl. ¶ 84 (emphasis added))

In fact, under Plaintiff's theory, every buyer that has signed an agreement to purchase more than a majority of a corporation's stock is converted into a controller, with fiduciary duties to the corporation it was seeking to acquire, during the period between signing and closing.  This is not and never has been the law.  And, to state the obvious, it is demonstrably clear from the ongoing litigation over whether the Merger Agreement is terminated or should be specifically enforced that Defendants do not control or have any sway over Twitter or its board by virtue of the Merger Agreement.

At bottom, Plaintiff has alleged no facts from which this Court could reasonably infer that Defendants owe fiduciary duties as a controlling stockholder of Twitter.  Therefore, Plaintiff's claim for breach of fiduciary duty should be dismissed with prejudice.

*     *     *     *

Accordingly, the Complaint fails to state a claim for breach of contract or breach of fiduciary duty and should be dismissed.

## CONCLUSION

For all of the foregoing reasons, Defendants respectfully requests that the Court grant the Motion to Dismiss the Verified Shareholder Class Action Complaint.


Respectfully submitted,

*/s/  Edward B. Micheletti*

OF COUNSEL:                              Edward B. Micheletti (ID No. 3794)
                                         Lauren N. Rosenello (ID No. 5581)
Alex Spiro                               Ryan M. Lindsay (ID No. 6435)
Andrew J. Rossman                        SKADDEN, ARPS, SLATE,
Christopher D. Kercher                     MEAGHER & FLOM LLP
Silpa Maruri                             One Rodney Square
QUINN EMANUEL URQUHART                   P.O. Box 636
  & SULLIVAN, LLP                        Wilmington, Delaware  19899-0636
51 Madison Avenue, 22nd Floor            Tel.:  (302) 651-3000
New York, New York  10010

                                         *Attorneys for Defendants Elon R. Musk, X*
                                         *Holdings I, Inc. and X Holdings II, Inc.*

                                         **Words:  5,313**

DATED:  August 18, 2022

# Exhibit 8

| | |
|---|---|
| **From:** | Frank Bottini |
| **To:** | Joseph Sarles; Adam Hakki; Tyson Redenbarger; Billy Marsh; Aubrey Jones |
| **Cc:** | Mark Molumphy |
| **Subject:** | RE: Heresniak v. Musk et al. - Meet and Confer re Discovery |
| **Date:** | Tuesday, August 9, 2022 7:10:14 PM |

Joseph, we discussed on our call the fact that Plaintiff needs and is entitled to coordinated/expedited discovery in order to support Plaintiff's anticipated motion for declaratory and injunctive relief.  It is far more efficient for the parties to try to coordinate that document and deposition discovery now than to have to engage in a second round of related discovery and depositions of the same individuals later.

   Since you refuse to agree to coordination and refuse to hold a Rule 26(f) conference now, we intend to seek relief from the Court as to those topics.  Please advise if you consent to an expedited schedule for resolution of that motion.

**Frank A. Bottini, Esq.**
fbottini@bottinilaw.com

BOTTINI & BOTTINI, INC.

**7817 Ivanhoe Avenue, Suite 102**
**La Jolla, CA 92037**
**Tel: 858.914.2001**
**Fax: 858.914-2002**
www.bottinilaw.com

**The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please contact the sender by reply email and destroy all copies of the original message.**

**From:** Joseph Sarles <josephsarles@quinnemanuel.com>
**Sent:** Friday, August 5, 2022 6:10 PM
**To:** Frank Bottini <fbottini@bottinilaw.com>; Adam Hakki <Adam.Hakki@Shearman.com>; Tyson Redenbarger <TRedenbarger@cpmlegal.com>; Billy Marsh <Billy.Marsh@Shearman.com>; Aubrey Jones <aubreyjones@quinnemanuel.com>
**Cc:** Mark Molumphy <MMolumphy@cpmlegal.com>
**Subject:** Re: Heresniak v. Musk et al. - Meet and Confer re Discovery

Counsel,

Based on your email below and our discussion on Wednesday, it appears the only basis on which plaintiff seeks coordination is his contention that it would be better for defendants.  You have not identified any burden or prejudice you contend plaintiff would suffer absent coordination.  If you believe there is any, please identify it.  We would also be interested to know your explanation of your client's standing to pursue his claims related to the merger agreement at this time, as well as your explanation of your client's ability to pursue such claims in a court outside of Delaware.  Each defendant's initial view is that the claims against them are subject to dismissal on multiple, threshold

grounds, and that as a result there should be no discovery during the pendency of motions to dismiss or, potentially alternatively, that the case should be stayed pending resolution of the Chancery Court proceeding.  Having said that, our clients are prepared to consider in good faith your response to the above questions in considering next steps.

Finally, as discussed on our call, we think the order setting the CMC for September 30 and the CMC statement for September 16 had both the purpose and effect of adjusting the Rule 26(f) schedule as well.  As we said on Wednesday, we are not prepared to hold the Rule 26(f) conference at this time, but will be prepared to do so well in advance of filing the CMC statement, as provided the relevant rules and orders.

Best,

Joseph Sarles

---

**From:** Frank Bottini <fbottini@bottinilaw.com>
**Sent:** Wednesday, August 3, 2022 1:58:00 PM
**To:** Adam Hakki <Adam.Hakki@Shearman.com>; Joseph Sarles <josephsarles@quinnemanuel.com>; Tyson Redenbarger <TRedenbarger@cpmlegal.com>; Billy Marsh <Billy.Marsh@Shearman.com>; Aubrey Jones <aubreyjones@quinnemanuel.com>
**Cc:** Mark Molumphy <MMolumphy@cpmlegal.com>
**Subject:** RE: Heresniak v. Musk et al. - Meet and Confer re Discovery

**[EXTERNAL EMAIL from fbottini@bottinilaw.com]**

---

Dear Adam, Joe, Billy & Aubrey:  Thank you for taking the time to discuss discovery and case scheduling matters with us yesterday.  As discussed on our call, Plaintiff requests coordination of discovery between our case and the *Twitter v. Musk* action pending in Delaware Chancery Court.  Because discovery and trial has been expedited in that matter, and due to overlapping factual matters and discovery, we believe coordination is desirable and necessary in order to avoid duplicative and/or inconsistent discovery.  As stated on the call, our desire is to promptly coordinate document and deposition discovery so as to avoid any duplication or inconsistent demands to defendants, to the extent possible.  We have also requested that the parties hold a Rule 26(f) call either tomorrow or Friday.  We continue to believe that the Court's orders and rules require that the Rule 26(f) conference be held by August 8, but understand that you believe the deadline is approximately September 1 based on the reassignment.  Regardless of which date is correct, the deadline is merely that – an outer date by which the conference must take place.  Nothing prevents the parties from holding the conference before the last possible date, and again as we emphasized yesterday, given the expedition of discovery and trial ordered in Delaware (at Twitter's request), we do not believe it makes sense to delay discussing coordination until later this month because a significant amount of discovery will probably have already occurred in the Delaware proceeding by then.

You indicated yesterday that you would promptly get back to us in response to our request to coordinate document discovery and depositions.  Thank you and we look forward to hearing from

you, preferably by the end of this week.  As stated, our strong preference is to resolve these issues with Defendants informally, but we intend to seek an order of coordination from the Court if Defendants refuse to agree to any coordination.   We are available for another call to discuss. Thanks.

**Frank A. Bottini, Esq.**
fbottini@bottinilaw.com

BOTTINI & BOTTINI, INC.

**7817 Ivanhoe Avenue, Suite 102**
**La Jolla, CA 92037**
**Tel: 858.914.2001**
**Fax: 858.914.2002**
**www.bottinilaw.com**

**The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please contact the sender by reply email and destroy all copies of the original message.**

# Exhibit 9

Exhibit 3.2

**AMENDED AND RESTATED BYLAWS OF**
**TWITTER, INC.**

**(as amended on February 14, 2022)**

**TABLE OF CONTENTS**

**Page**

ARTICLE I - CORPORATE OFFICES                                                    1

1.1 REGISTERED OFFICE                                                            1

1.2 OTHER OFFICES                                                                1

ARTICLE II - MEETINGS OF STOCKHOLDERS                                           1

2.1 PLACE OF MEETINGS                                                            1

2.2 ANNUAL MEETING                                                              1

2.3 SPECIAL MEETING                                                             1

2.4 ADVANCE NOTICE PROCEDURES                                                   2

2.5 NOTICE OF STOCKHOLDERS' MEETINGS                                            6

2.6 QUORUM                                                                      6

2.7 ADJOURNED MEETING; NOTICE                                                   7

2.8 CONDUCT OF BUSINESS                                                         7

2.9 VOTING                                                                      7

2.10 STOCKHOLDER ACTION BY WRITTEN CONSENT WITHOUT A MEETING                    8

2.11 RECORD DATES                                                              8

2.12 PROXIES                                                                   9

2.13 LIST OF STOCKHOLDERS ENTITLED TO VOTE                                     9

2.14 INSPECTORS OF ELECTION                                                    10

2.15 PROXY ACCESS FOR DIRECTOR NOMINEES.                                       10

ARTICLE III - - DIRECTORS                                                      19

3.1 POWERS                                                                     19

3.2 NUMBER OF DIRECTORS                                                        20

**TABLE OF CONTENTS**
(continued)

| | |
|---|---|
| 3.3 ELECTION, QUALIFICATION AND TERM OF OFFICE OF DIRECTORS | 20 |
| 3.4 RESIGNATION AND VACANCIES | 20 |
| 3.5 PLACE OF MEETINGS; MEETINGS BY TELEPHONE | 21 |
| 3.6 REGULAR MEETINGS | 21 |
| 3.7 SPECIAL MEETINGS; NOTICE | 21 |
| 3.8 QUORUM; VOTING | 22 |
| 3.9 BOARD ACTION BY WRITTEN CONSENT WITHOUT A MEETING | 22 |
| 3.10 FEES AND COMPENSATION OF DIRECTORS | 22 |
| 3.11 REMOVAL OF DIRECTORS | 22 |
| ARTICLE IV - COMMITTEES | 23 |
| 4.1 COMMITTEES OF DIRECTORS | 23 |
| 4.2 COMMITTEE MINUTES | 23 |
| 4.3 MEETINGS AND ACTION OF COMMITTEES | 23 |
| 4.4 SUBCOMMITTEES | 24 |
| ARTICLE V - - OFFICERS | 24 |
| 5.1 OFFICERS | 24 |
| 5.2 APPOINTMENT OF OFFICERS | 24 |
| 5.3 SUBORDINATE OFFICERS | 24 |
| 5.4 REMOVAL AND RESIGNATION OF OFFICERS | 25 |
| 5.5 VACANCIES IN OFFICES | 25 |
| 5.6 REPRESENTATION OF SECURITIES OF OTHER ENTITIES | 25 |
| 5.7 AUTHORITY AND DUTIES OF OFFICERS | 25 |

**TABLE OF CONTENTS**
(continued)

ARTICLE VI - STOCK                                                                                25

6.1 STOCK CERTIFICATES; PARTLY PAID SHARES                                                        25

6.2 SPECIAL DESIGNATION ON CERTIFICATES                                                           26

6.3 LOST CERTIFICATES                                                                             26

6.4 DIVIDENDS                                                                                     27

6.5 TRANSFER OF STOCK                                                                             27

6.6 STOCK TRANSFER AGREEMENTS                                                                     27

6.7 REGISTERED STOCKHOLDERS                                                                       27

ARTICLE VII - MANNER OF GIVING NOTICE AND WAIVER                                                  28

7.1 NOTICE OF STOCKHOLDERS' MEETINGS                                                              28

7.2 NOTICE TO STOCKHOLDERS SHARING AN ADDRESS                                                     28

7.3 NOTICE TO PERSON WITH WHOM COMMUNICATION IS UNLAWFUL                                          28

7.4 WAIVER OF NOTICE                                                                              28

ARTICLE VIII - FORUM FOR CERTAIN ACTIONS                                                          28

ARTICLE IX - INDEMNIFICATION                                                                      29

9.1 INDEMNIFICATION OF DIRECTORS AND OFFICERS IN THIRD PARTY PROCEEDINGS                          29

9.2 INDEMNIFICATION OF DIRECTORS AND OFFICERS IN ACTIONS BY OR IN THE RIGHT OF                    30
THE CORPORATION

9.3 SUCCESSFUL DEFENSE                                                                            30

9.4 INDEMNIFICATION OF OTHERS                                                                     30

9.5 ADVANCE PAYMENT OF EXPENSES                                                                   31

9.6 LIMITATION ON INDEMNIFICATION                                                                 31

9.7 DETERMINATION; CLAIM                                                                          32

**TABLE OF CONTENTS**
**(continued)**

| | |
|---|---|
| 9.8 NON-EXCLUSIVITY OF RIGHTS | 32 |
| 9.9 INSURANCE | 32 |
| 9.10 SURVIVAL | 33 |
| 9.11 EFFECT OF REPEAL OR MODIFICATION | 33 |
| 9.12 CERTAIN DEFINITIONS | 33 |
| ARTICLE X - GENERAL MATTERS | 33 |
| 10.1 EXECUTION OF CORPORATE CONTRACTS AND INSTRUMENTS | 33 |
| 10.2 FISCAL YEAR | 34 |
| 10.3 SEAL | 34 |
| 10.4 CONSTRUCTION; DEFINITIONS | 34 |
| ARTICLE XI - AMENDMENTS | 34 |

# BYLAWS OF TWITTER, INC.

## ARTICLE I - CORPORATE OFFICES

### 1.1 REGISTERED OFFICE

The registered office of Twitter, Inc. shall be fixed in the corporation's certificate of incorporation, as the same may be amended from time to time.

