**COTCHETT, PITRE & MCCARTHY, LLP**
Joseph W. Cotchett (SBN 36324)
*jcotchett@cpmlegal.com*
Mark C. Molumphy (SBN 168009)
*mmolumphy@cpmlegal.com*
Anne Marie Murphy (SBN 202540)
*ammurphy@cpmlegal.com*
Tyson C. Redenbarger (SBN 294424)
*tredenbarger@cpmlegal.com*
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone:   (650) 697-6000

**BOTTINI & BOTTINI, INC.**
Francis A. Bottini, Jr. (SBN 175783)
*fbottini@bottinilaw.com*
Anne B. Beste (SBN 326881)
*abeste@bottinilaw.com*
Albert Y. Chang (SBN 296065)
*achang@bottinilaw.com*
Yury A. Kolesnikov (SBN 271173)
*ykolesnikov@bottinilaw.com*
Nicholaus H. Woltering (SBN 337193)
*nwoltering@bottinilaw.com*
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone:   (858) 914-2001

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **WILLIAM HERESNIAK**, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>**ELON R. MUSK, X HOLDINGS I, INC., X HOLDING II, INC., and TWITTER, INC.,**<br><br>Defendants. | Case No.:  3:22-CV-03074-CRB<br><br>**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT ELON MUSK'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**<br><br>Judge:      Hon. Charles R. Breyer<br>Courtroom: 6, 17th Floor<br><br>Hearing Date: May 12, 2023<br>Time:            10:00 a.m. |

Case No: 22-cv-3074-CRB
Plaintiff's Memorandum in Opposition to Defendant Elon Musk's Motion to Dismiss the SAC

1

2

**Table of Contents**

3    I.      SUMMARY OF ARGUMENT .................................................................................................1

4    II.     ARGUMENT ......................................................................................................................2

5            A.      Plaintiff Has Standing to Bring His Claims..........................................................2

6            B.      Plaintiff's Claims Are Not Brought in the Wrong Forum ...................................6

7            C.      Plaintiff Has Adequately Pleaded His Cause of Action for Aiding

8                    and Abetting Breach of Fiduciary Duty Under Delaware Law ...........................6

9            D.      Plaintiff's Claim for Declaratory Relief is Well-Pleaded.................................12

10           E.      Plaintiff Has Adequately Pleaded His Claim for Unjust Enrichment.................12

11   III.    CONCLUSION..................................................................................................................15

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Table of Authorities**

**Cases**

*Barkan v. Amsted Indus., Inc.*,
  567 A.2d 1279 (Del. 1989).................................................................................................. 9

*Basho Techs. Holdco B, LLC v. Georgetown Basho Investors, LLC*,
  2018 Del. Ch. LEXIS 222 (Del. Ch. July 6, 2018) ................................................... 8, 15

*Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*,
  27 A.3d 531 (Del. 2011)................................................................................................... 7

*Doe v. Cahill*,
  884 A.2d 451 (Del. 2005)................................................................................................. 6

*Duff v. Engelberg*,
  237 Cal. App. 2d 505 (1965)........................................................................................... 15

*Golaine v. Edwards*,
  1999 WL 1271882 (Del. Ch. Dec. 21, 1999) ................................................................. 5

*Hai-Ning Huang v. Reyes*,
  2008 U.S. Dist. LEXIS 108522 (N.D. Cal. Mar. 6, 2008) ...................................... 13, 14

*In re J.P. Morgan Chase & Co. S'holder Litig.*,
  906 A.2d 766 (Del. 2006).............................................................................................. 11

*In re Mindbody, Inc.*,
  2020 Del. Ch. LEXIS 307 (Del. Ch. Oct. 2, 2020) ...................................................... 12

*In re Plx Tech. Stockholders Litig.*,
  2018 Del. Ch. LEXIS 448 (Del. Ch. Feb. 16, 2018) ................................................ 7, 10

*In re Stillwater Capital Partners Inc. Litig.*,
  851 F. Supp. 2d 556 (S.D.N.Y. 2012) ............................................................................ 3

*In re Straight Path Commc'ns Inc. Consol. S'holder Litig.*,
  2018 Del. Ch. LEXIS 202 (Del. Ch. June 25, 2018)....................................................... 4

*In re Tri–Star Pictures, Inc. Litig.*,
  634 A.2d 319 (Del. 1993)............................................................................................... 11

*Laborers' Local v. Intersil*,
  868 F. Supp. 2d 838 (N.D. Cal. 2012)........................................................................... 15

*Lacey v. Maricopa Cnty.*,
  693 F.3d 896 (9th Cir. 2012)............................................................................................ 2

*Loudon v. Archer-Daniels-Midland Co.*,
   700 A.2d 135 (Del. 1997) .................................................................................................... 11

*Malone v. Brincat*,
   722 A.2d 5 (Del. 1998) ................................................................................................. 11, 12

*Morgan v. Cash*,
   2010 Del. Ch. LEXIS 148 (Del. Ch. July 16, 2010) ...................................................... 10

*Morrison v. Berry*,
   191 A.3d 268 (Del. 2018) ............................................................................................ 11, 12

*New York City Emps.' Ret. Sys. v. Jobs*,
   593 F.3d 1018 (9th Cir. 2010), ........................................................................................ 2

*Owens v. Palos Verdes Monaco*,
   142 Cal. App. 3d 855 (1983) ........................................................................................... 15

*Parnes v. Bally Entm't Corp.*,
   722 A.2d 1243 (Del. 1999) ............................................................................................ 1, 4

*RBC Capital Mkts., LLC v. Jervis*,
   129 A.3d 816 (Del. 2015) ............................................................................................. 9, 10

*S.E.C. v. Cavanagh*,
   445 F.3d 105 (2d Cir. 2006) ............................................................................................ 13

*S.E.C. v. Platforms Wireless Int'l Corp.*,
   617 F.3d 1072 (9th Cir. 2010) ......................................................................................... 13

*Thorpe by Castleman v. CERBCO*,
   676 A.2d 436 (1996) ....................................................................................................... 15

