1
2
3
4
5
6
7
8
9
10

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM HERESNIAK,<br><br>            Plaintiff,<br><br>       v.<br><br>ELON R. MUSK, et al.,<br><br>            Defendants. | Case No. 22-cv-03074-CRB<br><br>**ORDER GRANTING MOTIONS TO DISMISS** |

If the Delaware litigation surrounding Elon Musk's acquisition of Twitter was "center stage," and "backstage," respectively, this case has been in the parking lot.[1] In May 2022, Plaintiff William Heresniak ("Heresniak"), then a Twitter shareholder, brought this action for damages, declaratory relief, and injunctive relief for Musk's (as it turns out, temporary) failure to follow through on his agreement to acquire Twitter. In October, on the eve of trial in Delaware, Musk finally closed the deal. Though this litigation was stayed for the pendency of those proceedings, that stay was lifted in November, and Defendants Elon R. Musk, X Holdings I, Inc., X Holdings II, Inc., and Twitter, Inc. (together, "Defendants") bring two motions to dismiss. A hearing was held on the motions on May 12, 2023. For the reasons stated below, the Court GRANTS Defendants' motions to dismiss.

---

[1] See Crispo v. Musk, No. 2022-0666-KSJM, 2022 WL 6693660, at *1 (Del. Ch. Oct. 11, 2022).

United States District Court
Northern District of California

## I.    BACKGROUND

Heresniak alleges as follows:

Musk, a prolific user of Twitter, began acquiring large amounts of Twitter stock in Spring 2022.  See SAC (dkt. 66) ¶¶ 46, 50.  In March 2022, after Musk had purchased more than five percent of Twitter's common stock, he contacted his friends on the Twitter board, Egon Durban, managing partner at private equity firm Silver Lake, and Jack Dorsey, a founder and former CEO of Twitter, to discuss "the future direction of social media" and the prospect of Musk joining the board.  Id. ¶¶ 57–59.  Durban then contacted other members of the board, who offered Musk a seat soon thereafter.  Id. ¶¶ 59, 75.

Meanwhile, Musk continued to acquire more Twitter stock, becoming Twitter's largest individual shareholder at 9.2 percent.  Id. ¶ 66.  Despite surpassing the trigger point for disclosure in late March, he belatedly filed a Form 13G on April 4, 2022, and then a Form 13D on April 5.  Id. ¶¶ 61–62.  The Wall Street Journal estimated that Musk had saved $143 million by failing to promptly disclose his stake, while he continued to purchase stock at artificially depressed prices.  Id. ¶¶ 64–66.

Already in intense disagreements with the members of the board he was set to join, Musk began considering making an offer to acquire Twitter and take it private.  Id. ¶ 86.  After delivering his first proposal to acquire Twitter on April 13, the board responded by adopting a shareholder rights plan, or "poison pill," to stop Musk's takeover.  Id. ¶¶ 89, 92.  Dorsey responded by "publicly denigrat[ing]" the board on Twitter, stating that it had "consistently been the dysfunction of the company."  Id. ¶¶ 84, 93.  Musk began preparing a hostile tender offer to acquire Twitter, and it was reported that he approached investment firms, including Silver Lake, to help him finance the takeover.  Id. ¶ 94.

After much back and forth and continual tweeting, over the weekend of April 23–24, the board agreed to Musk's "best and final" offer of $54.20 per share, for a total of $44 billion, and the acquisition was announced on April 25.  Id. ¶¶ 98–101.  Heresniak attributes the quick deal to "Dorsey and Durban['s] fail[ure] to negotiate at arms'-length with Musk," "engage in sufficient due diligence regarding Musk's sources of financing,"

or "shop [Twitter] to other potential suitors." Id. ¶¶ 99, 120, 122.  On the day the deal was announced, Dorsey tweeted that Musk was the "singular solution [he] trust[ed]" to run Twitter.  Id. ¶ 102.

It was later revealed that "Musk had offered special benefits to Dorsey not available to Twitter's other shareholders," an equity rollover agreement, discussed as a possibility in a May 2022 Schedule 13D/A filing with the SEC and in the July 2022 Proxy Statement, and then confirmed after the deal closed in October.  Id. ¶¶ 100, 163–64, 178, 188–90. Under that agreement, instead of receiving merger consideration (i.e., a cash payout) like nearly all other shareholders, Dorsey was able to keep his more than 18 million shares in Twitter and roll them over into the new private Twitter as an equity investor.  Id. ¶ 198.