### 1.2 OTHER OFFICES

The corporation may at any time establish other offices.

## ARTICLE II - MEETINGS OF STOCKHOLDERS

### 2.1 PLACE OF MEETINGS

Meetings of stockholders shall be held at a place, if any, within or outside the State of Delaware, designated by the board of directors. The board of directors may, in its sole discretion, determine that a meeting of stockholders shall not be held at any place, but may instead be held solely by means of remote communication as authorized by Section 211(a)(2) of the Delaware General Corporation Law (the "**DGCL**"). In the absence of any such designation or determination, stockholders' meetings shall be held at the corporation's principal executive office.

### 2.2 ANNUAL MEETING

The annual meeting of stockholders shall be held on such date, at such time, and at such place (if any) within or without the State of Delaware as shall be designated from time to time by the board of directors and stated in the corporation's notice of the meeting. At the annual meeting, directors shall be elected and any other proper business, brought in accordance with Section 2.4 of these bylaws, may be transacted. The board of directors may cancel, postpone or reschedule any previously scheduled annual meeting at any time, before or after the notice for such meeting has been sent to the stockholders.

### 2.3 SPECIAL MEETING

(i) A special meeting of the stockholders, other than those required by statute, may be called at any time by (A) the board of directors, (B) the chairperson of the board of directors, or (C) the chief executive officer, but a special meeting may not be called by any other person or persons. The board of directors may cancel, postpone or reschedule any previously scheduled special meeting at any time, before or after the notice for such meeting has been sent to the stockholders.

(ii) The notice of a special meeting shall include the purpose for which the meeting is called. Only such business shall be conducted at a special meeting of stockholders as shall have been brought before the meeting by or at the direction of the board of directors, chairperson of the board of directors or chief executive officer. Nothing contained in this Section 2.3(ii) shall be construed as limiting, fixing or affecting the time when a meeting of stockholders called by action of the board of directors may be held.

2.4 ADVANCE NOTICE PROCEDURES

(i) *Advance Notice of Stockholder Business.* At an annual meeting of the stockholders, only such business shall be conducted as shall have been properly brought before the meeting. To be properly brought before an annual meeting, business must be brought: (A) pursuant to the corporation's proxy materials with respect to such meeting, (B) by or at the direction of the board of directors, or (C) by a stockholder of the corporation who (1) is a stockholder of record at the time of the giving of the notice required by this Section 2.4(i) and on the record date for the determination of stockholders entitled to vote at the annual meeting and (2) has timely complied in proper written form with the notice procedures set forth in this Section 2.4(i). In addition, for business to be properly brought before an annual meeting by a stockholder, such business must be a proper matter for stockholder action pursuant to these bylaws and applicable law. For the avoidance of doubt, except for proposals properly made in accordance with Rule 14a-8 under the Securities and Exchange Act of 1934, as amended, or any successor thereto (the "**1934 Act**"), and the regulations thereunder (or any successor rule and in any case as so amended), clause (C) above shall be the exclusive means for a stockholder to bring business before an annual meeting of stockholders.

(a) To comply with clause (C) of Section 2.4(i) above, a stockholder's notice must set forth all information required under this Section 2.4(i) and must be timely received by the secretary of the corporation. To be timely, a stockholder's notice must be received by the secretary at the principal executive offices of the corporation not later than the 45th day nor earlier than the 75th day before the one-year anniversary of the date on which the corporation first mailed its proxy materials or a notice of availability of proxy materials (whichever is earlier) for the preceding year's annual meeting; *provided, however,* that in the event that no annual meeting was held in the previous year or if the date of the annual meeting is advanced by more than 30 days prior to or delayed by more than 60 days after the one-year anniversary of the date of the previous year's annual meeting, then, for notice by the stockholder to be timely, it must be so received by the secretary not earlier than the close of business on the 120th day prior to such annual meeting and not later than the close of business on the later of (i) the 90th day prior to such annual meeting, or (ii) the tenth day following the day on which Public Announcement (as defined below) of the date of such annual meeting is first made. In no event shall any adjournment, rescheduling or postponement of an annual meeting or the announcement thereof commence a new time period for the giving of a stockholder's notice as described in this Section 2.4(i)(a). "**Public Announcement**" shall mean disclosure made via a Tweet from a verified account operated by the corporation (e.g., @Twitter), in a press release reported by the Dow Jones News Service, Associated Press or a comparable national news service or in a document publicly filed by the corporation with the Securities and Exchange Commission pursuant to Section 13, 14 or 15(d) of the 1934 Act.

-2-

(b)To be in proper written form, a stockholder's notice to the secretary must set forth as to each matter of business the stockholder intends to bring before the annual meeting: (1) a brief description of the business intended to be brought before the annual meeting and the reasons for conducting such business at the annual meeting, (2) the name and address, as they appear on the corporation's books, of the stockholder proposing such business and any Stockholder Associated Person (as defined below), (3) the class and number of shares of the corporation that are held of record or are beneficially owned by the stockholder or any Stockholder Associated Person, (4) whether and the extent to which any hedging or other transaction or series of transactions has been entered into by or on behalf of such stockholder or any Stockholder Associated Person with respect to any securities of the corporation, and a description of any other agreement, arrangement or understanding (including any short position or any borrowing or lending of shares), the effect or intent of which is to mitigate loss to, or to manage the risk or benefit from share price changes for, or to increase or decrease the voting power of, such stockholder or any Stockholder Associated Person with respect to any securities of the corporation, (5) any material interest of the stockholder or a Stockholder Associated Person in such business, (6) a statement as to whether such person, if elected, intends to tender, if elected, promptly following such person's election or re-election, an irrevocable resignation effective upon (a) such person's failure to receive the required vote for re-election at the next stockholder meeting at which such person would face re-election and (b) acceptance of such resignation by the board of directors, in accordance with the corporation's Corporate Governance Guidelines, and (7) a statement whether either such stockholder or any Stockholder Associated Person will deliver a proxy statement and form of proxy to holders of at least the percentage of the voting power of the corporation's voting shares required under applicable law to carry the proposal (such information provided and statements made as required by clauses (1) through (7), a "**Business Solicitation Statement**"). In addition, to be in proper written form, a stockholder's notice to the secretary must be supplemented not later than ten days following the record date for the determination of stockholders entitled to notice of the meeting to disclose the information contained in clauses (3) and (4) above as of the record date. For purposes of this Section 2.4, a "**Stockholder Associated Person**" of any stockholder shall mean (i) any person controlling, directly or indirectly, or acting in concert with, such Stockholder, (ii) any beneficial owner of shares of stock of the corporation owned of record or beneficially by such stockholder and on whose behalf the proposal or nomination, as the case may be, is being made, or (iii) any person controlling, controlled by or under common control with such person referred to in the preceding clauses (i) and (ii).

(c)Without exception, no business shall be conducted at any annual meeting except in accordance with the provisions set forth in this Section 2.4(i) and, if applicable, Section 2.4(ii). In addition, business proposed to be brought by a stockholder may not be brought before the annual meeting if such stockholder or a Stockholder Associated Person, as applicable, takes action contrary to the representations made in the Business Solicitation Statement applicable to such business or if the Business Solicitation Statement applicable to such business contains an untrue statement of a material fact or omits to state a material fact necessary to make the statements therein not misleading. The chairperson of the annual meeting shall, if the facts warrant, determine and declare at the annual meeting that business was not properly brought before the annual meeting and in accordance with the provisions of this Section 2.4(i), and, if the chairperson should so determine, he or she shall so declare at the annual meeting that any such business not properly brought before the annual meeting shall not be conducted.

(ii)Advance Notice of Director Nominations at Annual Meetings. Notwithstanding anything in these bylaws to the contrary, only persons who are nominated in accordance with the procedures set forth in this Section 2.4(ii) shall be eligible for election or re-election as directors at an annual meeting of stockholders. Nominations of persons for election to the board of directors of the corporation shall be made at an annual meeting of stockholders only (A) by or at the direction of the board of directors, (B) by a stockholder of the corporation who (1) was a stockholder of record at the time of the giving of the notice required by this Section 2.4(ii) and on the record date for the determination of stockholders entitled to vote at the annual meeting and (2) has complied with the notice procedures set forth in this Section 2.4(ii) or (C) in compliance with Section 2.15 below. In addition to any other applicable requirements, for a nomination to be made by a stockholder, the stockholder must have given timely notice thereof in proper written form to the secretary of the corporation.

(a)To comply with clause (B) of Section 2.4(ii) above, a nomination to be made by a stockholder must set forth all information required under this Section 2.4(ii) and must be received by the secretary of the corporation at the principal executive offices of the corporation at the time set forth in, and in accordance with, the final three sentences of Section 2.4(i)(a) above; provided additionally, however, that in the event that the number of directors to be elected to the board of directors is increased and there is no Public Announcement naming all of the nominees for director or specifying the size of the increased board made by the corporation at least ten days before the last day a stockholder may deliver a notice of nomination pursuant to the foregoing provisions, a stockholder's notice required by this Section 2.4(ii) shall also be considered timely, but only with respect to nominees for any new positions created by such increase, if it shall be received by the secretary of the corporation at the principal executive offices of the corporation not later than the close of business on the tenth day following the day on which such Public Announcement is first made by the corporation.

(b)To be in proper written form, such stockholder's notice to the secretary must set forth:

(1)as to each person (a "**nominee**") whom the stockholder proposes to nominate for election or re-election as a director: (A) the name, age, business address and residence address of the nominee, (B) the principal occupation or employment of the nominee, (C) the class and number of shares of the corporation that are held of record or are beneficially owned by the nominee and any derivative positions held or beneficially held by the nominee, (D) whether and the extent to which any hedging or other transaction or series of transactions has been entered into by or on behalf of the nominee with respect to any securities of the corporation, and a description of any other agreement, arrangement or understanding (including any short position or any borrowing or lending of shares), the effect or intent of which is to mitigate loss to, or to manage the risk or benefit of share price changes for, or to increase or decrease the voting power of the nominee, (E) a description of all arrangements or understandings between or among any of the stockholder, each nominee and/or any other person or persons (naming such person or persons) pursuant to which the nominations are to be made by the stockholder or relating to the nominee's potential service on the board of directors, (F) a written statement executed by the nominee acknowledging that as a director of the corporation, the nominee will owe a fiduciary duty under Delaware law with respect to the corporation and its stockholders, and (G) any other information relating to the nominee that would be required to be disclosed about such nominee if proxies were being solicited for the election of the nominee as a director, or that is otherwise required, in each case pursuant to Regulation 14A under the 1934 Act (including without limitation the nominee's written consent to being named in the proxy statement, if any, as a nominee and to serving as a director if elected); and

-4-

(2)as to such stockholder giving notice, (A) the information required to be provided pursuant to clauses (2) through (5) of Section 2.4(i)(b) above, and the supplement referenced in the second sentence of Section 2.4(i)(b) above (except that the references to "business" in such clauses shall instead refer to nominations of directors for purposes of this paragraph), and (B) a statement whether either such stockholder or Stockholder Associated Person will deliver a proxy statement and form of proxy to holders at least the percentage of the corporation's voting shares reasonably believed by such stockholder or Stockholder Associated Person to be necessary to elect such nominee(s) (such information provided and statements made as required by clauses (A) and (B) above, a "**Nominee Solicitation Statement**").