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.*,
   845 A.2d 1031 (Del. 2004) .......................................................................................*passim*

*Weinberger v. UOP*,
   457 A.2d 701 (Del. 1983) ................................................................................................ 15

*Zoren v. Genesis Energy, L.P.*,
   195 F. Supp. 2d 598 (D. Del. 2002) .......................................................................... 13, 14

**Statutes**

15 U.S.C. § 77p ............................................................................................................... 13, 14

**Rules**

FED. R. EVID. 201 ................................................................................................................... 8

# I.   SUMMARY OF ARGUMENT

Defendant Elon Musk's contention that Plaintiff does not have standing to assert the claims in the Second Amended Complaint ("SAC") is without merit.  This case concerns shareholder claims related to Musk's $44 billion, all-cash buyout of Twitter, Inc.  Plaintiff was a stockholder of Twitter and had the right to receive, and did receive, the Buyout consideration of $54.20 per cash.  Under Delaware law, which applies here, the claims are direct because under the governing standard Plaintiff, not Twitter, has the right to receive any recovery in this case.  *See Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004).  In addition, as Musk concedes in his motion, under *Parnes v. Bally Entm't Corp.*, 722 A.2d 1243, 1245 (Del. 1999), a "stockholder who directly attacks the fairness or validity of a merger alleges an injury to the stockholders, not the corporation, and may file a direct claim."  *See* Musk Mem. at 7-8.

Plaintiff's claim for aiding and abetting breach of fiduciary duty is also well-pleaded.  First, Musk aided breaches of the *duty of disclosure* by Director Dorsey, Twitter's founder, and Director Durban.  The Proxy failed to disclose key facts about Musk's sources of financing for the $44 billion Buyout, which was the largest leveraged buyout in the history of the United States.  The problems with Musk's financing and Musk's wrongful conduct directly caused the unlawful delay of the closing of the Buyout, saving Musk over $200 million and depriving Plaintiff and the Class of the use of their Buyout proceeds, which are the damages sought here.  Under Delaware law, a breach of the duty of disclosure/candor creates *per se* liability.  Second, a claim for aiding and abetting is clearly stated where, as here, a third party conspires with a board member to provide the board member with personal financial benefits not fully disclosed to the board or company's shareholders.  Musk offered Dorsey the ability to retain an equity investment in Twitter following the completion of the Buyout. ¶¶ 178, 189, 198.[1]  The Proxy, however, falsely stated that there was no equity rollover agreement between Musk and Dorsey.  ¶ 164.

Finally, contrary to Musk's argument, Plaintiff's unjust enrichment claim is well-pleaded.  Musk's motion does not even address the SAC's detailed allegations that Musk was unjustly

---

[1] All "¶ __" references are to Plaintiff's November 28, 2022 second amended complaint.  Unless otherwise noted, internal citations and quotation marks omitted, and emphasis is added.

1   enriched by over $156 million when he failed to timely file a Form 13D when he crossed the 5%

2   threshold.  ¶ 77. The SAC also adequately pleads a claim by demonstrating that Musk saved over

3   $200 million by unlawfully failing to close the Buyout on time, which also wrongfully denied

4   Plaintiff the timely use of the cash Buyout consideration.  The claim is also not barred by SLUSA.

5                                    **II.      ARGUMENT**

6   **A.      Plaintiff Has Standing to Bring His Claims**

7           Plaintiff has standing to bring his claims because such claims are direct, not derivative,

8   given that this case involves a merger in which Plaintiff and the Company's other shareholders

9   were the ones who had the right to receive the cash Merger consideration.  The money was paid to

10  Plaintiff, not Twitter.   Under such circumstances, Delaware courts have consistently held that

11  shareholder merger claims are direct, not derivative.  Musk's brief in fact admits this, conceding

12  that the relevant test as established by the Delaware Supreme Court is "who would receive the

13  benefit of any recovery or other remedy (the corporation or the stockholders, individually)?"  *See*

14  Musk Mem. at 6 (citing *Tooley*, 845 A.2d at 1033).[2]  The *Tooley* case is instructive because there,

15  as here, the stockholders had the right to receive the merger consideration and alleged they had

16  been damaged by a delay in closing the merger.  The reason that the *Tooley* court determined that

17  the shareholders did not have a right to damages or interest for the delayed merger, however, was

18  because the parties to the merger had agreed among themselves to delay or continue the closing

19  date.  *Tooley*, 845 A.2d at 1034-35 (noting that "[b]ecause Credit Suisse Group and DLJ did in

20  fact agree to extend the tender offer period, any right to payment plaintiffs could have did not ripen

21  until this newly negotiated period was over.").   Thus, *Tooley* recognizes the direct nature of

22  shareholder claims for a delayed cash merger, but merely found that the facts of that case did not

23  support such a claim because the delay had been agreed to by the parties.  In the present case, in

24  stark contrast, Twitter never agreed to extend the closing date for the Merger, and in fact sued

25  Musk and X Holdings I and II in Delaware to enforce the closing date.  The SAC alleges that "all

26  conditions necessary for the closing of the Merger were satisfied as of September 13, 2022, when

27          [2] The test for direct versus derivative claims articulated in *Tooley* was endorsed by the Ninth
    Circuit in *New York City Emps.' Ret. Sys. v. Jobs*, 593 F.3d 1018, 1022 (9th Cir. 2010), overruled in
28  part on other grounds, *Lacey v. Maricopa Cnty.*, 693 F.3d 896 (9th Cir. 2012).

1    Twitter shareholders approved the Merger, and thus that Musk had a legal obligation to close the

2    Merger within two business days (*i.e.*, by September 15, 2022), that Musk wrongfully failed to

3    close the Merger on such date, and that Plaintiff is entitled to interest on the Merger proceeds from

4    September 15, 2022 to the actual, delayed date of closing and receipt by Plaintiff of the Merger

5    proceeds of $54.20 per share on or about October 31, 2022." ¶ 205; *see also* ¶¶ 25, 201, 207.