On May 13, 2022, Musk tweeted that the buyout was "temporarily on hold" pending details about bot accounts on Twitter—details that Heresniak alleges that Musk already knew, or at least could easily have learned before he agreed to the deal.  Id. ¶ 13–14.  Over the next few weeks, Musk continued to sow doubt in the deal, causing Twitter's stock price to tumble.  Id. ¶¶ 15–17.  Heresniak alleges that Musk attempted to get out of the deal—or at least renegotiate it—because his Tesla stock, which Musk had pledged as collateral for his loan to finance the Twitter deal, was declining.  Id. ¶ 7.

In the ensuing months, Musk would send three letters to Twitter purporting to terminate the agreement.  Id. ¶ 22.  Twitter responded by filing suit in Delaware, seeking specific performance.  Id. ¶ 24.  On September 13, 2022, Twitter shareholders voted to approve the merger.  Id. ¶ 25.  Heresniak contends that, pursuant to Section 2.2 of the Merger Agreement, Musk was required to close the merger two business days later, on September 15.  Id.

On the eve of trial in October, Musk capitulated and closed the deal.  Id. ¶ 34. Twitter shareholders did not receive merger consideration for their shares until October 31, 2022, which Heresniak alleges was "one and a half months" late.  Id.  Heresniak then filed the second amended complaint in this action, bringing claims for aiding and abetting breach of fiduciary duty, declaratory and injunctive relief, and unjust enrichment.  Id.

United States District Court
Northern District of California

3

¶¶ 195–209. Defendants now move to dismiss and request judicial notice of the April, May, and July Proxy Statements, Twitter's bylaws, and the Merger Agreement. <u>See</u> Musk Mot. (dkt. 67); X Holdings Mot. (dkt. 68); RJN (dkt. 69).[2]

## II.    LEGAL STANDARD

"The doctrine of standing limits federal judicial power." <u>Or. Advocacy Ctr. v. Mink</u>, 322 F.3d 1101, 1108 (9th Cir. 2003).  The question of whether plaintiffs have standing "precedes, and does not require, analysis of the merits." <u>Equity Lifestyle Props., Inc. v. Cnty. of San Luis Obispo</u>, 548 F.3d 1184, 1189 n.10 (9th Cir. 2008).  To have standing, plaintiffs must establish (1) that they have suffered an injury in fact, (2) that their injury is fairly traceable to a defendant's conduct, and (3) that their injury would likely be redressed by a favorable decision.  <u>See</u> <u>Lujan v. Defs. of Wildlife</u>, 504 U.S. 555, 560–61 (1992).

Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, a defendant may move to dismiss for lack of standing and thus lack of subject matter jurisdiction.  <u>See</u> <u>White v. Lee</u>, 227 F.3d 1214, 1242 (9th Cir. 2000).  Rule 12(b)(1) attacks on standing can be either facial, confining the court's inquiry to allegations in the complaint, or factual, permitting the court to look beyond the complaint.  <u>Id.</u>; Safe Air for Everyone v. Meyer, 373 F.3d 1035, 1039 (9th Cir. 2004).  For facial attacks, courts accept the jurisdictional allegations in the complaint as true.  <u>See, e.g.</u>, <u>Whisnant v. United States</u>, 400 F.3d 1177, 1179 (9th Cir. 2005).  When addressing a factual attack, however, courts may consider evidence like declarations submitted by the parties, and the party opposing the motion to dismiss has the burden of establishing subject matter jurisdiction by a preponderance of the evidence.  <u>See, e.g.</u>, <u>Leite v. Crane Co.</u>, 749 F.3d 1117, 1121 (9th Cir. 2014).

If the Court has jurisdiction to address the merits, a complaint may nonetheless be dismissed for failure to state a claim for which relief may be granted.  Fed. R. Civ. P. 12(b)(6).  Rule 12(b)(6) applies when a complaint lacks either a "cognizable legal theory"

_____

[2] The Court need not take judicial notice of the documents Defendants have provided to resolve their motions to dismiss.  Therefore, Defendants' request for judicial notice is denied as moot.

United States District Court
Northern District of California

or "sufficient facts alleged" under such a theory.  Godecke v. Kinetic Concepts, Inc., 937 F.3d 1201, 1208 (9th Cir. 2019).  Whether a complaint contains sufficient factual allegations depends on whether it pleads enough facts to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to survive a 12(b)(6) motion. Id. (citing Twombly, 550 U.S. at 555).  When evaluating a motion to dismiss, the Court "must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party." Usher v. City of Los Angeles, 828 F.2d 556, 561 (9th Cir. 1987).  However, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286 (1986); Clegg v. Cult Awareness Network, 18 F.3d 752, 754–55 (9th Cir. 1994).