(c)At the request of the board of directors, any person nominated by a stockholder for election as a director must furnish to the secretary of the corporation (1) that information required to be set forth in the stockholder's notice of nomination of such person as a director as of a date subsequent to the date on which the notice of such person's nomination was given and (2) such other information as may reasonably be required by the corporation to determine the eligibility of such proposed nominee to serve as an independent director of the corporation or that could be material to a reasonable stockholder's understanding of the independence, or lack thereof, of such nominee; in the absence of the furnishing of such information if requested, such stockholder's nomination shall not be considered in proper form pursuant to this Section 2.4(ii).

(d)Without exception, no person shall be eligible for election or re-election as a director of the corporation at an annual meeting of stockholders unless nominated in accordance with the provisions set forth in this Section 2.4(ii). In addition, a nominee shall not be eligible for election or re-election if a stockholder or Stockholder Associated Person, as applicable, takes action contrary to the representations made in the Nominee Solicitation Statement applicable to such nominee or if the Nominee Solicitation Statement applicable to such nominee contains an untrue statement of a material fact or omits to state a material fact necessary to make the statements therein not misleading. The chairperson of the annual meeting shall, if the facts warrant, determine and declare at the annual meeting that a nomination was not made in accordance with the provisions prescribed by these bylaws, and if the chairperson should so determine, he or she shall so declare at the annual meeting, and the defective nomination shall be disregarded.

(iii)*Advance Notice of Director Nominations for Special Meetings.*

(a)For a special meeting of stockholders at which directors are to be elected pursuant to Section 2.3, nominations of persons for election to the board of directors shall be made only (1) by or at the direction of the board of directors or (2) by any stockholder of the corporation who (A) is a stockholder of record at the time of the giving of the notice required by this Section 2.4(iii) and on the record date for the determination of stockholders entitled to vote at the special meeting and (B) delivers a timely written notice of the nomination to the secretary of the corporation that includes the information set forth in Sections 2.4(ii)(b) and (ii)(c) above. To be timely, such notice must be received by the secretary at the principal executive offices of the corporation not later than the close of business on the later of the 90th day prior to such special meeting or the tenth day following the day on which Public Announcement is first made of the date of the special meeting and of the nominees proposed by the board of directors to be elected at such meeting. In no event shall any adjournment, rescheduling or postponement of a special meeting or the announcement thereof commence a new time period for the giving of a stockholder's notice. A person shall not be eligible for election or re-election as a director at a special meeting unless the person is nominated (i) by or at the direction of the board of directors or (ii) by a stockholder in accordance with the notice procedures set forth in this Section 2.4(iii). In addition, a nominee shall not be eligible for election or re-election if a stockholder or Stockholder Associated Person, as applicable, takes action contrary to the representations made in the Nominee Solicitation Statement applicable to such nominee or if the Nominee Solicitation Statement applicable to such nominee contains an untrue statement of a material fact or omits to state a material fact necessary to make the statements therein not misleading.

(b)The chairperson of the special meeting shall, if the facts warrant, determine and declare at the meeting that a nomination or business was not made in accordance with the procedures prescribed by these bylaws, and if the chairperson should so determine, he or she shall so declare at the meeting, and the defective nomination or business shall be disregarded.

(iv)*Other Requirements and Rights.* In addition to the foregoing provisions of this Section 2.4, a stockholder must also comply with all applicable requirements of state law and of the 1934 Act and the rules and regulations thereunder with respect to the matters set forth in this Section 2.4, including, with respect to business such stockholder intends to bring before the annual meeting that involves a proposal that such stockholder requests to be included in the corporation's proxy statement, the requirements of Rule 14a-8 (or any successor provision) under the 1934 Act. Nothing in this Section 2.4 shall be deemed to affect any right of the corporation to omit a proposal from the corporation's proxy statement pursuant to Rule 14a-8 (or any successor provision) under the 1934 Act.

2.5NOTICE OF STOCKHOLDERS' MEETINGS

Whenever stockholders are required or permitted to take any action at a meeting, a notice of the meeting shall be given which shall state the place, if any, date and hour of the meeting, the means of remote communications, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such meeting, the record date for determining the stockholders entitled to vote at the meeting, if such date is different from the record date for determining stockholders entitled to notice of the meeting, and, in the case of a special meeting, the purpose or purposes for which the meeting is called. Except as otherwise provided in the DGCL, the certificate of incorporation or these bylaws, the notice of any meeting of stockholders shall be given not less than 10 nor more than 60 days before the date of the meeting to each stockholder entitled to vote at such meeting as of the record date for determining the stockholders entitled to notice of the meeting.

## 2.6 QUORUM

The holders of a majority of the voting power of the stock issued and outstanding and entitled to vote, present in person or represented by proxy, shall constitute a quorum for the transaction of business at all meetings of the stockholders, unless otherwise required by law, the certificate of incorporation, these bylaws or the rules of any applicable stock exchange. Where a separate vote by a class or series or classes or series is required, a majority of the voting power of the issued and outstanding shares of such class or series or classes or series, present in person or represented by proxy, shall constitute a quorum entitled to take action with respect to that vote on that matter, except as otherwise required by law, the certificate of incorporation, these bylaws or the rules of any applicable stock exchange.

Whether or not a quorum is present at a meeting of stockholders, the chairperson of the meeting shall have power to adjourn the meeting from time to time, without notice other than announcement at the meeting. At such adjourned meeting at which a quorum is present or represented, any business may be transacted that might have been transacted at the original meeting.

## 2.7 ADJOURNED MEETING; NOTICE

When a meeting is adjourned to another time or place, unless these bylaws otherwise require, notice need not be given of the adjourned meeting if the time, place, if any, thereof, and the means of remote communications, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such adjourned meeting are announced at the meeting at which the adjournment is taken. At the adjourned meeting, the corporation may transact any business which might have been transacted at the original meeting. If the adjournment is for more than 30 days, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting. If after the adjournment a new record date for stockholders entitled to vote is fixed for the adjourned meeting, the board of directors shall fix a new record date for notice of such adjourned meeting in accordance with Section 213(a) of the DGCL and Section 2.11 of these bylaws, and shall give notice of the adjourned meeting to each stockholder of record entitled to vote at such adjourned meeting as of the record date fixed for notice of such adjourned meeting.

## 2.8 CONDUCT OF BUSINESS

The chairperson of any meeting of stockholders shall determine the order of business and the procedure at the meeting, including such regulation of the manner of voting and the conduct of business. The chairperson of any meeting of stockholders shall be designated by the board of directors; in the absence of such designation, the chairperson of the board, if any, the chief executive officer (in the absence of the chairperson) or the lead independent director (in the absence of the chairperson of the board and the chief executive officer), or in their absence any other executive officer of the corporation, shall serve as chairperson of the stockholder meeting.

## 2.9 VOTING

The stockholders entitled to vote at any meeting of stockholders shall be determined in accordance with the provisions of Section 2.11 of these bylaws, subject to Section 217 (relating to voting rights of fiduciaries, pledgors and joint owners of stock) and Section 218 (relating to voting trusts and other voting agreements) of the DGCL.

Except as may be otherwise provided in the certificate of incorporation, each stockholder shall be entitled to one vote for each share of capital stock held by such stockholder.

Except as otherwise required by law, the certificate of incorporation, these bylaws or the rules of any applicable stock exchange, in all matters other than the election of directors, the affirmative vote of a majority of the voting power of the shares present in person or represented by proxy at the meeting and entitled to vote on the subject matter shall be the act of the stockholders. Except as otherwise required by law, the certificate of incorporation, these bylaws or the rules of any applicable stock exchange, directors shall be elected by a majority of the voting power of the shares present in person or represented by proxy at the meeting and entitled to vote on the election of directors. For the purposes of this section, a majority of votes shall mean that the number of votes cast "for" a director's election exceeds the number of votes "against" that director's election (with "abstentions" and "broker nonvotes" not counted as votes cast "for" or "against" that director's election); provided that, if at the close of the notice period set forth in Section 2.4 of this Article II, the number of director nominees exceeds the number of directors to be elected, the directors shall be elected by a plurality of the votes cast. If the directors are to be elected by a plurality of the votes cast, the stockholders shall not be permitted to vote against a nominee. Where a separate vote by a class or series or classes or series is required, in all matters other than the election of directors, the affirmative vote of the majority of the voting power of shares of such class or series or classes or series present in person or represented by proxy at the meeting shall be the act of such class or series or classes or series, except as otherwise provided by law, the certificate of incorporation, these bylaws or the rules of any applicable stock exchange.

## 2.10 STOCKHOLDER ACTION BY WRITTEN CONSENT WITHOUT A MEETING

Subject to the rights of the holders of the shares of any series of Preferred Stock or any other class of stock or series thereof that have been expressly granted the right to take action by written consent, any action required or permitted to be taken by the stockholders of the corporation must be effected at a duly called annual or special meeting of stockholders of the corporation and may not be effected by any consent in writing by such stockholders.

## 2.11 RECORD DATES

In order that the corporation may determine the stockholders entitled to notice of any meeting of stockholders or any adjournment thereof, the board of directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the board of directors and which record date shall not be more than 60 nor less than 10 days before the date of such meeting. If the board of directors so fixes a date, such date shall also be the record date for determining the stockholders entitled to vote at such meeting unless the board of directors determines, at the time it fixes such record date, that a later date on or before the date of the meeting shall be the date for making such determination.

If no record date is fixed by the board of directors, the record date for determining stockholders entitled to notice of and to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held.

A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; *provided, however,* that the board of directors may fix a new record date for determination of stockholders entitled to vote at the adjourned meeting, and in such case shall also fix as the record date for stockholders entitled to notice of such adjourned meeting the same or an earlier date as that fixed for determination of stockholders entitled to vote in accordance with the provisions of Section 213 of the DGCL and this Section 2.11 at the adjourned meeting.

In order that the corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the board of directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than 60 days prior to such action. If no record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the board of directors adopts the resolution relating thereto.

2.12 PROXIES

Each stockholder entitled to vote at a meeting of stockholders, or such stockholder's authorized officer, director, employee or agent may authorize another person or persons to act for such stockholder by proxy authorized by a document or by a transmission permitted by law filed in accordance with the procedure established for the meeting, but no such proxy shall be voted or acted upon after three years from its date, unless the proxy provides for a longer period. The revocability of a proxy that states on its face that it is irrevocable shall be governed by the provisions of Section 212 of the DGCL.

2.13 LIST OF STOCKHOLDERS ENTITLED TO VOTE

The corporation shall prepare, at least 10 days before every meeting of stockholders, a complete list of the stockholders entitled to vote at the meeting; *provided, however,* if the record date for determining the stockholders entitled to vote is less than 10 days before the meeting date, the list shall reflect the stockholders entitled to vote as of the tenth day before the meeting date, arranged in alphabetical order, and showing the address of each stockholder and the number of shares registered in the name of each stockholder. The corporation shall not be required to include electronic mail addresses or other electronic contact information on such list. Such list shall be open to the examination of any stockholder for any purpose germane to the meeting for a period of at least 10 days prior to the meeting: (i) on a reasonably accessible electronic network, *provided* that the information required to gain access to such list is provided with the notice of the meeting, or (ii) during ordinary business hours, at the corporation's principal place of business. In the event that the corporation determines to make the list available on an electronic network, the corporation may take reasonable steps to ensure that such information is available only to stockholders of the corporation. If the meeting is to be held at a place, then a list of stockholders entitled to vote at the meeting shall be produced and kept at the time and place of the meeting during the whole time thereof, and may be examined by any stockholder who is present. If the meeting is to be held solely by means of remote communication, then the list shall also be open to the examination of any stockholder during the whole time of the meeting on a reasonably accessible electronic network, and the information required to access such list shall be provided with the notice of the meeting. Such list shall presumptively determine the identity of the stockholders entitled to vote at the meeting and the number of shares held by each of them.