6         Musk's argument that Plaintiff's claims are derivative because "all of the stockholders are

7    harmed" (Musk Mem. at 6) is also wrong.  It was rejected by the *Tooley* court, which noted that

8    the damages in a direct claim "can also fall on all stockholders equally, without the claim thereby

9    becoming a derivative claim."  *Tooley*, 845 A.2d at 1037.  Shareholders state a direct claim

10   whenever they allege harm "independent of any injury to the corporation." *Id.* at 1038.  That is

11   the case here -- Plaintiff alleges he was deprived of timely receipt of the Merger consideration

12   which Plaintiff, not Twitter, had the right to receive.  It is undisputed that Twitter had absolutely

13   no right to receive the Merger consideration:  all the proceeds were paid by Musk ***directly to***

14   ***Twitter's shareholders***.  ¶ 205. Under such circumstances, Plaintiff's claims are clearly direct.

15        Musk incorrectly argues that "Plaintiff thus alleges the 'diminution in the value of shares,'

16   which is the 'quintessential[] … derivative claim.'"  Musk Mem. at 7.  This argument is baseless.

17   Nowhere in the SAC does Plaintiff allege a "diminution in the value of his shares."  Quite to the

18   contrary, Plaintiff alleges that Musk was eventually forced to pay the full $54.20 Merger price.

19   ¶ 170.  The damages alleged in the SAC under an equitable claim for aiding and abetting breach

20   of fiduciary duty are for the loss of use/interest on the Merger consideration ***due to the***

21   ***unlawful/tortious delay*** in the closing of the Merger: "Twitter stockholders suffered damages

22   alleged herein, including lost interest and monies due to the wrongful delay in the closing of the

23   Merger from September 15, 2022 to on or about October 31, 2022." ¶ 201; *see also* ¶ 177.  This

24   has nothing to do with alleged diminution in the value of stock.[3]

25

---

26        [3] In addition to misrepresenting the allegations of the SAC, Musk cites cases that are factually
     inapposite.  In *In re Stillwater Capital Partners Inc. Litig.*, 851 F. Supp. 2d 556 (S.D.N.Y. 2012)
27   (Musk Mem. at 7), the plaintiff charged the defendants with "imprudently investing assets and failing
     to properly value them [and] (b) failing to sell assets in a timely manner."  The case had nothing to
28   do with alleged interest due for a delayed cash merger.

1    Musk's motion concedes that, under *Parnes*, 722 A.2d at 1245, a "stockholder who directly

2 attacks the fairness or validity of a merger alleges an injury to the stockholders, not the corporation,

3 and may file a direct claim." *See* Musk Mem. at 7-8.[4]  Musk claims that Plaintiff's claims do not

4 fit within *Parnes*'s "direct merger claim" line of cases, however, because to do so a plaintiff must

5 allege some form of "unfair dealing" in connection with a merger.  *See* Musk Mem. at 8.  Musk's

6 argument is puzzling since the SAC alleges a litany of unfair dealings in connection with the

7 Merger.  The SAC is replete with allegations of Musk's wrongful conduct in publicly stating that

8 the Merger was "on hold" without any legal basis, and then later terminating the Merger three

9 times without any justification and solely because he was attempting to get out of the Merger or

10 negotiate a lower price after the value of his Tesla shares, which he had pledged as collateral, had

11 plunged, threatening Musk with a margin call.  ¶¶ 125-159.  Twitter's founder, Dorsey, and

12 Director Durban, were extremely loyal to Musk and assisted Musk in his wrongful conduct,

13 violating their duty of loyalty to Twitter. *See* ¶¶ 51-59, 183-187.  Dorsey went so far as to publicly

14 denigrate his own Board, saying it "had been the consistent dysfunction of the company" and

15 pledging allegiance to his good friend Musk, who he professed to be the only person who could

16 save Twitter. ¶ 93. Thus, the SAC clearly alleges wrongful conduct in connection with the Merger.

17    Musk also baselessly claims that courts have only held shareholder merger claims to be

18 direct "under limited circumstances" where a plaintiff alleges that insiders expropriated part of the

19 merger consideration for themselves.  *See* Musk Mem. at 8.  Not so.  In *Tooley*, the Delaware

20 Supreme Court expressly clarified and corrected conflicting and confusing past precedent as to

21 when a claim is direct or derivative.  *See* 845 A.2d at 1038-39 (for purposes of distinguishing

22

23    [4] Musk cites *In re Straight Path Commc'ns Inc. Consol. S'holder Litig.*, 2018 Del. Ch. LEXIS
24 202 (Del. Ch. June 25, 2018), for the same proposition. *See* Musk Mem. at 8-9.  The court in *Straight
Path* held that the plaintiff's merger claims were direct because the plaintiff alleged unfair dealing in
connection with the merger that directly harmed the shareholders. The same is true here. The *Straight
25 Path* court noted that the essential inquiry is whether a defendant "caused legally compensable harm
to the target's stockholders by improperly diverting consideration from them to [the defendant]." *Id.*,
26 2018 Del. Ch. LEXIS 202, at *30.  That is exactly what happened here.  Musk, by unlawfully delaying
27 the closing of the Merger, saved money by delaying having to pay the $44 billion Merger
consideration.  His delay and savings directly caused a loss of interest and use of the Merger
28 consideration by Plaintiff.

between derivative and direct claims, expressly disapproving of the concept of "special injury" and "the concept that a claim is necessarily derivative if it affects all stockholders equally").  As the Court held, going forward, the issue of whether a claim is direct or derivative "must turn **solely** on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?"  *Id.* at 1033.