If a court dismisses a complaint for failure to state a claim, it should "freely give leave" to amend "when justice so requires." Fed. R. Civ. P. 15(a)(2).  But leave to amend "is not to be granted automatically." In re W. States Wholesale Nat. Gas Antitrust Litig., 715 F.3d 716, 738 (9th Cir. 2013).  A court has discretion to deny leave to amend due to "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendment previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment." Leadsinger, Inc. v. BMG Music Publ'g, 512 F.3d 522, 532 (9th Cir. 2008) (citing Foman v. Davis, 371 U.S. 178, 182 (1962)).

## III.   DISCUSSION

Defendants argue that Heresniak's claims fail for a host of reasons.  This order addresses two: First, whether Heresniak pleads derivative claims, thus depriving him of standing; and second, whether Heresniak's claims fail as a matter of law.  Because

1    Heresniak's claims are subject to dismissal on these grounds alone, the Court does not

2    address Defendants' other arguments for dismissal, including lack of standing to sue under

3    the Merger Agreement, and <u>forum non conveniens</u>.

### A.    Motion to Dismiss for Lack of Standing

5    The threshold (and as explained below, dispositive) standing question is whether

6    Heresniak brings derivative or direct claims. If he brings direct claims, they may proceed

7    post-merger, assuming, of course, they survive all other challenges on a motion to dismiss.

8    However, if they are derivative, then they must be dismissed for lack of standing post-

9    merger, because, as Twitter is now private and Heresniak retains no shares,[3] he can no

10   longer maintain a derivative action on Twitter's behalf.  See <u>Lewis v. Anderson</u>, 477 A.2d

11   1040, 1049 (Del. 1984); <u>see also</u> <u>Golaine v. Edwards</u>, No. CIV.A. 15404, 1999 WL

12   1271882, at *4 (Del. Ch. Dec. 21, 1999) ("In the context of a merger transaction, the

13   derivative-individual distinction is essentially outcome-determinative of any breach of

14   fiduciary duty claims that can be asserted in connection with the merger by the target

15   company stockholders.").

16   To determine whether a plaintiff's claims are derivative or direct, courts apply the

17   <u>Tooley</u> test: "(1) who suffered the alleged harm (the corporation or the suing stockholders,

18   individually); and (2) who would receive the benefit of any recovery or other remedy (the

19   corporation or the stockholders, individually)?"  <u>Tooley v. Donaldson, Lufkin & Jenrette,</u>

20   <u>Inc.</u>, 845 A.2d 1031, 1033 (Del. 2004).  To proceed with a direct claim, "[t]he stockholder

21   must demonstrate that the duty breached was owed to the stockholder and that he or she

22   can prevail without showing an injury to the corporation."  <u>Id.</u> at 1039.  In deciding this

23   question, "the court is not bound by labels used in the pleadings, but 'must look at all the

24   facts of the complaint and determine for itself whether a direct claim exists.'"  <u>Brokerage</u>

---

[3] The Court notes that the second amended complaint seems to erroneously state that Heresniak is "a <u>current</u> shareholder of Twitter, Inc. and has owned Twitter stock at all relevant times."  SAC ¶ 39 (emphasis added).  This is likely a holdover from prior versions of the complaint, which were drafted and filed prior to the closing of the merger.  <u>See</u> FAC (dkt. 7) ¶ 26 (same); Compl. (dkt. 1) ¶ 27 (same).  In any case, Heresniak does not assert in his briefing that he remains a shareholder, or otherwise argue that he may still bring derivative claims on Twitter's behalf.

United States District Court
Northern District of California

1    Jamie Goldenberg Komen Rev Tru U/A 06/10/08 Jamie L Komen Tr. for Komen v.

2    Breyer, No. CV 2018-0773-AGB, 2020 WL 3484956, at *11 (Del. Ch. June 26, 2020)

3    (quoting In re Massey Energy Co. Deriv. & Class Action Litig., 160 A.3d 484, 502 (Del.

4    Ch. 2017)).

5         A long line of cases clarifies what a former shareholder must plead in the merger

6    context to state a direct claim: "A stockholder who directly attacks the fairness or validity

7    of a merger alleges an injury to the stockholders, not the corporation, and may pursue such

8    a [direct] claim even after the merger at issue has been consummated."  Parnes v. Bally

9    Ent. Corp., 722 A.2d 1243, 1245 (Del. 1999).  While "it is often difficult to determine

10   whether a stockholder is challenging the merger itself, or alleged wrongs associated with

11   the merger," id., Delaware courts agree that the allegations must "rise to an attack on the

12   merger itself" to plead a direct claim.  Komen, 2020 WL 3484956, at *8 (quoting Kramer

13   v. W. Pac. Indus., Inc., 546 A.2d 348, 354 (Del. 1988)).  This is done either by plausibly

14   alleging that the merger price was unfair, or that the sales process was tainted by self-

15   dealing such that a fiduciary "improperly diverted merger consideration that otherwise

16   would have gone to the stockholders."  In re Straight Path Commc'ns Inc. Consol.