2.14 INSPECTORS OF ELECTION

Before any meeting of stockholders, the corporation shall appoint an inspector or inspectors of election to act at the meeting or its adjournment. The corporation may designate one more persons as alternate inspectors to replace any inspector who fails to appear or fails or refuses to act.

Each inspector, before entering upon the discharge of his or her duties, shall take and sign an oath to execute faithfully the duties of inspector with strict impartiality and according to the best of his or her ability. Such inspectors shall:

(i)ascertain the number of shares outstanding and the voting power of each;

(ii)determine the shares represented at the meeting and the validity of proxies and ballots;

(iii)count all votes and ballots;

(iv)determine and retain for a reasonable period a record of the disposition of any challenges made to any determination by the inspectors; and;

(v)certify their determination of the number of shares represented at the meeting, and their count of all votes and ballots.

The inspectors of election shall perform their duties impartially, in good faith, to the best of their ability and as expeditiously as is practical. If there are multiple inspectors of election, the decision, act or certificate of a majority is effective in all respects as the decision, act or certificate of all. Any report or certificate made by the inspectors of election is *prima facie* evidence of the facts stated therein.

## 2.15 PROXY ACCESS FOR DIRECTOR NOMINEES.

(i)*Inclusion of Stockholder Nominees in Proxy Materials*. Whenever the board of directors solicits proxies with respect to the election of directors at an annual meeting of stockholders, subject to the provisions of this Section 2.15, the corporation will include in its proxy materials for such annual meeting of stockholders, in addition to any persons nominated for election by the board of directors or a committee appointed by the board of directors, the name, together with the Required Information (as defined below), of any person properly nominated for election (a "**Stockholder Nominee**") to the board of directors by an Eligible Stockholder (as defined below). An Eligible Stockholder must expressly elect, at the time of providing the notice required by this Section 2.15 (the "**Nomination Notice**"), to have the nominee of such Eligible Stockholder included in the corporation's proxy materials pursuant to this Section 2.15. For the avoidance of doubt, if a Stockholder Nominee is included in the corporation's proxy materials for an annual meeting of stockholders then the corporation will also include such Stockholder Nominee on (A) any ballot distributed at such annual meeting; (B) the corporation's proxy card; and (C) any other format through which the corporation permits proxies to be submitted.

(ii)*Definition of Eligible Stockholder*. An "**Eligible Stockholder**" is a stockholder, or a group of no more than 20 stockholders, of the corporation that has satisfied (individually or, in the case of a group, collectively) all applicable conditions and has complied with all applicable procedures, in each case as set forth in this Section 2.15. No person may be a member of more than one group of persons constituting an Eligible Stockholder. A record holder acting on behalf of one or more beneficial owners will not be counted separately as a stockholder with respect to the shares owned by beneficial owners on whose behalf such record holder has been directed in writing to act, but each such beneficial owner will be counted separately, subject to the other provisions of this Section 2.15, for purposes of determining the number of stockholders whose holdings may be considered as part of an Eligible Stockholder's holdings. For purposes of this Section 2.15, two or more funds or trusts will be treated as one stockholder or beneficial owner (a "**Qualifying Fund**") if they are (i) under common management and investment control; (ii) under common management and funded primarily by the same employer; or (iii) a "group of investment companies," as such term is defined in Section 12(d)(1)(G)(ii) of the Investment Company Act of 1940, as amended.

(iii)*Required Information.* For purposes of this Section 2.15, the "Required Information" that the corporation will include in its proxy materials is (i) the information concerning the Stockholder Nominee and the Eligible Stockholder that is required to be disclosed in the corporation's proxy statement by the rules and regulations of the Securities and Exchange Commission (the "**SEC**") promulgated under the Securities Exchange Act of 1934 (the "**Exchange Act**"); and (ii) if the Eligible Stockholder so elects, one or more Supporting Statements (as defined below).

(iv)*Delivery of Nomination Notice.* To be timely, a Nomination Notice must be delivered to, or mailed and received at, the principal executive offices of the corporation not less than 120 days nor more than 150 days prior to the first anniversary of the day on which the corporation's proxy statement (or Notice of Internet Availability) relating to the immediately preceding annual meeting of stockholders was first mailed to stockholders. No adjournment, postponement or other delay of an annual meeting, or any public announcement thereof, will commence a new time period (or extend any time period) for the giving of a Nomination Notice.

(v)*Maximum Number of Stockholder Nominees.*

(a)*Maximum Number; Reductions.* The maximum aggregate number of Stockholder Nominees that will be included in the corporation's proxy materials with respect to an annual meeting of stockholders will not exceed the greater of (A) two or (B) 20 percent of the number of directors in office as of the last day on which a Nomination Notice may be delivered pursuant to this Section 2.15, or if such amount is not a whole number, then the closest whole number below 20 percent. This maximum number will be reduced by (1) the number of persons serving as nominees for director who will be included in the corporation' proxy materials as an unopposed (by the corporation) nominee pursuant to an agreement, arrangement or other understanding with a stockholder or group of stockholders (other than any such agreement, arrangement or understanding entered into in connection with an acquisition of shares of common stock of the corporation by such stockholder or group of stockholders from the corporation) (2) any Stockholder Nominee whose name was submitted by an Eligible Stockholder for inclusion in the corporation's proxy materials pursuant to this Section 2.15 but either (a) is subsequently withdrawn, disregarded or declared invalid or ineligible; or (b) that the board of directors or a committee appointed by the board of directors decides to nominate for election; and (3) the number of incumbent directors (as of the last day on which a Nomination Notice may be delivered pursuant to this Section 2.15) who were Stockholder Nominees at any of the preceding two annual meetings (including any individual covered under clause (2) above) and whose election at the upcoming annual meeting of stockholders is being recommended by the board of directors. Notwithstanding the previous sentence, in no event will the aggregate number of Stockholder Nominees in the corporation's proxy materials with respect to an annual meeting of stockholders be below one if a valid Nomination Notice is properly delivered pursuant to this Section 2.15. The number of Stockholder Nominees cannot exceed the number of directors to be elected at the applicable annual meeting of stockholders.

(b)*Impact of Vacancies.* If (A) one or more vacancies for any reason occurs on the board of directors after the last day on which a Nomination Notice may be delivered pursuant to this Section 2.15 but before the date of the annual meeting of stockholders and (B) the board of directors resolves to reduce the size of the board of directors in connection with such vacancy, then the maximum number of Stockholder Nominees will be calculated based on the number of directors in office as so reduced.

(c)*Ranking of Stockholder Nominees*. Any Eligible Stockholder submitting more than one Stockholder Nominee for inclusion in the corporation's proxy materials must rank its Stockholder Nominees in its Nomination Notice based on the order in which the Eligible Stockholder desires that such Stockholder Nominees be selected for inclusion in the corporation's proxy materials. If the number of Stockholder Nominees submitted by Eligible Stockholders exceeds the maximum number of nominees provided for pursuant to Section 2.15(v)(a), then the highest-ranking qualifying Stockholder Nominee of each Eligible Stockholder will be selected by the corporation for inclusion in the corporation's proxy materials until the maximum number of Stockholder Nominees is reached, going in order by the number (largest to smallest) of shares of common stock of the corporation that each Eligible Stockholder disclosed as Owned (as defined below) in its Nomination Notice. If the maximum number of Stockholder Nominees is not reached after the highest-ranking qualifying Stockholder Nominee of each Eligible Stockholder has been selected, then this process will continue with the next highest-ranked Stockholder Nominees as many times as necessary, following the same order each time, until the maximum number is reached.

(vi)*Ownership*. For purposes of this Section 2.15, an Eligible Stockholder will be deemed to "**Own**" only those outstanding shares of common stock of the corporation as to which the Eligible Stockholder possesses both (i) the full voting and investment rights pertaining to the shares; and (ii) the full economic interest in (including the opportunity for profit and risk of loss on) such shares. The number of shares calculated in accordance with the prior sentence will not include any shares (A) sold by such Eligible Stockholder or any of its affiliates in any transaction that has not been settled or closed, including any short sale; (B) borrowed by such Eligible Stockholder or any of its affiliates for any purpose; (C) purchased by such Eligible Stockholder or any of its affiliates subject to an agreement to resell; or (D) subject to any option, warrant, forward contract, swap, contract of sale, or other derivative or similar agreement entered into by such Eligible Stockholder or any of its affiliates, whether any such instrument or agreement is to be settled with shares or with cash based on the notional amount or value of shares of common stock of the corporation, in any such case which instrument or agreement has, or is intended to have, or if exercised would have, the purpose or effect of (1) reducing in any manner, to any extent or at any time in the future, the full right to vote or direct the voting of any such shares by the Eligible Stockholder or its affiliates; or (2) hedging, offsetting or altering to any degree any gain or loss arising from the full economic ownership of such shares by such Eligible Stockholder or its affiliates. A stockholder will "Own" shares held in the name of a nominee or other intermediary so long as the stockholder retains the right to instruct how the shares are voted with respect to the election of directors and possesses the full economic interest in the shares. A stockholder's Ownership of shares will be deemed to continue during any period in which the stockholder has (a) loaned such shares so long as the stockholder has the power to recall such loaned shares on no more than five business days' notice and includes with the Nomination Notice an agreement that it (i) will promptly recall such loaned shares upon being notified by the corporation that any of its Stockholder Nominees will be included in the corporation's proxy materials and (ii) will continue to hold such recalled shares through the date of the annual meeting of stockholders; or (b) delegated any voting power by means of a proxy, power of attorney, or other instrument or arrangement that is revocable at any time by the stockholder. The terms "Owned," "Owning", "Ownership" and other variations of the word "Own" will have correlative meanings. Whether outstanding shares of common stock of the corporation are "Owned" for purposes of this Section 2.15 will be determined by the board of directors or any of its committees, which determination will be conclusive and binding on the corporation and its stockholders. For purposes of this Section 2.15, the term "affiliate" will have the meaning given to it in Rule 405 promulgated under the Securities Act of 1933 (the "**Securities Act**").

(vi)Eligible Stockholder Requirements.

(a)*Ownership Requirement*. To make a nomination pursuant to this Section 2.15, an Eligible Stockholder must have Owned continuously for at least three years (the "**Holding Period**") a number of shares representing at least three percent of the corporation's common stock (such required number of shares, the "**Required Shares**"). For purposes of determining whether the Eligible Stockholder owned the Required Shares for the Holding Period, the number of shares of common stock will be determined by reference to the corporation's periodic filings with the SEC during the Holding Period. The Required Shares must also be Owned continuously as of (i) the date on which the Nomination Notice is delivered to, or mailed and received at, the principal executive offices of the corporation in accordance with this Section 2.15; (ii) the record date for determining stockholders entitled to vote at the annual meeting of stockholders; and (iii) the date of the annual meeting of stockholders.

(b)*Additional Requirements for Groups of Stockholders*. If a group of stockholders aggregates Ownership of shares in order to meet the requirements under this Section 2.15, then (i) all shares held by each stockholder constituting their contribution to the Required Shares must have been held by that stockholder continuously for at least the Holding Period, and must also be Owned continuously as of (A) the date on which the Nomination Notice is delivered to, or mailed and received at, the principal executive offices of the corporation in accordance with this Section 2.15; (B) the record date for determining stockholders entitled to vote at the annual meeting of stockholders; and (C) the date of the annual meeting of stockholders; (ii) each provision in this Section 2.15 that requires the Eligible Stockholder to provide any written statements, representations, undertakings, agreements or other instruments or to meet any other conditions will be deemed to require each stockholder that is a member of such group to provide such statements, representations, undertakings, agreements or other instruments and to meet such other conditions (except that the members of such group may aggregate their stockholdings in order to meet the Required Shares); and (iii) a breach of any obligation, agreement or representation under this Section 2.15 by any member of such group will be deemed a breach by the Eligible Stockholder.