Musk's alleged test for what must be shown for a direct claim to be stated is not consistent with the test established in *Tooley*.  In is not surprising, then, that Musk's main case in support of his argument is a 1999 slip opinion that significantly pre-dated *Tooley*.[5]  Moreover, even if Musk were correct that a plaintiff alleging direct merger claims must show that a fiduciary received an undisclosed "side deal" (Musk Mem. at 8), Plaintiff has done so here.  The SAC added allegations demonstrating that Dorsey was offered special benefits not available to Twitter's public shareholders – an equity rollover agreement.  ¶¶ 189-90.  The Proxy, however, falsely stated that no director had any special interests in the Buyout, and affirmatively misrepresented that "*there is no agreement, arrangement, or understanding, whether express or implied, between Mr. Dorsey, on the one hand, and Parent or its affiliates (including Mr. Musk), on the other hand, relating to the voting or contribution of shares of our common stock held by Mr. Dorsey in connection with the merger.*" ¶ 198  Dorsey breached his duties of loyalty, disclosure, and good faith by preferring his own interests over those of Twitter's public shareholders.  Thus, even if there was some requirement to allege that insiders received some "side deal" in the Merger, Plaintiff has done so.

Musk's argument that Plaintiff is allegedly attempting to "enforce its [the Merger Agreement's] terms on Twitter's behalf and collect interest on merger consideration" (Musk Mem. at 8) is also wrong. Plaintiff is not attempting to enforce the Merger Agreement's terms on behalf of Twitter.  Plaintiff is not a party to the Merger Agreement and is not asserting a breach of contract claim.  Thus, Musk's arguments are incorrect.  To the contrary, Plaintiff is asserting a tort claim

---

[5] *See* Musk Mem. at 8-9, citing *Golaine v. Edwards*, 1999 WL 1271882 (Del. Ch. Dec. 21, 1999). In addition to pre-dating *Tooley*, *Golaine* contained inapposite facts. The sole allegation there was that the Board had approved a $20 million payment to KKR. *Golaine*, 1999 WL 1271882, at *2. The case had nothing to do with a tortiously delayed merger or the unlawful termination of a merger.

1   against Musk and is seeking a damages remedy (lost use of money/interest) due to Musk's tortious

2   conduct.  And the fact that Plaintiff may also be able to recover lost interest as an intended third-

3   party beneficiary does not transform Plaintiff's direct claim into a derivative claim.

4          Plaintiff's unjust enrichment claim is also a direct claim.  Musk unlawfully saved over $156

5   million by failing to timely file a Form 13D when he exceeded the 5% threshold, and he unjustly

6   earned interest on the Merger proceeds by retaining them as a result of his improper delay of the

7   Merger's closing. ¶ 207-08. The remedy sought is an order requiring Musk to disgorge the unjustly

8   received monies and profits and all interest earned from such monies and benefits.  ¶ 209.  Under

9   the same case law cited above, this claim is clearly direct.  The Merger consideration was owed to

10  Plaintiff, not Twitter.  Any disgorgement is also appropriately paid directly to the shareholders,

11  not Twitter, which does not exist anymore.  Musk owns Twitter.  Musk's argument thus appears

12  to be that the claim is derivative and thus that he, as the new owner of Twitter, should receive any

13  proceeds from the claim against himself.  His argument is baseless and contrary to long-standing

14  principles of equity, pursuant to which a wrongdoer may not profit from his unlawful conduct.

15         Finally, Musk joins in the arguments made by Twitter and X Holdings I and II that Plaintiff

16  lacks standing because he is not a party or third-party beneficiary of the Merger Agreement.  *See*

17  Musk Mem. at 9.  For the same reasons stated in Plaintiff's opposition to those Defendants' motion,

18  such argument is without merit.

19  **B.     Plaintiff's Claims Are Not Brought in the Wrong Forum**

20         Musk merely filed a joinder in Twitter's separate motion regarding *forum non conveniens*.

21  Plaintiff incorporates his opposition to Twitter's motion, which arguments equally apply to Musk.

22  **C.     Plaintiff Has Adequately Pleaded His Cause of Action for Aiding and Abetting Breach of Fiduciary Duty Under Delaware Law**

23         As Musk acknowledges, the elements of a claim for aiding and abetting breach of fiduciary

24  duty are well-established and not subject to any heightened pleading standard.  A plaintiff need

25  only allege a duty, a breach of the fiduciary's duty, knowing participation in the breach by a non-

26  fiduciary defendant, and damages.  Musk Mem. at 10.  Moreover, "the threshold for the showing

27  a plaintiff must make to survive a motion to dismiss is low."  *Doe v. Cahill*, 884 A.2d 451, 458

28  (Del. 2005).  On a motion to dismiss, the court applies a plaintiff-friendly standard of review,

1    under which a plaintiff need only establish that its claims are reasonably conceivable. *Cent. Mortg.*

2    *Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 27 A.3d 531, 535 (Del. 2011). When

3    applying this standard, the court cannot weigh competing inferences. Instead, the plaintiff is

4    entitled to all reasonable inferences. *Id.* Moreover, an "enhanced scrutiny" standard is applied to

5    the review of defendants' conduct. *See In re Plx Tech. Stockholders Litig.*, 2018 Del. Ch. LEXIS

6    448, at *5 (Del. Ch. Feb. 16, 2018) ("The Delaware Supreme Court also has held that enhanced

7    scrutiny could be deployed as the proper standard of review to evaluate a board's decision in a

8    post-closing action for money damages for purposes of a claim for aiding and abetting.").

9    　　　Here, Plaintiff plainly alleges all required elements of his aiding-and-abetting claim. *See*

10   ¶¶ 195-202. Musk does not contend otherwise. Instead, Musk mischaracterizes the SAC's

11   allegations and attempts to impose requirements for Plaintiff's aiding-and-abetting claim that do

12   not apply to the facts pleaded here. Under Delaware law, a claim for aiding and abetting is clearly

13   stated where, as here, a third party conspires with a board member to provide the board member

14   with personal financial benefits not fully disclosed to the board or the company's shareholders.

15   　　　Musk offered Dorsey the ability to retain an equity investment in Twitter following the

16   completion of the Buyout. ¶¶ 178, 189, 198. The rollover benefitted both parties: Musk saved $1

17   billion in the short run by not having to pay Dorsey cash for his stock, and Dorsey received the

18   ability to receive a much larger payout down the line when and if Musk takes Twitter public again.