17   S'holder Litig., No. CV 2017-0486-SG, 2018 WL 3120804, at *13 (Del. Ch. June 25,

18   2018), aff'd sub nom. IDT Corp. v. JDS1, LLC, 206 A.3d 260 (Del. 2019); see also

19   Golaine, 1999 WL 1271882, at *9; Houseman v. Sagerman, No. CIV.A. 8897-VCG, 2014

20   WL 1600724, at *12 (Del. Ch. Apr. 16, 2014).

21        At the outset, but for the exception outlined in Parnes and its progeny, Heresniak's

22   claims would be derivative.  His first claim, aiding and abetting breach of fiduciary duty,

23   clearly depends on Musk aiding and abetting Dorsey and Durban's injury to Twitter during

24   the sale.  See, e.g., SAC ¶ 197 ("Dorsey and Durban breached their fiduciary duties by

25   failing to protect the best interests of Twitter and instead preferring and favoring their own

26   and Musk's interests in the Buyout."); id. ¶ 198 ("Dorsey breached his duty of loyalty and

27   good faith by preferring his own inter[e]sts over those of Twitter's public shareholders.");

28   id. ¶ 200 ("Durban and Silver Lake have been loyal to Musk at all times and preferred his

United States District Court
Northern District of California

7

interests in the Buyout over those of Twitter and its other shareholders.").  Any injury to Heresniak as a Twitter shareholder on this claim derives from an alleged injury to the <u>corporation</u>, by Dorsey and Durban's alleged failure to entertain other offers or perform due diligence.  <u>Id.</u> ¶¶ 197–200; <u>Tooley</u>, 845 A.2d at 1039.  Heresniak's other claim, for unjust enrichment, fares no better—Heresniak alleges that Musk was unjustly enriched by failing to timely disclose his accumulation of Twitter shares prior to announcing the buyout, and again when he failed to timely close the buyout.  <u>See</u> SAC ¶ 207.  This claim boils down to an allegation that Musk cheated <u>Twitter</u> out of the consideration it was owed by purchasing his shares at below-market prices, and by delaying closing the merger until after the agreed-upon date. The fact that, at least for the latter argument, the stockholders were alleged to be injured by receiving their merger proceeds a month late does not make their claim direct.  <u>See</u> <u>Feldman v. Cutaia</u>, 951 A.2d 727, 733 (Del. 2008) ("The mere fact that the alleged harm is ultimately suffered by, or the recovery would ultimately inure to the benefit of, the stockholders does not make a claim direct under <u>Tooley</u>.").[4]

Therefore, for Heresniak to plead a direct claim, he must fit into the so-called <u>Parnes</u> carve-out, that is, by attacking the "fairness or validity of the merger."  <u>Parnes</u>, 722 A.2d at 1245.  Because Heresniak conceded at the hearing on this motion that he does not plead that Musk acquired Twitter at an unfair price, his other allegations must squarely attack the "validity of the merger."  <u>Id.</u>  Heresniak fails to meet this threshold.

Heresniak alleges the following breaches of fiduciary duty: (1) the failure to disclose Dorsey's $1 billion equity rollover agreement with Musk; and (2) the "fail[ure] to engage in due diligence regarding Musk's sources of financing for the Buyout before

---

[4] In his opposition, Heresniak argues that <u>Tooley</u> itself held that a delay in receiving merger consideration is a direct claim, and, but for the ripeness issue in that case (which is not present here), those claims would have survived.  <u>See</u> Opp'n to Musk (dkt. 74) at 2.  But <u>Tooley</u> was brought by <u>minority</u> stockholders, who argued that the merger delay "harmed <u>minority</u> stockholders while improperly benefitting [the controlling stockholder]."  <u>Tooley</u>, 845 A.2d at 1034 (emphasis added).  Thus, the plaintiffs in <u>Tooley</u> alleged an injury to a particular class of shareholders, not to <u>all</u> shareholders, and not to the corporation itself.  <u>Tooley</u> therefore does not speak directly to Heresniak's argument that <u>all</u> shareholders were injured equally, and Twitter itself not injured at all, due to Musk's delay in closing the merger.