(vii)*Information to be Provided by an Eligible Stockholder*. Within the time period specified for providing the Nomination Notice, an Eligible Stockholder (which, for purposes of this Section 2.15(viii), will be deemed to include any beneficial owner on whose behalf the nomination is made) making a nomination pursuant to this Section 2.15 must provide the following information in writing to the secretary of the corporation at the principal executive offices of the corporation:

(a)the name and address of the Eligible Stockholder;

(b)a statement by the Eligible Stockholder (A) setting forth and certifying as to the number of shares of common stock of the corporation that it Owns and has Owned continuously during Holding Period; (B) agreeing to continue to Own the Required Shares through the date of the annual meeting of stockholders; and (C) indicating whether it intends to continue to own the Required Shares for at least one year following the annual meeting of stockholders (it being understood that this statement will not be deemed to impose any obligation on the Eligible Stockholder to hold any of the Required Shares following the annual meeting of stockholders);

-13-

(c)in the case of a nomination by a group of stockholders that together is an Eligible Stockholder, (A) the designation by all group members of one group member that is authorized to receive communications, notices and inquiries from the corporation and to act on behalf of all such members with respect to the nomination and all related matters (including any withdrawal of the nomination); (B) the written acceptance by such group member of such designation; and (C) the address, phone number and email address of such group member,

(d)one or more written statements from each record holder of the Required Shares (and from each intermediary through which the Required Shares are or have been held during the Holding Period) verifying that, as of a date within seven calendar days prior to the date that Nomination Notice is delivered or received at the principal executive offices of the corporation, the Eligible Stockholder then Owns, and has Owned continuously for the Holding Period, the Required Shares;

(e)an undertaking by the Eligible Stockholder to provide, within seven calendar days after (A) the record date for the annual meeting of stockholders (if, prior to such record date, the corporation (1) has made disclosure of the record date in a press release reported by the Dow Jones News Service, Associated Press or a comparable national news service or in a document publicly filed by the corporation with the SEC pursuant to Section 13, Section 14 or Section 15(d) of the Exchange Act; or (2) delivered a written notice (including by email) of the record date to the Eligible Stockholder) or (B) the date on which the corporation delivered to the Eligible Stockholder written notice (including by email) of the record date (if such notice is provided after the record date), one or more written statements from each record holder of the Required Shares (and from each intermediary through which the Required Shares are or have been held during the Holding Period) verifying the Eligible Stockholder's continuous Ownership of the Required Shares through the record date;

(f)in the case of a Qualifying Fund whose share Ownership is counted for purposes of qualifying as an Eligible Stockholder, documentation reasonably satisfactory to the board of directors that demonstrates that such Qualifying Fund meets the requirements of a Qualifying Fund;

(g)the information, agreements, certifications, representations and other documents required to be set forth in or included with a stockholder's notice of a nomination pursuant to Article II, Section 2.4(ii);

(h)a copy of the Schedule 14N that has been or is concurrently being filed by such Eligible Stockholder with the SEC as required by Rule 14a-18 under the Exchange Act (or any successor rule);

-14-

(i)a representation and undertaking that (A) the Eligible Stockholder (1) did not acquire, and is not holding, securities of the corporation for the purpose or with the effect of influencing or changing control of the corporation; (2) has not nominated, and will not nominate, for election to the board of directors at the annual meeting of stockholders any person other than the Stockholder Nominees being nominated by it pursuant to this Section 2.15; (3) has not engaged, and will not engage, in a, and has not and will not be a "participant" in another person's, "solicitation" within the meaning of Rule 14a-1(*l*) under the Exchange Act (or any successor rule) in support of the election of any individual as a director at the annual meeting of stockholders (other than its Stockholder Nominees or a nominee of the board of directors); (4) has not distributed, and will not distribute, to any stockholder any form of proxy for the annual meeting of stockholders other than the form distributed by the corporation; (5) has complied, and will comply, with all laws, rules and regulations applicable to any actions taken pursuant to this Section 2.15, including the nomination of its Stockholder Nominees and any permissible solicitation in connection with the annual meeting of stockholders; and (6) consents to the public disclosure of the information provided pursuant to this Section 2.15; and (B) the facts, statements and other information in all communications with the corporation and its stockholders by the Eligible Stockholder are, and will be, true and correct in all material respects and do not, and will not, omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(j)an undertaking that the Eligible Stockholder agrees to (A) assume all liability stemming from any legal or regulatory violation arising out of the Eligible Stockholder's communications with the stockholders of the corporation or out of the information that the Eligible Stockholder provides to the corporation; (B) indemnify and hold harmless the corporation and each of its directors, officers, employees, agents and affiliates individually against any liability, loss or damages in connection with any threatened or pending action, suit or proceeding, whether legal, administrative or investigative, against the corporation or any of its directors, officers, employees, agents or affiliates arising out of any nomination, solicitation or other activity by the Eligible Stockholder in connection with its efforts to elect any Stockholder Nominees pursuant to this Section 2.15; (C) comply with all requirements of this Section 2.15; and (D) upon request, provide to the corporation within five business days after such request, but in any event prior to the date of the applicable annual meeting of stockholders, such additional information as is reasonably requested by the corporation (including any information reasonably necessary to verify the Eligible Stockholder's continuous Ownership of the Required Shares for the Holding Period and through the date of the annual meeting of stockholders).

-15-

(ix)Representations and Agreement of any Stockholder Nominee.

(a)*Materials Required to be Provided*. Within the time period specified in this Section 2.15 for delivering the Nomination Notice, each Stockholder Nominee must deliver to the secretary of the corporation a written representation and agreement that the Stockholder Nominee (A) other than as disclosed to the corporation, (1) is not, and will not become, a party to any agreement, arrangement or understanding with, and has not given, and will not give, any commitment or assurance to, any person or entity as to how such Stockholder Nominee, if elected as a director, will act or vote on any issue or question; and (2) is not, and will not become, a party to any agreement, arrangement or understanding with any person or entity other than the corporation with respect to any direct or indirect compensation, reimbursement or indemnification in connection with service or action as a Stockholder Nominee or director; (B) if elected, will comply with the corporation's corporate governance guidelines, code of conduct, share ownership guidelines and insider trading policies and guidelines, and any other policies and guidelines of the corporation applicable to directors, as well as any applicable law, rule or regulation or listing requirement; (C) consents to being named in the corporation's proxy statement for the annual meeting of stockholders as a nominee of the applicable Eligible Stockholder or of the board of directors; (D) agrees to serve as a director if elected; (E) consents to the public disclosure of the information provided pursuant to this Section 2.15; and (F) represents that such Stockholder Nominee intends to serve as director of the corporation for the full term if so elected.

(b)*Additional Materials*. At the written request of the corporation, the Stockholder Nominee must promptly, but in any event within five business days of such request, submit all (A) completed and signed questionnaires required of the corporation's directors, nominees for director, and officers; and (B) additional information requested by the corporation (1) as may be reasonably necessary to permit the board of directors or any of its committees to determine if such Stockholder Nominee (a) is independent under the listing standards of the principal U.S. exchange upon which the corporation's common stock is listed, any applicable rules of the SEC and any publicly disclosed standards used by the board of directors in determining and disclosing the independence of the corporation's directors (collectively, the "**Applicable Independence Standards**"); (b) is eligible to serve as a director of the corporation; (c) has any direct or indirect relationship with the corporation; and (d) is not, and has not been, subject to any event specified in Item 401(f) of Regulation S-K promulgated under the Securities Act (or any successor rule) or any order of the type specified in Rule 506(d) of Regulation D promulgated under the Securities Act (or any successor rule); and (2) that could be material to a reasonable stockholder's understanding of the independence, or lack thereof, of such Stockholder Nominee.

(x)*Supporting Statement*. For each of its Stockholder Nominees, the Eligible Stockholder may provide to the secretary of the corporation, within the time period specified for providing the Nomination Notice, a written statement, not to exceed 500 words, for inclusion in the corporation's proxy statement for the annual meeting of stockholders in support of the candidacy of such Stockholder Nominee (a "**Supporting Statement**"). No Supporting Statement may include any images, charts, pictures, graphic presentations or similar items.

(xi)*True, Correct and Complete Information*. If any information or communications provided by any Eligible Stockholder or Stockholder Nominee to the corporation or its stockholders is not, when provided, or thereafter ceases to be, true, correct and complete in all material respects (including omitting a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading), then such Eligible Stockholder or Stockholder Nominee, as the case may be, must promptly notify the secretary of the corporation in writing and provide the information that is required to make such information or communication true, correct, complete and not misleading. In addition, any person or entity providing any information to the corporation pursuant to this Section 2.15 must further update and supplement such information, if necessary, so that all such information is true and correct as of the record date for the annual meeting of stockholders and as of the date that is 10 business days prior to the annual meeting of stockholders or any adjournment, postponement or other delay thereof. Any update or supplement (or a written certification that no such updates or supplements are necessary and that the information previously provided remains true and correct as of the applicable date) pursuant to this Section 2.15(xi) must be delivered to, or mailed and received by, the secretary of the corporation at the principal executive offices of the corporation no later than (i) five business days after the record date for the annual meeting of stockholders (in the case of any update and supplement required to be made as of the record date); and (ii) seven business days prior to the date of the annual meeting of stockholders or any adjournment, postponement or other thereof (in the case of any update and supplement required to be made as of 10 business days prior to the annual meeting of stockholders). No notification, update or supplement provided pursuant to this Section 2.15(xi) or otherwise will be deemed to cure any defect in any previously provided information or communications or limit the remedies available to the corporation relating to any such defect (including the right to omit a Stockholder Nominee from its proxy materials).

(xii)Disqualifications and Exclusions of Stockholder Nominees.

(a)*Bases for Disqualifying or Excluding Stockholder Nominees*. Notwithstanding anything to the contrary in this Section 2.15, the corporation will not be required to include a Stockholder Nominee in its proxy materials (A) if the Eligible Stockholder who has nominated such Stockholder Nominee has engaged in or is currently engaged in, or has been or is a "participant" in another person's, "solicitation" (within the meaning of Rule 14a-1(*l*) under the Exchange Act (or any successor rule)) in support of the election of any individual as a director at the annual meeting of stockholders other than its Stockholder Nominees or a nominee of the board of directors; (B) who is not independent under the Applicable Independence Standards, as determined in good faith by the board of directors or any of its committees; (C) whose election as a member of the board of directors would cause the corporation to be in violation of these bylaws, the corporation's certificate of incorporation, the rules and listing standards of the principal exchange upon which the corporation's shares of common stock are listed or traded, or any applicable law, rule or regulation; (D) who is or has been, within the past three years, an officer or director of a competitor, as defined in Section 8 of the Clayton Antitrust Act of 1914; (E) who is a named subject of a pending criminal proceeding (excluding traffic violations and other minor offenses) or has been convicted in such a criminal proceeding within the past 10 years; (F) who is subject to any order of the type specified in Rule 506(d) of Regulation D promulgated under the Securities Act (or any successor rule); (G) if such Stockholder Nominee dies, becomes disabled or otherwise becomes ineligible for inclusion in the corporation's proxy materials pursuant to this Section 2.15 or otherwise becomes unavailable for election at the annual meeting of stockholders (including because such Stockholder Nominee is no longer willing to serve on the board of directors); (H) if such Stockholder Nominee or the Eligible Stockholder who has nominated such Stockholder Nominee has provided information to the corporation with respect to such nomination that was untrue in any material respect or omitted to state a material fact necessary in order to make the statement made, in light of the circumstances under which it was made, not misleading, as determined by the board of directors; (I) if such Stockholder Nominee or the Eligible Stockholder who has nominated such Stockholder Nominee otherwise contravenes any of the agreements or representations made by such Stockholder Nominee or Eligible Stockholder, as applicable, or fails to comply with its obligations pursuant to this Section 2.15; (J) if the Eligible Stockholder who has nominated such Stockholder Nominee ceases to be an Eligible Stockholder for any reason, including but not limited to not Owning the Required Shares through the date of the applicable annual meeting of stockholders; or (K) if such Stockholder Nominee and the Eligible Stockholder (or a representative thereof) or, in the case of a nomination by a group of stockholders, the representative designated by the group in accordance with Section 2.15(viii)(c), do not appear at the annual meeting of stockholders to, as applicable, present the Stockholder Nominee for election.