19   ¶ 189. The Proxy, however, falsely stated that no director had any special interests in the Buyout,

20   and affirmatively misrepresented that Dorsey and Musk had no rollover agreement. ¶ 164. As a

21   result of the undisclosed rollover agreement, Dorsey was conflicted in the Buyout and breached

22   his fiduciary duties of loyalty and candor. After the Merger closed, Dorsey belatedly disclosed

23   the rollover of his 18 million shares, or 2.4% of all Twitter shares. ¶¶ 163, 198.[6]

24   _____

25   　　　[6] The Proxy thus did not disclose, as Musk erroneously contends, Dorsey's rollover agreement
     with Musk. *See* Musk Mem. at 11. The Proxy affirmatively misrepresented that there was no rollover

26   agreement with Dorsey or any other director. ¶¶ 164, 198. Musk misleadingly quotes the first part
     of the relevant paragraph of the Proxy, which merely refers to "the possibility of [Dorsey] contributing

27   shares of our common stock of such holders to Parent," and then omits the statement three sentences
     later in the same paragraph that "there is no agreement, arrangement, or understanding, whether

28   express or implied, between Mr. Dorsey, on the one hand, and Parent or its affiliates (including Mr.

1    Musk ignores these well-pleaded allegations and baselessly claims that Dorsey's "supposed

2    benefit at issue—retaining his stock instead of selling it—does not confer any financial gain not

3    equally shared by other stockholders or materially change Dorsey's economic circumstances. He

4    just kept what he had." *See* Musk Mem. at 11. It is patently false that Dorsey did not receive "any

5    financial gain not equally shared by other stockholders." Dorsey was allowed to roll over his stock

6    and thus be eligible to reap a large windfall far in excess of the Merger consideration if and when

7    Musk takes Twitter public again. No other shareholders other than Dorsey, Musk, and Prince

8    Alwaleed Bin Talal were allowed this hidden benefit. ¶¶ 191-193, 198. Musk and Dorsey also

9    discussed reinstating Dorsey as CEO of Twitter. ¶ 187. On October 27, 2022, as Musk was

10   preparing to close the deal, he in fact fired the CEO of Twitter, Mr. Agrawal. *Id.* Being restored

11   as CEO of the company he founded would be a significant benefit to Dorsey, who was previously

12   forced out as CEO for not having enough time to devote to both Twitter and Square. ¶ 55.

13       Dorsey and Durban breached their duties by exclusively favoring Musk, by failing to

14   engage in due diligence about Musk's sources of financing, and by negotiating a $44 billion change

15   of control transaction over a single weekend without contacting any other suitors or engaging in

16   any market check process. Although the Board recognized on April 20, 2022 "the need for

17   additional clarity from Mr. Musk on equity financing and any debt financing" (¶ 97), it failed to

18   do anything to further investigate Musk's financing and instead hastily accepted his first and only

19   offer just three days later. This amply demonstrates a lack of fair dealing, since "[f]air dealing

20   encompasses an evaluation of how the transaction was initiated." *Basho Techs. Holdco B, LLC v.*

21   *Georgetown Basho Investors, LLC*, 2018 Del. Ch. LEXIS 222, at *84 (Del. Ch. July 6, 2018). At

22   a time when Twitter was in no particular distress and was not for sale, the Board, influenced by

23   the Company's founder Dorsey and another director loyal to Musk (Durban), approved a $44

24   billion sale of the company to Musk over a single weekend. ¶¶ 3, 51, 57-59, 74. The Proxy

25   Musk), on the other hand, relating to the voting or contribution of shares of our common stock held
26   by Mr. Dorsey in connection with the merger and, as of the date of this proxy statement, Twitter has
     not received any information to the contrary." *See* Definitive Proxy dated July 26, 2022, at pp. 117-
27   118, available at https://www.sec.gov/Archives/edgar/data/1418091/000119312522202163/
     d283119ddefm14a.htm. The Court may take judicial notice of the Proxy because its contents are
28   explicitly alleged in the SAC (¶ 164) and pursuant to F.R.E. 201(b)(2).

1  admitted that "***The Twitter Board determined not to contact other parties***" before agreeing to

2  accept Musk's first and only offer.  ¶ 122.  A mere ten days elapsed between the time Musk's offer

3  was publicly announced and the date the Twitter Board accepted his offer on April 24, 2022.  *Id.*

4       While a board retains some discretion to determine the best way to maximize value in a

5  cash change of control situation, it must take active steps to ensure it is achieving maximum value

6  and fair terms for shareholders. *See Barkan v. Amsted Indus., Inc.*, 567 A.2d 1279, 1287 (Del.

7  1989) ("When the board is considering a single offer and has no reliable grounds upon which to

8  judge its adequacy, this concern for fairness demands a canvas of the market to determine if higher

9  bids may be elicited.").  Here, it is undisputed that Twitter had received one and only one offer

10  and did not contact other parties before accepting Musk's first and only offer.  ¶ 122.  Dorsey and

11  Durban were close friends with Musk and took steps to prefer Musk's interests.   ¶¶ 51, 55-59.

12  They pressured their fellow Board members into accepting Musk's first offer just ten days after it

13  was made and without investigating Musk's sources of financing.  As it turned out, Musk had

14  major problems with his financing and those problems ended up causing a significant delay in the

15  Merger's closing, thus directly and proximately causing the damage asserted by Plaintiff (lost

16  interest/use of the Merger proceeds due to the delayed closing).[7]  Plaintiff has thus adequately

17  alleged a claim against Musk for aiding and abetting breaches of fiduciary duty by Dorsey and

18  Durban.  *See also RBC Capital Mkts., LLC v. Jervis*, 129 A.3d 816, 831, 850-57 (Del. 2015) (board

19  failed to oversee a special committee appointed to consider a merger proposal, failed to become

20  informed about strategic alternatives and about potential conflicts faced by advisors, and approved

21  the merger without adequate information).