United States District Court
Northern District of California

accepting the first and only offer from Musk"; (3) the failure "to shop the Company to other potential suitors"; and (4) that Durbin had "been loyal to Musk at all times and preferred his interests in the Buyout over those of Twitter and its other shareholders." SAC ¶¶ 198–200.  But fundamentally, none of these allegations plausibly plead that the Twitter board engaged in the kind of "side deal[ing]" that Delaware courts have held affected the validity of the merger as a whole.  Compare In re Straight Path, 2018 WL 3120804, at *13 (holding that shareholders had stated a direct claim where the controlling stockholder of the corporation "manipulated the sales process to secure significant benefits for . . . himself at the expense of Straight Path's other stockholders"), with Golaine, 1999 WL 1271882, at *9 (holding that shareholders stated a derivative claim where they did not allege "that KKR's negotiation of a $20 million fee from Duracell tainted the merger's final terms in a way that injured Duracell's other stockholders"), and Komen, 2020 WL 3484956, at *12 (same, where the plaintiffs did not allege "that Defendants tainted the sale process or the negotiations so as to improperly divert to the Murdochs part of the consideration for the Transaction").

The only "side deal" that might fit the bill is Dorsey's equity rollover agreement. Under that deal, Dorsey was able to keep his 18 million shares in the new company as an equity investor, rather than receiving a cash payout like most[5] other shareholders, including Heresniak.  SAC ¶ 198.  But that deal did not "improperly divert[] merger consideration that otherwise would have gone to the stockholders."  In re Straight Path, 2018 WL 3120804, at *13.  It only affected the merger consideration paid to Dorsey, and lowered the total amount Musk was required to pay to close the deal; the total value of Twitter and the value of Heresniak's shares, or any other shareholder's shares, were unaffected.[6]

---

[5] The complaint alleges that another investor—Saudi Prince Alwaleed Bin Talal—also took advantage of a similar agreement with Musk, rolling over his nearly 35 million shares into the new company.  SAC ¶¶ 191–92.

[6] To the extent that Heresniak argues that Musk "improperly diverted merger consideration" to himself, either through his acquisition of Twitter shares prior to the announcement of the buyout,

1    In all, Heresniak "alleges wrongful conduct in connection with the merger," as far

2    as it goes. Opp'n to Musk at 4.  But he must "challenge the merger itself," rather than

3    merely "allege[] wrongs associated with the merger."  Parnes, 722 A.2d at 1245.  Because

4    he does only the latter and not the former, his claims are derivative, and are dismissed for

5    lack of standing.

6    **B.**    **Motion to Dismiss for Failure to State a Claim**

7    As discussed above, because the Court holds that Heresniak's claims are derivative,

8    and because Heresniak is no longer a shareholder, all claims are dismissed for lack of

9    standing. But even if Heresniak had pleaded direct claims, they fail as a matter of law.

10    **1.**    **Aiding and Abetting Breach of Fiduciary Duty**

11    To plead a claim for aiding and abetting a breach of fiduciary duty, four elements

12    are required: (1) a fiduciary duty; (2) a breach of that fiduciary duty; (3) knowing

13    participation of that breach by the aider and abettor; and (4) damages proximately caused

14    by the breach. See Malpiede v. Townson, 780 A.2d 1075, 1096 (Del. 2001). Even

15    assuming that Dorsey and Durban breached their fiduciary duties—and the Court takes no

16    position on that issue—Heresniak does not plausibly plead that Musk "knowingly

17    participated" in any such breach.

18    "Knowing participation in a board's fiduciary breach requires that the third party act

19    with the knowledge that the conduct advocated or assisted constitutes such a breach."  Id.

20    at 1097.  While "attempts to reduce a sale price through arm's-length negotiations cannot

21

22    ─────────────────────

23    or through the delay in closing, neither of those diversions were large enough to call into question
       the validity of the merger as a whole.  Those two actions combined saved Musk approximately
24    $356 million, or less than one percent of the $44 billion deal—which Delaware courts have held is
       not significant enough to make out a direct claim in comparable cases.  Compare SAC ¶ 10
25    (alleging that Musk saved $156 million by failing to timely disclose his stake in Twitter) and
       Opp'n to Musk at 15 (arguing that Musk saved over $200 million due to his delay in closing the
26    merger), with In re Straight Path, 2018 WL 3120804, at *13 (direct claim where the controller of
       the corporation had extracted benefits to himself "potentially worth over half a billion dollars"
27    "that otherwise would have gone to stockholders" after a $3.1 billion sale), and Komen, 2020 WL
       3484956, at *12 (derivative claim where challenged diverted consideration was worth $82.4
28    million, "just about 1/10th of 1 percent of the $71.3 billion in consideration that" stockholders
       received in that merger).  See also Golaine, 1999 WL 1271882, at *8 ("[L]et me express my doubt
       that the $20 million fee wagged the $8.3 billion merger dog.").