(b)*Process Following Disqualification or Exclusion*. Following any determination in accordance with Section 2.15(xii)(a), (A) the corporation will not be required to include in its proxy materials any successor or replacement nominee proposed by the applicable Eligible Stockholder or any other Eligible Stockholder; (B) to the extent feasible, the corporation may remove the information concerning a Stockholder Nominee and any related Supporting Statement (or portion thereof) from its proxy materials or otherwise communicate to its stockholders that such Stockholder Nominee will not be eligible for election at the annual meeting of stockholders; and (C) the board of directors or the person presiding at the annual meeting of stockholders will declare the nomination of such Stockholder Nominee to be invalid and such nomination will be disregarded notwithstanding that proxies in support of such Stockholder Nominee may have been received by the corporation.

(c)*Future Status of Withdrawn or Ineligible Stockholder Nominees*. Any Stockholder Nominee who is included in the corporation's proxy materials for an annual meeting of stockholders but either (A) withdraws from or becomes ineligible or unavailable for election at such annual meeting of stockholders or (B) does not receive at least 25% of the votes cast in favor of such Stockholder Nominee's election at such annual meeting of stockholders will be ineligible to be a Stockholder Nominee pursuant to this Section 2.15 for the next two annual meetings. For the avoidance of doubt, the preceding sentence will not prevent any stockholder from nominating any person to the board of directors pursuant to Article II, Section 2.4(ii).

(xiii)*No Stockholder Nominees at Contested Annual Meetings*. Notwithstanding anything to the contrary in this Section 2.15, if the corporation receives notice pursuant to Article II, Section 2.4(ii) that any stockholder intends to nominate any person for election to the board of directors an annual meeting of stockholders, then the corporation will not include in its proxy materials any Stockholder Nominees at such annual meeting of stockholders.

(xiv)*Filing Obligation*. The Eligible Stockholder (including any person or entity who Owns shares of common stock of the corporation that constitute part of the Ownership of such Eligible Stockholder for purposes of meeting the Required Shares) must file with the SEC any solicitation of the corporation's stockholders relating to the annual meeting of stockholders at which the Stockholder Nominee will be nominated, regardless of whether any such filing is required under Regulation 14A of the Exchange Act (or any successor rule) or whether any exemption from filing is available for such solicitation under Regulation 14A of the Exchange Act.

(xv)*Omitted Disclosure by the Corporation*. Notwithstanding anything to the contrary contained in this Section 2.15, the corporation may omit from its proxy materials any information or Supporting Statement (or portion thereof) that it, in good faith, believes (i) is not true in all material respects or omits a material statement necessary to make such information or Supporting Statement (or portion thereof) not misleading; (ii) directly or indirectly impugns the character, integrity or personal reputation of, or directly or indirectly makes charges concerning improper, illegal or immoral conduct or associations, without factual foundation, with respect to, any person; or (iii) violates any applicable law, rule, regulation or listing standard.

(xvi)*No Limitation on the Corporation*. Nothing in this Section 2.15 will limit the corporation's ability to (i) solicit against any Stockholder Nominee; (ii) include in its proxy materials its own statements or other information relating to any Eligible Stockholder or Stockholder Nominee (including any information provided to the corporation pursuant to this Section 2.15); or (iii) include in its proxy materials any Stockholder Nominee as a nominee of the board of directors.

(xvii)*Board of Directors Has Exclusive Power to Interpret*. The board of directors or a committee appointed by the board of directors will have the exclusive power and authority to interpret the provisions of this Section 2.15 and make all determinations deemed necessary or advisable in connection with this Section 2.15. All interpretations and determinations by the board of directors or a committee appointed by the board of directors will be made in good faith and be final, conclusive and binding on the corporation, its stockholders and beneficial owners, and all other parties. All such actions, interpretations and determinations shall be final, conclusive and binding on the corporation, its stockholders and all other parties.

(xviii)*Exclusive Method for Proxy Access*. This Section 2.15 provides the exclusive method for a stockholder to include nominees for election to the board of directors in the corporation's proxy materials.

**ARTICLE III - DIRECTORS**

3.1 POWERS

The business and affairs of the corporation shall be managed by or under the direction of the board of directors, except as may be otherwise provided in the DGCL or the certificate of incorporation.

3.2 NUMBER OF DIRECTORS

The board of directors shall consist of one or more members, each of whom shall be a natural person. Unless the certificate of incorporation fixes the number of directors, the number of directors shall be determined from time to time by resolution of the board of directors. No reduction of the authorized number of directors shall have the effect of removing any director before that director's term of office expires.

3.3 ELECTION, QUALIFICATION AND TERM OF OFFICE OF DIRECTORS

Except as provided in Section 3.4 of these bylaws, each director, including a director elected to fill a vacancy, shall hold office until the expiration of the term for which elected and until such director's successor is elected and qualified or until such director's earlier death, resignation or removal. Directors need not be stockholders unless so required by the certificate of incorporation or these bylaws. The certificate of incorporation or these bylaws may prescribe other qualifications for directors.

3.4 RESIGNATION AND VACANCIES

Any director may resign at any time upon notice given in writing or by electronic transmission to the corporation. A resignation is effective when the resignation is delivered unless the resignation specifies a later effective date or an effective date determined upon the happening of an event or events. A resignation which is conditioned upon the director failing to receive a specified vote for reelection as a director may provide that it is irrevocable. Unless otherwise provided in the certificate of incorporation or these bylaws, when one or more directors resign from the board of directors, effective at a future date, a majority of the directors then in office, including those who have so resigned, shall have power to fill such vacancy or vacancies, the vote thereon to take effect when such resignation or resignations shall become effective.

Unless otherwise provided in the certificate of incorporation or these bylaws, vacancies and newly created directorships resulting from any increase in the authorized number of directors elected by all of the stockholders having the right to vote as a single class shall be filled only by a majority of the directors then in office, although less than a quorum, or by a sole remaining director. If the directors are divided into classes, a person so elected by the directors then in office to fill a vacancy or newly created directorship shall hold office until the next election of the class for which such director shall have been chosen and until his or her successor shall have been duly elected and qualified.

If at any time, by reason of death or resignation or other cause, the corporation should have no directors in office, then any officer or any stockholder or an executor, administrator, trustee or guardian of a stockholder, or other fiduciary entrusted with like responsibility for the person or estate of a stockholder, may call a special meeting of stockholders in accordance with the provisions of the certificate of incorporation or these bylaws, or may apply to the Delaware Court of Chancery for a decree summarily ordering an election as provided in Section 211 of the DGCL.

If, at the time of filling any vacancy or any newly created directorship, the directors then in office constitute less than a majority of the whole board of directors (as constituted immediately prior to any such increase), the Court of Chancery may, upon application of any stockholder or stockholders holding at least 10% of the voting power of the voting stock at the time outstanding having the right to vote for such directors, summarily order an election to be held to fill any such vacancies or newly created directorships, or to replace the directors chosen by the directors then in office as aforesaid, which election shall be governed by the provisions of Section 211 of the DGCL as far as applicable.

3.5 PLACE OF MEETINGS; MEETINGS BY TELEPHONE

The board of directors may hold meetings, both regular and special, either within or outside the State of Delaware.

Unless otherwise restricted by the certificate of incorporation or these bylaws, members of the board of directors, or any committee designated by the board of directors, may participate in a meeting of the board of directors, or any committee, by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other, and such participation in a meeting shall constitute presence in person at the meeting.

3.6 REGULAR MEETINGS

Regular meetings of the board of directors may be held without notice at such time and at such place as shall from time to time be determined by the board of directors.

3.7 SPECIAL MEETINGS; NOTICE

Special meetings of the board of directors for any purpose or purposes may be called at any time by the chairperson of the board of directors, the chief executive officer, the secretary or a majority of the authorized number of directors, at such times and places as he or she or they shall designate.

Notice of the time and place of special meetings shall be:

(i) delivered personally by hand, by courier or by telephone;

(ii) sent by United States first-class mail, postage prepaid;

(iii) sent by facsimile;

(iv) sent by electronic mail; or

(v) otherwise given by electronic transmission (as defined in Section 232 of the DGCL),

directed to each director at that director's address, telephone number, facsimile number, electronic mail address or other contact for notice by electronic transmission, as the case may be, as shown on the corporation's records.

If the notice is (i) delivered personally by hand, by courier or by telephone, (ii) sent by facsimile (iii) sent by electronic mail or (iv) otherwise given by electronic transmission, it shall be delivered, sent or otherwise directed to each director, as applicable, at least 24 hours before the time of the holding of the meeting. If the notice is sent by United States mail, it shall be

deposited in the United States mail at least four days before the time of the holding of the meeting. Any oral notice may be communicated to the director. The notice need not specify the place of the meeting (if the meeting is to be held at the corporation's principal executive office) nor the purpose of the meeting, unless required by statute.

3.8 QUORUM; VOTING

At all meetings of the board of directors, a majority of the total authorized number of directors shall constitute a quorum for the transaction of business. If a quorum is not present at any meeting of the board of directors, then the directors present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum is present. A meeting at which a quorum is initially present may continue to transact business notwithstanding the withdrawal of directors, if any action taken is approved by at least a majority of the required quorum for that meeting.

The affirmative vote of a majority of the directors present at any meeting at which a quorum is present shall be the act of the board of directors, except as may be otherwise specifically provided by statute, the certificate of incorporation or these bylaws.

If the certificate of incorporation provides that one or more directors shall have more or less than one vote per director on any matter, every reference in these bylaws to a majority or other proportion of the directors shall refer to a majority or other proportion of the votes of the directors.

3.9 BOARD ACTION BY WRITTEN CONSENT WITHOUT A MEETING

Unless otherwise restricted by the certificate of incorporation or these bylaws, any action required or permitted to be taken at any meeting of the board of directors, or of any committee thereof, may be taken without a meeting if all members of the board of directors or committee, as the case may be, consent thereto in writing or by electronic transmission. Any person (whether or not then a director) may provide, whether through instruction to an agent or otherwise, that a consent to action will be effective at a future time (including a time determined upon the happening of an event), no later than 60 days after such instruction is given or such provision is made and such consent shall be deemed to have been given for purposes of this Section 3.9 at such effective time so long as such person is then a director and did not revoke the consent prior to such time. Any such consent shall be revocable prior to its becoming effective.

3.10 FEES AND COMPENSATION OF DIRECTORS

Unless otherwise restricted by the certificate of incorporation or these bylaws, the board of directors shall have the authority to fix the compensation of directors.

3.11 REMOVAL OF DIRECTORS

Any director may be removed from office by the stockholders of the corporation in the manner specified in the certificate of incorporation and applicable law.

No reduction of the authorized number of directors shall have the effect of removing any director prior to the expiration of such director's term of office.

**ARTICLE IV - COMMITTEES**

4.1 COMMITTEES OF DIRECTORS

The board of directors may designate one or more committees, each committee to consist of one or more of the directors of the corporation. The board of directors may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee. In the absence or disqualification of a member of a committee, the member or members thereof present at any meeting and not disqualified from voting, whether or not such member or members constitute a quorum, may unanimously appoint another member of the board of directors to act at the meeting in the place of any such absent or disqualified member. Any such committee, to the extent provided in the resolution of the board of directors or in these bylaws, shall have and may exercise all the powers and authority of the board of directors in the management of the business and affairs of the corporation, and may authorize the seal of the corporation to be affixed to all papers that may require it; but no such committee shall have the power or authority to (i) approve or adopt, or recommend to the stockholders, any action or matter (other than the election or removal of directors) expressly required by the DGCL to be submitted to stockholders for approval, or (ii) adopt, amend or repeal any bylaw of the corporation.

4.2 COMMITTEE MINUTES

Each committee and subcommittee shall keep regular minutes of its meetings.