22       Musk also erroneously claims that the SAC does not adequately allege "knowing

23  participation" by Musk in Dorsey's and Durban's breaches.  Not so.  "A bidder may be liable to

24  the target's stockholders if the bidder attempts to create or exploit conflicts of interest in the

25

26       [7] Problems with Musk's financing for the Buyout were the main cause of the delay in the
closing of the deal.  Due to Musk's wrongful disparagement of Twitter, the banks providing the
27  financing faced significant difficulties marketing the debt because potential buyers did not know if
the Buyout would occur or not.  If the banks were forced to keep the loans on their balance sheets,
28  that would entail other problems, such as restrictions on lending.  ¶ 123.

1  board." *RBC Capital Mkts.*, 129 A.3d at 862.  "If the third party knows that the board is breaching

2  its duty of care and participates in the breach by misleading the board or creating the informational

3  vacuum, then the third party can be liable for aiding and abetting." *Id.*  That is exactly what the

4  SAC alleges.  Musk exploited and took advantage of conflicts on the Twitter board.  Chairman

5  Bret Taylor and CEO Agrawal did not want to sell to Musk, so Musk directly reached out to his

6  friends on the Board who he knew would support him – Dorsey and Durban.  ¶¶ 51-59.  Dorsey

7  eagerly came to Musk's aid and preferred Musk's interests over those of Twitter, going so far as

8  to publicly denigrate Twitter's Board, stating that the Board had "consistently been the dysfunction

9  of the company."  ¶ 197.  Durban and Dorsey both acted out of allegiance to Musk and supported

10  Musk's interests in the Buyout. Both Dorsey and Durban failed to negotiate at arms' length with

11  Musk and instead simply accepted Musk's first offer to acquire Twitter. ¶ 197.  Musk exploited

12  these conflicts knowingly and intentionally, and bought insurance by offering Dorsey an

13  undisclosed equity rollover to ensure Dorsey's fealty.  ¶ 164.  These facts amply plead Musk's

14  knowing participation in Dorsey's and Durban's breaches.  *RBC Capital Mkts.*, 129 A.3d at 862.

15  　　　Contrary to Musk's suggestion, Plaintiff does not need to allege that Dorsey and Durban

16  influenced the other directors.  Musk Mem. at 13.  Because Dorsey never disclosed his equity

17  rollover agreement to the other members of the Board until after the Merger, the Board was

18  operating in an informational vacuum, which is sufficient to establish Dorsey's breach and Musk's

19  aiding and abetting. *Id.* at 831, 850-57, 862; *see also Plx Tech.*, 2018 Del. Ch. LEXIS 336, at *100-

20  105 (aiding and abetting claims stated because "Potomac and Singer succeeded in influencing the

21  directors to favor a sale when they otherwise would have decided to remain independent" and

22  because "by withholding this information from the rest of the Board, Singer breached his fiduciary

23  duty and induced the other directors to breach theirs."). No Delaware case requires a stockholder

24  to allege that directors were improperly influenced about matters they were never told about.[8]

25

26  　　　[8] Musk's reliance on *Morgan v. Cash*, 2010 Del. Ch. LEXIS 148 (Del. Ch. July 16, 2010), is

27  unavailing.  *Morgan* involved a completely conclusory complaint in which the plaintiff alleged nothing "other than the unremarkable fact that EMC offered Voyence's management modest compensation packages to stay on after the merger, Morgan's complaint points to no other facts

28  suggesting that there was an unseemly *quid pro quo* between EMC and the Voyence directors."

1    For similar reasons, Plaintiff has adequately alleged an aiding-and-abetting claim against

2  Musk for violation of Durban's and Dorsey's fiduciary **duty of disclosure**. When directors request

3  discretionary stockholder action such as approval of a merger, they must disclose fully and fairly

4  all material facts within their control bearing on the request. *Malone v. Brincat*, 722 A.2d 5, 9

5  (Del. 1998).  This application of the fiduciary duties of care and loyalty is referred to as the

6  "fiduciary duty of disclosure." Directors breach their fiduciary duty of disclosure when the

7  "alleged omission or misrepresentation is material." *Id.* at 12.  When directors seek stockholder

8  action and breach their fiduciary duty of disclosure, a stockholder can seek equitable relief or

9  damages. *See Loudon v. Archer-Daniels-Midland Co.*, 700 A.2d 135, 138 (Del. 1997).  In this

10 context, the Delaware Supreme Court has characterized a fiduciary's damages liability as "*per se*."

11 *Id.* at 141 (citing *In re Tri–Star Pictures, Inc. Litig.*, 634 A.2d 319 (Del. 1993)).  That is, when

12 directors seek stockholder action, and the directors fail to disclose material facts, a shareholder

13 need not demonstrate other elements of proof—reliance, causation, or damages.[9]

14    The SAC alleges that the Proxy was materially misleading for failure to disclose the full

15 risks related to Musk's financing and the facts about the equity rollover agreement with Dorsey.

16 ¶¶ 117-24, 198.  The failure to disclose facts about an equity rollover agreement is material.  For

17 example, in *Morrison v. Berry*, the Delaware Supreme Court held that a proxy's failure to disclose

18 facts about an equity rollover agreement was material.  191 A.3d 268, 277-286 (Del. 2018).  In

19 *Morrison*, similar to here, the proxy had disclosed that a key insider was considering an equity

20 rollover, but that no decision had been made and that the insider was open to selling his shares or

21 doing a rollover with other entities, thus creating a misleading impression that there was no actual

22 rollover agreement or preference of the insider for the favored bidder. *Id.*  These statements were

23 false since the insider had allegedly already agreed to an equity rollover agreement and had already

24 expressed an exclusive preference for Apollo, the preferred bidder. *Id.*  The Delaware Supreme

25    [9] *See Malone*, 722 A.2d at 12 ("An action for a breach of fiduciary duty arising out of
26 disclosure violations in connection with a request for stockholder action does not include the elements
   of reliance, causation and actual quantifiable monetary damages."). Typically, when seeking damages
27 for breaching the duty of disclosure, a plaintiff must show that the damages are "logically and
   reasonably related to the harm or injury for which compensation is being awarded." *In re J.P. Morgan
28 Chase & Co. S'holder Litig.*, 906 A.2d 766, 773 (Del. 2006).