give rise to liability for aiding and abetting," liability may attach if a defendant "attempts to create or exploit conflicts of interest on the board," Morgan v. Cash, No. CIV.A. 5053-VCS, 2010 WL 2803746, at *4 n.38 (Del. Ch. July 16, 2010), or "extract[] terms which required the opposite party to prefer its interests at the expense of its shareholders." Gilbert v. El Paso Co., 490 A.2d 1050, 1058 (Del. Ch. 1984), aff'd, 575 A.2d 1131 (Del. 1990). "The standard for an aiding and abetting claim is a stringent one, one that turns on proof of scienter of the alleged abettor." In re Essendant, Inc. S'holder Litig., No. CV 2018-0789-JRS, 2019 WL 7290944, at *17 (Del. Ch. Dec. 30, 2019) (quoting Binks v. DSL.net, Inc., No. 2823-VCN, 2010 WL 1713629, at *10 (Del. Ch. Apr. 29, 2010)).

 Heresniak pleads the following facts about Musk's interactions with Dorsey and Durban in connection with the acquisition:

- Musk "began his efforts to acquire Twitter by contacting his two closest friends and allies on Twitter's Board—Jack Dorsey and Egon Durban," SAC ¶ 51.

- On March 26 and 27, 2022, Musk contacted Dorsey and Durban to discuss "the future direction of social media" and the prospect of Musk joining the board, id. ¶¶ 58–59.

- In early April 2022, after Musk decided to join the board, he called Dorsey to ask for his "perspectives on Twitter" in connection with the announcement that Musk was joining the board, id. ¶ 84.

- On April 16, 2022, after the board adopted a shareholder rights plan, or "poison pill," to stop Musk's takeover, Dorsey "publicly denigrated" the board on Twitter, stating that it had "consistently been the dysfunction of the company," id. ¶¶ 84, 93.

- As Musk was preparing a tender offer to acquire Twitter, it was reported that Musk contacted Silver Lake Partners, Durban's investment firm, for financing help, id. ¶ 94.

- On April 24, 2022, the board accepted Musk's offer, which Heresniak attributed to "Dorsey and Durban's fail[ure] to negotiate at arms'-length with Musk,"

"engage in adequate due diligence regarding Musk's sources of equity financing," or "shop [Twitter] to other potential suitors," id. ¶¶ 99, 120, 122.

- On April 25, 2022, Dorsey tweeted that Musk was the "singular solution [he] trust[ed]" to run Twitter, id. ¶ 102.

- It was later revealed that "Musk had offered special benefits to Dorsey not available to Twitter's other shareholders," an equity rollover agreement, discussed as a possibility in a May 2022 Schedule 13D/A filing with the SEC, in the July 2022 Proxy, and then confirmed after the deal closed, id. ¶¶ 100, 163–64, 178, 188–90.

- "[I]t was widely speculated that upon the closing of the Buyout, Musk may reinstate Dorsey as CEO of Twitter." Id. ¶ 187.[7]

These allegations, even taken together, do not support an inference that Musk "knowingly participated" in any breaches of fiduciary duty by Dorsey and Durban. First, the fact that Musk is friendly with Dorsey and Durban, and has both personal and professional history with them, does not allow a court to infer, without more facts, that they schemed with Musk to induce the board to accept Musk's offer. Cf., e.g., In re Transkaryotic Therapies, Inc., 954 A.2d 346, 369 (Del. Ch. 2008), as revised (June 24, 2008). Even having allies on the board—as we can assume Dorsey and Durban were—and contacting them (particularly when Musk was himself, at that time, likely to join the board) does not amount to an attempt to "create or exploit conflicts of interest on the board." Morgan, 2010 WL 2803746, *4 n.38; In re Essendant, 2019 WL 7290944, at *17 (Del. Ch. Dec. 30, 2019) ("The Complaint lacks any reference to non-conclusory communications between [the defendant] and the [board] that would support an inference of concerted activity."). Similarly, there is no evidence that Musk was involved in, or induced Dorsey

---

[7] Musk never reinstated Dorsey as CEO. Musk remained CEO until a little over a week ago, when he named Linda Yaccarino, chair of global advertising and partnerships at NBCUniversal, to the post. See Chris Isidore, Elon Musk Names NBCU Ad Chief Linda Yaccarino as Twitter CEO, CNN (May 13, 2023), https://www.cnn.com/2023/05/12/tech/twitter-ceo-linda-yaccarino/index.html.