4.3 MEETINGS AND ACTION OF COMMITTEES

Meetings and actions of committees and subcommittees shall be governed by, and held and taken in accordance with, the provisions of:

(i) Section 3.5 (place of meetings and meetings by telephone);

(ii) Section 3.6 (regular meetings);

(iii) Section 3.7 (special meetings and notice);

(iv) Section 3.8 (quorum; voting);

(v) Section 7.4 (waiver of notice); and

(vi) Section 3.9 (action without a meeting)

with such changes in the context of those bylaws as are necessary to substitute the committee or subcommittee and its members for the board of directors and its members. *However:*

(i) the time and place of regular meetings of committees or subcommittees may be determined either by resolution of the board of directors or by resolution of the committee or subcommittee;

(ii) special meetings of committees or subcommittee may also be called by resolution of the board of directors or the committee or the subcommittee; and

(iii)notice of special meetings of committees or subcommittees shall also be given to all alternate members, who shall have the right to attend all meetings of the committee or subcommittee. The board of directors or a committee may adopt rules for the government of any committee not inconsistent with the provisions of these bylaws.

Any provision in the certificate of incorporation providing that one or more directors shall have more or less than one vote per director on any matter shall apply to voting in any committee or subcommittee, unless otherwise provided in the certificate of incorporation or these bylaws.

## 4.4 SUBCOMMITTEES

Unless otherwise provided in the certificate of incorporation, these bylaws or the resolutions of the board of directors designating the committee, a committee may create one or more subcommittees, each subcommittee to consist of one or more members of the committee, and delegate to a subcommittee any or all of the powers and authority of the committee.

## ARTICLE V - OFFICERS

## 5.1 OFFICERS

The officers of the corporation shall be a chief executive officer and/or president and a secretary. The corporation may also have, at the discretion of the board of directors, a chairperson of the board of directors, a vice chairperson of the board of directors, a chief executive officer, a chief financial officer or treasurer, one or more vice presidents, one or more assistant vice presidents, one or more assistant treasurers, one or more assistant secretaries, and any such other officers as may be appointed in accordance with the provisions of these bylaws. Any number of offices may be held by the same person.

## 5.2 APPOINTMENT OF OFFICERS

The board of directors shall appoint the officers of the corporation, except such officers as may be appointed in accordance with the provisions of Section 5.3 of these bylaws, subject to the rights, if any, of an officer under any contract of employment.

## 5.3 SUBORDINATE OFFICERS

The board of directors may appoint, or empower the chief executive officer or, in the absence of a chief executive officer, another officer, to appoint such other officers as the business of the corporation may require. Each of such officers shall hold office for such period, have such authority, and perform such duties as are provided in these bylaws or as the board of directors may from time to time determine.

## 5.4 REMOVAL AND RESIGNATION OF OFFICERS

Subject to the rights, if any, of an officer under any contract of employment, any officer may be removed, either with or without cause, by the board of directors or, for the avoidance of doubt, any duly authorized committee or subcommittee thereof or by any officer upon whom such power of removal may be conferred by the board of directors.

-24-

Any officer may resign at any time by giving notice, in writing or by electronic transmission, to the corporation. Any resignation shall take effect at the date of the receipt of that notice or at any later time specified in that notice. Unless otherwise specified in the notice of resignation, the acceptance of the resignation shall not be necessary to make it effective. Any resignation is without prejudice to the rights, if any, of the corporation under any contract to which the officer is a party.

## 5.5 VACANCIES IN OFFICES

Any vacancy occurring in any office of the corporation shall be filled by the board of directors or as provided in Section 5.3.

## 5.6 REPRESENTATION OF SECURITIES OF OTHER ENTITIES

The chairperson of the board of directors, the chief executive officer and/or president, any vice president, the treasurer, the secretary or assistant secretary of this corporation, or any other person authorized by the board of directors or the chief executive officer and/or president or a vice president, is authorized to vote, represent, and exercise on behalf of this corporation all rights incident to any and all shares or other securities of any other entity or entities, and all rights incident to any management authority conferred on the corporation in accordance with the governing documents of any entity or entities, standing in the name of this corporation, including the right to act by written consent. The authority granted herein may be exercised either by such person directly or by any other person authorized to do so by proxy or power of attorney duly executed by such person having the authority.

## 5.7 AUTHORITY AND DUTIES OF OFFICERS

All officers of the corporation shall respectively have such authority and perform such duties in the management of the business of the corporation as may be designated from time to time by the board of directors and, to the extent not so provided, as generally pertain to their respective offices, subject to the control of the board of directors.

## ARTICLE VI - STOCK

## 6.1 STOCK CERTIFICATES; PARTLY PAID SHARES

The shares of the corporation shall be represented by certificates, provided that the board of directors may provide by resolution or resolutions that some or all of any or all classes or series of its stock shall be uncertificated shares. Any such resolution shall not apply to shares represented by a certificate until such certificate is surrendered to the corporation. Every holder of stock represented by certificates shall be entitled to have a certificate signed by, or in the name of, the corporation by any two officers of the corporation representing the number of shares registered in certificate form. Any or all of the signatures on the certificate may be a facsimile. In case any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed upon a certificate has ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the corporation with the same effect as if such person were such officer, transfer agent or registrar at the date of issue. The corporation shall not have power to issue a certificate in bearer form.

The corporation may issue the whole or any part of its shares as partly paid and subject to call for the remainder of the consideration to be paid therefor. Upon the face or back of each stock certificate issued to represent any such partly-paid shares, or upon the books and records of the corporation in the case of uncertificated partly-paid shares, the total amount of the consideration to be paid therefor and the amount paid thereon shall be stated. Upon the declaration of any dividend on fully-paid shares, the corporation shall declare a dividend upon partly-paid shares of the same class, but only upon the basis of the percentage of the consideration actually paid thereon.

6.2 SPECIAL DESIGNATION ON CERTIFICATES

If the corporation is authorized to issue more than one class of stock or more than one series of any class, then the powers, the designations, the preferences, and the relative, participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights shall be set forth in full or summarized on the face or back of the certificate that the corporation shall issue to represent such class or series of stock; *provided, however,* that, except as otherwise provided in Section 202 of the DGCL, in lieu of the foregoing requirements there may be set forth on the face or back of the certificate that the corporation shall issue to represent such class or series of stock, a statement that the corporation will furnish without charge to each stockholder who so requests the powers, designations, preferences and relative, participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights. Within a reasonable time after the issuance or transfer of uncertificated stock, the corporation shall give the registered owner thereof a notice, in writing or by electronic transmission, containing the information required to be set forth or stated on certificates pursuant to this section 6.2 or Sections 151, 156, 202(a) or 218(a) of the DGCL or with respect to this section 6.2 a statement that the corporation will furnish without charge to each stockholder who so requests the powers, designations, preferences and relative, participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights. Except as otherwise expressly provided by law, the rights and obligations of the holders of uncertificated stock and the rights and obligations of the holders of certificates representing stock of the same class and series shall be identical.

6.3 LOST CERTIFICATES

Except as provided in this Section 6.3, no new certificates for shares shall be issued to replace a previously issued certificate unless the latter is surrendered to the corporation and cancelled at the same time. The corporation may issue a new certificate of stock or uncertificated shares in the place of any certificate theretofore issued by it, alleged to have been lost, stolen or destroyed, and the corporation may require the owner of the lost, stolen or destroyed certificate, or such owner's legal representative, to give the corporation a bond sufficient to indemnify it against any claim that may be made against it on account of the alleged loss, theft or destruction of any such certificate or the issuance of such new certificate or uncertificated shares.

## 6.4 DIVIDENDS

The board of directors, subject to any restrictions contained in the certificate of incorporation or applicable law, may declare and pay dividends upon the shares of the corporation's capital stock.

The board of directors may set apart out of any of the funds of the corporation available for dividends a reserve or reserves for any proper purpose and may abolish any such reserve. Such purposes shall include but not be limited to equalizing dividends, repairing or maintaining any property of the corporation, and meeting contingencies.

## 6.5 TRANSFER OF STOCK

Transfers of record of shares of stock of the corporation shall be made only upon its books by the holders thereof, in person or by an attorney duly authorized, and, subject to Section 6.3 of these bylaws, if such stock is certificated, upon the surrender of a certificate or certificates for a like number of shares, properly endorsed or accompanied by proper evidence of succession, assignation or authority to transfer.

## 6.6 STOCK TRANSFER AGREEMENTS

The corporation shall have power to enter into and perform any agreement with any number of stockholders of any one or more classes of stock of the corporation to restrict the transfer of shares of stock of the corporation of any one or more classes owned by such stockholders in any manner not prohibited by the DGCL.

## 6.7 REGISTERED STOCKHOLDERS

The corporation:

(i) shall be entitled to recognize the exclusive right of a person registered on its books as the owner of shares to receive dividends, notices and and to vote as such owner;

(ii) shall be entitled to hold liable for calls and assessments the person registered on its books as the owner of shares; and

(iii) shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of another person, whether or not it shall have express or other notice thereof, except as otherwise provided by the laws of Delaware.

## ARTICLE VII - MANNER OF GIVING NOTICE AND WAIVER

### 7.1 NOTICE OF STOCKHOLDERS' MEETINGS

Notice of any meeting of stockholders shall be given in the manner set forth in the DGCL.

### 7.2 NOTICE TO STOCKHOLDERS SHARING AN ADDRESS

Except as otherwise prohibited under the DGCL, without limiting the manner by which notice otherwise may be given effectively to stockholders, any notice to stockholders given by the corporation under the provisions of the DGCL, the certificate of incorporation or these bylaws shall be effective if given by a single written notice to stockholders who share an address if consented to by the stockholders at that address to whom such notice is given. Any such consent shall be revocable by the stockholder by written notice to the corporation. Any stockholder who fails to object in writing to the corporation, within 60 days of having been given written notice by the corporation of its intention to send the single notice, shall be deemed to have consented to receiving such single written notice. This Section 7.2 shall not apply to Sections 164, 296, 311, 312 or 324 of the DGCL.

### 7.3 NOTICE TO PERSON WITH WHOM COMMUNICATION IS UNLAWFUL

Whenever notice is required to be given, under the DGCL, the certificate of incorporation or these bylaws, to any person with whom communication is unlawful, the giving of such notice to such person shall not be required and there shall be no duty to apply to any governmental authority or agency for a license or permit to give such notice to such person. Any action or meeting which shall be taken or held without notice to any such person with whom communication is unlawful shall have the same force and effect as if such notice had been duly given. In the event that the action taken by the corporation is such as to require the filing of a certificate under the DGCL, the certificate shall state, if such is the fact and if notice is required, that notice was given to all persons entitled to receive notice except such persons with whom communication is unlawful.

### 7.4 WAIVER OF NOTICE

Whenever notice is required to be given under any provision of the DGCL, the certificate of incorporation or these bylaws, a written waiver, signed by the person entitled to notice, or a waiver by electronic transmission by the person entitled to notice, whether before or after the time of the event for which notice is to be given, shall be deemed equivalent to notice. Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the stockholders need be specified in any written waiver of notice or any waiver by electronic transmission unless so required by the certificate of incorporation or these bylaws.

## ARTICLE VIII - FORUM FOR CERTAIN ACTIONS

To the fullest extent permitted by applicable law:

(A) Unless the corporation consents in writing to the selection of an alternative forum, the Court of Chancery of the State of Delaware (or, if the Court of Chancery does not have jurisdiction, another State court in Delaware or the federal district court for the District of Delaware) shall, to the fullest extent permitted by law, be the sole and exclusive forum for (i) any derivative action or proceeding brought on behalf of the corporation, (ii) any action asserting a claim of breach of a fiduciary duty owed by, or otherwise wrongdoing by, any director, stockholder, officer or other employee of the corporation to the corporation or the corporation's stockholders, (iii) any action arising pursuant to any provision of the DGCL or the certificate of incorporation or these bylaws (as either may be amended from time to time), (iv) any action to interpret, apply, enforce or determine the validity of the certificate of incorporation or these bylaws (as either may be amended from time to time), or (v) any action asserting a claim governed by the internal affairs doctrine, except for, as to each of (i) through (v) above, any claim as to which such court determines that there is an indispensable party not subject to the jurisdiction of such court (and the indispensable party does not consent to the personal jurisdiction of such court within ten (10) days following such determination), which is vested in the exclusive jurisdiction of a court or forum other than such court, or for which such court does not have subject matter jurisdiction. For the avoidance of doubt, this Article VIII, Part (A) shall not apply to any action brought to enforce a duty or liability created by the Securities Act of 1933, or any successor thereto (the "**Securities Act**") or the 1934 Act.