1 │ Court held that these facts were sufficient to allege a materially misleading proxy and reversed the

2 │ lower court for granting defendants' motion to dismiss.  *Id.* at 284.[10]

3 │      The Proxy here was even more misleading:  it affirmatively misrepresented there was no

4 │ rollover agreement between Musk and Dorsey.  ¶¶ 164, 198.  As the court in *Morrison* noted:

> We agree with the Plaintiff that this [Rollover] Agreement Omission was material.  A reasonable stockholder would want to know the facts showing that Ray Berry had not been forthcoming with the Board about his agreement with Apollo (among other information discussed below), as directors have an 'unremitting obligation' to deal candidly with their fellow directors.  Moreover, a reasonable stockholder would want to know about this level of commitment to a potential purchaser, in the context of this deal.

191 A.3d at 284.

     In *In re Mindbody, Inc.*, 2020 Del. Ch. LEXIS 307, at *62 (Del. Ch. Oct. 2, 2020), the court noted that "[f]acts that shed light on the depth of a lead negotiator's commitment to the acquirer and personal economic incentives are generally deemed material to a reasonable stockholder."  In holding that the proxy omissions involved in that case were material, the court cited to *Morrison*'s finding that a proxy was materially misleading since "[t]he company did not disclose, for example, that the chairman had agreed early on in the sale process to 'roll over his equity interest' if the acquirer reached a deal with the target's board."  *In re Mindbody*, 2020 Del. Ch. LEXIS 307, at *62.  The undisclosed facts here are similarly material.  As such, Plaintiff need not demonstrate other elements of proof—reliance, causation, or damages.  *Malone*, 722 A.2d at 12.

**D.      Plaintiff's Claim for Declaratory Relief is Well-Pleaded**

     Musk joins in Twitter's motion to dismiss with respect to Plaintiff's claim for declaratory relief.  Musk Mem. at 13.  For the reasons stated in Plaintiff's opposition to Twitter's motion to dismiss, which Plaintiff incorporates herein by reference, defendants' arguments are without merit.

**E.      Plaintiff Has Adequately Pleaded His Claim for Unjust Enrichment**

**1.      Plaintiff's Unjust-Enrichment Claim Is Preserved by the Delaware Carve-Out**

     Citing a lone district-court decision, Musk seeks dismissal of the unjust-enrichment claim based on SLUSA.  Musk Mem. at 14.  Even assuming SLUSA is applicable, Plaintiff's allegations

---

[10] The Delaware Supreme Court noted that "once defendants traveled down the road of partial disclosure of the history leading up to the Merger ... they had an obligation to provide the stockholders with an accurate, full, and fair characterization of those historic events." *Morrison*, 191 A.3d at 283.

1    relating to Musk's failure to timely file a Schedule 13G falls within the "Delaware carve-out":

2        The carve-out specifically preserves "Actions under [the] State law of [the] State of incorporation" so long as they meet one of two criterium.  The action must involve

3        either:

4            (i) the purchase or sale of securities by the issuer or an affiliate of the issuer exclusively from or to holders of equity securities of the issuer; or

5            (ii) any recommendation, position, or other communication with respect to the sale of securities of the issuer that —

6                (I) is made by or on behalf of the issuer or an affiliate of the issuer to holders of equity securities of the issuer; and

7                (II) concerns decisions of those equity holders with respect to voting their securities, acting in response to a tender or exchange offer, or exercising

8                dissenters' or appraisal rights.

9    *See Hai-Ning Huang v. Reyes*, 2008 U.S. Dist. LEXIS 108522, at **6–7 (N.D. Cal. Mar. 6, 2008)

10   (Breyer, J.) (quoting 15 U.S.C. § 77p(d)(1)(B)).

11         Plaintiff's unjust-enrichment claim is preserved under criterion (i) because the Buyout

12   involved the purchase or sale of Twitter stock by Musk, who was Twitter's affiliate, from Twitter

13   shareholders. ¶¶ 178–194.   Musk's claim that he was not Twitter's affiliate is meritless.  While

14   case law on the meaning of "control" under 15 U.S.C. § 77p(f)(1) is sparse, case law in other

15   similar contexts "suggest[s] that ownership of something between ten and twenty percent is

16   enough, especially if other factors suggest actual control." *S.E.C. v. Cavanagh*, 445 F.3d 105, 113

17   n.19 (2d Cir. 2006).  Here, Plaintiff alleges that Musk — himself owning 9.6% Twitter stock as of

18   March 2022 — entered into voting agreements with Morgan Stanley (8.8% owner), Prince

19   Alwaleed Bin Talal (4.57% owner), and Jack Dorsey (2.4% owner).  ¶ 178.  Plaintiff also alleges

20   the close relationship between Musk and Dorsey — Twitter's founder who encouraged and

21   supported Musk's efforts to take over Twitter.  ¶¶ 184–190.  This is more than sufficient to

22   establish Musk's status as Twitter's affiliate at the pleadings stage because control is "a question

23   of fact which depends upon the totality of the circumstances including an appraisal of the influence

24   upon management and policies of a corporation by the person involved." *See S.E.C. v. Platforms*

25   *Wireless Int'l Corp.*, 617 F.3d 1072, 1087 (9th Cir. 2010).[11]

26   _____

27       [11] Furthermore, to the extent that Musk's untimely Schedule 13G implicates SLUSA, Musk purchased Twitter shares "exclusively from" Twitter shareholders both before March 2022 and at the closing.  *Zoren v. Genesis Energy, L.P.*, the sole case cited by Musk, is inapposite because that case

28   involved an initial public offering where the issuer sold stock in the open market to "prospective" —

1    Plaintiff's unjust-enrichment claim is also preserved under criterion (ii) because, to the

2    extent that Musk's untimely Schedule 13G implicates SLUSA, it involves a "communication" by

3    him, as a Twitter affiliate, to Twitter shareholders concerning their response and vote regarding

4    the tender offer.  *See* 15 U.S.C. § 77p(d)(1)(B)(ii).  Musk's throw-away argument against the

5    application of criterion (ii) is illogical.  If he claims that his untimely Schedule 13G does not

6    constitute "communications with shareholders," SLUSA is not implicated because there would be

7    no "communication" of "an untrue statement or omission."  Absent a SLUSA bar, there would be

8    no need for a Delaware carve-out.  Musk cannot have it both ways.  As this Court held in *Hai-*

9    *Ning Huang*, Plaintiff's claim is preserved under SLUSA.