1    to make, his comments "publicly denigrat[ing]" the board.  To the extent that Dorsey and

2    Durban "failed to negotiate at arm's-length" with Musk or persuaded the rest of the board

3    to forgo due diligence or decline to seek other potential buyers, Heresniak does not plead

4    facts indicating that Musk "knowingly participated" in any of those efforts.

5          The only allegation that even comes close to pleading this element is the equity

6    rollover agreement between Dorsey and Musk.  But even assuming they came to that

7    agreement prior to the deal's closing and failed to disclose it to the rest of the board and

8    the shareholders—which is not supported by any facts, apart from Dorsey's eventual

9    rollover in October—"knowing participation" is shown "by extracting terms which

10   required the opposite party to prefer its interests at the expense of its shareholders."

11   Gilbert, 490 A.2d at 1058 (emphasis added); see also, e.g., id. at 1057 ("[B]ecause this

12   valuable concession, which greatly impacted upon [the target company's] shareholders

13   who had already tendered their shares, was extracted in exchange for other terms which

14   clearly benefitted only [the company's] management and not its shareholders, it cannot be

15   said, as a matter of law, that [the acquiror] was merely engaged in arm's-length

16   negotiations.").  It is not clear how any equity rollover agreement between Dorsey and

17   Musk preferred Dorsey's interest at the expense of Twitter's shareholders.  After all, as

18   discussed above, the agreement affected neither the value the deal as a whole nor the

19   merger consideration shareholders like Heresniak could expect to receive.  See In re

20   Hansen Med., Inc. S'holders Litig., No. CV 12316-VCMR, 2018 WL 3025525, at *18

21   (Del. Ch. June 18, 2018) ("The facts in the Complaint show only that Auris negotiated a

22   not-uncommon agreement to reduce its cash outlay by having the major investors in

23   Hansen rollover their stock.").  And while in theory Dorsey may be "eligible to reap a

24   large windfall far in excess of the Merger consideration if and when Musk takes Twitter

25   public again," Opp'n to Musk at 8, what Heresniak characterizes as a "windfall" was in

26   reality a hefty risk, one that even Dorsey may now suspect is unlikely to pay off.[8]  Unless

27

28   ───────────────
     [8] See, e.g., Kate Conger, Jack Dorsey Has a Lot to Say, Including About Elon Musk and Twitter,
     N.Y. Times (May 3, 2023), https://www.nytimes.com/2023/05/03/technology/dorsey-musk-

any such agreement—assuming it existed prior to the merger's closing—allowed Musk to acquire Twitter at an unfair price, or induced the board to forgo courting other (better) offers—neither of which Heresniak alleges, let alone plausibly—it is unclear how Dorsey was benefitted at the expense of Twitter's shareholders.

Accordingly, because Heresniak has failed to plausibly allege Musk's "knowing participation" in Dorsey and Durban's breaches of fiduciary duty, his aiding and abetting claim fails as a matter of law.

### 2. Declaratory and Injunctive Relief

Heresniak brings a claim for declaratory and injunctive relief, seeking a declaration that "all conditions necessary for the closing of the Merger were satisfied as of September 13, 2022, when Twitter shareholders approved the Merger," and thus Musk was contractually obligated to close the merger by September 15, 2022, and did not. SAC ¶ 205. Heresniak "also seeks appropriate injunctive relief to be determined by the Court." Id.

Under California law, a court has broad discretion to grant (and refuse) declaratory relief. See Cal. Civ. Proc. Code §§ 1060–61. The purpose of declaratory relief is to resolve ongoing uncertainties between the parties—that will either "serve some practical end in quieting or stabilizing an uncertain or disputed jural relation," or to "liquidate doubts with respect to uncertainties or controversies which might otherwise result in subsequent litigation." Meyer v. Sprint Spectrum L.P., 45 Cal. 4th 634, 647 (2009) (internal quotation marks and citations omitted). In the contractual context, declaratory relief is typically inappropriate to resolve "past wrongs," that is, where there is no ongoing contractual relationship, and "any implications of practical consequences on the parties' future behavior are speculative." Osseous Techs. of Am., Inc. v. DiscoveryOrtho Partners LLC, 191 Cal. App. 4th 357, 375 (2010).

twitter-bluesky-nostr.html; Kate Conger & Ryan Mac, Elon Musk Values Twitter at $20 Billion, N.Y. Times (Mar. 26, 2023), https://www.nytimes.com/2023/03/26/technology/elon-musk-twitter-value.html.