(B) Unless the corporation consents in writing to the selection of an alternative forum, the federal district courts of the United States of America shall be the sole and exclusive forum for the resolution of any complaint asserting a cause of action arising under the Securities Act.

## ARTICLE IX - INDEMNIFICATION

### 9.1 INDEMNIFICATION OF DIRECTORS AND OFFICERS IN THIRD PARTY PROCEEDINGS

Subject to the other provisions of this Article IX, the corporation shall indemnify, to the fullest extent permitted by the DGCL, as now or hereinafter in effect, any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (a "**Proceeding**") (other than an action by or in the right of the corporation) by reason of the fact that such person is or was a director or officer of the corporation, or is or was a director or officer of the corporation serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by such person in connection with such Proceeding if such person acted in good faith and in a manner such person reasonably believed to be in or not opposed to the best interests of the corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe such person's conduct was unlawful. The termination of any Proceeding by judgment, order, settlement, conviction, or upon a plea of *nolo contendere* or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner which such person reasonably believed to be in or not opposed to the best interests of the corporation, and, with respect to any criminal action or proceeding, had reasonable cause to believe that such person's conduct was unlawful.

-29-

## 9.2 INDEMNIFICATION OF DIRECTORS AND OFFICERS IN ACTIONS BY OR IN THE RIGHT OF THE CORPORATION

Subject to the other provisions of this Article IX, the corporation shall indemnify, to the fullest extent permitted by the DGCL, as now or hereinafter in effect, any person who was or is a party or is threatened to be made a party to any threatened, pending or completed Proceeding by or in the right of the corporation to procure a judgment in its favor by reason of the fact that such person is or was a director or officer of the corporation, or is or was a director or officer of the corporation serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against expenses (including attorneys' fees) actually and reasonably incurred by such person in connection with the defense or settlement of such Proceeding if such person acted in good faith and in a manner such person reasonably believed to be in or not opposed to the best interests of the corporation; except that no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable to the corporation unless and only to the extent that the Court of Chancery or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which the Court of Chancery or such other court shall deem proper.

## 9.3 SUCCESSFUL DEFENSE

To the extent that a present or former director or officer (for purposes of this Section 9.3 only, as such term is defined in Section 145(c)(1) of the DGCL) of the corporation has been successful on the merits or otherwise in defense of any action, suit or proceeding described in Section 9.1 or Section 9.2, or in defense of any claim, issue or matter therein, such person shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by such person in connection therewith. The corporation may indemnify any other person who is not a present or former director or officer of the corporation against expenses (including attorneys' fees) actually and reasonably incurred by such person to the extent he or she has been successful on the merits or otherwise in defense of any suit or proceeding described in Section 9.1 or Section 9.2, or in defense of any claim, issue or matter therein.

## 9.4 INDEMNIFICATION OF OTHERS

Subject to the other provisions of this Article IX, the corporation shall have power to indemnify its employees and agents, or any other persons, to the extent not prohibited by the DGCL or other applicable law. The board of directors shall have the power to delegate to any person or persons identified in subsections (1) through (4) of Section 145(d) of the DGCL the determination of whether employees or agents shall be indemnified.

## 9.5 ADVANCE PAYMENT OF EXPENSES

Expenses (including attorneys' fees) actually and reasonably incurred by an officer or director of the corporation in defending any Proceeding shall be paid by the corporation in advance of the final disposition of such Proceeding upon receipt of a written request therefor (together with documentation reasonably evidencing such expenses) and an undertaking by or on behalf of the person to repay such amounts if it shall ultimately be determined that the person is not entitled to be indemnified under this Article IX or the DGCL. Such expenses (including attorneys' fees) actually and reasonably incurred by former directors and officers or other employees and agents of the corporation or by persons serving at the request of the corporation as directors, officers, employees or agents of another corporation, partnership, joint venture, trust or other enterprise may be so paid upon such terms and conditions, if any, as the corporation deems appropriate. The right to advancement of expenses shall not apply to any Proceeding for which indemnity is excluded pursuant to these bylaws, but shall apply to any Proceeding (or any part of any Proceeding) referenced in Section 9.6(ii) or 9.6(iii) prior to a determination that the person is not entitled to be indemnified by the corporation.

## 9.6 LIMITATION ON INDEMNIFICATION

Subject to the requirements in Section 9.3 and the DGCL, the corporation shall not be obligated to indemnify any person pursuant to this Article IX in connection with any Proceeding (or any part of any Proceeding):

(i) for which payment has actually been made to or on behalf of such person under any statute, insurance policy, indemnity provision, vote or otherwise, except with respect to any excess beyond the amount paid;

(ii) for an accounting or disgorgement of profits pursuant to Section 16(b) of the 1934 Act, or similar provisions of federal, state or local statutory law or common law, if such person is held liable therefor (including pursuant to any settlement arrangements);

(iii) for any reimbursement of the corporation by such person of any bonus or other incentive-based or equity-based compensation or of any profits realized by such person from the sale of securities of the corporation, as required in each case under the 1934 Act (including any such reimbursements that arise from an accounting restatement of the corporation pursuant to Section 304 of the Sarbanes-Oxley Act of 2002 (the "**Sarbanes-Oxley Act**"), or the payment to the corporation of profits arising from the purchase and sale by such person of securities in violation of Section 306 of the Sarbanes-Oxley Act), if such person is held liable therefor (including pursuant to any settlement arrangements);

(iv) initiated by such person, including any Proceeding (or any part of any Proceeding) initiated by such person against the corporation or its directors, officers, employees, agents or other indemnitees, unless (a) the board of directors authorized the Proceeding (or the relevant part of the Proceeding) prior to its initiation, (b) the corporation provides the indemnification, in its sole discretion, pursuant to the powers vested in the corporation under applicable law, (c) otherwise required to be made under Section 9.7 or (d) otherwise required by applicable law; or

-31-

(v)if prohibited by applicable law; provided, however, that if any provision or provisions of this Article IX shall be held to be invalid, illegal or unenforceable for any reason whatsoever: (1) the validity, legality and enforceability of the remaining provisions of this Article IX (including, without limitation, each portion of any paragraph or clause containing any such provision held to be invalid, illegal or unenforceable, that is not itself held to be invalid, illegal or unenforceable) shall not in any way be affected or impaired thereby; and (2) to the fullest extent possible, the provisions of this Article IX (including, without limitation, each such portion of any paragraph or clause containing any such provision held to be invalid, illegal or unenforceable) shall be construed so as to give effect to the intent manifested by the provision held invalid, illegal or unenforceable.

9.7 DETERMINATION; CLAIM

If a claim for indemnification or advancement of expenses under this Article IX is not paid in full within 90 days after receipt by the corporation of the written request therefor, the claimant shall be entitled to an adjudication by a court of competent jurisdiction of his or her entitlement to such indemnification or advancement of expenses. The corporation shall indemnify such person against any and all expenses that are actually and reasonably incurred by such person in connection with any action for indemnification or advancement of expenses from the corporation under this Article IX, to the extent such person is successful in such action, and to the extent not prohibited by law. In any such suit, the corporation shall, to the fullest extent not prohibited by law, have the burden of proving that the claimant is not entitled to the requested indemnification or advancement of expenses.

9.8 NON-EXCLUSIVITY OF RIGHTS

The indemnification and advancement of expenses provided by, or granted pursuant to, this Article IX shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under the certificate of incorporation or any statute, bylaw, agreement, vote of stockholders or disinterested directors or otherwise, both as to action in such person's official capacity and as to action in another capacity while holding such office. The corporation is specifically authorized to enter into individual contracts with any or all of its directors, officers, employees or agents respecting indemnification and advancement of expenses, to the fullest extent not prohibited by the DGCL or other applicable law.

9.9 INSURANCE

The corporation may purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the corporation, or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against any liability asserted against such person and incurred by such person in any such capacity, or arising out of such person's status as such, whether or not the corporation would have the power to indemnify such person against such liability under the provisions of the DGCL.

9.10 SURVIVAL

The rights to indemnification and advancement of expenses conferred by this Article IX shall continue as to a person who has ceased to be a director, officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such a person.

9.11 EFFECT OF REPEAL OR MODIFICATION

A right to indemnification or to advancement of expenses arising under a provision of the certificate of incorporation or a bylaw shall not be eliminated or impaired by an amendment to or repeal or elimination of the certificate of incorporation or these bylaws after the occurrence of the act or omission that is the subject of the civil, criminal, administrative or investigative action, suit or proceeding for which indemnification or advancement of expenses is sought, unless the provision in effect at the time of such act or omission explicitly authorizes such elimination or impairment after such action or omission has occurred.

9.12 CERTAIN DEFINITIONS

For purposes of this Article IX, references to the "**corporation**" shall include, in addition to the resulting corporation, any constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger which, if its separate existence had continued, would have had power and authority to indemnify its directors, officers, employees or agents, so that any person who is or was a director, officer, employee or agent of such constituent corporation, or is or was serving at the request of such constituent corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, shall stand in the same position under the provisions of this Article IX with respect to the resulting or surviving corporation as such person would have with respect to such constituent corporation if its separate existence had continued. For purposes of this Article IX, references to "**other enterprises**" shall include employee benefit plans; references to "**fines**" shall include any excise taxes assessed on a person with respect to an employee benefit plan; and references to "**serving at the request of the corporation**" shall include any service as a director, officer, employee or agent of the corporation which imposes duties on, or involves services by, such director, officer, employee or agent with respect to an employee benefit plan, its participants or beneficiaries; and a person who acted in good faith and in a manner such person reasonably believed to be in the interest of the participants and beneficiaries of an employee benefit plan shall be deemed to have acted in a manner "**not opposed to the best interests of the corporation**" as referred to in this Article IX.

## ARTICLE X - GENERAL MATTERS

10.1 EXECUTION OF CORPORATE CONTRACTS AND INSTRUMENTS

Except as otherwise provided by law, the certificate of incorporation or these bylaws, the board of directors may authorize any officer or officers, or agent or agents, to enter into any contract or execute any document or instrument in the name of and on behalf of the corporation; such authority may be general or confined to specific instances. Unless so authorized or ratified by the board of directors or within the agency power of an officer, no officer, agent or employee shall have any power or authority to bind the corporation by any contract or engagement or to pledge its credit or to render it liable for any purpose or for any amount.

10.2 FISCAL YEAR

The fiscal year of the corporation shall be fixed by resolution of the board of directors and may be changed by the board of directors.

10.3 SEAL

The corporation may adopt a corporate seal, which shall be adopted and which may be altered by the board of directors. The corporation may use the corporate seal by causing it or a facsimile thereof to be impressed or affixed or in any other manner reproduced.

10.4 CONSTRUCTION; DEFINITIONS

Unless the context requires otherwise, the general provisions, rules of construction, and definitions in the DGCL shall govern the construction of these bylaws. Without limiting the generality of this provision, the singular number includes the plural, the plural number includes the singular, and the term "**person**" includes a corporation, partnership, limited liability company, joint venture, trust or other enterprise, and a natural person. Any reference in these bylaws to a section of the DGCL shall be deemed to refer to such section as amended from time to time and any successor provisions thereto.

## ARTICLE XI - AMENDMENTS

These bylaws may be adopted, amended or repealed by the stockholders entitled to vote; provided, however, that the affirmative vote of the holders of at least eighty percent (80%) of the total voting power of outstanding voting securities, voting together as a single class, shall be required for the stockholders of the corporation to alter, amend or repeal, or adopt any provision of these bylaws. The board of directors shall also have the power to adopt, amend or repeal bylaws.

A bylaw amendment adopted by stockholders which specifies the votes that shall be necessary for the election of directors shall not be further amended or repealed by the board of directors.

-34-