10        **2.       Plaintiff's Unjust Enrichment Claim Is Not Based on the Merger Agreement**

11    Musk argues that the unjust enrichment claim is barred because it is based on the merger

12    agreement and thus precluded since a breach of contract claim is available.  *See* Musk Mem. at 15.

13    Plaintiff is not a party to the Merger Agreement.  Musk's argument also ignores the fact that the

14    unjust enrichment claim is based on two predicate acts, not one:  (1) Musk was unjustly enriched

15    by at least $156 million when he unlawfully acquired Twitter shares at depressed prices during a

16    time when he should have (but failed to) timely file a Form 13D after exceeding the applicable 5%

17    threshold; and (2) Musk was unjustly enriched when he failed to timely close the Merger and pay

18    the Merger consideration to Plaintiff.  ¶ 207.  Musk's unjust conduct in failing to timely file a

19    Form 13D well before the Merger was ever agreed to has nothing to do with any contract, and

20    Musk fails to argue otherwise.  The unjust enrichment claim must be upheld on that basis alone.

21        Moreover, Plaintiff's claim for interest due to the delayed close is not based on the merger

22    agreement, and instead is based on damages that accrue from Musk's tortious conduct of aiding

23    and abetting breach of fiduciary duty.  As a result, Musk's cited authorities are inapposite, since

24    in those cases the plaintiffs tethered their unjust enrichment claim to a supposed contract of which

25    they were a party.  Delaware law is clear that a claim for breach of fiduciary duty, or aiding and

26    abetting breach of fiduciary duty, is an equitable claim and that a court may award whatever

27    remedy and damages are necessary to make the plaintiff whole or render equity between the

28    rather than existing — shareholders.  *See* 195 F. Supp. 2d 598, 604 (D. Del. 2002).

1    parties.  *See, e.g., Weinberger v. UOP*, 457 A.2d 701, 714 (Del. 1983) (overruling the *Lynch II*

2    decision that had limited recovery "to a single remedial formula for monetary damages in a cash-

3    out merger" and holding that a court's "powers are complete to fashion any form of equitable and

4    monetary relief as may be appropriate"); *Basho Techs. Holdco B, LLC*, 2018 Del. Ch. LEXIS 222,

5    at \*98 ("Once a breach of duty has been established, this court's 'powers are complete to fashion

6    any form of equitable and monetary relief as may be appropriate ... ."); *see also Thorpe by*

7    *Castleman v. CERBCO,* 676 A.2d 436, 445 (1996) ("Once disloyalty has been established, the

8    standards evolved in *Kirby v. Oberly* and *Tri-Star* require that a fiduciary not profit personally

9    from his conduct, and that the beneficiary not be harmed by such conduct. While there are no

10   transactional damages in this case, we find the Eriksons liable for damages incidental to their

11   breach of duty.  Specifically, the Eriksons are liable to CERBCO for the amount of $75,000

12   received from INA in connection with the letter of intent.").[12]  Here, the Buyout, valued at $44

13   billion, was the largest leveraged buyout deal of all time.  Through his tortious conduct, Musk

14   successfully delayed the closing of the Merger by a month and a half, or 46 days.  At current 3-

15   month T-bill rates of approximately 4.73%, Musk saved ***over $200 million***.  Principles of equity

16   require Musk to disgorge his unjust enrichment.

### III.    CONCLUSION

18         The Court should deny Musk's motion.  Should the Court grant the motion, leave to amend

19   is warranted.  *See Laborers' Local v. Intersil,* 868 F. Supp. 2d 838, 851 (N.D. Cal. 2012).

20   / / /

21   / / /

22

23         [12] The same standards apply in California.  "A person who commits a tort against another for
     the purpose of causing a particular harm to the other is liable for such harm if it results, whether or
24   not it is expectable."  *Duff v. Engelberg*, 237 Cal. App. 2d 505, 508-09 (1965) (awarding incidental
     damages to purchases after defendant tortiously interfered with contract, calculated as the difference
25   between the rate of interest plaintiffs had to pay on moneys borrowed and the normal bank rate); *see*
     *also Owens v. Palos Verdes Monaco*, 142 Cal. App. 3d 855, 872 (1983) (affirming *Duff*'s holding
26   that a plaintiff can obtain both specific performance of the contract as well as compensatory and
     exemplary damages against a third party who interferes with the contract).  In *Owens*, the court also
27   noted that the rule against awarding tort damages against a party to the contract does not apply where
     the defendant is alleged to have conspired with others to induce a breach.
28

Dated:  April 3, 2023

Respectfully submitted,

**BOTTINI & BOTTINI, INC.**
Francis A. Bottini, Jr. (175783)
Anne B. Beste (326881)
Albert Y. Chang (296065)
Yury A. Kolesnikov (271173)
Nicholaus H. Woltering (337193)

_____*s/ Francis A. Bottini, Jr.*_____
Francis A. Bottini, Jr.

7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone:   (858) 914-2001
Facsimile:    (858) 914-2002

**COTCHETT, PITRE & MCCARTHY, LLP**
Joseph W. Cotchett (36324)
Mark C. Molumphy (168009)
Anne Marie Murphy (202540)
Tyson C. Redenbarger (294424)

_____*s/ Tyson C. Redenbarger*_____
Tyson C. Redenbarger

San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone:   (650) 697-6000

*Counsel for Plaintiff*

**Attestation Pursuant to Civil Local Rule 5-1(h)(3)**

I, Francis A. Bottini, Jr., attest that concurrence in the filing of this document has been obtained from the other signatory.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on April 3, 2023, at La Jolla, California.

_____*s/ Francis A. Bottini, Jr.*_____
Francis A. Bottini, Jr.