The Court is not persuaded that Heresniak seeks declaratory relief to resolve any controversy other than a "past wrong." He alleges that Musk's conduct caused him to receive his merger proceeds a month and a half late; he seeks damages as a result. Other than vague assertions in his opposition, Heresniak has not alleged with any particularity that declaratory relief would "have any practical consequences." Meyer, 45 Cal.4th at 648; see also Opp'n to X Holdings (dkt. 73) at 13 ("[T]he declaratory relief sought by Plaintiff will serve a useful purpose in clarifying and settling the relationship between shareholders and Twitter concerning post-Merger rights."). The merger has closed; Heresniak (and his proposed class) are no longer shareholders; therefore, any relief they would be afforded would remedy a past wrong.

Accordingly, Heresniak's claims for declaratory and injunctive relief are dismissed.

### 3.   Unjust Enrichment

"Unjust enrichment is the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." Stein v. Wind Energy Holdings, Inc., No. N21C-09-060 CEB, 2022 WL 17590862, at *9 (Del. Super. Ct. Dec. 13, 2022) (quoting Nemec v. Shrader, 991 A.2d 1120, 1130 (Del. 2010)). To plead a claim for unjust enrichment, a plaintiff must plead five elements: (1) enrichment; (2) impoverishment; (3) a relationship between the enrichment and the impoverishment; (4) lack of justification; and (5) absence of a legal remedy. Id. Under Delaware law, unjust enrichment cannot be claimed where a contract "comprehensively governs the parties' relationship." Id. (quoting BAE Sys. Info. & Elec. Sys. Integration, Inc. v. Lockheed Martin Corp., No. 3099-VCN, 2009 WL 264088, at *7 (Del. Ch. Feb. 3, 2009)). If a contract is "the measure of the plaintiffs' right, there can be no recovery under an unjust enrichment theory independent of it." Wood v. Coastal States Gas Corp., 401 A.2d 932, 942 (Del. 1979).

Heresniak argues that Musk was unjustly enriched in two ways: First, by "fail[ing] to timely disclose his stake in Twitter," thus allowing him to "acquire a large number of Twitter shares at below-market prices"; and second, by "fail[ing] to timely close the

Buyout on or about September 15, 2022 . . . unjustly depriv[ing] Plaintiff and the Class of interest on the Merger proceeds they sho[u]ld have received on" that date.  SAC ¶ 207.  Neither of these allegations supports a claim for unjust enrichment.

First, as to Musk's failure to timely disclose his stake in Twitter, Heresniak does not explain the "relationship between [Musk's] enrichment and [Heresniak's] impoverishment."  Stein, 2022 WL 17590862, at *9.  In other words, though Heresniak alleges that Musk was enriched by acquiring Twitter stock at depressed prices, he does not allege that Heresniak lost money as a result.[9]

Second, as to Musk's delay in closing the merger, the merger proceeds were owed to shareholders under the Merger Agreement, and Heresniak seeks the same relief he would have sought for breach of contract.  Seemingly aware that he would face a difficult path asserting breach himself, given that a Delaware court has already held that the Merger Agreement does not create standing for shareholders to sue for breach of contract, Heresniak attempts to plead around that difficulty by suing for unjust enrichment instead.  See Crispo, 2022 WL 6693660, at *11.[10]  Delaware law does not allow this kind of artful pleading where, fundamentally, a plaintiff is seeking what he is claimed to be owed under the terms of a contract.  "At bottom, an unjust enrichment claim cannot be used to circumvent an inadequate breach-of-contract claim."  Stein, 2022 WL 17590862, at *9 (quoting Intermec IP Corp. v. TransCore, LP, No. 20-3254, 2021 WL 3620435, at *17 (Del. Super. Ct. Aug. 16, 2021)).[11]

Accordingly, Heresniak fails to state a claim for unjust enrichment.

---

[9] Even assuming Heresniak argues that Musk injured or impoverished Twitter by acquiring shares at artificially low prices, rather than impoverishing the other shareholders themselves, this is just one more reason that Heresniak's claim is derivative, not direct.  See supra Section III.A.

[10] To the extent Crispo left open the possibility of a shareholder suit in breach of contract for damages, that was only in the context of a provision discussing termination of the agreement.  See id. at *9–10.  Because the agreement was not terminated, that provision is no longer applicable.

[11] Because Heresniak's unjust enrichment claim fails on the merits, the Court need not address Defendants' alternate argument that the claim is preempted by SLUSA.

## IV.   CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' motions to dismiss. Because Heresniak's claims fail for lack of standing and fail on the merits, any further amendment would be futile.  <u>See</u> <u>Leadsinger</u>, 512 F.3d at 532.  Accordingly, the Court's dismissal is without leave to amend.

   **IT IS SO ORDERED.**

   Dated: May 22, 2023



CHARLES R. BREYER
United States District Judge

17